# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: LIQUID ALUMINUM SULFATE ANTITRUST LITIGATION | Civil Action No. 16-md-2687 (JLL) (JAD)<br><br>**CONSOLIDATED AMENDED COMPLAINT** |

Plaintiffs Central Arkansas Water, City of Charlotte, North Carolina, City and County of Denver, Colorado, acting by and through its board of Water Commissioners, Denver, Colorado, Flambeau River Papers, LLC, City of Greensboro, North Carolina, Mobile Area Water and Sewer System, City of Rochester, Minnesota, City of Sacramento, California, SUEZ Water Environmental Services Inc., SUEZ Water New Jersey Inc., SUEZ Water Princeton Meadows Inc., SUEZ Water New York Inc., SUEZ Water Pennsylvania Inc., and City of Texarkana, Arkansas and City of Texarkana, Texas, d/b/a Texarkana Water Utilities, by way of Consolidated Amended Complaint against Defendants, say:

## I.      NATURE OF ACTION

1.      This is an antitrust class action arising from a conspiracy among Defendants, as identified below, to allocate territories and/or not to compete for each other's historical business by rigging bids for, allocating customers and fixing, stabilizing, and maintaining the price of liquid aluminum sulfate ("Alum") sold in the United States.   This Consolidated Amended Complaint is filed pursuant to the Court's Orders dated April 8, 2016 (Docket Entry 139),  April 26, 2016 (Docket Entry 153) and July 13, 2016 (Docket Entry 216).

2.      Alum is a coagulant used to remove impurities and other substances from water. It hydrolyzes to form insoluble precipitates, which aid in the removal of tiny particles that cannot

be easily filtered or are too small to settle.  Essentially, it aggregates small particles of impurities into larger particles that fall to the bottom of a vessel for removal or are filtered out of the water.

3.     This lawsuit is brought as a class action on behalf of all entities and persons that purchased Alum directly from one or more of the Defendants from January 1, 1997 through at least February 2011 ("Class Period").  The named Plaintiffs and Class here include public bodies and private water companies, which use Alum in their water and wastewater treatment processes, and paper and pulp manufacturers, which use Alum to remove impurities from the water used to make paper.

4.     During the Class Period, Defendants implemented their Alum conspiracy through a number of mechanisms.  Defendants agreed to "stay away" from each other's "historical" customers and territories.  The documentary evidence (which includes specific and detailed communications between and among Defendants' executives and employees) shows that Defendants operated on the shared understanding that it would be, in their own words, "***better business for everyone to work together instead of competing and ruining the market price***."

5.     Defendants regularly met and spoke throughout the Class Period, creating an industry culture where there was no inhibition about discussing customer allocation and prices for Alum. Phone records and emails between top executives at the Defendant companies and their co-conspirators demonstrate that they furthered the conspiracy by (a) meeting or otherwise communicating to discuss their respective Alum businesses, including the prices quoted or bid to their customers, (b) agreeing to submit intentionally high "throw-away" bids to a particular customer to ensure that their "competitor," the existing seller to that customer, would continue to "win" that customer's business (or to help that "competitor" raise the prices paid by that customer), and (c) in instances where they inadvertently submitted a winning bid or price quote

2

against a nominal "competitor," withdrawing the inadvertently winning bid or price quote, returning the customer to the original supplier the following year, or allowing that "competitor" to win business from another customer.

6.      As a result of these efforts, Defendants were able to raise or maintain the price of Alum at supra-competitive levels.  Data on bids produced to Plaintiffs in discovery confirms that bidding throughout the Class Period was infected by Defendants' collusion.

7.      The DOJ is likewise investigating Defendants' conspiracy "not to compete for each other's historical business by rigging bids, allocating customers and fixing the price for liquid aluminum sulfate."   On June 21, 2016, Defendant GEO pled guilty in connection with the conspiracy to rig bids and allocate customers for, and to fix the price of, Alum supplied to municipalities and pulp and paper manufacturers in the United States.   As a condition of its guilty plea, GEO agreed to pay a fine of $5,000,000.   Pursuant to 15 U.S.C. § 16(a), GEO's guilty plea is prima facie evidence of its liability in this civil action.   Defendant Chemtrade, the current parent of GenChem, publicly disclosed that it "is cooperating with the investigation and has the benefit of the conditional amnesty and a leniency 'marker' from the U.S. Department of Justice."   Critically, the DOJ only affords such amnesty where the leniency applicant admits there is evidence suggesting that a criminal violation of the antitrust laws occurred.   Additionally, on October 27, 2015, Defendant Frank A. Reichl, a former executive of GenChem, pled guilty for his role in the conspiracy.   Defendant Reichl admitted that he "did knowingly and intentionally conspire and agree with others not to compete for each other's historical business by rigging bids, allocating customers and fixing the price for liquid aluminum sulfate."   Defendant Reichl also admitted that he and others he supervised and co-conspirators did submit "intentionally losing bids … in order for the intended winner to be awarded the contract," and

3

that "that agreement came about as a result of meetings and conversations…that [he] had with [his] co-conspirators in which [he] discussed each other's liquid aluminum sulfate business."  In addition, Defendants Vincent J. Opalewski (a former GenChem executive) and Brian C. Steppig (a former GEO executive) have been indicted.

## II.    PARTIES

### A.    Plaintiffs

8.    Plaintiff Central Arkansas Water is a consolidated water system created and existing under the Consolidated Waterworks Authorization Act, Act 982 of the 83rd General Assembly of the State of Arkansas, with its principal place of business at 211 East Capital Avenue, Little Rock, Arkansas.

9.    Plaintiff City of Charlotte, North Carolina ("Charlotte") is a municipal corporation chartered by the State of North Carolina.  Its principal place of business is the Charlotte-Mecklenburg Government Center, 600 East Fourth Street, Charlotte, North Carolina.

10.    Plaintiff City and County of Denver, Colorado, acting by and through its Board of Water Commissioners, ("Denver Water") is a municipal corporation of the State of Colorado with its principal place of business at 1600 West 12th Avenue, Denver, Colorado.

11.    Plaintiff Flambeau River Papers, LLC ("Flambeau") is a Wisconsin limited liability company with its principal place of business at 200 1st Avenue North, Park Falls, Wisconsin.

12.    Plaintiff City of Greensboro, North Carolina ("Greensboro") is a municipal corporation chartered by the State of North Carolina with its principal place of business at 300 West Washington Street, Greensboro, North Carolina.

