**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

IN RE LIQUID ALUMINUM SULFATE
ANTITRUST LITIGATION

---

Civil Action No.: 16-md-2687 (JLL)

**OPINION**

**LINARES**, Chief District Judge.

This matter comes before the Court by way of several Motions to Dismiss on behalf of Defendants in this multi-district litigation. Plaintiffs in this action bring claims against Defendants in connection with Defendants' alleged conspiracy to fix the price of liquid aluminum sulfate ("Alum"). For the sake of brevity, this Opinion will address all the pending Motions which seek dismissal of four Complaints: 1) DPP Compl.; 2) IPP Compl.; 3) Shreveport Compl.; 4) Florida Shreveport. The various claims alleged by the plaintiffs will be expounded upon at length in this Opinion. In response to these claims, Defendant GEO Specialty Chemicals, Inc. ("GEO"), Defendant General Chemical LLC, and all of Defendant General Chemical's Chemtrade entities (collectively referred to as "GCC") argue that the claims against them must be dismissed because that they cannot be held liable for any damages that accrued prior to the effective date of their respective Bankruptcy discharge orders. (ECF Nos. 244-1, 255-1, 298, 299-1, 304-1, 366-1, 372). Defendants Ghazey and Sundbeck submitted a Motion to Dismiss for lack of general and specific personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. (ECF Nos.

308, 310).   Defendants Southern Ionics Inc. ("Southern"), USALCO, Ghazey, Sundbeck, and Kemira also filed a Motion to Dismiss on the ground that all claims against them are time barred by the relevant statute of limitations.   (ECF Nos. 249, 250, 308, 310, 311).   Defendants jointly argue that the IPP Complaint fails to properly assert both Article III and Antitrust standing to bring this action.   (ECF No. 306-1 at 4-16).   Defendants Southern and USALCO also move to dismiss the DPP Complaint under Rule12(b)(6) of the Federal Rules of Civil Procedure.   (ECF Nos. 249; 250-1).   Defendants GEO, C&S Chemicals ("C&S"), and C&S Chemicals of Georgia ("C&S Georgia") move to dismiss the Florida Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).   (ECF Nos. 368, 369).   Defendants also filed a Joint Motion to Dismiss IPP's state-law claims for alleged deficiencies in IPP Compl.   (ECF No. 306).   The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court denies all Defendants' Motions to Dismiss. [1]

## I.   BACKGROUND[2]

### A.   The Parties

#### a.   Direct Purchaser Plaintiffs ("DPP")

Plaintiff Central Arkansas Water ("CAW") is a business entity operating in the State of Arkansas with its principal place of business in Little Rock. (DPP Compl. ¶ 8).   CAW operates a

---

[1] The Court notes that Defendant C&S withdrew its Motion to Dismiss DPP Compl. on June 6, 2017 (ECF No. 248) by submitting a request to withdraw same.   (ECF No. 394).   Additionally, Defendant C&S withdrew its Motion to Dismiss IPP Compl. on June 19, 2017 (ECF No. 309) by filing a withdrawal request.   (ECF No. 398).

[2] This background is derived from DPP's Consolidated Amended Complaint (ECF No. 220 ("DPP Compl."), Indirect Purchaser Plaintiff's ("IPP") Consolidated Class Action Complaint (ECF No. 242 ("IPP Compl.")), The City of Shreveport's ("Shreveport") Complaint (ECF No. 1 on Civ. No. 16-4679 ("Shreveport Compl.")), and the State of Florida's ("Florida") Complaint (ECF No. 1 on Civ. No. 17-384 ("Fl. Compl.")), all of which the Court must accept as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).   For purposes of brevity, the Court will cite to DPP Compl., so long as the allegations therein are consistent with any of the parallel complaints.

2

consolidated water system, which was created under the Consolidated Waterworks Authorization Act, Act 982 of the 83rd General Assembly of the State of Arkansas. (DPP Compl. ¶ 8). Next, Plaintiff City of Charlotte, North Carolina ("Charlotte") is a municipal corporation chartered by the State of North Carolina. (DPP Compl. ¶ 9). Also a municipal corporation is the City and County of Denver, Colorado ("Denver"). (DPP Compl. ¶ 10).

Next, Plaintiff Flambeau River Papers, LLC ("Flambeau") is a Wisconsin limited liability company located in Park Falls, Wisconsin. (DPP Compl. ¶ 11). The following Plaintiff is the City of Greensboro, North Carolina ("Greensboro"), which is a municipal corporation with its principal place of business in Greensboro, North Carolina. (DPP Compl. ¶ 12). Further, Plaintiff Mobile Area Water and Sewer System ("Mobile") is a municipal authority with its principle place of business in Mobile, Alabama. (DPP Compl. ¶ 13). The next Plaintiff is the City of Rochester ("Rochester"), which is a municipal corporation located in the State of Minnesota. (DPP Compl. ¶ 14).

The following parties are entities that are collectively referred to as the "SUEZ Entites" herein. (DPP Compl. ¶ 15). Plaintiff SUEZ Water Environmental Services, Inc. is a Delaware corporation with its principal place of business in Paramus, New Jersey. (DPP Compl. ¶ 15). Plaintiff SUEZ Water New Jersey, Inc. is a New Jersey corporation with its principal place of business in Paramus, New Jersey. (DPP Compl. ¶ 15). Plaintiff SUEZ Water Princeton Meadows Inc. is also a New Jersey corporation with its principal place of business in Plainsboro, New Jersey. (DPP Compl. ¶ 15). Next, Plaintiff SUEZ Water New York, Inc. is a New York corporation with its principal place of business in West Nyack, New York. (DPP Compl. ¶ 15). The last SUEZ

3

Entity is Plaintiff SUEZ Water Pennsylvania Inc., a Pennsylvania corporation with its principal place of business in Harrisburg, Pennsylvania.  (DPP Compl. ¶ 15).

Further, Plaintiff City of Sacramento is a municipal corporation with its principal place of business in Sacramento, California.  (DPP Compl. ¶ 16).   The next two Plaintiffs are both municipal corporations collectively referred to as "Texarkana Plaintiffs" herein.  (DPP Compl. ¶ 17). The first is Plaintiff City of Texarkana, Arkansas chartered by the State of Arkansas.  (DPP Compl. ¶ 17).  The second is Plaintiff City of Texarkana Texas chartered by the State of Texas. (DPP Compl. ¶ 17).  The two cities jointly own and operate the two aforementioned municipal corporations, creating an unincorporated entity that manages and operates the cities' integrated water and sewer systems.  (DPP Compl. ¶ 17).  All of DPPs allege that they directly purchased Alum from one or more of Defendants.[3]

### b.  Indirect Purchaser Plaintiffs ("IPP")

The first IPP is Plaintiff City of Homestead, Florida ("Homestead"), which is a Florida municipality located in Miami Dade County, Florida.  (IPP Compl. ¶ 19).  The other IPP is Plaintiff City of Creston Water Works Department ("Creston") which is located in Union County, Iowa. (IPP Compl. ¶ 20).

### c.  Additional Plaintiffs

Also before the Court are two additional complaints filed by Plaintiff Shreveport and Plaintiff Florida.  (*See generally* Shreveport Compl; Fl. Compl.).   Plaintiff Shreveport is a municipal corporation located in the State of Louisiana and operates "the City's water supply reservoir, its water treatment plants, its water storage tanks, its water distribution systems, its

---

[3] A full discussion regarding Alum and the alleged conduct that is the subject matter of this action is contained herein, *infra*.

4

wastewater sewer systems and treatment plants, and its outfall systems[.]" (Shreveport Compl. ¶ 9).   Plaintiff Florida includes the State of Florida, the Attorney General of Florida, and the Department of Legal Affairs of Florida, and bring this action "on behalf of one or more individual consumers, municipalities, and governmental entities in Florida[.]" (Fl. Compl. ¶ 12-14).

### d.   Corporate Defendants

During the class period, Defendant General Chemical LLC was a limited liability company duly formed under the laws of Delaware and had its principal place of business in Parsippany, New Jersey. (DPP Compl. ¶ 20).  Also operating out of the same office in Parsippany, New Jersey was Defendant General Chemical Corporation, a Delaware corporation.   (DPP Compl. ¶ 21). Defendant General Chemical Performance Products LLC was a Delaware limited liability company that operated out of the same Parsippany, New Jersey office. (DPP Compl. ¶ 22).  All three of these aforementioned Defendants were part of a holding company, Defendant GenTek, Inc., a Delaware corporation. (DPP Compl. ¶ 23; IPP Compl. ¶ 24).[4]  Also located at this same Parsippany, New Jersey office is Defendant Chemtrade Chemicals Corporation, a Delaware corporation.  (DPP Compl. ¶ 27).  Two additional Delaware limited liability companies occupy that same office: Defendants Chemtrade Chemicals US LLC and Chemtrade Solutions LLC. (DPP Compl. ¶¶ 28-29).  Defendant Chemtrade Logistics, Inc. is a publicly traded Canadian corporation, with its principal place of business in Parsippany, New Jersey.[5]  (Shreveport Compl. ¶ 15).  The final Chemtrade entity named in this action is a Canadian company, Defendant Chemtrade Logistics Income Fund. (IPP Compl. ¶ 25).[6]  Defendant Chemtrade acquired Defendant GenChem,

---

[4] These Defendants shall collectively be referred to as "GenChem Defendants."
[5] Defendant Chemtrade Logistics, Inc. is only the subject of Shreveport Compl.
[6] The GenChem Defendants and all of the Chemtrade entities shall collectively be referred to as "GCC Defendants."

its entire business, and all of Defendant GenChem's subsidiaries on January 23, 2014. (Shreveport Compl. ¶ 11).

The next corporate Defendant is GEO, which is a private corporation located in Ambler, Pennsylvania. (DPP Compl. ¶ 30). Defendant Southern is a Mississippi corporation located in Baton Rouge, Louisiana. (DPP Compl. ¶ 32).[7] Additionally, Defendant C&S Chemicals, Inc. ("C&S") is a Pennsylvania corporation with its principal place of business located in Marietta, Georgia. (DPP Compl. ¶ 33). Further, Defendant C&S Georgia is a Delaware corporation also located in Marietta, Georgia. (Fl. Compl. ¶ 27).[8] Also, Defendant USALCO, LLC ("USALCO") is a Maryland limited liability company and is located in Baltimore, Maryland. (DPP Compl. ¶ 34).[9] The final corporate defendant is Defendant Kemira Chemicals, Inc. ("Kemira"), which is a duly formed corporation under Georgia law and is located in Atlanta, Georgia. (IPP Compl. ¶ 37).[10]

### e.  Individual Defendants[11]

Defendant Frank A. Reichl is a New Jersey resident who previously worked for Defendant GenChem. (DPP Compl. ¶ 35). From 1993 to 2005 Reich was the General Manager of Water Treatment at Defendant GenChem. (DPP Compl. ¶ 35). He was also the Vice President of Sales and Marketing from 2006 through 2010, when he was ultimately terminated. (DPP Compl. ¶ 35). Also a New Jersey resident, Defendant Vincent J. Opalewski served as Defendant GenChem's General Manager of Sulfur Products from 1999 through 2005. (DPP Compl. ¶ 36). Defendant

---

[7] Defendant Southern is only the subject of DPP Compl. and IPP Compl.
[8] Defendant C&S Georgia is only the subject of Fl. Compl.
[9] Defendant USALCO is only the subject of DPP Compl. and IPP Compl.
[10] Defendant Kemira is only the subject of IPP Compl.
[11] Plaintiff Florida has not asserted any claims against any individual Defendants. *See generally* Fl. Compl.

6

Opalewski was then the Vice President of Sale and Marketing from 2005 to 2006, Vice President and General Manager from 2006 through 2009, and, finally, President from 2009 to 2011.  (DPP Compl. ¶ 36).  Additionally, Defendant Brian Steppig, an Arkansas resident, was the National Sales Manager for Defendant GEO from 1997 to 2006.  (DPP Compl. ¶ 38).  Thereafter, Defendant Steppig served as Defendant GEO's Director of Sales and Marketing from 2006 until "at least 2011."  (DPP Compl. ¶ 38).

New Jersey resident Alex Avraamides served as Director of Sales and Marketing for Defendant GenChem from 1994 to 2005.[12]  (DPP Compl. ¶ 37).  Thereafter, Defendant Avraamides served as Defendant GEO's Senior Vice President and General Manager from 2005 to 2010.  (DPP Compl. ¶ 37).  Defendant Avraamides returned to Defendant GenChem in 2010 and served as Vice President of Sales and Marketing until 2011.  (DPP Compl. ¶ 37).  Further, Defendant Amita Gupta "is a resident of the United States," who served as Director of Sales and Marketing for Water Treatment Chemicals from 2008 until 2012 at Defendant GenChem.  (DPP Compl. ¶ 39).[13]

Defendant Kenneth A. Ghazey is a resident of the Commonwealth of Massachusetts, who, from 2005 to present, has served as Defendant GEO's President and Chief Executive Officer.[14] (IPP Compl. ¶ 45).  He has also served on Defendant GEO's Board of Directors.  (IPP Compl. ¶ 45).  Finally, Defendant Milton Sundbeck is a resident of Mississippi and "has been the President and Chief Executive Officer of [Defendant Southern] during the entire Class Period."[15]  (IPP Compl. ¶ 46).

---

[12] Defendant Avraamides is only the subject of DPP Compl. and IPP Compl.
[13] Defendant Gupta is only the subject of DPP Compl. and IPP Compl.
[14] Defendant Ghazey is only the subject of IPP Compl.
[15] Defendant Sundbeck is only the subject of IPP Compl.

7

B.      **Liquid Aluminum Sulfate**

Alum is a chemical compound that is used to treat water by removing impurities and other substances.[16]  (DPP Compl. ¶ 53).  It is used as a coagulant in the early stages of the water filtration process.   (DPP Compl. ¶ 54).   As a coagulant, its positively charged molecules attract any suspended particles which are later removed through sediment or filtration.  (DPP Compl. ¶ 54).  "Alum is one of the most established chemicals utilized in water and wastewater treatment[,]" and its use has risen due to stringent water purity regulations.  (DPP Compl. ¶ 55).  Municipalities and private water companies purchase Alum to use it in the treatment of potable water and wastewater.  (DPP Compl. ¶ 56).