13.     Plaintiff Mobile Area Water and Sewer System ("Mobile") is a municipal authority created under the laws of the State of Alabama with its principal place of business at 4725 Moffett Road, Mobile, Alabama.

14.     Plaintiff City of Rochester, Minnesota ("Rochester") is a municipal corporation of the State of Minnesota, with its principal place of business at 201 4th Street SE, Rochester, Minnesota.

15.     Plaintiff SUEZ Water Environmental Services Inc. is a Delaware corporation with its principal place of business in Paramus, New Jersey.  Plaintiff SUEZ Water New Jersey Inc. is a New Jersey corporation with its principal place of business in Paramus, New Jersey. Plaintiff SUEZ Water Princeton Meadows Inc. is a New Jersey corporation with its principal place of business in Plainsboro, New Jersey. Plaintiff SUEZ Water New York Inc. is a New York corporation with its principal place of business in West Nyack, New York.  Plaintiff SUEZ Water Pennsylvania Inc. is a Pennsylvania corporation with its principal place of business in Harrisburg, Pennsylvania.  These entities are collectively referred to as "SUEZ" herein.

16.     Plaintiff City of Sacramento, California ("Sacramento") is a municipal corporation under the laws of the State of California with its principal place of business at 915 I Street, Sacramento, California.

17.     Plaintiffs the City of Texarkana, Arkansas and the City of Texarkana, Texas, d/b/a Texarkana Water Utilities ("Texarkana"), are, respectively, municipal corporations chartered by the State of Arkansas and Texas.  The two cities jointly own and operate Texarkana Water Utilities, which is an unincorporated entity that manages and operates the cities' integrated water and sewer systems.

18.     Plaintiffs each directly purchased Alum from one or more of the Defendants during the Class Period.  As a direct and proximate result of the unlawful conduct and price-fixing conspiracy of Defendants alleged herein, Plaintiffs and other members of the Class have paid more during the Class Period for Alum than they otherwise would have paid in a competitive market and have therefore been injured in their respective business and property. Plaintiffs seek damages for the inflated Alum prices they paid as a result of Defendants' illegal conduct.

**B.     Corporate Defendants**

**1.     General Chemical**

19.     During the Class Period, Defendants General Chemical Corporation, General Chemical LLC, and, General Chemical Performance Products LLC (collectively, GenChem) manufactured and sold Alum and other water treatment chemicals for use by municipalities and pulp and paper plants.

20.     Defendant General Chemical LLC was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 Halsey Street, Parsippany, New Jersey.

21.     Defendant General Chemical Corporation was a Delaware corporation with its principal place of business at 90 Halsey Street Parsippany, New Jersey.

22.     Defendant General Chemical Performance Products, LLC was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 Halsey Street Parsippany, New Jersey.

23.     Until January 2014, the GenChem entities were part of a holding company, GenTek, Inc.  On or about October 11, 2002, GenTek filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware, including bankruptcy filings on

behalf of its subsidiaries, including GenChem.   Effective October 7, 2003, GenTek and GenChem emerged from bankruptcy under a plan of reorganization.   After emerging from bankruptcy, GenChem reaffirmed its participation in the conspiracy through specific post-bankruptcy actions taken by GenChem in furtherance of the conspiracy, as alleged below. GenChem also reaffirmed its participation in the conspiracy in part by continuing to engage in the conduct described herein with respect to Alum.

24.     GenChem participated in the conspiracy alleged herein throughout the Class Period through the actions of GenChem's senior executives.

25.     In approximately January 2014, Defendants Chemtrade Chemicals Corporation, Chemtrade Chemicals US LLC, and Chemtrade Solutions, LLC (collectively, "Chemtrade") absorbed GenChem, and assumed all rights and obligations of GenChem in a transaction valued at approximately $860 million.   As the legal successor in interest to GenChem, Chemtrade assumed the liability for damages caused by GenChem's participation in the conspiracy to fix prices and rig bids for Alum.

26.     Chemtrade has publicly disclosed that it "is cooperating with the [DOJ] investigation and has the benefit of the conditional amnesty and a leniency 'marker' from the U.S. Department of Justice."  Prior to Chemtrade's acquisition of GenChem, GenChem received conditional amnesty from the Department of Justice in connection with the investigation.  The DOJ grants conditional amnesty only where the leniency applicant admits there is evidence suggesting that a criminal violation of the antitrust laws occurred.

27.     Defendant Chemtrade Chemicals Corporation is a Delaware corporation, with its principal place of business at 90 E. Halsey Road, Parsippany, New Jersey, and is a wholly owned

and controlled subsidiary of Defendant Chemtrade Holding Partnership.  It is a successor-in-interest to GenChem.

28.     Defendant Chemtrade Chemicals US LLC is a limited liability company organized under Delaware law, with its principal place of business at 90 E. Halsey Road, Parsippany, New Jersey.  It is a wholly owned and controlled subsidiary of Defendant Chemtrade Chemicals Corporation and a successor-in-interest to GenChem.

29.     Defendant Chemtrade Solutions, LLC is a limited liability company organized under Delaware law, with its principal place of business at 90 E. Halsey Road, Parsippany, New Jersey.  It is a wholly owned and controlled subsidiary of Defendant Chemtrade Chemicals Corporation and a successor-in-interest to GenChem.

### 2.     GEO

30.     Defendant Geo Specialty Chemicals Inc. ("GEO") is a private corporation with its principal place of business at 340 Mathers Road, Ambler, Pennsylvania.  GEO was founded in 1993 and manufactures and sells water treatment chemicals, including Alum. On June 21, 2016, GEO pled guilty for its role in the conspiracy and agreed to pay a $5 million fine.

31.     On or about March 18, 2004, GEO filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey.  Effective December 20, 2004, GEO emerged from bankruptcy under a plan of reorganization.  GEO participated in the conspiracy alleged herein throughout the Class Period through the actions of GEO's senior executives. After emerging from bankruptcy, GEO reaffirmed its participation in the conspiracy through specific post-discharge actions taken by GEO in furtherance of the conspiracy, as alleged below.  GEO also reaffirmed its participation in the conspiracy in part by continuing to engage in the conduct described herein with respect to Alum.

8

### 3. Southern Ionics

32.     Defendant Southern Ionics, Inc. ("Southern Ionics") is a Mississippi corporation with its principal place of business located at 1250 Neosho Ave., Baton Rouge, Louisiana. Southern Ionics manufactures and sells water treatment chemicals, including Alum.

### 4. C&S

33.     C&S Chemicals, Inc. ("C&S") is a Pennsylvania corporation with its principal place of business at 4180 Providence Road, Marietta, Georgia.  C&S manufactures and sells water treatment chemicals, including Alum.