These entities usually purchase Alum "though a publicly advertised bidding process, and municipal contracts for Alum are typically one year in duration with options to renew for a certain period of time."  (DPP Compl. ¶ 56).  These bids are kept confidential from both the bidders and the general public.   (IPP Compl. ¶ 62).   "Thus, bidders are not privy to the content of their competitors' bids any sooner than the general public."  (IPP Compl. ¶ 62).  "Many municipalities also require that bidders execute and submit an affidavit of non-collusion with their bid to certify that the bidder has not divulged or discussed their bid with any other bidders."  (IPP Compl. ¶ 63).

Paper mills also use Alum for drainage enhancement and "to set rosins (a sizing agent used in the manufacturing process)."  (DPP Compl. ¶ 57).  Specifically, Alum is used to adjust the pH level during the production process, "with higher pH levels requiring higher quantities of Alum."  (DPP Compl. ¶ 57).  Its most common paper product usage is in the production of "fine paper."  (DPP Compl. ¶ 57).  The paper industry consumed approximately 43% of the nation's Alum and

---

[16] Alum's chemical proper chemical name is $Al_2(SO_4)_3$.

usually purchase same by issuing requests for price to manufacturers and purchasing Alum pursuant to supply contracts.  (DPP Compl. ¶¶ 58-59).  Municipal, private water, and wastewater entities consume approximately 41% of the nation's Alum.  (DPP Compl. ¶ 59).

### C.      Allegations of Collusion

While the crux of the four complaints are nearly identical, *i.e.* that Defendants colluded to fix the price of Alum and/or allocate customers thereby restraining free trade, each complaint is nuanced in how the various groups of Plaintiffs were impacted by the conduct in question. Accordingly, the Court discusses the allegations of each complaint separately herein.

#### a.  DPP's Allegations

According to DPP, the Alum market is inherently susceptible to collusion.  (DPP Compl. ¶ 60). Specifically, DPP point to four factors that render the market susceptible, with those being the following: "(1) industry concentration and consolidation; (2) a standardized product for which competition was principally on the basis of price; (3) the lack of available economic substitutes; and (4) stable demand."  (DPP Compl. ¶ 60).  "The Alum industry experienced significant consolidation in the period leading up to and including 1997."  (DPP Compl. ¶ 62). In support of this contention, DPP point to Defendant GenChem's acquisition of three competitor chemical companies' Alum businesses.  (DPP Compl. ¶ 62).  Those companies acquired were Rhone, Poulech (February 1993), Courtney Industries (July 1994), and Cytec Industries (December 1996). (DPP Compl. ¶ 62).  Defendant GenChem also participated in the consolidation of the industry when, in June 1997, it acquired a Georgia-based company that produced sulfuric acid, Alum, and oleum.  (DPP Compl. ¶ 63).  "The concentration of the Alum industry is also enhanced by agreements among Defendants to distribute one another's products."  (DPP Compl. ¶ 64).  These

agreements include "swaps, trades, and selling and distribution agreements." (DPP Compl. ¶ 64). The concentration and consolidation of the Alum industry, DPP conclude, renders the industry susceptible to collusion. (DPP Compl. ¶ 64).

DPP also allege that Alum is a commodity because its "market participants compete principally based on the price rather than other attributes such as product quality." (DPP Compl. ¶ 65). This characteristic, DPP assert, makes it easier for collusion to occur because "price is more often objectively measurable and observable than non-price factors." ((DPP Compl. ¶ 65). DPP further allege that "the bidding process by which suppliers compete to provide [A]lum to a municipality demonstrates that [A]lum is interchangeable across supplies and that competition is primarily based on price." (DPP Compl. ¶ 66). Furthermore, DPP point to the fact that there is a lack of substitutes for Alum in the two subject industries (water treatment and paper production) to support their assertion that the Alum market is highly susceptible to collusion. (DPP Compl. ¶¶ 67-68).

The Alum market has a consistent demand and is generally stable. (DPP Compl. ¶ 69). This, DPP aver, incentivizes collusion in order "to avoid market share or price competition with competitors." (DPP Compl. ¶ 69). "During the relevant time period, the Alum market was mature and stable. Demand for Alum grew at approximately 1% to 3% percent [*sic*] per year[,]" with the water treatment industry's demand being pegged to the relevant population growth. (DPP Compl. ¶ 70). Growth in the industry was stunted by the fact that the water treatment facilities were not operating at maximum capacity, thereby rendering "no capacity-related reason for any Defendant not to compete for Alum business during the Class Period." (DPP Compl. ¶ 71).

10

Against this backdrop, DPP claim Defendants engaged in bid rigging and illegal market allocation. (DPP Compl. at 18-29). Prior to the alleged conspiracy, "there was a 'price war' between [Defendant] GenChem and [Defendant] GEO in which each company bid aggressively for the accounts of the other company." (DPP Compl. ¶ 72). Defendant GEO's guilty plea evidences that the "war" concluded in 1997 when the companies "agreed to 'stay away' from each other's 'historical' customers by not pursuing the business of those customers, and to engage in related bid-rigging." (DPP Compl. ¶ 73). The agreement was arrived at when Defendant Avraamides, Defendant Reichl, and Defendant GenChem's CEO, Denny Grandle, met and agreed to stop fighting for each other's customers. (DPP Compl. ¶ 73). Other entities then began joining the alleged conspiracy, such as Defendant Southern. (DPP Compl. ¶ 73). Executives at Defendant Southern and Defendant GEO communicated that there should be "'peace in the valley' in order to 'not bring down market price' because Defendants agreed that it would be 'better business for everyone to work together instead of competing and ruining the market price.'" (DPP Compl. ¶ 73).

DPP point to several other communications to bolster their conspiracy allegations. (DPP Compl. ¶ 74). On March 31, 2003, Defendant GenChem circulated an internal marketing strategy memorandum which outlined its "strategy for its nominal competitor, [Defendant] USALCO" and stated "[c]ontinue to work in conjunction at Akron, OH, and Western Michigan accounts." (DPP Compl. ¶ 74(a)). In March 2006, Defendant GEO's "internal business review concluded that both [Defendant GenChem] and Defendant Southern were '[r]emaining non-aggressive consistently favoring price increases over share gain strategy.'" (DPP Compl. ¶ 74(b)). Also, in September 2008, an executive from Defendant GenChem arranged a meeting with Defendant Gupta,

11

Defendant Steppig, and Mr. Scot Lang from Defendant GEO. (DPP Compl. ¶ 74(c)). This "getting to know you meeting" was "designed to introduce [Defendant] Gupta to senior staff of [Defendant GenChem's] friendly 'competitor' [Defendant] GEO, and to discuss market and supply agreements." (DPP Compl. ¶ 74(c)). DPP assert that "Defendants took a number of actions in support of this overarching conspiracy … [that] included regular communications with each other in private, including discussions of specific bids and accounts." (DPP Compl. ¶ 75).

Executives from the corporate Defendants regularly "communicated with each other" via telephone, email, and in person. (DPP Compl. ¶ 76). During said communications, Defendants discussed their market allocation plans, as well as certain customer accounts that "were off-limits to the other companies and how to handle the bidding process as it related to those accounts." (DPP Compl. ¶ 76). One example centers around when Defendant Gupta became the Director of Marketing for Alum at Defendant GenChem in April 2008. (DPP Compl. ¶ 77). "On May 28, 2008, [Defendant] Gupta exchanged contact information via email with [Defendant] Steppig," and "promised to get 'back to [him] with the other info we discussed,' and later called [Defendant] Steppig on his mobile phone." (Id.). Another example is Defendant Opalewski's January 14, 2010 email to Defendant Sundbeck, where Defendant Opalewski wrote "[w]ith regard to dinner, happy to include the entire team or keep it to you and me. If we do get everyone together, would still like to slip away at some point to discuss the larger issue we touched on." (DPP Compl. ¶ 78). Trade associations also allowed frequent face-to-face interaction at various meetings and events. (DPP Compl. ¶ 79).

DPP recount numerous specific instances of bid coordination throughout their complaint. (DPP Compl. ¶¶ 81-104). In 2005, Defendant GenChem and Defendant GEO conspired to

coordinate bids for the paper mill of Potlatch-McGehee, Arkansas when Defendant Avraamides asked Defendant GenChem "what price [Defendant] GEO should bid for the Potlatch-McGehee account." (DPP Compl. ¶¶ 82-83). Defendant "Avraamides instructed ... [Defendant] Steppig to bid $198.73 so that [Defendant] GEO would not take the account from [Defendant] GenChem." (DPP Compl. ¶ 83). In 2006, Defendants GenChem and GEO conspired when Defendant "Avraamides spoke with an employee [at Defendant] GenChem." (DPP Compl. ¶¶ 84-85). Defendant "Avraamides instructed [Defendant] GenChem to bid above $260 per ton for [the municipality of] Columbiana[, Alabama's] Alum business, so that [Defendant] GEO would win the business." (DPP Compl. ¶ 85).

Also in 2006, Defendant GenChem and Defendant GEO swapped their historical accounts at MeadWestvaco paper mill and the municipality of Fayetteville, North Carolina by coordinating bids. (DPP Compl. ¶ 86). Defendant GenChem had historically serviced the MeadWestvaco paper mill until 2006, when it sought a new supplier. (DPP Compl. ¶ 87). Either Defendant Opalewski or Defendant Reichl told Defendant Avraamides about the issue. (DPP Compl. ¶ 87). Fedison of Defendant GEO sent an email on April 11, 2006 to Defendant Avraamides which "identified Fayetteville as a location where [Defendant] GenChem would be more freight logical than [Defendant] GEO and could 'take a dent out of our swap imbalance.'" (DPP Compl. ¶ 87). DPP asserts that absent Defendants' decision to engage in the swap, Defendant GEO would not have been an aggressive bidder on Defendant GenChem's historical account. (DPP Compl. ¶ 88). DPP Compl. contains at least six more recitations of similar situations, but the sum and substance of each situation is the same. Defendants used the bidding process to control the allocation of customers, or to control the price of Alum on the open market. (DPP Compl. ¶¶ 90-104).

13

Additionally, DPP assert that Defendants were enjoying "*supra*-competitive profit margins during this time period, not counting freight charges. Thus, the sellers of Alum had the ability to submit bids at considerably lower prices than they did and still make a profit." (DPP Compl. ¶ 105). This was one of the reasons Defendants chose to engage in the alleged conspiracy. (DPP Compl. ¶ 105). A large portion of Alum's price is comprised of its shipping cost. (DPP Compl. ¶ 106). Industry standard dictates that Alum suppliers include the cost of shipping in the quoted price. (DPP Compl. ¶ 106). Accordingly, a "freight logical" supplier has an inherent economic advantage.[17]   However, throughout the Class Period, various "non-freight-logical suppliers consistently submitted winning bids to the same customer." (DPP Compl. ¶ 107). No reasonable economic explanation could be offered for the pattern of illogical bidding other than the alleged conspiracy, DPP claim. (DPP Compl. ¶ 107).

One instance of the anomalous bidding is when Defendant GEO, which had a treatment plant in Baltimore, Maryland, but almost never bid for business in the Mid-Atlantic region, despite being one of the closes Alum producers in the area. (DPP Compl. ¶ 108). Another example is how Defendant Southern had a water treatment plant in Williamsport, Maryland, but never competitively bid in the Mid-Atlantic region. (DPP Compl. ¶ 108). A third example is how Defendant GenChem won a bid that was 205 miles away from its closest treatment facility, despite the fact that Defendants GEO, C&S, and Southern all had plants located at 90, 97, and 131 miles away, respectively. (DPP Compl. ¶ 109(a)). Additionally, Defendant USALCO won a bid that was 246 miles away when Defendant GenChem had a plant only 84 miles away. (DPP Compl. ¶

---

[17] Freight logical simply means the supplier that is closest to the customer, who thereby will have a lower bid due to the decreased cost of shipping. (DPP Compl. ¶ 106).

14

109(b)).  Defendant GenChem also bid illogically higher on this account as well.  (DPP Compl. ¶ 109(b)).

Defendants also took efforts to police the actions of their alleged co-conspirators.  (DPP Compl. ¶ 110).  For example, a lower bid made to one of Defendants' historical clients would prompt a complaint that would result in withdrawal of the lower bid.  (DPP Compl. ¶ 110).  One example occurred in 2009, when Defendant GenChem submitted a lower bid to a client historically supplied by Defendant GEO.  (DPP Compl. ¶ 110).  Defendant Steppig called Defendant Gupta to complain she was not being consistent with the parties' agreements.  (DPP Compl. ¶ 110).  Thereafter, Defendant GenChem withdrew its bid.  (DPP Compl. ¶ 110).

The alleged collusion by Defendants caused the price of Alum to increase.  (DPP Compl. ¶ 112).  Defendants specifically told consumers that the price was increasing due to the increases in cost of raw materials and other manufacturing costs.  (DPP Compl. ¶ 113).  Defendant GenChem told one customer that there was an "emerging alumna crisis and its impact on raw material costs. In a nut shell, alumna is short globally and producers are accelerating price increase at unprecedented levels."  (DPP Compl. ¶ 113).  However, the reality, according to DPP, was that Defendants' actions were the cause of the increased prices of Alum.  (DPP Compl. ¶ 114).

Defendants are also alleged to have fraudulently concealed the conspiracy from DPP. (DPP Compl. ¶ 122).  The alleged misrepresentations were presented in the form of "non-collusion affidavits" used during the bidding procedure, and other representations made during bid submissions.  (Id.)(quotations in original).  The alleged collusion itself, DPP argue, was self-concealing as the submission of fake or altered bids led to the appearance of competition.  (Id.). DPP did not, and could not, discover the existence of the conspiracy until Defendant Reichl pled

15

guilty and his file was made public.  (DPP Compl. ¶ 123).  Defendants also allegedly lied about the reason for the increased prices, citing to increased manufacturing costs, when in reality it was their joint decision to collectively increase the price of Alum.  (DPP Compl. ¶ 127).  For these reasons, DPP brought the single count DPP Compl. for Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  (DPP Compl. ¶¶ 132-140).