### 5. USALCO

34.     USALCO, LLC ("USALCO") is a Maryland limited liability company with its principal place of business at 2601 Cannery Avenue, Baltimore Maryland.  USALCO is also the successor-in-interest to Delta Chemical Corporation ("Delta") as the result of the purchase of Delta's assets on or about November 17, 2013.  USALCO manufactures and sells, and Delta formerly manufactured and sold, water treatment chemicals, including Alum.

### C. Individual Defendants

35.     Defendant Frank A. Reichl resides in Flanders, New Jersey.  From 1993 through 2010, Reichl held high-level executive positions at GenChem, including serving as General Manager of Water Treatment from 1993 to 2005 and Vice President of Sales and Marketing from 2006 until he was terminated in 2010.  In these positions, Reichl oversaw the sale and marketing of water treatment chemicals, including Alum, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bid and price proposals, and supervising other sales and marketing employees of GenChem.  During the Class Period, Reichl conspired with other Defendants and co-conspirators in their unlawful price-fixing and bid-rigging conspiracy.  On October 27, 2015, Reichl pled guilty for his role in the conspiracy.

9

36.     Defendant Vincent J. Opalewski resides in Rockaway, New Jersey.  From 2000 through 2011, Opalewski held high-level executive positions at GenChem, including serving as General Manager of the Sulfur Products business group from 1999 to 2005, Vice President of Sales and Marketing from 2005 to 2006, Vice President and General Manager from 2006 to 2009, and President from 2009 to 2011.  In these positions, Opalewski's responsibilities included directing the sale and marketing of Alum.  During the Class Period, Opalewski conspired with other Defendants and co-conspirators in their unlawful price-fixing and bid-rigging conspiracy.  On February 17, 2016, Opalewski was indicted by the United States for his role in this price-fixing and bid-rigging conspiracy.

37.     Defendant Alex Avraamides resides in Maywood, New Jersey.  From 1994 through 2011, Avraamides held high-level executive positions at GenChem and Defendant GEO, including serving as the Director of Sales and Marketing at GenChem from 1994 to 2005, the Senior Vice President and General Manager of GEO from 2005 to 2010, and Vice President of Sales and Marketing at GenChem from 2010 to 2011.  In these positions, Avraamides's responsibilities included directing the sale and marketing of Alum.  During the Class Period, Avraamides conspired with Defendants and co-conspirators in their unlawful price-fixing and bid-rigging conspiracy.

38.     Defendant Brian C. Steppig resides in the Little Rock, Arkansas area.  From 1998 through at least 2011, Steppig held high-level executive positions at GEO, including serving as National Sales Manager from 1997 through August 2006 and as Director of Sales and Marketing from August 2006 through at least 2011.  In these positions, Steppig's responsibilities included directing the sale and marketing of Alum.  During the Class Period, Steppig conspired with Defendants and co-conspirators in their unlawful price-fixing and bid-rigging conspiracy.  On

February 17, 2016, Steppig was indicted by the United States for his role in this price-fixing and bid-rigging conspiracy.

39.     Defendant Amita Gupta is a resident of the United States.  From April 2008 until September 2012 she was the Director of Sales and Marking for Water Treatment Chemicals for GenChem.  In this position, Gupta's responsibilities included directing the sale and marketing of Alum.  During the Class Period, Gupta conspired with Defendants and co-conspirators in this unlawful price-fixing and bid-rigging conspiracy.

40.     Defendants' acts, as alleged herein, were authorized, ordered and condoned by their respective parent companies and authorized, ordered and performed by their officers, directors, agents, employees, representatives or subsidiaries while engaged in the management, direction, control or transaction of their business affairs.

### C.     Co-Conspirators

41.     Various persons or entities not named as a Defendant have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as a Defendant in this Complaint.

## III.     JURISDICTION AND VENUE

42.     This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331 & 1337(a).

43.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, the Defendants resided in, transacted substantial business in, were found in, and/or had agents within this District. Venue is also

proper in this district because much of the conduct giving rise to Plaintiff's claims occurred in New Jersey.

44.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the U.S., including in this District; (b) participated in the manufacturing and distribution of Alum throughout the U.S., including in this District; (c) had substantial contacts with the U.S., including in this District; and/or (d) was engaged in an illegal scheme and competition-elimination conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the U.S., including in this District.

## IV.     CLASS ACTION ALLEGATIONS

45.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action on behalf of the following Class:

> All persons and entities in the United States who purchased liquid aluminum sulfate directly from Defendants, from 1997 through at least February 2011. Excluded from the Class are Defendants and their officers, directors, management, employees, parents, subsidiaries, or affiliates, and all federal governmental entities.

46.     Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are hundreds, if not thousands of Class members. Further, the Class is readily identifiable from information and records maintained by Defendants.

47.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

48.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Class. In addition, Plaintiffs are represented by counsel who are experienced and competent in

the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law.

49.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members. Questions of law and fact common to the Class include:

a)     whether Defendants and their co-conspirators conspired to fix prices, rig bids, and allocate customers of Alum sold in the U.S.;

b)     the duration and extent of the alleged conspiracy;

c)     the identity of the conspirators;

d)     the effect of the conspiracy on the prices of Alum sold in the U.S. during the Class Period;

e)     whether Defendants engaged in fraudulent concealment;

f)     whether the alleged conspiracy violated the Sherman Act, § 1; and

g)     the nature and extent of damages to which Plaintiffs and the Class are entitled.

50.     Class action treatment is superior to any alternative method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any hypothetical difficulties in management of this class action.

51.     Class action treatment also is superior to any alternative method to compensate the victims of Defendants' conspiracy—Plaintiffs and the proposed Class—for the injuries they have suffered as a direct result of Defendants' conduct.

52.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V.     FACTUAL ALLEGATIONS

### A.     Background Regarding the Alum Industry

53.     Alum is a water treatment chemical that removes impurities and other substances from water. Alum is the salt of sulfuric acid and aluminum hydroxide known by its chemical name $Al_2(SO_4)_3$.

54.     Alum is used in the early stages of the water filtration process and functions as a coagulant.  Coagulants are positively charged molecules which attract suspended particles in water and facilitate their removal through sedimentation or filtration.

55.     Alum is one of the most established chemicals utilized in water and wastewater treatment today.  Stringent water purity regulations have driven utilization of Alum.

56.     Municipalities and private water companies routinely purchase Alum to treat potable water and wastewater. Municipalities typically acquire Alum through a publicly advertised bidding process, and municipal contracts for Alum are typically one year in duration with options to renew for a certain period of time.