### b. IPP's Allegations

With the exception of naming a few different Defendants, IPP Compl. nearly mirrors DPP Compl.  (IPP Compl. ¶¶ 1-49).  IPP agree with DPP as to what Alum is and its primary commercial purposes.  (IPP Compl. ¶¶ 50-55).  Moreover, IPP agree with DPP's allegations regarding the Alum industry's susceptibility to collusion given the nature of the product, the way bids are made, and the fact that Alum is a commodity.  (IPP Compl. ¶¶ 56-77).  Further, IPP agree with DPP that Defendants had an incentive to conspire, that the conspiracy started at the 1997 meeting between Defendants GenChem and GEO, and as to the general description as to how the conspiracy was carried out.  (IPP Compl. ¶¶ 84-89).

IPP also outline additional meetings and discussions between Defendants regarding the alleged conspiracy.  (IPP Compl. ¶¶ 90-92).  In one instance, Defendant Avraamides met with Defendant GEO "at a restaurant in New Orleans to reconfirm their agreement to conspire."  (IPP Compl. ¶ 92(a)).  Another instance occurred in 2005, when Defendants GenChem and GEO met in Chicago, Illinois, and the very next day Defendant GenChem met with USALCO in Schaumberg, Illinois to discuss the alleged conspiracy.  (IPP Compl. ¶ 92(b)).  A third example occurred in 2008, when Defendant Gupta and another executive from Defendant GenChem met with Defendant Steppig and another executive from Defendant GEO at a "get to know you

meeting" that was designed to introduce Defendant Gupta to Defendant GEO as a "friendly 'competitor'" and to further discuss the alleged conspiracy. (IPP Compl. ¶ 92(d)).

IPP also adds that several individual Defendants have pled guilty or have been indicted for their participation in the alleged conspiracy, which, they claim further bolsters the fact that a conspiracy did in fact exist. (IPP Compl. ¶¶ 78-83). Defendant Reichl pled guilty on October 27, 2015, where he admitted that he "did knowingly and intentionally conspire and agree with others not to compete for each other's historical business by rigging bids, allocating customers and fixing the price for [Alum]." (IPP Compl. ¶ 80)(quoting *United States v. Reichl*, Cr. No. 15-554 (D.N.J. Oct. 27, 2015)(Linares, J.). Defendant GEO also has pled guilty in connection with the scheme. (IPP Compl. ¶ 81). Moreover, Defendants Opalewski and Steppig have both been indicted in connection with the alleged conspiracy. (IPP Compl. ¶ 82).

Moreover, documents show that the alleged conspiracy was furthered in ways other than simply through in-person meetings. (IPP Compl. ¶ 93). In 2005, Defendant Sundbeck called Defendant Avraamides "to ensure that the conspiracy was maintained and that their companies 'not bring down market price.'" (IPP Compl. ¶ 94). "[T]elephone call logs [also] reveal that [Defendant] GEO's Steppig and Defendant GenChem's Gupta communicated very frequently with each other by telephone between 2009-2011." (IPP Compl. ¶ 96).

According to IPP, internal documents further bolster the fact that the alleged conspiracy took place. (IPP Compl. ¶¶ 97(a)-(f)). Defendant GenChem's documents show a business strategy for dealing with competitors, including Defendant USALCO, and how said competitors were "not to gain market share from them but to 'work together' or 'work in conjunction' in order to 'protect market stability and maintain market pricing.'" (IPP Compl. ¶ 97(a)). "A March 31, 2003

17

[Defendant] GenChem internal marketing strategy memorandum stated [Defendant] GenChem's strategy for its supposed competitor, [Defendant] USALCO, as follows: 'Continue to work in conjunction at Akron, OH and Western Michigan accounts.'" (IPP Compl. ¶ 97(b)). "An internal [Defendant] GEO memo written by [Defendant] Steppig in 2005 reveals that [Defendant] Opalewski and [Defendant] GenChem agreed to 'stay away intentionally' from [Defendant] USALCO's customers." (IPP Compl. ¶ 97(c)).  These are just a few of the internal documents IPP rely on.  (IPP Compl. ¶¶ 97(d)-(f)).

Additionally, Defendants used a "code word" to conceal the alleged conspiracy.  (IPP Compl. ¶ 98).  "One such frequently used code phrase to describe the cooperation among the supposed competitors was 'peace in the valley.'" (IPP Compl. ¶ 98).  Defendant Sundbeck used "peace in the valley" when he called Defendant Avraamides in November 2005, "to indicate that [Defendant Southern] wanted to maintain 'peace in the valley and not bring down the market price.'" (IPP Compl. ¶ 99)(internal quotations omitted).  "As another example, on December 20, 2005, [Defendant] Ghazey sent [Defendant] Avraamides (both at [Defendant] GEO) an email about their strategic plans, which stated: '[L]ook forward to … having some 'peace in the valley.'" (IPP Compl. ¶ 100)(internal quotations omitted).  A third example occurred "in April 2005, [when Defendant] Kemira's Product Manager, John Cowan, had expressed concerns in an internal email chain to [Defendant] Kemira's Vice President of Sales & Logistics Bill Wowchuk and others at [Defendant] Kemira about the fact that [Defendant] GenChem might try to bid on [Defendant] Kemira's St. Louis, Missouri account.  Two months later, in a July 20, 2005 email, Bill Wowchuk wrote the following to John Cowan: 'John this [Gulf Coast Water Authority bid] and [a] St. Louis

18

[Missouri bid] will test our theory whether there will be peace in the valley.'" (IPP Compl. ¶ 102)(internal quotations omitted).

IPP also recount at least nineteen different specific instances of alleged bid rigging and customer allocation.[18] (IPP Compl. ¶¶ 104-165). One example of bid rigging occurred in 2005, when Defendants C&S and GenChem rigged bids in Rochester, Minnesota. (IPP Compl. ¶ 105). Specifically, Defendant GenChem won a one-year supply contract for the City of Rochester. (IPP Compl. ¶ 106). Despite having the winning bid, in 2006, Defendant GenChem withdrew the winning bid "leaving [Defendant] C&S as the winning bidder for the 2006 calendar year." (IPP Compl. ¶ 107). Another example of the conspiracy occurred in 2006, when Defendants GEO and Southern "met to coordinate and allocate customers." (IPP Compl. ¶ 115). "In an email exchange dates April 30, 2006, [Defendants] Avraamides and Ghazey .., corresponded via [Defendant] Ghazey's personal email account about a request for pricing to customer Akzo Nobel." (IPP Compl. ¶ 116). In response, Defendant Avraamides wrote "[a]s you know, I have been holding off to assess if we are experiencing any competitive threat from [Defendant Southern] on our Mead-Westvaco quotation. So far, it does not appear as though we have a threat ... [Defendant] Sundbeck – [Defendant] Southern, welcomed a meeting and proposed May 15th in Houston." (Id.)(internal quotations omitted). One final example happened in 2009, when Defendants GenChem and C&S coordinated bids to Dekalb County, Georgia. (IPP Compl. ¶ 120). Specifically, Defendant GenChem's Larry McShane indicated he was interested in the aforementioned account, "which previously had been awarded to RGM of Georgia." (IPP Compl. ¶ 121). "After learning that RGM of Georgia was selling to fellow conspirator [Defendant] C&S,

---

[18] For purposes of brevity, the Court will discuss a sample of these allegations. However, as noted in n. 1, *supra*, the Court accepts each instance as true for purposes of these motion.

McShane emailed [Defendant] Gupta: 'RGM of GA turned out to be [Defendant] C&S (Austell) so I assume we don't want to take it.'" (IPP Compl. ¶ 122).  These are just a few of the nineteen examples contained in IPP Compl.

"Defendants also allocated customer accounts concerning other sulfate-based water treatment chemicals … in order to maintain their agreement to allocate customers." (IPP Compl. ¶ 166).  One example happened in 2009, when Defendant Reichl told Defendant Opalewski, "[t]he $480 [Defendant GenChem] bid last year [for the Clayton, Georgia ferric sulfate account against Kemira] was a throw away price[,]" and further explained that Defendant GenChem took the account in 2009 because Defendant Kemira "took a few accounts from us and this one made sense for [Defendant GenChem] to have."  (IPP Compl. ¶ 167)(internal quotations omitted).  Another example of customer allocation for other sulfate-based water treatment chemical products took place in 2010.  (IPP Compl. ¶ 168).  Defendant Reichl noted, when discussing a bid for ferric sulfate to Denton, Texas, "Bid opened yesterday.  We lost.  Was in plan." (IPP Compl. ¶ 168)(internal quotations omitted).

Furthermore, "purchasers of Alum received bids that made no economic sense."  (IPP Compl. ¶ 169).  "In March 2005, [Defendant] USALCO entered into a three-year contract with Grand Rapids, Michigan, at a price of $149.52 per ton.  The only other two bidders were [Defendants] GenChem and C&S, which submitted bids of $186.94 and $232," respectively.  (IPP Compl. ¶ 169(a)).  The next example happened "[i]n October 2008, [when Defendant] GenChem won a bid for Fayetteville, Arkansas at a price of $184.20 per ton. The second-lowest bidder was [Defendant] C&S, with a bid of $247.60 per ton." (IPP Compl. ¶ 169(b).  A third example of the nonsensical bidding took place "[i]n May 2009, [when Defendant] GenChem received a contract

with Milwaukee, Wisconsin, at a price of $429 per ton.  The only other bidder, [Defendant] USALCO, submitted a bid of $562 per ton." (IPP Compl. ¶ 169(c)).  The final example offered by IPP occurred "[i]n June 2010, [when Defendant] GenChem received a contract to supply Pensacola, Florida, at a price of $212.93 per ton.  While the second-lowest bidder, a small regional producer named Southern States, submitted a bid of $219 per ton, the other larger national Alum producers, [Defendants] GEO and C&S, bid prices which were an astounding 117.7% and 162% higher than [Defendant] GenChem's winning bid." (IPP Compl. ¶ 169(d)).  These actions, IPP aver, were "designed to, and did, result in artificially inflated and *supra*-competitive prices to wholesalers, distributors, and resellers." (IPP Compl. ¶ 170).

IPP claim that Defendants' conduct restrained or eliminated competition in the Alum market. (IPP Compl. ¶ 182).  For this reason, IPP allege that they were forced to pay a significantly higher price than if Defendants had not engaged in the alleged conspiracy.  (IPP Compl. ¶¶ 183-84).  Against this backdrop, IPP filed IPP Compl., asserting three causes of actions containing multiple sub-claims based on the laws of each IPP's home state.[19]  Count I is for "Violation of State Antitrust Statutes," and asserts claims under the laws of the following states: 1) Arizona; 2) California; 3) District of Columbia; 4) Hawaii; 5) Illinois; 6) Iowa; 7) Kansas; 8) Maine; 9) Michigan; 10) Minnesota; 11) Mississippi; 12) Nebraska; 13) Nevada; 14) New Hampshire; 15) New Mexico; 16) New York; 17) North Carolina; 18) North Dakota; 19) Oregon; 20) Puerto Rico; 21) Rhode Island; 22) South Dakota; 23) Tennessee; 24) Utah; 25) Vermont; 26) West Virginia; and 27) Wisconsin.  (IPP Compl. ¶¶ 191-96(aa)).  Count II is for alleged violations of the following states' consumer protection and unfair and deceptive trade practices statutes: 1) Alabama; 2)

---

[19] The Court is cognizant that the District of Columbia and the Commonwealth of Puerto Rico are not states.  However, the Court will refer to both as "states" for purposes of consistency throughout this discussion.

Arkansas; 3) California; 4) Colorado; 5) District of Columbia; 6) Florida; 7) Massachusetts; 8) Nebraska; 9) New Hampshire; 10) New Mexico; 11) New York; 12) North Carolina; 13) Oregon; 14) Rhode Island; 15) South Carolina; and 16) Vermont. Finally, Count III is for unjust enrichment and disgorgement of profits under the laws of the following states: 1) Alabama; 2) Arizona; 3) Arkansas; 4) California; 5) Colorado; 6) District of Columbia; 7) Florida; 8) Hawaii; 9) Illinois; 10) Iowa; 11); Kansas; 12) Maine; 13) Massachusetts; 14) Michigan; 15) Minnesota; 16) Mississippi; 17) Nebraska; 18) Nevada; 19) New Hampshire; 20) New Mexico; 21) New York; 22) North Carolina; 23) North Dakota; 24) Oregon; 25) Puerto Rico; 26) Rhode Island; 27) South Carolina; 28) South Dakota; 29) Tennessee; 30) Utah; 31) Vermont; 32) West Virginia; and 33) Wisconsin. (IPP Compl. ¶¶ 267-43).

### c. Plaintiff Shreveport

Plaintiff Shreveport brings a separate action on behalf of itself only. (*See generally* Shreveport Compl.). The allegations therein regarding the conspiracy and customer allocations are identical to those in DPP Compl. and IPP Compl. (Shreveport Compl. ¶¶ 1-87). Accordingly, the Court will not belabor the point by restating same herein and incorporates the above background. Plaintiff Shreveport claims that the alleged conspiracy caused the price of Alum to artificially rise, thereby causing it to spend more money per ton of Alum, to Defendants' benefit at its detriment. (Shreveport Compl. ¶¶ 74-77). Accordingly, Plaintiff Shreveport brought an action asserting claims for Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Violation of Louisiana Monopolies Act, La. Rev. Stat § 51:122. (Shreveport Compl. ¶¶ 88-99).

### d. Plaintiff Florida

Similarly, Plaintiff Florida's complaint recites a nearly identical history of the Alum market as well as the alleged conspiracy. (Fl. Compl. ¶¶ 1-105). According to Plaintiff Florida, the conspiracy caused it damages because the inflated prices and increased costs were passed-through to consumers of the State of Florida, including various municipal entities and individuals. (Fl. Compl ¶ 106). Accordingly, Plaintiff Florida filed a three count complaint seeking to recover money damages stemming from the alleged collusion. Count I is for Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (Fl. Compl. ¶¶ 125-32). Count II is Violation of the Florida Antitrust Act, Section 542.21 of the Florida Statutes. (Fl. Compl. ¶¶ 133-42). Finally, Count III is for Violation of the Florida Deceptive and Unfair Trade Practices Act. (Fl. Compl. ¶¶ 143-52).