57.     Alum is also used in paper mills for drainage enhancement and to set rosins (a sizing agent used in the manufacturing process).  The amount of Alum used in paper manufacturing is related to the pH level of the production processes—with higher pH levels requiring higher quantities of Alum.  For instance, alum is heavily used in the production of fine

paper, which involve pH neutral or alkaline production processes.  Alum is used less heavily in the production of newsprint and containerboard, which have more acidic production processes.

58.     Pulp and paper manufacturers typically acquire Alum by issuing requests for price to manufacturers, including Defendants, and then purchasing Alum pursuant to supply contracts.

59.     During the relevant time period, approximately 43% of Alum was consumed by pulp and paper manufacturers while approximately 41% was consumed by municipal water and wastewater authorities.

**B.      Structural Characteristics of the Alum Market in the United States Make It Susceptible to Collusion**

60.     Publicly available data on the Alum industry demonstrates that it is susceptible to cartelization by the Defendants and their co-conspirators. Factors that made the Alum market susceptible to collusion during the Class Period include: (1) industry concentration and consolidation; (2) a standardized product for which competition was principally on the basis of price; (3) the lack of available economic substitutes; and (4) stable demand.

**1.      The Alum Industry Is Highly Concentrated and Has Experienced Heavy Consolidation**

61.     When the market for a product is concentrated and dominated by a small number of firms, economic theory holds that it is easier to form and maintain an effective cartel.  The Alum industry is highly concentrated, dominated by a small number of producers.

62.     The Alum industry experienced significant consolidation in the period leading up to and including 1997.  In February 1993, GEO acquired the aluminum chemicals division from Rhone Poulenc.  In July 1994, GEO acquired the aluminum chemicals business of Courtney Industries.   In December 1996, GEO acquired the aluminum chemicals division of Cytec Industries.

63.     The consolidation of the industry continued throughout the Class Period.  In June 1997, for example, GenChem purchased Augusta Georgia-based Peridot, a producer of sulfuric acid, Alum, and oleum.  In September 2006, GenChem acquired GAC MidAmerica, Inc., a producer of Alum and bleach.  In February 2007, GenChem acquired Chalum, Inc., which produced Alum for the greater Phoenix area.  In December 2007, GenChem acquired Bay Chemical and Supply Company, a producer and distributor of Alum and other water treatment chemicals in south Texas. In early 2011, GenChem acquired certain Alum-related assets of Alchem, including Alchem's customer list.

64.     The concentration of the Alum industry is also enhanced by agreements among Defendants to distribute one another's products. Such swaps, trades, and selling and distribution agreements among competitors in a consolidated market such as Alum in the United States also facilitates the formation of collusion among ostensible competitors.

### 2.     Alum Is A Commodity Product With A High Degree Of Interchangeability

65.     Typically, when a product is characterized as a commodity, market participants compete principally on the basis of price rather than other attributes such as product quality. When competition occurs principally on the basis of price it is easier to implement and monitor a cartel because price is more often objectively measurable and observable than non-price factors.

66.     Further, the bidding process by which suppliers compete to provide alum to a municipality demonstrates that alum is interchangeable across suppliers and that competition is primarily based on price.

### 3.   Lack of Substitutes for Alum

67.     The lack of available substitutes for a product facilitates collusion among producers, because customers are not able to avoid supra-competitive prices for Alum by switching to another type of inorganic coagulant.

68.     In the water treatment market, switching from Alum to another inorganic coagulant may require the reconfiguration of water treatment plants, which requires a significant expenditure of time and capital.  In the paper manufacturing market, there is no viable substitute for Alum.

### 4.   The Alum Market Experienced Stable Demand During the Class Period

69.     Static demand makes the formation of a collusive arrangement more likely. In a competitive market, when faced with stable demand conditions, firms often will attempt to increase sales decreasing prices in order to take market share from competitors.  For this reason, firms faced with static demand have a greater incentive to collude to avoid market share or price competition with competitors.

70.     During the relevant time period, the Alum market was mature and stable. Demand for Alum grew at approximately 1% to 3% percent per year.  In the water treatment industry, demand for Alum is tied to population growth.

71.     The lack of significant demand growth was further exacerbated by the presence of excess capacity.  None of any of Defendants' water treatment chemical plants were working at or near capacity for production of Alum during the Class Period.  Thus, there was no capacity-related reason for any Defendant not to compete for Alum business during the Class Period. Absent an antitrust conspiracy, the presence of excess capacity, particularly for a commodity

product, means that firms are incentivized to increase their sales by maintaining or even lowering prices, not increasing them.

### C.      Defendants' Market Allocation and Related Bid-Rigging Activities

72.      Prior to Defendants' conspiracy, the market for the sale of Alum in the United States was marked by competition.  In the mid-1990s, for example, there was a "price war" between GenChem and GEO in which each company bid aggressively for the accounts of the other company.

73.      As reflected in the GEO guilty plea and criminal indictments discussed in greater detail below, this era of competition and price wars ended in 1997 when Defendants agreed to "stay away" from each other's "historical" customers by not pursuing the business of those customers, and to engage in related bid-rigging.  It appears that the conspiracy was hatched at that time when GEO's Avraamides, GenChem's Reichl, and GenChem's CEO Denny Grandle met and came to an agreement that they would no longer fight for each other's customers. Thereafter, others joined the conspiracy and abided by that agreement.  For example, as reflected by communications between executives at GEO and Southern Ionics during the Class Period, the purpose of Defendants' conspiracy was to keep "peace in the valley" in order to "not bring down market price" because Defendants agreed that it would be "better business for everyone to work together instead of competing and ruining the market price."

74.      Numerous   other   documents   confirm   Defendants'   understanding   of   their overarching agreement.  For example, based on the information currently available to Plaintiffs:

>    a.      A March 31, 2003 GenChem internal marketing strategy memorandum outlined GenChem's strategy for its nominal competitor, USALCO: "Continue to work in conjunction at Akron, OH and Western Michigan accounts."

    b.    A March 2006 GEO internal business review concluded that both GenChem and Southern Ionics were "[r]emaining non-aggressive, consistently favoring price increases over share gain strategy."

    c.    In September, 2008, Housel of GenChem arranged for a meeting with himself and Gupta from GenChem and Steppig and Scot Lang of GEO, a "get to know you meeting" designed to introduce Gupta to senior staff of their friendly "competitor" GEO, and to discuss market and supply agreements.