**D.    Defendants GenChem and GEO's Bankruptcies**

This action presents an additional factual wrinkle; both Defendants GenChem and GEO previously filed for, and have since emerged from, Bankruptcy protection. (IPP Compl. ¶¶ 21-24, 31-33, Shreveport Compl. ¶¶ 13, 20). Defendant GenChem filed a voluntary Chapter 11 petition for Bankruptcy in the United States Bankruptcy Court for the District of Delaware. (Shreveport Compl. ¶ 13(a)). Said Bankruptcy petition included all the relevant subsidiaries discussed above. (Shreveport Compl. ¶ 13(a)). Defendant GenChem emerged from Bankruptcy on October 7, 2003, and its debts were discharged under a plan of reorganization. (Shreveport Compl. ¶ 13(a)). It is alleged that "[a]fter its discharge from bankruptcy, [Defendants] GenTek and General Chemical reaffirmed their participation in the conspiracy, in part by continuing to engage in the [above described] conduct … with respect to Alum." (Shreveport Compl. ¶ 13(b)).

Defendant GEO also filed a voluntary Chapter 11 Bankruptcy petition in the United States Bankruptcy Court for the District of New Jersey on March 18, 2004. (Shreveport Compl. ¶ 20(a)).

23

"Effective December 20, 2004, [Defendant] GEO was discharged from bankruptcy under a plan of reorganization." (Id.). It is alleged that "[a]fter its discharge from bankruptcy, [Defendant GEO] reaffirmed its participation in the conspiracy, in part by continuing to engage in the [above described] conduct ... with respect to the sale of Alum." (Shreveport Compl. ¶ 20(b)). All Plaintiffs alleged that Defendants GenChem and GEO's conduct after their discharge from bankruptcy render them jointly and severally liable for any damages that may have accrued since the beginning of the alleged conspiracy. (*See, e.g.,* Shreveport Compl. ¶¶ 12(b)-(c)).

## II.     **LEGAL STANDARD**

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d

24

Cir. 2016) (citations omitted).  "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.   ANALYSIS

The Court recognizes three general categories of arguments advanced by Defendants in support of dismissal of the aforementioned complaints.  First, Defendants GenChem and GEO argue that their Bankruptcy discharge orders preclude any Plaintiff from recovering damages for their actions prior to the discharge order.  In other words, Defendants GenChem and GEO assert they are not liable for any pre-discharge conduct; only for any alleged post-discharge collusion. The next argument advanced by all Defendants is that each of the complaints fail to state a claim upon which relief may be granted.  Finally, the third category is a miscellaneous category, which includes personal jurisdiction and standing arguments.  For purposes of clarity, the Court discusses each category separately as it relates to the various Defendants.

### A. Bankruptcy

Defendant GEO and GCC Defendants all assert the same argument.  (*See* ECF Nos. 244-1, 251-1, 298, 299-1, 304-1, 366-1, 372).  Specifically, those Defendants assert that they cannot be held liable for any damages that accrued prior to the effective date of their respective Bankruptcy discharge orders.  (Id.).  This argument relies primarily on Third Circuit law regarding how to determine whether a specific claim has been discharged.  In *In re Grossman's, Inc.*, 607 F.3d 114, 122 (3d Cir. 2010), the Third Circuit announced a two-part test regarding how to make said determination.  Specifically, this Court must ascertain 1) whether the claim arose prior to the

confirmation of the reorganization plan, and, if so, 2) whether Due Process has been afforded to the claimant such that it is "fair" to discharge his or her claim. *In re Grossman's*, 607 F.3d at 127.

Primarily, the Court is cognizant that GCC Defendants and Defendant GEO both assert that civil antitrust claims are dischargeable in Bankruptcy, relying on 11 U.S.C. § 1141(d)(1)(A) and *In re Grossman's*, *supra*. No Plaintiff opposes this position, and the Court agrees that the antitrust claims are potentially dischargeable. However, for the reasons set forth below, the Court finds that these specific antitrust claims against Defendant GEO and GCC Defendants are not subject to the discharge orders and, therefore, said Defendants may be liable for antitrust damages that accrued prior to the dates of the discharge orders.

As noted, for claims to be barred by the discharge order under *Grossman's* this Court must find that Plaintiffs' claims accrued prior to the confirmation of Defendants' reorganization plans and that Plaintiffs were afforded due process. *Grossman's*, 607 F.3d at 127. There is no dispute that Plaintiffs' claims accrued prior to the 2003 and 2004 discharge orders since the alleged conspiracy must have started by 1997. Hence, the first prong is met. Thus, the only question for the Court to resolve is whether Plaintiffs were afforded Due Process in connection with said claims and the two Bankruptcy proceedings.

The Bankruptcy Code broadly defines the term claim as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). Congress broadly coined this definition to assure that debtors received a fresh start by "maximizing the scope of a discharge." *Grossman's*, *supra* at 122 (quotations omitted). As discussed, a claim

26

has been construed to include civil antitrust claims when such claims are based on pre-discharge conduct. *See In re Penn. Cent. Transp. Co.*, 771 F.2d 762, 766-67 (3d Cir. 1985).

However, in order for a discharge order to bar a claim, the claimant must have been provided with ample notice consistent with Due Process. *Grossman's*, *supra* at 122. The method for how a creditor is provided notice depends on whether the creditor was known or unknown to the debtor. *Chemetron Corp. v. Jones*, 72 F.3d 341, 345 (3d Cir. 1995). This determination is made from the perspective of the debtor. *Chemetron*, 72 F.3d at 345. If the creditor is known to the debtor, then the debtor must give actual notice of the Bankruptcy proceedings to the creditor. *Id.* However, if the creditor is unknown to the debtor then notice by publication satisfies due process and serves as adequate notice. *Id.* at 345-46. Hence, the Court must ascertain whether Plaintiffs were known to Defendant GEO and GCC Defendants at the time of the Bankruptcy filings.

The Court disagrees with Movants that Plaintiffs' various complaints make allegations that would require this Court to consider Plaintiffs unknown creditors. Indeed, Plaintiffs have pled that any of the victims of the alleged conspiracies would be the purchasers of Alum. (DPP Compl. ¶ 5). Said differently, Defendants knew that Plaintiffs were creditors since Plaintiffs make up the Alum market Defendants allegedly conspired to monopolize. (Id.). Defendants had a duty to make a reasonable and diligent inquiry regarding all possible known creditors and not merely rely on their books and records. *See, e.g., In re XO Commc'ns, Inc.*, 301 B.R. 782, 793-94 (Bankr. S.D.N.Y. 1995)("Reasonable diligence in fettering out known creditors will, of course, vary in different contexts … A debtor is obligated … to undertake more than a cursory review of its

records and files to ascertain its known creditors. *Known creditors are defined as creditors that a debtor* knew of, *or should have known of*, when service notice of the bar date.")(emphasis added).

As discussed, Defendant Reichl has already pled guilty to his participation in the alleged conspiracy. (DPP Compl. ¶¶ 7, 35). Moreover, Defendants Steppig and Opalewski have both been indicted for their alleged participation in the alleged conspiracy. (*See* Cr. No. 16-65). Indeed, Plaintiffs have sufficiently pled that Defendant GEO and GCC Defendants were aware of their alleged conspiracy, took overt steps to keep the conspiracy a secret, and failed to provide all Plaintiffs with sufficient notice regarding their Bankruptcies consistent with due process. (DPP Compl. 4-6; IPP Compl. 24-31; Shreveport Compl. 26-29; Fl. Compl. 14-26). Hence, the Court is satisfied that Plaintiffs have all shown, at this juncture, that Defendants knew or should have known that Plaintiffs were known creditors. Because Plaintiffs fall under the definition of known creditors under the Code, they were entitled to actual notice. All Plaintiffs have sufficiently pled that not a single one of them was ever apprised of the two Bankruptcy proceedings. Thus, the Court concludes that the discharge orders will not bar Plaintiffs' ability to recover damages prior to the effective date of said orders from Defendant GEO and GCC Defendants.

Moreover, even if this Court were to conclude that due process was satisfied, which it does not, Defendant GEO and GCC Defendants' alleged post-discharge conduct subjects them to joint and several liability for the entirety of the alleged conspiracy. This is because a party is jointly and severally liable for all the damages caused from the beginning of the conspiracy until its conclusion. *In re K-Dur Antitrust Litig.* 338 F. Supp. 2d 517, 538-39)("Although Plaintiffs' complaints allege that [defendant] joined the conspiracy ... after it was formed, a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the

conspiracy.")(citing *Lefco v. United States*, 74 F.2d 66, 68-69 (3d Cir. 1934)).   A party who withdraws from a conspiracy and later rejoins it remains jointly and severally liable for all of the conspirators' conduct. *See Hyde v. United States*, 225 U.S. 347, 370-72 (1912).

Both Bankruptcy Defendants allegedly continued to be involved in the conspiracy during the Bankruptcy periods and thereafter.  For example, in 2006 GCC Defendants allegedly won an account that historically belonged to Defendant GEO.   Thereafter, top executives at both companies agreed to let Defendant GEO take one of GCC Defendants' accounts of the same size to "mak[e] the playing field even again." (DPP Compl. ¶ 111).   Another example took place in 2009 when GCC Defendants submitted a low bid for an account held by a distributor that Defendant GEO supplied, but said bid was withdrawn when Defendant Steppig complained to Defendant Gupta. (DPP Compl. ¶ 110).   The various Defendants also continued to have private meetings and conference calls far after the Bankruptcies were over. (DPP Compl. ¶¶ 76-80).

Accordingly, even if the Bankruptcies precluded recovery of damages for pre-discharge conduct, the Bankruptcy Defendants' post-discharge conduct renders them jointly and severally liable for the entire conspiracy.  This is because the Defendants continued to allegedly participate in the conspiracy.  By doing so Defendant GEO and GCC Defendants subjected themselves to potential liability for the entire length of the conspiracy and for any and all damages supposedly caused by their co-conspirators.  Thus, Defendant GEO and GCC Defendants' Motions to Partially Dismiss based on their Bankruptcies (ECF Nos. 244, 251) are hereby denied.

**B.  Personal Jurisdiction**

Defendants Ghazey and Sundbeck argue that this Court is without personal jurisdiction and accordingly must be dismissed from this action.[20]   (ECF Nos. 308, 310, respectively).   The arguments advanced by both of these Defendants are identical. They argue that this Court lacks general and specific personal jurisdiction over them since they do not reside in the State of New Jersey and have no minimum contacts with the forum state.   (Id.; id.).   The Court rejects these Defendant-specific personal jurisdiction arguments.

Once a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the "plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (internal citations omitted).   Where, as here, the district court does not hold an evidentiary hearing, a plaintiff need only establish a "*prima facie* case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004)(emphasis added). Additionally, "[i]f the contents of the plaintiff's complaint conflict with the defendant's affidavits, the district court must construe all reasonable inferences that can be drawn from the papers in the plaintiff's favor." *Haffen v. Butler Specialties, Inc.*, 2011 WL 831933 at *2 (D.N.J. Mar. 3, 2011) (quoting 4 Wright & Miller, Federal Practice and Procedure: Civil 3d § 1067.6 (3d ed. 2002)).   The plaintiff, however, retains "the burden of demonstrating that the defendants' contacts with the forum state are sufficient to give the court *in personam* jurisdiction." *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 699 (3d Cir. 1990)(emphasis added).   "These contacts must be shown 'with reasonable particularity.'" *Wellness Publ'g v. Barefoot*, 128 F. App'x 266, 268 (3d Cir. 2005)

---

[20] The Court notes that both Defendants Ghazey and Sundbeck advance additional arguments in support of dismissal, which shall be addressed *infra*.

(quoting *Mellon Bank v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)).

"A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales, Inc.*, 384 F.3d at 96. "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Id.* (citing N.J. Ct. R. 4:4-4(c)). A district court sitting in New Jersey may therefore exercise personal jurisdiction over a non-resident defendant if the defendant has "certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Henry Heide, Inc. v. WRH Prods. Co., Inc.*, 766 F.2d 105, 108 (3d Cir. 1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"Minimum contacts can be analyzed in the context of general jurisdiction or specific jurisdiction." *Metcalfe*, 566 F.3d at 334. "General jurisdiction results from, among other things, 'systematic and continuous' contact between a non-resident defendant and the forum state. *Spuglio v. Cabaret Lounge*, 344 F. App'x 724, 725 (3d Cir. 2009) (quoting *Int'l Shoe*, 326 U.S. at 320). "Specific jurisdiction over a defendant exists when that defendant has 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.'" *Miller Yacht Sales*, 384 F.3d at 96 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

### i.      General Jurisdiction

"'[G]eneral jurisdiction exists when a defendant has maintained systematic and continuous contacts with the forum state.' This is a fact-specific inquiry, and the 'nonresident's contacts to the forum must be continuous and substantial' to support the exercise of general jurisdiction." *Arpaio v. Dupre*, 527 F. App'x 108, 113 (3d Cir. 2013) (internal citations omitted). In recent years,

the United States Supreme Court has offered guidance on the level of "continuous and substantial" contacts that might justify the exercise of general or "all purpose" jurisdiction.

In *Goodyear Dunlop Tires Operations S.A. v. Brown* the Court addressed a situation in which the foreign subsidiaries of an American corporation challenged a North Carolina court's exercise of personal jurisdiction over them. 131 S. Ct. 2846 (2011). A unanimous Court discussed the parameters of general jurisdiction, writing that, "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.* at 2853-54. The Court reiterated the principle that "[a] corporation's 'continuous activity of some sorts within a state' . . . 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" *Id.* at 2856 (quoting *Int'l Shoe Co.*, 326 U.S. at 318). The Court further noted that neither regular purchases of goods from a state nor the sales of goods to a state were sufficient, in themselves, to subject an entity to general jurisdiction on claims unrelated to the sales/purchases. *Id.* at 2856-57 (citing *Helicopteros Nacionales De Colombia v. Hall*, 466 U.S. 408, 418 (1984)). As the defendant subsidiaries in *Goodyear* had only "attenuated" contacts with the state (*i.e.*, their products were sold into the state via intermediaries)[21] and were "in no sense at home in North Carolina," the Court found that the subsidiaries were not subject to general jurisdiction in North Carolina. *Id.* at 2857.