75.    Throughout the Class Period, Defendants took a number of actions in support of this overarching conspiracy to allocate customers among themselves.   Those actions included regular communications with each other in private, including discussions of specific bids and accounts.

### 1.    Regular Inter-Defendant Meetings and Communications

76.    Defendants' executives and employees routinely communicated with each other over the telephone, email and during face-to-face meetings.   As admitted by the criminal pleas, Defendants discussed their overarching market allocation agreement, as well as specific customer accounts that were off-limits to the other companies and how to handle the bidding process as it related to those accounts.

77.    For example, in April 2008, Gupta, the then-recently hired Director of Marketing for Alum at GenChem, began the role of coordinating and enforcing the agreement between the Defendants.  On May 28, 2008, Gupta exchanged contact information via email with Steppig, the Director of Sales and Marketing at GEO who is currently under indictment for his role in this conspiracy.  Gupta promised to get "back to [him] with the other info we discussed," and later called Steppig on his mobile phone.

78.    In addition, on January 14, 2010, Opalewski, Vice President and General Manager of Sales and Marketing for GenChem, emailed Milton Sundbeck, President of Southern Ionics, to discuss arrangements for a dinner meeting.  Opalewski wrote, "With regard to dinner,

happy to include the entire team or keep it to you and me.  If we do get everyone together, would still like to slip away at some point to discuss the larger issue we touched on."

79.     Trade associations also provided opportunities for Defendants to meet frequently and exchange information to facilitate collusion. Defendants are members of a number of trade associations in the United States, including the American Water Works Association, American Water Technologists, and the Association of Water Technologies.  Defendants attended meetings and events sponsored by those associations.  Their overlapping membership in various trade associations also provided an incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor one another's activities in the Alum market and punish non-compliance. Defendants' participation in trade associations helped facilitate their collusion.

80.     For example, on July 16, 2009, GenChem's Housel contacted Gupta and Reichl regarding a conversation that he had had with Southern Ionics' founder Sundbeck.  Housel stated, "Just spoke to Milton [Sundbeck].  He will be attending the SWFC [Southwestern Fertilizer Conference] in San Antonio.  He's going to send me his schedule next week . . . they have a suite.  Amita - anything you would like me to discuss with him?"

### 2.     Specific Instances of Bid Coordination

81.     Based on the information currently available to Plaintiffs, the following are specific instances where Defendants coordinated their bids for Alum contracts.   While illustrative of how Defendants implemented their scheme, they are not an exclusive list of Defendants' activities in furtherance of their conspiracy.

### a.     Potlatch-McGehee, Arkansas (2005)

82.     In 2005, GenChem and GEO furthered the conspiracy by coordinating bids for the paper mill of Potlatch-McGehee, Arkansas.

83.     In December 2005, GEO's Avraamides asked GenChem's Rich Fedison what price GEO should bid for the Potlatch-McGehee account.   Following that conversation, Avraamides instructed his colleague Steppig to bid $198.73 so that GEO would not take the account from GenChem.

### b.      Columbiana, Alabama (2006)

84.     In 2006, GenChem and GEO furthered the conspiracy by coordinating bids for the municipality of Columbiana, Alabama.

85.     In January 2006, GEO's Avraamides spoke with an employee of GenChem. Avraamides instructed GenChem to bid above $260 per ton for Columbiana's Alum business, so that GEO would win the business.

### c.      Mahrt Paper Mill and Fayetteville, North Carolina (2006)

86.     In 2006, GenChem and GEO furthered the conspiracy by using coordinated bids to swap their historical accounts at MeadWestvaco paper mill in Mahrt, Alabama and the municipality of Fayetteville, North Carolina.

87.     GenChem had been the historical supplier of Alum to the Mahrt paper mill until 2006, when the owners of the mill sought a new supplier.  Opalewski or Reichl at GenChem told GEO's Avraamedes about the situation.  An April 11, 2006 email from Fedison of GEO to Avraamides identified Fayetteville as a location where GenChem would be more freight logical than GEO and could "take a dent out of our swap imbalance."

88.     In an email exchange dated May 22, 2006 between Steppig and Avraamides, they agreed that they needed to work out "The Swap" with GenChem "before we take Marht." Absent this coordination, GEO would not have bid aggressively for what was a historical GenChem account.

89.     In exchange for this and after GEO won the Mahrt paper mill account, a GenChem employee called GEO and asked for the Fayetteville, North Carolina Alum account. GenChem subsequently won the Fayetteville contract, which had historically been a GEO account. For the September 2005 through September 2006 contract year, GEO, bidding through distributor Southern States, had been the winning bidder for Fayetteville's Alum business. For the September 2006 through September 2007 contract year, GenChem's bid was over $50 per ton lower than GEO's bid, $191.90 per ton for GenChem vs. $248.55 for GEO.

### d.     DeKalb County, Georgia (2009)

90.     In 2009, GenChem and C&S furthered the conspiracy by coordinating bids for DeKalb County, Georgia.

91.     In February 2009, GenChem's Larry McShane expressed interest in the DeKalb County account, which had previously been awarded to RGM of Georgia. After learning that RGM of Georgia was a distributor selling for C&S, McShane emailed Gupta "so I assume we don't want to take it." Gupta responded "Don't take. Thx."

### e.     Charlotte and High Point, North Carolina (2009)

92.     In 2009, GenChem and Alchem[1] furthered the conspiracy by coordinating bids for the municipalities of Charlotte and High Point in North Carolina. High Point and Charlotte are approximately 80 miles apart on Interstate 85.

93.     High Point was historically Alchem's account, but GenChem placed a low, winning bid in 2009. Alchem's Robert Wolcott called GenChem's Gupta to complain, and they later agreed that Alchem would not bid competitively for the Charlotte account if GenChem withdrew its High Point bid. Gupta did withdraw the bid. She provided Mark Paul of GenChem

---

[1]     Alchem is a manufacturer of Alum which is not presently named as a Defendant.

with contact information for the buyer at High Point and noted that there was a typo in their bid, that they meant to bid $324 per ton rather than $224 per ton.

94.    In June 2009, consistent with the agreement, GenChem submitted a high bid for the Charlotte account.  Alchem did not uphold its end of the bargain, underbidding GenChem by $5 per ton to win the account.  After GenChem's Gupta called Alchem's Wolcott to complain, Alchem withdrew its winning bid and GenChem was awarded the Charlotte contract.