The Supreme Court confirmed the narrow applicability of the general jurisdiction doctrine in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). In *Daimler*, the Court rejected a formulation of

---

[21] The *Goodyear* Court also specified that while the "[f]low of a manufacturer's products into the forum . . . may bolster an affiliation germane to *specific* jurisdiction . . . ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has *general* jurisdiction over a defendant." *Id.* at 2855 (emphases in original).

the doctrine that would "approve the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business,'" characterizing that broad definition as "unacceptably grasping." *Id.* at 749 (internal citation omitted). The Court observed that "the inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so 'continuous and systematic' as to render it essentially at home in the forum State.'" *Id.* at 761 (quoting *Goodyear*, 131 S. Ct. at 2851). The Court also clarified that "the general jurisdiction inquiry does not 'focus solely on the magnitude of the defendant's in-state contacts.' General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States." *Id.* at 762, n. 20. The Court ultimately found that there was "no basis to subject Daimler to general jurisdiction in California, for Daimler's slim contacts with the State hardly render it at home there." *Id.* at 760, 761-62.

Here, Defendants assert that they are not subject to general jurisdiction because they do not reside in New Jersey nor maintain continuous and systemic contacts with New Jersey for general jurisdiction. (ECF Nos. 308, 310). While IPP do not concede this argument completely, they acknowledge that their complaint relies on specific jurisdiction. (*See* ECF No. 337 ("IPP Opp. Br.") at n. 43). Accordingly, this Court concludes that Defendants Ghazey and Sundbeck are not subject to general jurisdiction for the alleged wrongdoings.

**ii.    Specific Jurisdiction**

"Specific jurisdiction is established when a non-resident defendant has 'purposefully directed' his activities at a resident of the forum and the injury arises from or is related to those activities." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (quoting *Burger King*, 471 U.S. at 472). In other words, specific jurisdiction exists where the "cause of action arises out of [t]he defendant's forum-related activities, such that the defendant should reasonably anticipate being haled into court in that forum." *Abel v. Kirbaran*, 267 F. App'x 106, 108 (3d Cir. 2008) (internal citations and quotations omitted).

Three elements must be met to establish specific jurisdiction. *HS Real Co., LLC v. Sher*, 526 F. App'x 203, 206 (3d Cir. 2013). First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum. *Id.* Second, "plaintiffs' claims must arise out of or relate to at least one of the contacts with the forum." *Id.* (internal citations and quotations omitted). Third, the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007).

Because the existence of specific jurisdiction depends on a link between the defendant's activity and the resulting harm, a specific jurisdiction analysis is necessarily claim specific. *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) ("Such a determination is claim specific because a conclusion that the District Court has personal jurisdiction over one of the defendants as to a particular claim asserted by [plaintiff] does not necessarily mean that it has personal jurisdiction over that same defendant as to [plaintiff]'s other claims.").

Here, both Defendants Sundbeck and Ghazey are subject to specific personal jurisdiction in this Court. This is because both allegedly communicated with Defendant Avraamides, who was

located in New Jersey, to discuss the supposed conspiracy. Specifically, IPP allege that Defendant Ghazey emailed Defendant Avraamides discussing a strategic plan, where he used the code phrase "peace in the valley." (IPP Compl. ¶ 100). In another email, Defendant Avraamides wanted to confirm "peace in the valley." (IPP Compl. ¶ 101)(internal quotations omitted).

Defendant Sundbeck also called Defendant Avraamides to note that his company wanted "'peace in the valley' and not to bring down the market price." (IPP Compl. ¶ 99)(internal quotations omitted). IPP point to various documentary evidence supporting said communications. (*See* IPP Opp. Br. at n. 45). IPP Compl. even details a conversation between Defendant Ghazey and Defendant Avraamides where they discussed a meeting with Defendant Sundbeck. (IPP Compl. ¶ 116). That paragraph specifically discussed how Defendant Southern would not be a competitive threat because Defendant Sundbeck welcomed a meeting with Defendant Ghazey and his company. (Id.).

Such communications have been found by this District, as well as the Third Circuit, to be sufficient to confer specific personal jurisdiction. In *Eaton Corp. v. Maslym Holding Co.*, 929 F. Supp. 792, 797 & n. 8 (D.N.J. 1996) the Hon. Maryanne Trump Barry found that communications with a New Jersey defendant was sufficient to confer specific personal jurisdiction. Additionally, the Third Circuit has held phone calls into the forum state regarding the subject matter of the litigation were sufficient to establish the minimum contacts for the District to assert personal jurisdiction over a defendant. *See Grand Entm. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482-83 (3d Cir. 1993).

Hence, this Court is satisfied that both Defendants Ghazey and Sundbeck's alleged conduct are sufficient for this Court to assert personal jurisdiction over them. Both Defendants engaged in

communications with a resident of New Jersey with the intention and purpose of allegedly furthering the conspiracy. The claims here, at least in part, arise out of said conduct. Thus, IPP Compl. contains enough allegations to support the assertion of personal jurisdiction in this District.

Moreover, even if personal jurisdiction did not exist, which this Court explicitly disagrees with, the MDL standing order would lead to an identical result. This is because the MDL statute explicitly carves out venue and *in personam* jurisdiction restrictions when actions are transferred pursuant to said statute. 28 U.S.C. § 1707. The Judicial Panel on Multidistrict Litigation has explicitly rejected due process challenges to case transfers under 28 U.S.C. § 1407, and the Second Circuit has noted that the MDL statute authorized national personal jurisdiction when cases are transferred under said statute. *See In re Sugar Industry Antitrust Litig.*, 399 F. Supp. 1397, 1400 (J.P.M.D.L. 1975); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir. 1987). Accordingly, if this Court were to rule that Defendants Ghazey and Sundbeck must be sued in their forum states, the result would be the same. In other words, these individual Defendants will be required to defend this action in the District of New Jersey regardless of where the action is initiated because of the current MDL standing order regarding Alum related lawsuits. Accordingly, this Court will not dismiss IPP Compl. against Defendants Ghazey or Sundbeck for lack of personal jurisdiction.

## C. Choice of Law

New Jersey's choice of law principles are applicable to this matter since federal courts with diversity jurisdiction must apply the choice of law principles of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). However, the Court need not address any choice of law arguments at this juncture, since choice of law analysis has routinely been found to

be premature at the motion to dismiss phase of a class action lawsuit, especially when certain discovery is needed to further develop the facts that will be used in the choice of law analysis. *See, e.g., Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, 2013 WL 1431680, at *5 (D.N.J. Apr. 9, 2013) (finding choice of law analysis at motion to dismiss premature); *In re Samsung DLP Television Class Action Litig.*, No. 07-cv-2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009) (same); *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 55 (D.N.J. 2009) (same); *see also Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 295 (D.N.J. 2009) (finding that New Jersey's most significant relationship test requires a fact-sensitive analysis that cannot be performed on a record that consists solely of a complaint and motion to dismiss); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 541 (D.N.J. 2004) (finding that a choice of law analysis is premature at the motion to dismiss phase). Accordingly, this Court will not engage in a choice of law analysis at this point in the action.

Further, the various Defendants fail to explain how any of the various Plaintiffs' common law claims conflict with the laws of their home states. Rather, Defendants simply conclude that a conflict exists and therefore, the subject Complaints must be dismissed. Yet, as noted above, the most significant relationship test is a fact-sensitive inquiry. Accordingly, the Court declines to engage in a choice of law analysis at this juncture, and Defendants' Motions to Dismiss based on same are hereby denied.

### D. Statute of Limitations and Fraudulent Concealment

Defendants Southern, USALCO, Ghazey, Sundbeck, and Kemira all assert that the respective claims against them are time barred by the relevant statute of limitations. (ECF Nos. 249, 250, 308, 310, 311). According to Defendant Southern, the statute of limitations bars DPP's

Sherman Act claims. (ECF No. 249 at 13, 29-27). Defendant USALCO makes similar arguments against DPP Compl., arguing that DPP failed to plead fraudulent concealment thereby barring said claims under the statute of limitations. (ECF No. 250 at 18-24). Defendant Ghazey, relying on arguments advanced in the Defendants' Joint Motion to Dismiss (ECF No. 303, 308), avers that all claims asserted against him are barred by the relevant statutes of limitations. (ECF No. 303, 308). Indeed, Defendants jointly advance statute of limitations arguments regarding various claims, including unjust enrichment and state-specific statutory claims. (ECF No. 308). Defendant Sundbeck adopts Defendant Ghazey's statute of limitations arguments. (ECF No. 310). Finally, Defendant Kemira adopts the statute of limitations arguments advanced by the Joint Motion to Dismiss (ECF No. 311).

The Court is not persuaded by any of the above arguments regarding the statutes of limitations. This is because IPP, as well as all other Plaintiffs, have sufficiently pled fraudulent concealment.[22] For fraudulent concealment to toll the statute of limitations, a plaintiff must plead "(1) wrongful concealment by the party raising the statute of limitations defense, resulting in (2) plaintiff's failure to discover the operative facts forming the basis of his cause of action during the limitations period (3) despite the exercise of due diligence." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 523 (D.N.J. 2008).

Here, the Court is satisfied that all Plaintiffs have sufficiently pled fraudulent concealment and meet the above standard. DPP allege Defendants collectively engaged in fraudulent concealment when they made false representations to DPP, and members of the DPP Class, that

---

[22] The Court notes that IPP are correct in their argument that Puerto Rico law does acknowledge that fraudulent concealment tolls a statute of limitations. *See Rivera-Ramos v. Roman*, 156 F.3d 276, 282 (1st Cir. 1998)("Puerto Rico law would toll the statute of limitations if-because of active or fraudulent concealment-a reasonable person would not have been able to discovery the basis for the lawsuit.")

Defendants were not engaged in any collusion. (DPP Compl. ¶ 122). "These [allegedly] false representations took many forms, including 'non-collusion affidavits' and representations made in connection with Defendants' bid submissions." (DPP Compl. ¶ 122). DPP also allege that the conspiracy itself was inherently "self-concealing" since the bids "were submitted through the operation of the conspiracy [to give] the appearance of competition, when, in fact, none existed." (DPP Compl. ¶ 122). Due to this alleged concealment, DPP allege they had no actual nor constructive knowledge. (DPP Compl. ¶ 122). DPP further allege that they was no way for them to learn of the purported conspiracy through any sort of reasonable diligence, and only became aware of same when Defendant Reichl's plea agreement was filed and made public. (DPP Compl. ¶ 123). According to DPP, "Defendants engaged in a secret conspiracy that did not reveal facts that would put [DPP or the DPP Class] on inquiry notice that there was [an alleged] conspiracy to fix prices for Alum[,] … [and that] Defendants routinely met and had private conversations" to discuss how they could further the alleged conspiracy. (DPP Compl. ¶ 124).

DPP claim Defendants engaged in fraudulent concealment by affirmatively, but falsely, representing to DPP that their bids for Alum business were free from collusion or that there was any form of illegal coordination. (DPP Compl. ¶ 125). Once again, DPP point to the "non-collusion affidavits" signed by Defendants in connection with their bids and say that those affidavits alone made affirmative false representations. (Id.). In other instances, where such affidavits were not required, Defendants allegedly made affirmative false misrepresentations that the bid did not involve any other person or entity, nor were they in agreement with any third-party. (DPP Compl. ¶ 126). Additionally, DPP allege that Defendants falsely asserted that the reason for the increased price of Alum "was attributable *entirely* to higher raw material and energy costs."

(DPP Compl. ¶ 127)(emphasis added).   Moreover, Defendants allegedly further concealed the supposed conspiracy by assuring that very few written communications regarding same were in existence.  (DPP Compl. ¶ 128).  This secrecy, DPP allege, assured that DPP would never have any actual or constructive knowledge of the conspiracy.  (DPP Compl. ¶¶ 129-30).  IPP, Plaintiff Shreveport, and Plaintiff Florida all make nearly identical allegations of fraudulent concealment. (IPP Compl. ¶¶ 185-90; Shreveport Compl. ¶¶ 78-87; Fl. Compl. ¶¶ 107-24).

Here, the Court is satisfied that all Plaintiffs have sufficiently pled fraudulent concealment, and, accordingly, the statute of limitations defense is insufficient at the Motion to Dismiss phase.[23] To be clear, this Court is not concluding that Defendants did in fact fraudulently conceal the alleged conspiracy, but rather, it is merely satisfied that Plaintiffs have sufficiently pled same. Because Plaintiffs have successfully pled fraudulent concealment, the statute of limitations may be equitably tolled.  Accordingly, the Court finds that it is inappropriate to dismiss the claims at this stage in the litigations.  Defendants may renew this argument at a later point, should discovery lead them to a different conclusion.

### E. Article III Standing

Defendants jointly argue that IPP lack standing to bring this action.  (ECF No. 306-1 at 4-16).  Defendants specifically argue that IPP lack both Article III standing as well as Antitrust standing. (Id.).  For the following reasons, the Court rejects both arguments.

### i.     IPP Have Article III Standing

---

[23] Defendants also jointly assert a statute of limitations argument in favor of dismissing IPP's antitrust claim under Puerto Rico law.  (ECF No. 306-1 at 27-28).  Consistent with the analysis set forth in this subsection, the Court concludes that IPP's allegations of fraudulent concealment are sufficient to toll the statute of limitations. (IPP Compl. 185-90)  Thus, the Court incorporates its reasoning herein to IPP's antitrust claim under Puerto Rico law.

Article III standing requires Plaintiffs to allege: 1) an injury in fact; 2) causation; and 3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The purpose of the standing requirement is to assure that the "party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination' of difficult constitutional questions before it.'" *Flast v. Cohen*, 392 U.S. 83, 99 (1968). Class action plaintiffs are not excused from the above Article III standing requirement. *See McGuire v. BMW N. Am.*, 2014 WL 2566132, *5 (D.N.J. June 6, 2014)(Linares, J.) Defendants do not challenge that IPP have pled both causation and redressability with regard to these claims, nor do they assert that Plaintiffs have insufficiently pled any of the three claims. (*See* ECF No. 306-1 at 5-7). Rather, Defendants focus their argument strictly on injury in fact and residency of the named IPP. (Id.).

This Court is unpersuaded by either argument. Indeed, IPP Compl. is replete with claims of damages, such that it can be said IPP have a personal stake in the outcome of the litigation. Without belaboring the point by reciting all of IPP's allegations stated above, IPP have pled that they indirectly purchased Alum "through intermediary distributors, resellers, retailers, wholesales, and chemical supply companies." (IPP Compl. ¶ 3). According to IPP, Alum is sold directly to DPP who then sell smaller quantities to IPP. (IPP Compl. ¶ 4).