95.    In 2010, GEO wanted to take the High Point account. In late 2010, GenChem acquired Alchem's list of Alum customers, effective January 31, 2011.  GenChem's Avraamides advised GEO and C&S of this development and explained that it would treat the former Alchem customers, including High Point, as GenChem's own "historic" customers.  On the next High Point bid, GEO bid high and C&S did not bid at all, despite previously expressing interest in the contract.  Alchem had been supplying High Point at $255 per ton.  GEO bid at $400 per ton, and GenChem won the account at more than $300 per ton.

### f.    Maryville, Tennessee (2009 – 2010)

96.    In 2009 and 2010, GenChem and GEO furthered the conspiracy by coordinating bids for the municipality of Maryville, Tennessee.

97.    Maryville had historically been supplied by Dycho, a distributor supplied by GEO.  In 2009, GenChem submitted a low bid for Maryville, and GEO's Steppig called GenChem's Gupta to complain.  Following the conversation, GenChem withdrew its original bid and/or resubmitted a losing bid at a higher price.

98.    In 2010, consistent with Steppig and Gupta's conversation the previous year, GenChem submitted a high bid for the Maryville account, which GEO won.

### g.     Domtar Paper Company (2010-11)

99.     In 2010, GenChem and GEO furthered the conspiracy by coordinating bids for the Domtar paper company.

100.     In December 2010, GenChem's Gupta and GEO's Steppig discussed upcoming Alum price increases for Domtar across the United States so that the companies' price increases would be in line with each other.  Following the conversation with Steppig, GenChem submitted bids to Domtar that were higher than the previous year's and higher than it had intended to before speaking with GEO, and it was awarded Domtar business at a $29 per ton increase.

101.     In early 2011, Domtar's purchasing agent was unhappy with GenChem's pricing and called GEO's Steppig to encourage GEO to be competitive at Domtar's Ashdown, Arkansas mill.  Steppig then called GenChem's Gupta to ask how GEO should bid in order to look competitive without taking business from GenChem.  GEO bid higher than GenChem, which continued to supply the Ashdown mill.

### h.     Georgia Pacific Paper Company (2011)

102.     In 2011, GenChem and GEO furthered the conspiracy by coordinating bids for the Georgia Pacific paper company.

103.     In January 2011, GenChem's Avraamides and Gupta and GEO's Scott Lang, Opalewski, and Steppig spoke with each other about upcoming Alum price increases for Georgia Pacific across the United States so that the companies' price increases would be in line with each other.  After GenChem learned that GEO would increase prices by $35 per ton, GenChem raised its increase to $32 per ton, instead of the $23 per ton increase originally planned before coordinating with GEO.

### i.      Sidney, Ohio (2010)

104.    In 2010, GenChem and USALCO furthered the conspiracy by coordinating bids for the municipality of Sidney, Ohio.  As of the end of 2010, Sidney, Ohio was a USALCO customer.  When the bid for this customer was coming up in December 2010, GenChem's Lisa Brownlee emailed Gupta asking her if "you want to take this one too?" and noting that "US Alco supplies at $418.42.  GCC bid $494.00.  No history of Delta or Thatcher bidding here.  Volume is only 65 tons.  To take, I would bid $374 ($308 net for US Alco).  To stay away, up $32.00." Gupta responded, "No.  up 32," confirming GenChem decided to "stay away" from USALCO's historic customer.

### 3.      Widespread Anomalous Bidding Behavior

105.    Defendants enjoyed supra-competitive profit margins during this time period, not counting freight charges.  Thus, sellers of Alum had the ability to submit bids at considerably lower prices than they did and still make a profit.  Indeed, among the reasons for Defendants to agree to allocate customers was to protect their supra-competitive profit margins.

106.    A significant part of the price for Alum is the cost of shipping.  It is standard practice in the industry for suppliers of Alum to include in the quoted price the cost of shipping. Because shipping costs are a significant part of the price of Alum, a supplier that is "freight logical", *i.e.*, the supplier that is closest to the customer, has a built-in economic advantage over other suppliers which are materially farther away from the customer, since the freight logical supplier's shipping costs should be less than those of its competitors.  The freight logical supplier can offer a lower price at the same profit margin as other suppliers and/or a non-freight logical supplier must cut its profit margin in order to sell at a competitive price.

107.    During the Class Period, based on Plaintiffs' analysis for bidding data produced in discovery, it was common that non-freight-logical suppliers consistently submitted winning bids

to the same customer.  Throughout the Class Period, there exists a pattern of bidding among the Defendants for which there is no reasonable economic explanation other than a conspiracy. There was a common pattern among incumbent Defendants of consistently winning bids over other Defendants which submitted what appear to be throw-away bids.  In many instances, incumbent non-freight logical Defendants would continue to win bids over Defendants with plants materially closer to the customer, but who nonetheless repeatedly submitted bids that were higher than their non-freight logical co-conspirators.

108.    For example, GEO has a water treatment chemical plant in Baltimore, Maryland, but rarely bid for Alum business in the Mid-Atlantic region.  Southern Ionics has a water treatment chemical plant in Williamsport, Maryland, which would be freight logical to many locations in southern Pennsylvania, and from which it could also competitively bid in the Mid-Atlantic region, but it did not bid for Alum business in that region.

109.    Additional examples include the following:

     a.    Gadsden, Alabama: GenChem (205 miles away) won this bid throughout the period from 2007 through 2011 despite being significantly further away than GEO (90 miles away), C&S (97 miles away) and Southern Ionics (131 miles away), some or all of whom also bid throughout this period.

     b.    Mount Clemens, Michigan: USALCO (246 miles away) maintained this customer from 2006 through 2012 despite the fact that a GAC plant (which was acquired by GenChem in 2006) was only 84 miles away. GenChem consistently bid much higher on this account from 2007-2012 and lost.

     c.    El Dorado, Arkansas: GenChem (90 miles away) held this customer from 2004 through 2011 despite the fact that GEO (72 miles away) was closer. GEO's bids were consistently significantly higher than GenChem's.

### 4.    Policing and Enforcement Efforts

110.    Defendants also undertook specific efforts to monitor and enforce the conspiracy. If, either intentionally or accidentally, a "competitor" submitted a lower bid to its competitor's

historic customer, that would often prompt a complaint that resulted in the withdrawal of the lower bid.  For example, in 2009, GenChem submitted a low bid for the Maryville account held by distributor Dycho, which was supplied by GEO.  GEO's Steppig called GCC's Gupta to complain that she was in breach of the agreement, and GenChem withdrew the bid via telephone call.  GenChem then resubmitted a much higher bid so that GEO would win the account.