As noted above, IPP Compl. contains sufficient allegations to outline the scheme that Defendants allegedly engaged in. (*See e.g.* IPP Compl. ¶¶ 5-11, 78-173). Those allegations discuss when, how, and even why Defendants allegedly chose to conspire with each other, with the ultimate purpose being to inflate the price of Alum and assure that each Defendant increased their respective profits. Based on these allegations, IPP allege competition for Alum was

restrained, thereby increasing the price of Alum, which caused IPP to pay more for the product. (IPP Compl. ¶¶ 182-83). IPP specifically allege that the "inflated and *supra*-competitive prices" for Alum caused them to sustain a concrete injury in increased costs which they would not have been subjected to "in the absence of Defendants' [allegedly] illegal conduct, combination or conspiracy." (IPP Compl. ¶¶ 183-84). To say that IPP have not pled an injury is simply nonsensical. Accordingly, the Court rejects Defendants' argument that IPP lack Article III standing for failing to plead an injury.

The Court also rejects Defendants' argument that the named IPP Plaintiffs lack standing to bring state law claims under the laws of a state in which they do not reside. (ECF No. 306-1 at 5). As IPP correctly note, the United States Supreme Court has made it clear that District Courts should defer addressing standing questions concerning putative class members who are not named until after class certification when certification of the class is "logically antecedent" to the issue of standing. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997). It is true that class certification here is "logically antecedent" to the issue of standing. This is because class discovery will unveil the various members of the currently unknown class. Indeed, this Court has previously ruled on a nearly identical issue and declined to rule on standing until the Court addresses class certification. *See In re Hypodermic Prods. Antitrust Litig.*, MDL No. 1730, 2007 WL 1959225, *15 (D.N.J. June 29, 2007)(Linares, J.) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 816 (1999)); *see also Warma Witter Kreisler, Inc. v. Samsung Electronics Am., Inc.*, Civ. No. 08-5380, 2009 WL 4730187 (D.N.J. Dec. 3, 2009)(Linares, J.) (citations omitted). Upon such revelation, the Court will be able to ascertain whether each of the 33 state-based claims has a proper representative who resides in the subject states and if those claims may proceed, even if the named

IPP Plaintiffs' claims become moot. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 413 (1980). Hence, dismissal at this juncture would be inappropriate.

**ii.      IPP Have Antitrust Standing**

Defendants also jointly argue that IPP Compl. should be dismissed since IPP do not have Antitrust standing. (ECF No. 306-1 at 7-16). More specifically, Defendants aver that each IPP has failed to allege sufficient facts to support standing under the various state antitrust statutes. (Id.). In making this argument, Defendants rely heavily on *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)(hereinafter "*AGC*"). According to IPP, adopting this argument would be a resurrection of the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which denied indirect purchasers a right to pursue federal antitrust actions. (ECF No. 337 at 46-47). IPP further note that the Supreme Court clearly has permitted states to reject *Illinois Brick* by way of state legislation and still permit indirect purchasers the right to sue under their state's antitrust laws. (Id.)

Indeed, the Supreme Court has directly addressed whether states may reject the *Illinois Brick* doctrine in *California v. ARC America Corp.*, 490 U.S. 93 (1989). *ARC* involved an antitrust action brought by the States of Alabama, Arizona, California, and Minnesota on behalf of themselves and classes of all governmental entities within each state. *ARC*, 490 U.S. at 98. The plaintiffs in *ARC* alleged that defendants therein partook in a nationwide conspiracy to fix the price of cement. *Id.* Additionally, similar to this case, some of the plaintiffs were indirect purchasers and alleged violations of their own states' antitrust laws. *Id.* "The District Court certified the actions as class actions and established a number of plaintiff classes. Between July 1979 and October 1981, several major defendants settled with the various classes, resulting in a settlement

43

fund in excess of $32 million. The settlements left distribution of the fund for later resolution, subject to approval of the District Court." *Id*. at 98-99.

The indirect purchasers sought payment approval from the settlement fund for their state law based claims. *Id*. at 99. The direct purchaser plaintiffs objected. *ARC*, *supra* at 99. The District Court "refused to allow the claims against the fund pursuant to state indirect purchaser statutes," relying on *Illinois Brick*, *supra*. *Id*. The Ninth Circuit affirmed and the indirect purchasers' petition for *certiorari* was granted. *Id*. The Supreme Court clarified that the complaints in the matter sought relief under both federal and state antitrust statutes. *Id*. at 100.

The Court recited the history and purpose of pre-emption and concluded that *Illinois Brick* did not preclude the indirect purchasers from maintaining antitrust claims pursuant to their state antitrust statutes. *Id*. at 100-06. According to the Court, state antitrust laws "are consistent with the broad purposes of the federal antitrust laws: deterring anticompetitive conduct and ensuring the compensation of victims of that conduct." *Id*. at 102 (citing *Illinois Brick*, *supra* at 746; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485-86 (1977)). The Court further noted that *Illinois Brick* dealt strictly with "what was the proper construction of § 4 of the Clayton Act." *Id*. at 103 (citations omitted). Hence, the Supreme Court concluded that "nothing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." *Id*.

*ARC*'s holding remains valid law and directly addresses the issue herein. IPP's antitrust claims are all based on various state antitrust statutes. (IPP Compl. ¶¶ 191-96(aa)). Those claims contain state-specific allegations that Defendants participated in a conspiracy designed to inflate the price of Alum and allocate customers in contravention of each state's specific antitrust statute.

(Id.).   When these allegations are read in conjunction with IPP's allegations regarding the conspiracy itself, it is apparent that IPP have properly alleged that the conspiracy caused them to sustain damages in the form of purchasing overpriced Alum from one or more direct purchasers. IPP are correct that "Defendants will have ample opportunity to challenge whether IPP can *prove* that the [alleged] collusive overcharges were passed on to and paid for by the class at the summary judgment stage, or at trial." (ECF No. 337 at 51).   At the pleadings stage this Court must accept IPP Compl. as true.   Thus, as noted above, the Court is satisfied that IPP have pled facts sufficient to support antitrust standing under each of the state-specific antitrust statutes.   Accordingly, Defendants' Motion to Dismiss based on lack of antitrust standing is hereby denied.

### F.  Sufficiency of the Allegations

Both corporate and individual Defendants assert that the claims asserted against each are insufficiently pled.   For purposes of clarity, the Court will analyze each of the four subject complaints separately below.

### i.  DPP Compl.[24]

Defendants Southern and USALCO move to dismiss DPP's single claim of violation of Section 1 of the Sherman Act asserting that DPP have not sufficiently pled a *prima facie* cause of action under the statute.   (ECF Nos. 249; 250-1).   Section 1 of the Sherman Act provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal

---

[24] The Court notes that on June 6, 2017, Defendant C&S filed a Motion to Withdraw its Motion to Dismiss DPP Compl. (ECF No. 394).   Said Motion was granted by the Court on June 7, 2017. (ECF No. 397).   Accordingly, DPP's claims against Defendant C&S shall proceed.   The Court also notes that GCC Defendants and Defendant GEO have not moved to dismiss DPP Compl. for insufficiency of the allegations, but rather only based on their previously discussed bankruptcies. *See supra* at III.A; *see also* ECF Nos. 244-1, 251-1.   Finally, the Court notes that no individual Defendant has moved to dismiss DPP Compl.   Thus, only Corporate Defendants Southern and USALCO are presently moving to dismiss DPP Compl.

shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 100,000,000 if a corporation, or, if any other person, $ 1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1. The Third Circuit has explained that there are four essential elements of a § 1 violation:

> (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action.

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997). Moreover, "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy,' '[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553. As a result, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556.

In this matter, the Court finds that DPP have sufficiently pled their claim under the Sherman Act. DPP Compl. is laden with ample facts to support each and every element laid out by the Third Circuit in *Queen City Pizza*. DPP provide a robust explanation of Alum and the Alum industry. (DPP Compl. ¶¶ 53-71). Therein, DPP explain that the Alum market is susceptible to collusion due to the fact that it is highly concentrated and has experienced heavy consolidation. (DPP Compl. ¶¶ 61-64). Furthermore, DPP allege that there is no practical substitute for Alum, thereby

46

restricting DPP's ability to avoid the supposedly inflated prices and requiring them to continue purchasing Alum from Defendants. (DPP Compl. ¶¶ 67-68).

Thereafter, DPP explain that Defendants, acting in concert, colluded to fix the price of Alum and allocate customers. (DPP Compl. ¶¶ 72-121). Some specific examples of collusion include various in-person meetings Defendants attended where the alleged conspiracy was discussed and plans for the furtherance of the alleged conspiracy were made. (DPP Compl. ¶¶ 76-80). DPP also include allegations of specific bid rigging instances which produced an anti-competitive market for Alum. (DPP Compl. ¶¶ 81-121). DPP also allege that Defendants' conduct was illegal as it violated Section 1 of The Sherman Act. (DPP Compl. ¶¶ 132-40). Finally, DPP have sufficiently alleged that they have been harmed by the Defendants' concerted effort to price fix Alum as they were forced to pay more for an item they needed to operate their businesses and/or municipalities. (DPP Compl. ¶¶ 135-38). Accordingly, DPP have pled all the requisite elements necessary to assert a *prima facie* cause of action for violation of Section 1 of the Sherman Act. Therefore, Defendants' Motions to Dismiss DPP Compl. is denied.

 **ii.**  **Shreveport Compl.**

As discussed, Shreveport Compl. contains two claims. The first is for violation of Section 1 of The Sherman Act and the second is for violation of Louisiana's Monopolies Act under La. Rev. Stat. § 51:122. (*See generally* Shreveport Compl.). Only GCC Defendants and Defendant GEO have moved to dismiss Shreveport Compl., and those Motions are based on those Defendants' Bankruptcies, which this Court addressed in III.A, *supra*. Since no other Defendant attacks the sufficiency of the allegations contained in Shreveport Compl. under Rule 12(b)(6) the action shall proceed in due course.

### iii.     Fl. Compl.

Plaintiff Florida's Compl. asserts the following causes of action: 1) Violation of Section 1 of The Sherman Act; 2) Violation of the Florida Antitrust Act; and 3) Violation of the Florida Deceptive and Unfair Trade Practices Act. (*See generally* Fl. Compl.). Both GCC Defendants and Defendant GEO moved to dismiss Fl. Compl. based on their respective Bankruptcies, which the Court addresses in III.A, *supra*. Additionally, Defendants GEO, C&S, and C&S Georgia also attack the sufficiency of the allegations within Fl. Compl. (*See* ECF Nos. 368, 369). C&S Defendants argue that Plaintiff Florida has failed to properly allege a *prima facie* claim under Section 1 of the Sherman Act, Florida's Antitrust Act, and Florida's Deceptive and Unfair Trade Practices Act. (ECF No. 368). Meanwhile, Defendant GEO argues that both the Federal and State Antitrust claims must be dismissed because Plaintiff Florida cannot recover damages on behalf of private businesses or entities, and because Plaintiff Florida allegedly cannot seek civil penalties under the Florida Antitrust Act. (ECF No. 369). Additionally, Defendant GEO avers that Plaintiff Florida has failed to plead a *prima facie* cause of action pursuant to the Florida Deceptive and Unfair Trade Practices Act. (Id.).

First, the Court rejects any arguments that Plaintiff Florida has insufficiently pled a claim under Section 1 of The Sherman Act. As with DPP Compl., Fl. Compl. contains more than sufficient allegations regarding the conspiracy and the Movants involvement in same. Just as with all the subject Complaints, Plaintiff Florida provides an explanation of Alum and the Alum market. (FL. Compl. ¶¶ 30-57). Plaintiff Florida then outlines Defendants' allegedly competitive conduct. (Fl. Compl. ¶¶ 58-103). Therein, Plaintiff Florida makes direct allegations regarding Movants.

Specifically, Plaintiff Florida alleges that Defendant GEO and C&S Defendants "conspired to circumvent competitive bidding and independent pricing and to raise [Alum] prices by submitting artificially inflated bids in Florida and elsewhere." (Fl. Compl. ¶ 58). Plaintiff Florida also alleges that "[e]xecutives from [Defendants] C&S Chemicals ... and GEO communicated with their competitors by telephone, email, or at meetings on at least hundreds of occasions. *These executives included [Defendant] GEO executive Brian Steppig ... and [Defendant] C&S Chemicals executive Rob Chandler.*" (Fl. Compl. ¶ 61)(emphasis added). Fl. Compl. then goes on to detail Defendant GEO's alleged conspiracy related acts performed in concert with GCC Defendants. (Fl. Compl. ¶¶ 62-69). Additionally, Plaintiff Florida describes C&S Defendants alleged efforts to further the conspiracy performed in concert with GCC Defendants. (Fl. Compl. ¶¶ 70-103).

All of the aforementioned allegations are detailed accounts of Movants involvement in the alleged conspiracy. For example, as to Defendant GEO, Plaintiff Florida alleges that Defendant GEO and GCC Defendants "agreed to allocate the liquid aluminum sulfate account of a pulp and paper manufacturer in Florida to [Defendant] GEO from 2004 to 2011, resulting in inflated revenues to [Defendant] GEO of approximately $2.9 million." (Fl. Compl. ¶ 67). As to C&S Defendants, Plaintiff Florida discusses how in late 2008 Defendant "Gupta assessed the competitive state of [GCC Defendants'] plants, including its plant in Tampa, Florida. [Defendant Gupta] indicated that [C&S Defendants] knew better than to compete with [GCC Defendants], and that [GCC Defendants] could therefore extract substantial price increases from its customers." (Fl. Compl. ¶ 74).

Accordingly, the Court is satisfied that Plaintiff Florida has sufficiently pled a *prima facie* cause of action for violation of Section 1 of The Sherman Act. Fl. Compl. contains more than

sufficient allegations that Movants acted in concert to fix and raise the price of Alum. Moreover, Fl. Compl. contains sufficient allegations that Movants achieved said result and that their alleged conspiracy was illegal. Finally, Fl. Compl. contains ample allegations regarding the damages Plaintiff Florida sustained, mainly in the form of paying for Alum at an artificially inflated price.