111.    In addition, where a Defendant gained business at the apparent expense of its "competitor," that Defendant would often allow that "competitor" to win business from another customer to keep their respective levels of business and the conspiracy intact.  For example, in 2006, GenChem bid for and won an account in Carthage, Texas for 200 tons of Alum, an account which historically belonged to GEO.  Following discussions between Avraamides and Housel, GEO and GenChem agreed that GEO would take an account of the same size from GenChem in order to "mak[e] the playing field even again."

**D.    Defendants' Actions Increased Prices Across The Industry**

112.    During the Class Period, Defendants were able to maintain or increase the price of Alum at supra-competitive levels.

113.    Throughout the Class Period, Defendants told customers that the price increases for Alum flowed entirely from increases in manufacturing costs, such as the costs of raw materials.  For example, in December 2004, Fedison of GenChem told one customer that the industry was facing an "emerging alumina crisis and its impact on raw material costs.  In a nutshell, alumina is short globally and producers are accelerating price increases at unprecedented levels."

114.    In reality, however, Defendants' supra-competitive prices stemmed from their conduct described herein, including their direct and indirect discussions about prices.  In 2010,

for example, GenChem acknowledged internally that it was publicly announcing price increases which were above any raw material cost increases.

115.     As a result of Defendants' efforts described herein, including their coordination of price increases, the price of Alum increased across the United States during the Class Period. For example, according to the Chemical Market Reporter, the prices of Alum increased approximately 33.8% to 38% between 1998 and 2004.  In addition, according to a survey of U.S. drinking water utilities conducted by the Water Environment Research Foundation (WERF), during the period from January 2008 and January 2009, of the U.S. drinking water utilities that responded, those that used Alum experienced an average 53% price increase, with maximum increases as high as 168%.

116.     These price increases contributed to Defendants' bottom-lines.  For example, between 2007 and 2008, Defendant GenChem's sales to the water treatment market rose 34% due to, *inter alia*, higher prices for its water treatment chemicals.  The following year, price increases on Alum contributed significantly to GenChem's profits as reported in GenTek's 2009 Form 10-K.

> **E.     Changes in Defendants' Input Costs – Which Were Stable or Declining For Much of the Class Period – Cannot Fully Explain Defendants' Pricing**

117.     Rising input costs for Alum cannot fully explain the significant price increases Defendants charged their customers between 1997 and 2010.

118.     Alum is manufactured by combining sulfuric acid with aluminum trihydrate (also known as alumina or ATH). Aluminum trihydrate is purified from bauxite by dissolving the bauxite ore in strong caustic soda to form sodium aluminate, which is then precipitated by neutralization to form aluminum trihydrate.

119.   As shown by the graph below, bauxite (the raw material for alumina) prices fell markedly during the period from 1991 to 2003, declining from approximately $43/ton in 1991 to approximately $20/ton in 2003.  From 2003 to 2007, bauxite prices rose but did not reach the high prices seen in the early 1990s.  In the period that followed, bauxite prices were stable.  In 2008, bauxite prices dipped slightly to about $26/ton.  Prices in 2009 increased slightly to approximately $28/ton.



120.   Sulfuric acid costs were also relatively stable from 1997 to 2007.  A brief spike in sulfuric acid prices in 2008 was followed by a crash in prices by early 2009 and historically low prices for the remainder of 2009 and 2010.  However, GenChem maintained higher prices in 2009 despite decreasing commodity prices.

121.   The pricing of the primary input costs of Alum – bauxite and sulfuric acid – cannot fully explain the rise in Alum prices during the Class Period. Instead, Defendants' illegal conspiracy to fix the price of Alum resulted in Plaintiffs and Class members paying artificially inflated prices.

## VI.   DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY

122.   Defendants fraudulently concealed their conspiracy by making false representations to Plaintiffs and members of the Class that they were not engaged in collusion. These false representations took many forms, including "non-collusion affidavits" and representations made in connection with Defendants' bid submissions.  In addition, the structure of the conspiracy was self-concealing, in that the collusive bids that were submitted through the operation of the conspiracy gave the appearance of competition, when, in fact, none existed.  As a result, Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims for relief.

123.   Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at until at least November 2015 when Reichl's plea agreement was filed and made public.

124.   Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for Alum.  As discussed above, Defendants routinely met and had private conversations where they discussed their plans.

125.   Defendants fraudulently concealed their misconduct by affirmatively (but falsely) represented to Class members that their Alum bids were free from collusion or illegal coordination.  For example, Defendants signed "non-collusion affidavits" in connection with bids made that falsely represented that the bids Defendants submitted were genuine and not collusive.

126.   In other instances, rather than submit a non-collusion affidavit, municipalities required the bidders to represent, and the Defendants did falsely represent, that each bid was not

subject to or involved in any understanding or agreement with any other person or company. These false representations were meant to, and did, prevent Plaintiffs and members of the Class from discovering Defendants' conspiracy.

127.    In announcing price increases for Alum, Defendants often asserted that the cause of such increases was attributable entirely to higher raw material and energy costs, even though the increased pricing more than covered any increases in raw material costs and, critically, without disclosing their conspiracy to fix and maintain Alum prices.  Further, even when raw material prices dropped, Defendants often failed to make corresponding adjustments to their prices.

128.    Defendants also fraudulently concealed their conspiracy by ensuring that there were few written communications regarding their conspiracy and agreement.  For example, emails among the defendants' officers in furtherance of the conspiracy were often sent to and from personal email addresses, asking one another to speak via telephone, and telephone calls among the various conspirators were made from personal mobile phones rather than from office phones.  In at least one instance, GEO's Steppig explicitly acknowledged that "the number [GenChem's Gupta] called was [his] mobile number."

129.    Defendants' secrecy ensured that Plaintiffs could not have had either actual or constructive knowledge of the conspiracy until the public disclosure of the DOJ's criminal investigation.

130.    Because Defendants' agreement, understanding, and conspiracy was kept secret, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein, did not know that they were paying artificially high prices for alum during the Class

31

Period and could not have discovered Defendants' conspiracy and agreement by the exercise of due diligence.

131.    Plaintiffs and members of the Class exercised due diligence in many ways, including, *inter alia*, asking the basis for price increases and/or requiring Defendants to submit declarations that their bids were not the product of collusion.

## COUNT ONE
### (Violation Of Section 1 Of The Sherman Act, 15 U.S.C. § 1)

132.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

133.    Through the conduct alleged in this complaint, Defendants and their co-conspirators violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to increase prices and otherwise restrain competition in the market for Alum sold to Plaintiffs and Class members during the Class Period.