The Court is also satisfied that Plaintiff Florida has sufficiently pled a *prima facie* claim under the Florida Antitrust Act. Florida's Antitrust Act is analogous to The Sherman Act and is to be analyzed under the same set of rules and case law as federal antitrust laws. *See* Fla. Stat. §§ 542.16; 542.18; 542.32. Florida courts have held that courts should review Motions to Dismiss claims under the Florida Antitrust Act consistent with *Twombly*, *supra*. *See MYD Marine Distrib., Inc. v. Int'l Paint Ltd.*, 76 So. 3d 42, 47 n.4 (Fla. 4th DCA 2011); *see also St. Petersberg Yacht Charters, Inc. v. Morgan Yacht, Inc.*, 457 So. 2d 1028, 1032 (Fla. 2d DCA 1984)("the Florida legislature, has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act violations."). Hence, consistent with the finding that Plaintiff Florida sufficiently pled a *prima facie* cause of action under The Sherman Act against Movants, this Court finds that Plaintiff Florida has also pled a *prima facie* claim under the Florida Antitrust Act. Thus, at this juncture, this claim may not be dismissed.

Additionally, the Court finds that Plaintiff Florida has sufficiently pled its claim under the Florida Deceptive and Unfair Trade Practices Act. The parties agree that Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fl. Stat. § 501.204(1). "To prevail on a [Florida Deceptive and Unfair Trade Practices Act] claim, a plaintiff must establish: (1) a deceptive or unfair practice; (2) causation; and (3) damages."

*Dimattina Holdings, LLC v. Steri-Clean, Inc.*, 195 F. Supp. 3d 1285, 1291 (S.D. Fla. 2016). "A plaintiff can demonstrate a deceptive or unfair practice by showing either: (1) a representation, omission, or practice likely to mislead the consumer; or (2) violation of any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair practices." *Dimattina Holdings*, 195 F. Supp. 3d at 1291. When analyzing whether a claim may lie under the Florida Deceptive and Unfair Trade Practices Act, Courts are guided by federal antitrust laws. *See* Fla. Stat. § 501.204; *see also Mack v. Bristol-Meyer Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996)("a court should consider whether the [Fair Trade Commission] and federal courts deem such conduct to be an unfair method of competition or an unconscionable, unfair or deceptive act or practice under … the [Fair Trade Commission] Act" when attempting to analyze whether certain conduct violates the Florida Deceptive and Unfair Trade Practices Act). The *Mack* court found that "it is well established that collusive price-fixing constitutes a violation of section 5(a)(1) of the Fair Trade Commission Act." *Mack*, 673 So. 2d at 104.

Here, Plaintiff Florida has indeed sufficiently pled a claim under the Florida Deceptive and Unfair Trade Practices Act. This is because it has pled deceptive or unfair conduct on the part of Defendants. Specifically, Plaintiff Florida properly plead violations of both The Sherman Act and the Florida Antitrust Act. Consistent with the holding in *Mack*, both of these alleged violations constitute deceptive or unfair conduct, and, accordingly, Plaintiff Florida have met the first element of the claim. Additionally, Fl. Compl. also contains sufficient allegations regarding the damages Plaintiff Florida sustained as a result of Defendants' alleged conduct. (Fl. Compl. ¶ 106, 143-53). Hence, Plaintiff Florida has pled all three elements necessary to assert a claim under Florida's Deceptive and Unfair Trade Practices Act, and this Court will not dismiss same.

Finally, the Court is not persuaded by Defendant GEO's argument that Plaintiff Florida cannot recover damages on behalf of private entities or businesses, or the argument that Plaintiff is not entitled to seek civil penalties under the Florida Antitrust Act. First, Florida law provides the following:

> No action under [section 524.21(4) or s. 542.23 shall be commenced by the Attorney General against any person, who, at the time is a defendant in a suit filed by the United States for violation or alleged violation of the federal antitrust laws involving substantially the same subject matter and seeking the same relief.

Fla. Stat. § 524.21(4). Thus, this action would be precluded if: 1) Defendant GEO was a defendant in an action brought by the United States Government at the time Fl. Compl. was filed; 2) Plaintiff Florida sought the same relief in Fl. Compl. that the United States Government sought in the action it brought against Defendant GEO; and 3) both actions involved substantially the same subject matter. *Id.*

Here, that is simply not the case. As Plaintiff Florida correctly notes, Defendant GEO was not currently involved in any litigation with the United States at the time Fl. Compl. was filed. This is because Defendant GEO pled guilty to violations of The Sherman Act on June 16, 2016 and the action was terminated on June 21, 2016. (*See* Crim. No. 16-290). Meanwhile, Fl. Compl. was filed in January of 2017. Hence, no concurrent actions were pending against Defendant GEO that involved the United States at the time Plaintiff Florida brought its claim for violation of the Florida Antitrust Act. Moreover, the prior action between Defendant GEO and the United States was a criminal matter, where the Government sought criminal sanctions for Defendant GEO's conduct. Here, however, Plaintiff Florida seeks to recover civil damages. Accordingly, the type

of relief sought in both actions are not "substantially the same." Therefore, Plaintiff Florida is not barred from seeking civil penalties under the Florida Antitrust Act.

Finally, Defendant GEO is correct that Plaintiff Florida may not attempt to recover damages on behalf of private entities or businesses. *See* Fla. Stat. § 542.22(2). Plaintiff Florida concedes this point, but notes that it does not attempt to recover such damages. (ECF No. 373 at 30). Rather, the damages and various forms of injunctive relief sought in Fl. Compl. are on behalf of the State of Florida and its municipalities. (Fl. Compl. ¶¶ 126, 130-32, 134-35, 139-40, 142, 153(e)). Therefore, dismissal based on this argument is inappropriate as it is inapplicable to the claims asserted, and relief sought, by Plaintiff Fl.

### iv.    IPP Compl.

Aside from attacking IPP's antitrust claim under The Sherman Act, Defendants jointly move to dismiss IPP's state-law-based claims for "Violations of State Consumer Protection and Unfair and Deceptive Trade Practices Statutes" as well as IPP's state-law-based "Unjust Enrichment and Disgorgement of Profits" claims. (ECF No. 306). The Joint Motion to Dismiss advances different arguments for each state-law-based claim. (Id.).

### 1.   State-Law-Based Statutory Antitrust and Consumer Protection Claims

First, Defendants argue that Plaintiffs have not alleged a sufficient nexus between the purported antitrust conduct and certain states to satisfy those states' statutory requirements.[25] According to Defendants, the allegations are conclusory and fail to meet the requisite showing of

---

[25] This argument pertains to the following statutes: 1) California Unfair Competition Law; 2) District of Columbia Antitrust Act; 3) Kansas Restraint of Trade Act; 4) Massachusetts Consumer Protection Act; 5) Mississippi Antitrust Act; 6) Nebraska Junkin Act; 7) Nebraska Consumer Protection Act; 8) Nevada Unfair Trade Practices Act; 9) New Hampshire Consumer Protection Act; 10) New York Donnelly Act; 11) New York Deceptive Trade Practices Act; 12) North Carolina Unfair and Deceptive Trade Practices Act; 13) North Dakota Uniform State Antitrust Act; 14) South Dakota Antitrust Law; 15) Tennessee Trade Practices Act; 16) Vermont Consumer Fraud Act; and 17) West Virginia Antitrust Act. (ECF No. 306-1 at 16-17).

a nexus between Defendants' alleged conduct and the forum state. (ECF No. 306-1 at 16-20). However, this Court agrees with IPP that pleading intrastate conduct and allegations of nationwide price-fixing satisfies the nexus requirement for asserting claims under state antitrust and/or consumer fraud statutes. *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 407-08 (S.D.N.Y. 2011)(finding the nexus requirement satisfied when defendants' conduct was "in a continuous and uninterrupted flow of intrastate and interstate commerce."). Indeed, courts throughout the nation have found that pleading intrastate and interest commerce does in fact satisfy the nexus requirement for state-based statutory claims.[26]

The Court is satisfied that IPP have properly pled sufficient facts relating to interstate commerce such that they overcome Defendants' "nexus to the state" argument. IPP allege that the conspiracy took place across the United States and thereby implicates the statutory law of the seventeen states Defendants seek dismissal of. (IPP Compl. ¶¶ 2-11, 78-83, 117-19, 177). Moreover, IPP include allegations that show that Defendants' alleged conduct impacted IPP in their home states, which happen to also be the state-based claims Defendants seek to have dismissed. (*See, e.g.*, IPP Compl. ¶¶ 105-07, 117-19, 126-41). Accordingly, Defendant's "nexus to the state" argument fails, and this Court will not dismiss those statutory claims.

---

[26] *See In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 253 (D. Conn. 2015)(finding intrastate requirements satisfied by alleging interstate antitrust conduct in Mississippi, New York, Tennessee, and the District of Columbia); *In re Solodyn Antitrust Litig.*, 2015 WL 5458570, 16 (D. Mass. Sept. 19, 2016)( finding intrastate requirements satisfied by alleging interstate antitrust conduct in the District of Columbia, Massachusetts, Mississippi, Nevada, New York, New Hampshire, Oregon, and West Virgina); *in re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 698-99 (E.D. Pa. 2014)(finding intrastate requirements satisfied by alleging interstate antitrust conduct in the District of Columbia, Kansas, North Carolina, North Dakota, South Dakota, Tennessee, and West Virginia); *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 888-901 (E.D. Mich. 2014)(finding that indirect purchasers' claims under Nebraska's antitrust and Vermont's consumer fraud laws were sufficient since indirect purchasers alleged a price-fixing conspiracy which eliminated competition); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 540-41 (E.D. Pa. 2010)(holding that allegations that defendant therein sold a significant amount of the subject product in North Carolina satisfied the interstate requirement).

Defendants next argue that IPP's claims under the Illinois Antitrust Act, Alabama Deceptive Trade Practices Act, and South Carolina Unfair Trade Practices Act must be dismissed because, under those statutes, these claims may not be maintained as class actions. (ECF No. 306 at 20-21, 29-30). However, Defendants' argument fails to appreciate United States Supreme Court precedent. Specifically, Defendants' argument does not acknowledge *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). There, the Supreme Court held that, despite the fact that a state statute prohibits certain matters from proceeding as class action, such a bar does not apply to federal law suits. *Shady Grove*, 559 U.S. at 398. The Court's ruling relied on Rule 23 of the Federal Rules of Civil Procedure, holding that Rule 23 did not "abridge, enlarge or modify" any substantive right under the statute. *Id.* at 398. Thus, while the subject statutes may prohibit the Illinois, Alabama, and South Carolina statutory claims from proceeding as class actions, such a bar is inapplicable to this action. Accordingly, the Court rejects Defendants' argument regarding same.

Next, Defendants argue that IPP may not maintain a claim under the Arkansas Deceptive Trade Practices Act because the statute does not list "price-fixing" as an actionable claim under the statute. (ECF No. 306-1 at 21)(citing Ark. Code Ann. §§ 4-88-101, *et seq*.). However, Defendants' argument does not take into account that the Arkansas Deceptive Trade Practices Act explicitly states that the "deceptive and unconscionable trade practices listed [therein] are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of" Arkansas. Ark. Code Ann. § 4-88-107(b). Hence, the mere fact that "price-fixing" is not enumerated in the Arkansas Deceptive Trade Practices Act does not render such a claim non-actionable under same. *See Baptist Health v. Murphy*, 226 S.W.3d 800, 811 (Ark.

2006)(affirming the Circuit Court's finding that the "Arkansas Deceptive Trade Practices Act …
*makes illegal any trade practice which is unconscionable, which includes conduct violative of*
public policy or *statute*.")(internal citations and quotations omitted)(emphasis added).

Defendants' reliance on *Depriest v. Astrazeneca Pharms., L.P.*, 2008 WL 3243562 (Ark.
Cir. Ct. Jul. 31, 2008), *aff'd*, 351 S.W.3d 168 (Ark. 2009) is misplaced for two reasons.  First, that
case related to fraudulent marketing and not price-fixing.  *See Depriest*, 2008 WL 3243562, *1-2.
Moreover, to the extent that a "price-fixing" claim was raised in *Depriest*, that claim relied on a
different provision of the Arkansas Code, Ark. Code Ann. § 4-75-309, which does in fact prohibit
a private right of action.  *Id.* at 6.  IPP's price-fixing claim, however, relies on Ark. Code. Ann. §
4-88-101.  Hence, *Depriest* is inapplicable to this case, and Defendants' argument fails as it
pertains to the Arkansas Deceptive Trade Practices Act.

The following argument advanced by Defendants is that IPP may not sustain a claim under
the Colorado Consumer Protection Act because, Defendants aver, Plaintiffs have not suffered
"injury in fact to a legally protected interest."  (ECF No. 306-1 at 22).  The parties agree that the
standard for asserting a claim under the Colorado Consumer Protection Act has been clearly stated
in *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo.
2003).  There, Supreme Court of Colorado held that a plaintiff asserting a claim under the Colorado
Consumer Protection Act must allege the following elements: 1) the defendant engaged in an
unfair or deceptive trade practice; 2) in the course of its business; 3) significantly impacting the
public as actual or potential customers; 4) the plaintiff suffered an injury in fact to a legally
protected interest; and 5) the practice caused the injury.  *Rhino*, 62 P.3d at 146-47.

The Court is satisfied that IPP Compl. meets the above standard and that IPP have stated a *prima facie* claim under the Colorado Consumer Protection Act. As discussed in detail herein, IPP have made allegations regarding Defendants' supposed illegal conduct and the purported conspiracy. Moreover, IPP have alleged that Defendants' unfair trade practices were in the form of price-fixing and customer allocation and that the conduct occurred during the course of Defendants' business. (IPP Compl. ¶¶ 197-200). Finally, IPP Compl. contains sufficient allegations that IPP suffered injury as "end use purchasers" of Alum as a result of Defendants' purported illegal conspiracy. (IPP Compl. ¶¶ 213-16). Accordingly, IPP have met the above standard and their claim under the Colorado Consumer Protection Act cannot be dismissed at the Motion to Dismiss phase.

Defendants further argue IPP cannot maintain a claim under the District of Columbia Consumer Protection Procedures Act because IPP are not "consumers" as defined by the Act. This argument relies on Defendants' assertion that District of Columbia courts have held that a consumer is a person "who receives or demands goods or services that are primarily for personal, household, or family use." *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043 (D.C. Cir. 2010). However, this argument does not take into account the D.C. Appellate Court's holding that if "the purchaser is not engaged in the regular business or purchasing this type of goods or service and reselling it, then the transaction will usually fall within the Act." *Adam A. Weschler & Son, Inc. v. Klank*, 531 A.2d 1003, 1005 (D.C. Ct. App. 1989). While this Court is not absolutely certain that IPP will be able to prevail on their District of Columbia Consumer Protection Procedures Act, as they ultimately may be found to not be consumers, that is not the task at hand. IPP Compl., read as true, sufficiently states a claim to proceed. IPP allege that they purchased Alum, that the

purchased Alum was not for resale, and that Defendants conspired to fix the price of Alum in order to cause consumers, including IPP, to pay higher prices. (IPP Compl. ¶¶ 19-20, 174, 197-200, 217-20). These allegations are sufficient to survive Defendants' Motion to Dismiss.