134.    Defendants are *per se* liable under Section 1 of the Sherman Act for the injuries and damages caused by their conspiracy in restraint of trade as alleged herein.

135.    Defendants and their co-conspirators furthered and effectuated their conspiracy in the following ways, among others:

a)    Participating in secret communications, discussions, and meetings in the U.S. and elsewhere to exchange confidential and competitively sensitive information regarding each other's Alum business;

b)    Agreeing, during those conversations and meetings, to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

c)    Tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of Alum, so as to determine

32

whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

        d)      Submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" Alum customers;

        e)      From time to time, discussing and agreeing during those conversations and meetings, to set a price floor to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw away" bid or price quotation;

        f)      Where a co-conspirator could not withdraw its inadvertently winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer;

        g)      Instructing new employees how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete between Defendants and co-conspirators; and

        h)      Selling Alum to customers at collusive and non-competitive prices in the U.S.

136.    Defendants and their co-conspirators fixed, raised, stabilized and maintained at artificially high and supra-competitive levels the prices for Alum charged to Plaintiffs and Class members in the U.S.

137.    Defendants and their co-conspirators caused Plaintiffs and Class Members to pay more for Alum than they would have paid in the absence of a price-fixing conspiracy.

138.    As a direct and proximate result of the unlawful combination, contract or conspiracy, Plaintiffs and Class members sustained damages to their business and property.  The conspiracy had its intended effect, as prices for Alum sold in the United States during the Class

Period were higher than they would have been but for the wrongful conduct of Defendants and their co-conspirators as alleged in this complaint.

139.    As a result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property in that they have paid more for Alum than they otherwise would have paid in the absence of Defendants' unlawful conduct.  The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

140.    Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

WHEREFORE, Plaintiffs demand judgment as follows:

A.      Certifying this action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appoint Plaintiffs as class representatives and their counsel of record as Class Counsel;

B.      Adjudging and decreeing that acts alleged herein are unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.      For the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

D.      Awarding Plaintiffs and Class members pre-judgment and post-judgment interest as provided by law, including that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

E.     Awarding Plaintiffs and Class members the costs of this suit, including reasonable attorney fees; and

F.     Awarding such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all issues so triable.

Dated: August 22, 2016                           _____/s/ James E. Cecchi_____
                                                 James E. Cecchi
                                                 Lindsey H. Taylor
                                                 Zachary S. Bower
                                                 CARELLA BYRNE CECCHI OLSTEIN
                                                  BRODY & AGNELLO, P.C.
                                                 5 Becker Farm Road
                                                 Roseland, NJ 07068
                                                 Tel: (973) 994-1700
                                                 Email: jcecchi@carellabyrne.com
                                                        ltaylor@carellabyrne.com
                                                        zbower@carellabyrne.com

                                                 *Interim Lead Counsel and*
                                                 *Chair of the Plaintiffs' Steering Committee*


                                                 Bruce D. Greenberg
                                                 LITE DEPALMA GREENBERG, LLC
                                                 570 Broad Street, Suite 1201
                                                 Newark, NJ 07102
                                                 Tel: (973) 623-3000
                                                 Email: bgreenberg@litedepalma.com

                                                 *Liaison Counsel*

Michael D. Critchley                             Eric B. Fastiff
CRITCHLEY, KINUM & DENOIA LLC                    David Rudolph
75 Livingston Ave                                Katherine L. Benson
Roseland, NJ 07068                               LIEFF, CABRASER, HEIMAN &
Tel: (973) 422-9200                               BERNSTEIN, LLP
Email: mcritchley@critchleylaw.com               Embarcadero Center West
                                                 275 Battery Street, 30th Floor

35

San Francisco, CA 94111
Tel: (415) 956-1000
Email: efastiff@lchb.com
        drudolph@lchb.com
        kbenson@lchb.com

Paul J. Geller
ROBBINS GELLER RUDMAN &
   DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel: (561) 750-3000
Email: pgeller@rgrdlaw.com

Manuel Juan Dominguez
David A. Young
COHEN MILSTEIN SELLERS & TOLL
2925 PGA Blvd.
Palm Beach Gardens, FL 33410
Tel: (561) 833-6575
Email: jdominguez@cohenmilstein.com
        dyoung@cohenmilstein.com

H. Laddie Montague, Jr.
Ruthanne Gordon
Candice J. Enders
BERGER & MONTAGUE, PC
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: hlmontague@bm.net
        rgordon@bm.net
        cenders@bm.net

Paul F. Novak
MILBERG LLP
One Kennedy Square
777 Woodward Avenue, Suite 890
Detroit, MI 48226
Tel: (313) 309-1760
Email: pnovak@milberg.com

Linda P. Nussbaum
NUSSBAUM LAW GROUP PC
570 Lexington Avenue, 19th Floor
New York, NY 10022
Tel: (212) 702-7053
Email: lnussbaum@nussbaumpc.com

Lisa J. Rodriguez
SCHNADER HARRISON SEGAL &
   LEWIS LLP
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ 08002
Tel: (856) 482-5222
Email: ljrodriguez@schnader.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street, 26th Floor
New York, NY 10005
Tel: (212) 584-0700
Email: cseeger@seegerweiss.com

Whitney Erin Street
BLOCK & LEVITON LLP
610 16th Street, Suite 214
Oakland, CA 94612
Tel: (415) 968-8999
Email: whitney@blockesq.com

Stephen R. Neuwirth
Sami H. Rashid
Margaret Schmidt

QUINN EMANUEL URQUHART &
  SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Email: stephenneuwirth@quinnemanuel.com
        samirashid@quinnemanuel.com
        margaretschmidt@quinnemanuel.com

*Plaintiffs' Steering Committee*

W. Joseph Bruckner
Charles N. Nauen
Heidi M. Silton
Elizabeth R. Odette
Brian D. Clark
**LOCKRIDGE GRINDAL NAUEN P.L.L.P**
100 Washington Ave. South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
wjbruckner@locklaw.com
cnnauen@locklaw.com
hmsilton@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com

Lynn Lincoln Sarko
Mark A. Griffin
Derek W. Loeser
Raymond J. Farrow
Daniel P. Mensher
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
mgriffin@kellerrohrback.com
dloeser@kellerrohrback.com
rfarrow@kellerrohrback.com
dmensher@kellerrohrback.com

Joseph H. Meltzer
Kimberly A. Justice
Naumon A. Amjed
Melissa L. Troutner
**KESSLER TOPAZ
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
jmeltzer@ktmc.com

*Additional Plaintiffs' Counsel*