Additionally, Defendants argue that IPP's Florida Deceptive and Unfair Trade Practices Claim must be dismissed because it fails to meet the heightened pleading standard of Fed. R. Civ. P. 9(b). (ECF No. 306-1 at 24). This argument relies mainly on *Wrestlerunion, LLC v. Live Nation Television Holdings, Inc.*, 2008 WL 3048859, *3 (M.D. Fla. Aug. 4, 2009). However, reliance on *Wrestlerunion* is misplaced as that matter was a contract case with allegations of fraudulent inducement, which implicated Rule 9(b). *See generally Wrestlerunion.* As a matter of fact, Florida Courts have held that the heightened pleading requirements of Rule 9(b) are not applicable to claims under the Florida Deceptive and Unfair Trade Practices Act. *See, e.g., Galstaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045, 1058 (S.D. Fla. 2009)(refusing to apply Rule 9(b) to claims under the Florida Deceptive and Unfair Trade Practices Act). Here, the Court is satisfied that IPP have made allegations that Defendants' conduct was deceptive, which caused IPP to pay more for Alum in the State of Florida, to their detriment. (IPP Compl. ¶¶ 169(d), 177, 221-23). Hence, the Court denies Defendants' Motion to Dismiss IPP's claim under the Florida Deceptive and Unfair Trade Practices Act.

As to the Hawaii Antitrust Claim, Defendants jointly assert that the claim must fail because the Hawaii Attorney General has the first right of refusal. (ECF No. 306-1 at 25). Defendants rely on Haw. Rev. Stat §§ 480-2, 480-13.3, which states that private actions under Hawaii's Antitrust statute is only permitted after notice is given to the State's Attorney General. While IPP do not seem to wholly agree with this notion, since they do argue that Hawaii's pre-suit notice

requirements are inapplicable to federal actions, they do note that they have served pre-suit notice on the Hawaii Attorney General on May 24, 2016. (ECF No. 337 at 79). Therefore, the Hawaii Antitrust statutory requirements have been met and the claim is sustained at this juncture.

Next, Defendants assert that IPP's claim under the New Mexico Unfair Trade Practices Act fails because IPP do not allege an "unconscionable act," which is required by the statute. (ECF No. 306-1 at 25-26). The parties agree that an "unconscionable act" under the statute requires allegations of "a gross disparity between the value received … and the price paid." *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, *9 (N.D. Ill. 2009)("Federal courts have generally permitted claims under the New Mexico Unfair Practices Act in price fixing cases if the plaintiff alleges a gross disparity between the price paid for the product and the value received."); *see also In re Domestic Drywall Antitrust Litig.*, MDL No. 13-2437, 2016 WL 3769680, *10 (E.D. Pa. Jul 13, 2016). IPP have done just that by alleging "[t]here was a *gross disparity* between the price that [IPP] paid for [Alum] and the value of [Alum] received." (IPP Compl. ¶ 199). In fact, IPP make explicit allegations of "gross disparity" directly in the sub-count where they assert their claim under the New Mexico Unfair Practices Act. (*See* IPP Compl. ¶¶ 238, 240). These allegations, along with allegations of *supra*-competitive prices (*see* IPP Compl. ¶¶ 2, 9, 148, 170, 182-83, 191, 240), are more than sufficient to overcome a Motion to Dismiss. Accordingly, the Court will not dismiss IPP's New Mexico Unfair Practices Act claim.

The next argument advanced by Defendants is that IPP do not have a claim under the Oregon Unfair Trade Practices Act because the statute "does not provide a cause of action for antitrust claims" and does not apply to indirect purchasers. (ECF No. 306-1 at 26-27)(citing Or. Rev. Stat. §§ 646.607-08, 646.725). The parties agree that there are no cases discussing whether

indirect purchasers may maintain a price-fixing claim under the Oregon Unfair Trade Practices Act. (ECF No. 306-1 at 26-27 *cf.* ECF No. 337 at 81). However, this Court agrees with IPP's assessment that the Act is to be liberally construed in order to maximize protection of consumers. *See CollegeNet, Inc. v. Embard.Com, Inc.*, 230 F. Supp. 2d 1167, 1173 (D. Ore. 2001). Additionally, the Act is designed to prevent "false or misleading representations of fact" relating to the consumer's cost for goods. Or. Rev. Stat. § 646.608(s).

IPP Compl. contains such allegations, such as the allegation that "raw material cost increases were cited as" as the reason Alum's price was increasing (IPP Compl. ¶ 71); a statement IPP assert was utterly false. IPP also allege that at least one Defendant starkly increased its price for Alum and misrepresented that the increase was due to "worldwide competition and fuel and energy cost used to manufacture and transport" Alum. (IPP Compl. ¶ 119). Finally, IPP allege that Defendants took active steps to prevent their customers from learning about their purported misrepresentations and false statements. (IPP Compl. ¶ 189). The Court believes that these allegations are sufficient to sustain a claim under the Oregon Unfair Trade Practices Act.

Defendants further argue that IPP may not maintain a claim under the Rhode Island Unfair Trade Practices and Consumer Protection Act because this claim is a "repackaging" of IPP's antitrust claim. (ECF No. 28-29). This argument relies on two premises. First, Defendants rely on prior arguments that IPP do not have standing to bring an antitrust claim under Rhode Island law. (Id. at 28). However, the Court has disposed of this argument in Section III.E.i, *supra*, and need not readdress same herein.

Next, Defendants argue that IPP's Rhode Island Unfair Trade Practices and Consumer Protection Act claim is merely one for price-fixing, which, Defendants assert, is not actionable

under said Act. (Id. at 28-29)(citing R.I. Gen Laws § 3-13-1.1, *et seq.*). The following factors have been used to ascertain whether a plaintiff has successfully asserted a claim of "unfairness" under the Rhode Island Unfair Trade Practices and Consumer Protection Act:

> (1)   whether the practice affronts public policy, as delineated by the common law, statutes, and other established concept[s] of unfairness;
> (2)   whether it is immoral, unethical, oppressive, or unscrupulous; [and]
> (3)   whether it causes substantial injury to consumers.

*In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 586 (M.D. Pa. 2009)(internal citations and quotation marks omitted). The Court went on to find that "[t]hese factors encompass price-fixing injuries, and consumers subject to collusive pricing possess a cognizable claim under the [Rhode Island Unfair Trade Practices and Consumer Protection Act.]" *Id.* Additionally, other courts throughout the nation have permitted price-fixing claims to proceed under the subject Act. *See*, *e.g.*, *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, *16 (E.D. Mich. 2013); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1129-30 (N.D. Cal 2008). Additionally, the case Defendants rely on, *In re Dynamic Random Access Memory ("DRAM")*, 516 F. Supp. 2d 1072, 116 (N.D. Cal. 2007) initially did not sustain the price-fixing claim under the Act. However, after plaintiffs therein amended their complaint to allege violations of statutory prohibitions on price-fixing and unscrupulous conduct by defendants to cause injury to consumers in Rhode Island, the Court allowed the claim to proceed. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1145 (N.D. Cal. 2008).

Here, as discussed in detail above, IPP have alleged a statutory violation; specifically, IPP allege a violation of The Sherman Act. (IPP Compl. ¶¶ 191-96). That claim alleges Defendants engaged in a conspiracy to illegally fix the price of Alum and improperly allocate customers among

61

themselves. (Id.). IPP further allege that Defendants' purportedly illegal and unscrupulous conduct caused consumers in the State of Rhode Island to be injured as they were forced to pay a higher price of Alum. (IPP Compl. ¶¶ 255-58). Accordingly, IPP have properly pled a claim under the Rhode Island Unfair Trade Practices and Consumer Protection Act, and the Court will not dismiss the claim at this point in the litigation.

Finally, Defendants assert that IPP may not maintain a claim under the Utah Antitrust Act because IPP are not citizens of Utah. (ECF No. 306-1 at 30)(citing Utah Code Ann. 1953 § 76-10-3101, *et seq.*). IPP agree that under the Utah Antitrust Act, indirect purchasers may recover damages for antitrust violations only if they are citizens or residents of Utah. (ECF No. 337 at 67)(citing Utah Code Ann. 1953 § 76-10-3109(1)(a)). However, IPP correctly note that IPP Compl. "asserts claims under Utah Law on behalf of class members who are citizens or residents of Utah and made purchases in Utah." (ECF No. 337 at 67)(citing IPP Compl. ¶ 174). Indeed, allegations that "members of the putative class presumably include Utah citizens and residents" are sufficient to overcome a motion to dismiss indirect purchases claims under the Utah Antitrust Act when said allegations assert that said "members of the putative classes made purchases in Utah." *In re Asacol Antitrust Litig.*, 2016 WL 4083333, *13 (D. Mass. July 20, 2016). Accordingly, IPP have asserted a *prima facie* claim under the Utah Antitrust Act, and the Court will not dismiss said claim at this juncture.

### 2. State-Law-Based Unjust Enrichment and Disgorgement of Profit Claims

Defendants advance three arguments in favor of dismissing IPP's unjust enrichment claims. First, Defendants argue that IPP's unjust enrichment claims must fail because said claims are merely a "repackaging" of IPP's antitrust claims. (ECF No. 306-1 at 32-34) This argument

fails at the motion to dismiss phase because a plaintiff is entitled to plead causes of action in the alternative. (*See* ECF No. 337 at 85-86). Pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure, a party "may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2); *see also Verizon N.J., Inc. v. Ntegrity Telecontent Servs., Inc.*, 219 F. Supp. 2d 616, 635 (D.N.J. 2002). Therefore, Defendants' argument that IPP's unjust enrichment claims are duplicative fails.

Next, Defendants assert that IPP do not plead the essential elements for unjust enrichment claims. (ECF No. 306-1 at 31-32). To assert a *prima facie* cause of action for unjust enrichment a plaintiff must allege that: "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying for it." *In re K-Dur*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004)(citing Restatement of Restitution § 1 (1937)); *see also VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (N.J. Sup. Ct. 1994)(stating that a plaintiff seeking to assert a claim for unjust enrichment must establish that "defendant received a benefit[,] and that retention of that benefit without payment would be unjust[,] ... [and plaintiff] expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.").[27]

Here, IPP Compl. contains all the requisite elements to assert an unjust enrichment claim. IPP allege that at their expense, Defendants gained a benefit. (*See, e.g.*, IPP Compl. ¶¶ 269-77).

---

[27] The Court notes that there are no material differences between jurisdictions regarding the law of unjust enrichment. Accordingly, the Court's analysis is the same under New Jersey law. *See Tele Aid*, 257 F.R.D. at 58 ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict.").

Therein, IPP Allege that they have conferred an economic benefit to Defendants, by way of profits to Defendants, and that those profits came at the expense of IPP. (IPP Compl. ¶ 270). IPP further allege that it would be futile for them to seek a remedy from any party with whom Defendants had privity of contract with. (IPP Compl. ¶ 271). Moreover, IPP allege that the economic benefit Defendants obtained was derived from their artificially inflated Alum prices and that said benefit was rightfully IPP's. (IPP Compl. ¶¶ 273-74). The Court finds that these generalized allegations, along with the state-specific unjust enrichment allegations (IPP Compl. ¶¶ 278-413), are sufficient to maintain a *prima facie* cause of action for unjust enrichment and declines to dismiss same.

Finally, Defendants assert that IPP have failed to plead the state-specific elements for each state-law-based unjust enrichment claim. (ECF No. 306-1 at 31-32). However, the Court is not persuaded by this argument. Defendants, without citation of law, argue that IPP have failed to reference and/or plead state-specific elements for their unjust enrichment claims. (Id.). Yet, a thorough review of IPP Compl. leads to a different conclusion. IPP dedicate nearly 20 pages to their unjust enrichment claims, where they make different allegations for each and every state. (*See* IPP Compl. 58-79).

For example, IPP's Alabama unjust enrichment claim asserts that Defendants earned an economic benefit by charging monopolistic and artificially inflated prices for Alum, that said benefits to Defendants rightfully belonged to IPP, and that Defendants' benefit was earned to IPP's detriment. (IPP Compl. ¶¶ 278-80). Meanwhile, for IPP's Arizona unjust enrichment claim IPP allege that "Defendants derived [an economic benefit by] charging monopolistic and artificially inflated prices for" Alum, that said financial benefits belonged to IPP who paid the artificially inflated and anticompetitive prices to their detriment. (IPP Compl. ¶¶ 281-82). While these

64

allegations may seem identical, IPP continue to make additional allegations in support of their Arizona unjust enrichment claim.  Indeed, IPP then allege that they "have been impoverished by the overcharges for" Alum and that "Defendants' enrichment and [IPP's] impoverishment are connected," and that IPP "have no remedy at law." (IPP Compl. ¶¶ 283-85).  Additionally, IPP allege that Defendants' enrichment occurred "because of Defendants' illegal activities was without legally cognizable justification" and that "[t]o the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' [alleged] illegal profits from the sale of [Alum] to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit of Arizona indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefit of their sales of [Alum] at illegally inflated prices." (IPP Compl. ¶ 286).

When comparing these two claims, the Court is satisfied that IPP did not merely repeat the same allegations for the Alabama and Arizona unjust enrichment claims.  The same remains true with the balance of IPP's unjust enrichment claims.  (IPP Compl. ¶¶ 290-413).  Each of the various unjust enrichment claims contain specific allegations that pertain to that state's law.  Hence, the Court will not dismiss the unjust enrichment claims for lack of specificity or vagueness.

## CONCLUSION

For the aforementioned reasons, Defendants' Motions to Dismiss (ECF Nos. 244-1, 249, 250, 255-1, 298, 299-1, 304-1, 306-1, 308, 310, 311, 366-1, 368, 369, 372) Plaintiffs' Complaints are hereby denied.  An appropriate Order accompanies this Opinion.

DATED: July 20, 2017

JOSE L. LINARES
Chief Judge, United States District Court

65