William L. Mentlik
Roy H. Wepner
Aaron S. Eckenthal
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel:    908.654.5000
Fax:    908.654.7866

*Liaison Counsel for Indirect Purchasers*

| | | |
|---|---|---|
| IN RE: LIQUID ALUMINUM SULFATE ANTITRUST LITIGATION | : : : | **Document Filed Electronically** |
| | : | Civil Action No. 16-md-2687-JLL-JAD |
| This Document Relates to: | : | (MDL 2687) |
| *City of Homestead, Florida v. General Chemical Corporation et al.* | : : | |
| Civil Action No. 16-2873-JLL-JAD | : | District Judge Jose L. Linares |
| | : | Magistrate Judge Joseph A. Dickson |
| | : | |
| | x | **JURY TRIAL DEMANDED** |

## INDIRECT PURCHASER PLAINTIFFS'
## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1.      Indirect Purchaser Plaintiffs, City of Homestead, Florida, and City of Creston

Water Works Department (collectively, "Plaintiffs"), individually and on behalf of a class of all

indirect purchasers of liquid aluminum sulfate ("LAS" or "Alum") who are similarly situated,

bring this action to recover damages for violations of state antitrust and consumer protection

statutes and for unjust enrichment against Defendants General Chemical Corporation, General

Chemical Performance Products, LLC, General Chemical LLC, GenTek Inc., Chemtrade

Logistics Income Fund, Chemtrade Logistics Inc., Chemtrade Chemicals Corporation,

Chemtrade Chemicals US, LLC, Chemtrade Solutions, LLC (collectively, "GenChem"), C&S

Chemicals, Inc., GEO Specialty Chemicals, Inc., USALCO, LLC, Kemira Chemicals, Inc.,

Southern Ionics, Inc., Frank A. Reichl, Brian C. Steppig, Vincent J. Opalewski, Alex

Avraamides, Amita Gupta, Kenneth A. Ghazey, Milton Sundbeck (hereinafter referred to as "Defendants"), along with Defendants' co-conspirators, which are or were operating in the market known as liquid aluminum sulfate in the United States between as early as January 1, 1997 and continuing until the anticompetitive effects of Defendants' unlawful conduct ceases (the "Class Period"). All allegations made in this Consolidated Complaint are based upon information and belief or investigation of counsel, except those allegations that pertain to Plaintiffs, which are based on personal knowledge.

## INTRODUCTION

2. This case arises from a conspiracy to suppress and eliminate competition by allocating customers and territories, fixing prices, and rigging bids for LAS, a coagulant used: (1) to treat drinking and waste water; (2) to alter the pH of soil; (3) to clarify and to control algae growth in lakes, ponds and other water features; (4) to fix dyes to textiles; (5) as a litter amendment for ammonia control in poultry houses; and (6) in the manufacturing of pulp and paper. Plaintiffs bring this multi-state indirect-purchaser antitrust and consumer class action against Defendants for engaging in that conspiracy to suppress and eliminate competition in the sale and marketing of LAS, by agreeing to allocate customers and rig bids for, and to raise, stabilize, and maintain the price of LAS sold in the United States, all of which was intended to, and did, cause Plaintiffs and the other members of the Class to pay artificially inflated and supra-competitive prices for LAS.

3. Indirect purchasers purchase LAS through intermediary distributors, resellers, retailers, wholesalers, and chemical supply companies.

4. LAS is usually sold to direct purchasers and distributors by the ton. The distributor or chemical supply company may sell the LAS in smaller volumes to its customers.

For large indirect purchasers the distributor or chemical supply company may arrange for the product to be drop shipped to the indirect purchaser from the manufacturing plant.

5.      During the Class Period, Defendants and their co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the sale and marketing of LAS by agreeing to allocate customers and territories and fix, stabilize, and maintain the price of LAS sold to direct purchasers and distributors in the United States.

6.      Defendants agreed to "stay away" from each other's "historical" customers and territories.  Defendants recognized that it was "better business for everyone to work together instead of competing and ruining the market place."

7.      The documentary evidence, criminal indictments, and guilty pleas relating to the conspiracy (which, among other things, include specific and detailed communications between and among Defendants' executives and employees) show that Defendants: (1) agreed to allocate customers and fix prices; (2) rigged bids to direct purchasers of LAS; and (3) actively policed each other to ensure compliance with the conspiracy and punish cheating.

8.      This evidence shows that Defendants routinely met and communicated with each other to conspire and ensure compliance with the conspiracy.   Defendants' regular communications with each other created an industry culture where there was no inhibition about discussing customer allocation and prices for LAS.  Expense reports, phone records, and emails demonstrate that Defendants furthered the conspiracy by (a) communicating with each other about pricing, customers, and particular bids; (b) agreeing to submit intentionally high "throw-away" bids to a particular customer to ensure that their "competitor," the existing seller to that customer, would continue to "win" that customer's business (or to help that "competitor raise the prices paid by that customer), and (c) in instances where they inadvertently submitted a winning

bid or price quote against a supposed "competitor," withdrawing the winning bid or price quote, returning the customer to the original supplier the following year, or allowing that "competitor" to win business from another customer.

9.     As a result of these efforts, Defendants were able to raise or maintain the price of LAS at supra-competitive levels.  Data on bids produced to Plaintiffs in discovery confirms that bidding throughout the Class Period was infected by Defendants' collusion. The documentary and other evidence provided to Plaintiffs also establishes that Defendants' bid-rigging, market allocation and other anticompetitive conduct resulted in the sale of LAS to wholesalers, distributors and other resellers at artificially inflated and supra-competitive prices. Those artificially inflated and supra-competitive prices were passed on by such wholesalers, distributors and other resellers to Plaintiffs and the Class, causing Plaintiffs and the Class to pay higher prices for LAS than they would have absent Defendants' unlawful behavior.

10.     Two Defendants have already pled guilty to participating in the conspiracy, and two other Defendants are under criminal indictment by the United Stated Department of Justice.

11.     The combination and conspiracy engaged in by Defendants and co-conspirators violated the antirust and/or consumer protection and unfair and deceptive trade practices statutes, as well as the common law principle of unjust enrichment, of the following jurisdictions: Alabama, Arkansas, Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

## JURISDICTION AND VENUE

12.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from at least one Defendant.  This Court also has supplemental jurisdiction over the Class' state law claims under 28 U.S.C. § 1367.

13.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and under 28 U.S.C. § 1391(b) and (c), because Defendants reside, transact business or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

14.     This Court has *in personam* jurisdiction over each Defendant because they either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of LAS throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; (d) each Defendant acted as the agent for each other participant in the conspiracy and carried on the action on behalf of the conspiracy in each state in this Class; or (e) were engaged in an illegal price-fixing, bid rigging and market allocation conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

15.    Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

16.    The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

17.    Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Class.  Defendants directly and through their agents, engaged in activities to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for LAS, which conspiracy unreasonably restrained trade and adversely affected the market for LAS.

18.    Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who indirectly purchased LAS, including Plaintiffs and the Class.

### I.    PLAINTIFFS

19.    City of Homestead, Florida ("Homestead") is a Florida municipality located in Miami-Dade County, Florida.  During the Class Period, Homestead indirectly purchased, not for resale, LAS, which was produced by one or more Defendants.  Homestead primarily purchased LAS for purposes of wastewater treatment.  As a result of Defendants' unlawful conduct alleged herein, the prices Homestead paid for LAS were greater than the prices it would have paid in the absence of Defendants' unlawful conduct.  Homestead has therefore been injured by reason of Defendants' antitrust and consumer protection and unfair and deceptive trade practices statute violations.

20.     City of Creston Water Works Department ("Creston") is a utility located in Union County, Iowa.  During the Class Period, Creston indirectly purchased, not for resale, LAS, which was produced by one or more Defendants.  As a result of Defendants' unlawful conduct alleged herein, the prices Creston paid for LAS were greater than the prices it would have paid in the absence of Defendants' unlawful conduct.  Creston has therefore been injured by reason of Defendants' antitrust and consumer protection and unfair and deceptive trade practices statute violations.

## II.     CORPORATE DEFENDANTS

### A.     GenChem

21.     General Chemical Corporation ("General Chemical") was a Delaware corporation with its principal place of business at 90 E. Halsey Road, Suite 301, Parsippany, New Jersey, 07054. General Chemical manufactured a broad line of organic and inorganic chemicals for a wide variety of industries and applications, including LAS for water treatment and other applications.

22.     General Chemical Performance Products LLC ("GCCPP") was a Delaware limited liability company during the Class Period, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey.  GCCPP was at all relevant times a wholly owned subsidiary of General Chemical.

23.     General Chemical LLC ("GenChem LLC") was a Delaware limited liability company during the Class Period, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey.  GenChem LLC was at all relevant times a wholly-owned subsidiary of GCCPP.

24.     GenTek, Inc. ("GenTek") was a Delaware corporation, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey. GenTek was formed in April 1999 as

a way for General Chemical's then parent to spin off its non-commodity chemical business, including water treatment chemicals, into a new publicly traded company. General Chemical was a wholly owned and controlled subsidiary of GenTek. At all relevant times, as General Chemical's parent company, GenTek was fully aware of General Chemical's role and participation in its unlawful price-fixing and market allocation conspiracy as described herein.

a.  Around October 11, 2002, GenTek filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware, including bankruptcy filings on behalf of its subsidiaries, including General Chemical Corporation. Effective October 7, 2003, GenTek and General Chemical Corporation were discharged from bankruptcy under a plan of reorganization. GenTek and General Chemical Corporation participated in the conspiracy alleged herein throughout the Class Period through the actions of many of GenTek's and General Chemical's senior executives.

b.  After their discharge from bankruptcy, GenTek and General Chemical reaffirmed their participation in the conspiracy, in part by continuing to engage in the conduct described herein with respect to LAS. Specific post-discharge actions taken by GenTek and General Chemical in furtherance of the conspiracy are alleged herein and are consistent with the actions taken by all of the Defendants, GenTek, and General Chemical throughout the Class Period.

c.  Plaintiffs have been found to be known creditors at the time of certain Defendants' bankruptcies and that, therefore, those Defendants provided insufficient notice to discharge Plaintiffs' claims under the Bankruptcy Code. Specifically, on July 20, 2017 this Court held that, "Plaintiffs have sufficiently pled that Defendants GEO and GCC Defendants were aware of their alleged conspiracy, took overt steps to keep the conspiracy a secret, and

failed to provide all Plaintiffs with sufficient notice regarding their Bankruptcies consistent with due process." Additionally, on December 4, 2017 Judge Gambardella of the United States Bankruptcy Court for this District explicitly held, for multiple reasons, that a Plan and Confirmation Order stemming from these bankruptcies "do not bar Plaintiffs' claims … that arose prior to the Effective Date of the Plan of Reorganization." This Complaint, therefore, seeks to recover damages from GenTek and General Chemical for conduct throughout the Class Period.

25.    Chemtrade Logistics Income Fund ("CLIF"), located at 155 Gordon Baker Road, Suite 300 Toronto, Ontario, Canada M2H 3N5, is a Canadian provider of industrial chemicals and services to customers in North America and around the world. CLIF is publicly traded and listed on the Toronto Stock Exchange. Effective December 2013, CLIF and its wholly owned subsidiaries Chemtrade Logistics Inc., Chemtrade Chemicals Corporation, and Chemtrade Chemicals US, LLC, and Chemtrade Solutions, LLC (collectively, "Chemtrade") acquired all of the outstanding shares of ASP GT Holding Corp. (the "American Securities Entity"), thereby assuming all of that company's liabilities as well as those of its General Chemical-related subsidiaries. As the legal successor in interest to General Chemical, Defendants Chemtrade and CLIF assumed the liability for damages flowing from the conspiracy to fix prices, allocate customers, and rig bids.

26.    Chemtrade Chemicals Corporation ("Chemtrade Chemicals") is a Delaware corporation with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey. It is a wholly owned and controlled subsidiary of Defendant Chemtrade Logistics and is a successor in interest to General Chemical.

27.    Chemtrade Chemicals US LLC ("Chemtrade Chemicals US") is a Delaware limited liability company with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey.  It is a wholly owned and controlled subsidiary of Defendant Chemtrade Chemicals and is a successor in interest to General Chemical.

28.    Chemtrade Solutions, LLC ("Chemtrade Solutions") is a Delaware limited liability company with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey.  It is a wholly owned and controlled subsidiary of Defendant Chemtrade Chemicals and is a successor in interest to General Chemical.

**B.    C&S**

29.    C&S Chemicals, Inc. ("C&S") is a privately held Pennsylvania corporation with its principal place of business at 4180 Providence Road, Marietta, Georgia.  C&S specializes in the production of LAS and sodium aluminate and currently operates six manufacturing facilities in Florida, Georgia, South Carolina, Illinois, and Minnesota.  During the Class Period, directly or through its subsidiaries and affiliates, C&S sold LAS throughout the United States.

**C.    GEO**

30.    GEO Specialty Chemicals, Inc. ("GEO") is a privately held Ohio corporation with its corporate headquarters in Ambler, Pennsylvania, and its corporate finance headquarters in Lafayette, Indiana. During the Class Period, directly or through its subsidiaries and affiliates, GEO sold LAS throughout the United States.

31.    Around March 18, 2004, GEO filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey.  Effective December 20, 2004 GEO was discharged from bankruptcy under a plan of reorganization.  GEO participated in the conspiracy alleged herein throughout the Class Period through the actions of many of GEO's senior executives.

32.    After its discharge from bankruptcy, GEO reaffirmed its participation in the conspiracy, in part by continuing to engage in the conduct described herein with respect to LAS. Specific post-discharge actions taken by GEO in furtherance of the conspiracy are alleged herein and are consistent with the actions taken by all Defendants and GEO throughout the Class Period.

33.    Plaintiffs have been found to be known creditors at the time of certain Defendants' bankruptcies and that, therefore, those Defendants provided insufficient notice to discharge Plaintiffs' claims under the Bankruptcy Code.  Specifically, on July 20, 2017 this Court held that, "Plaintiffs have sufficiently pled that Defendants GEO and GCC Defendants were aware of their alleged conspiracy, took overt steps to keep the conspiracy a secret, and failed to provide all Plaintiffs with sufficient notice regarding their Bankruptcies consistent with due process."  Additionally, on December 4, 2017 Judge Gambardella of the United States Bankruptcy Court for this District explicitly held, for multiple reasons, that a Plan and Confirmation Order stemming from these bankruptcies "do not bar Plaintiffs' claims … that arose prior to the Effective Date of the Plan of Reorganization."  This Complaint, therefore, seeks to recover damages from GEO for conduct throughout the Class Period.

**D.    USALCO**

34.    USALCO, LLC is a privately held Maryland corporation founded in 1980, with its principal place of business at 2601 Cannery Avenue, Baltimore, Maryland.  It manufactures and distributes aluminum-based chemical products, including LAS, to the industrial and municipal markets throughout the United States.  Its aluminum coagulant manufacturing plant in Baltimore, Maryland is the largest in North America.  USALCO, LLC also has manufacturing facilities in Indiana, Louisiana, Maryland, and Ohio.

35.    In November 2011, USALCO, LLC acquired the assets of another LAS producer, Delta Chemical Corporation ("Delta").

36.    During the Class Period, Delta and USALCO, LLC (collectively, "USALCO") directly, or through subsidiaries and affiliates, sold LAS throughout the United States.

### E.    Kemira

37.    Kemira Chemicals, Inc. ("Kemira Chemicals") is a Georgia corporation with its principal place of business at 1000 Parkwood Circle, Suite 500, Atlanta, Georgia.    Kemira Chemicals is a subsidiary of Kemira Oyj, a publicly traded Finish company with its principal place of business in Helsinki, Finland.    Kemira Chemicals is the successor company to Kemiron Companies, Inc. ("Kemiron").    Kemira Chemicals maintained a 60% ownership interest in Kemiron prior to May 2005,[1] but Kemira Chemicals purchased the remaining 40% interest in May 2005.    Kemira Chemicals and Kemiron are collectively referred to herein as "Kemira."

38.    Kemira manufactures, formulates, and supplies specialty and process chemicals for paper, water treatment, mineral slurries, and industrial chemical industries in North America and internationally.    Kemira has water treatment chemical manufacturing facilities in Alabama, California, Florida, Georgia, Kansas, Missouri, North Carolina, Ohio, Texas, and Washington. During the Class Period, directly or through its subsidiaries and affiliates, Kemira sold LAS throughout the United States.

### F.    Southern Ionics

39.    Southern Ionics, Inc. ("Southern Ionics") is a Mississippi corporation founded in 1980, with its principal place of business located at 1250 Neosho Ave., Baton Rouge, Louisiana.

---

[1] Kemiron Chemicals, Inc. began business in 1992, and was founded by Lawrence Hjersted. Kemiron Chemicals was headquartered in Bartow, Florida and was one of the largest manufacturers of aluminum-based chemicals in North America. Hjersted sold his remaining ownership interest in Kemiron Chemicals, Inc. to Kemira Chemicals in May 2005.

It has plants in Alabama, Mississippi, Maryland, Louisiana, Tennessee, and Texas. During the Class Period, Southern Ionics manufactured and sold water treatment chemicals, including LAS, in the United States.

### III.    INDIVIDUAL DEFENDANTS

40.    Frank A. Reichl ("Reichl") is a resident of Flanders, New Jersey. From at least 1997 until 2010, Reichl held various high-level positions at GenChem, including as General Manager of Water Chemicals from 1997 until 2005, and VP of Sales and Marketing from 2006 until 2010.  At all relevant times, Reichl actively conspired with Defendants and co-conspirators in their unlawful price-fixing and market allocation conspiracy. On October 27, 2015, Reichl pled guilty for his role in the conspiracy as described herein.

41.    Brian C. Steppig ("Steppig") resides in the Little Rock, Arkansas area. From 1998 through at least 2011, Steppig held high-level executive positions at GEO, including serving as National Sales Manager from 1997 through August 2006 and as Director of Sales and Marketing from August 2006 through at least 2011. In these positions, Steppig's responsibilities included directing the sale and marketing of Alum. During the Class Period, Steppig conspired with Defendants and co-conspirators in their unlawful price-fixing, bid-rigging, and market allocation conspiracy. On February 17, 2016, Steppig was indicted by the United States for his role in this conspiracy.

42.    Vincent J. Opalewski ("Opalewski") resides in Rockaway, New Jersey.  From 2000 through 2011, Opalewski held high-level executive positions at GenChem, including serving as General Manager of the Sulfur Products business group from 1999 to 2005, Vice President of Sales and Marketing from 2005 to 2006, Vice President and General Manager from 2006 to 2009, and President from 2009 to 2011.  In these positions, Opalewski's responsibilities

included directing the sale and marketing of LAS. During the Class Period, Opalewski conspired with other Defendants and co-conspirators in their unlawful price-fixing, bid-rigging, and market allocation conspiracy. On February 17, 2016, Opalewski was indicted by the United States for his role in this conspiracy.

43.    Alex Avraamides ("Avraamides") resides in Maywood, New Jersey. From 1994 through 2011, Avraamides held high-level executive positions at both GenChem and at Defendant GEO, including serving as the Director of Sales and Marketing at GenChem from 1994 to 2005, the Senior Vice President and General Manager of GEO from 2005 to 2010, and Vice President of Sales and Marketing at GenChem from 2010 to 2011. In these positions, Avraamides's responsibilities included directing the sale and marketing of LAS. During the Class Period, Avraamides conspired with Defendants and co-conspirators in their unlawful price-fixing, bid-rigging, and market allocation conspiracy.

44.    Amita Gupta ("Gupta") resides in or near the State of New Jersey. From April 2008 until September 2012, she was the Director of Sales and Marketing for Water Treatment Chemicals for GenChem. In this position, Gupta's responsibilities included directing the sales and marketing of LAS. During the Class Period, Gupta conspired with Defendants and co-conspirators in this unlawful price-fixing, bid-rigging, and market allocation conspiracy.

45.    Kenneth A. Ghazey ("Ghazey") resides in the Commonwealth of Massachusetts. Beginning in early 2005, soon after GEO was discharged from its Chapter 11 bankruptcy, and continuing until the present, Ghazey has held the position of President and Chief Executive Officer of Defendant GEO. He has also served as a member of GEO's Board of Directors since 2005. During the Class Period, and in his capacity as an officer and director of GEO, Ghazey was an active participant in the anticompetitive scheme alleged herein and, by his acts,

omissions, and/or negligence furthered the unlawful price-fixing, bid-rigging, and market allocation conspiracy with Defendants and co-conspirators.  As more specifically alleged herein, Ghazey was directly involved in the coordination and implementation of price fixing, bid-rigging, market allocation and other anticompetitive activity on behalf of GEO, providing direction, instruction and management support to his subordinates at GEO in furtherance of the unlawful scheme alleged herein.  Ghazey knew or should have known that his acts and/or omissions would, and in fact did, further the conspiracy.

46.    Milton Sundbeck ("Sundbeck") resides in Clay County, Mississippi.  Sunbeck has been the President and Chief Executive Officer of Southern Ionics during the entire Class Period.  During the Class Period, and in his capacity as an officer of Southern Ionics, Sunbeck by his acts, omissions, and/or negligence furthered the unlawful price-fixing, bid-rigging, and market allocation conspiracy with Defendants and co-conspirators.   Sundbeck knew or should have known that his acts and/or omissions would, and in fact did, further the conspiracy.

47.    Defendants have engaged in the conduct alleged in this Complaint, and/or the Defendants' officers, agents, employees, or representatives have engaged in the alleged conduct while actively involved in the management of Defendants' businesses and affairs.

48.    Various persons or entities that are not named as Defendants have participated as coconspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. These other persons or entities have facilitated, adhered to, participated in, and/or communicated with others regarding the alleged antitrust conspiracy and the anticompetitive and anticompetitive agreements addressed in this lawsuit. Plaintiffs reserve the right to name some or all of these persons or entities as a Defendant at a later date.

49.     Other corporations, individuals, partnerships, or business entities, currently unknown to Plaintiffs, are co-conspirators with Defendants in their unlawful restraints of trade.

## BACKGROUND CONCERNING ALUM AND ASPECTS OF THE ALUM MARKET THAT MADE IT SUSCEPTIBLE TO COLLUSION

### I.    Liquid Aluminum Sulfate

50.     Liquid aluminum sulfate is a water treatment chemical that removes impurities and other substances from water.  LAS is the salt of sulfuric acid and aluminum hydroxide known by its chemical formula, $Al_2(SO_4)_3$.  In its most common uses in the water treatment and paper industries, LAS is a source of $Al3+$, which is a highly charged ionic "species" that attracts negative particles, such as those that discolor raw water supplies, reacts with those negative particles, and then precipitates those participles out of the solution as ionic solids.

51.     Put more simply, LAS aggregates small particles into larger particles that then fall to the bottom of a holding container or natural structure.

52.     LAS is used for a variety of purposes including in water treatment and purification as a coagulant to remove suspended solids and thus to speed up the filtration process; in wastewater treatment for clarification and phosphorous removal; in ornamental lakes and ponds for algae control; in fixing dyes to fabrics and textiles; in synthetic catalyst production; in poultry houses as a litter amendment for ammonia control; and in paper mills to remove impurities from the water used to make paper and in the pulp of paper itself to help bind materials, to neutralize charges and in rosin sizing.

53.     LAS has achieved wide use by municipalities, in part, because it is considerably safer and easier to use than alternatives like anhydrous ammonia or aqueous ammonia.

16

54.     With particular regard to the treatment of municipal waste water, LAS helps municipalities comply with environmental regulations concerning total organic carbon, turbidity, and phosphorus effluent discharge levels.

55.     Similarly, water treatment service providers purchase LAS to reduce phosphorous that can accumulate in ornamental lakes due to surface runoff.  This use is partially driven by environmental regulations requiring the reduction of phosphorus levels in surface water.

## II.    The Nature Of The LAS Industry Makes It Susceptible To Collusion

56.     The market for LAS is characterized by factors that increased its susceptibility to collusion during the Class Period.  These factors include: the commodity-like nature of LAS, the low level of market growth characteristic of a mature market, the announcement of nearly simultaneous price increases by Defendants in spite of steady or declining costs, the presence of high barriers to market entry, and the high level of market concentration.

### A.    Alum Is A Commoditized Product

57.     When a product is characterized as a commodity, market participants compete principally on the basis of price rather than other attributes such as product quality.  Commoditized products are susceptible to coordination because firms wishing to form a cartel can easily monitor and detect defections from a price-fixing agreement where observed differences in prices, other than those arising because of differences in product grade for example, are more likely to reflect cheating on the conspiracy.  Research conducted by industry analysts and leading manufacturers indicates that LAS is a commodity product and competition in the market is driven principally by price.

58.     A 2006 report noted the increased commoditization of LAS and other chemicals in the North American water treatment market.  A 2009 report by the Water Research Foundation stated "Alum is a commodity chemical."  More recently, a 2012 analyst report

described inorganic coagulants such as Alum as "commodity chemicals that are relatively easy to manufacture." A 2015 analyst report noted that the water management chemicals market is split into two major categories: specialty chemicals and "[c]ommodity chemicals such as alum."

### B.    The Bidding Process

59.    Municipalities primarily procured LAS through a bidding process.

60.    Typically, prospective bidders for LAS contracts learn of a municipality's LAS needs and requirements through public notice of an invitation to bid disseminated by the municipality.

61.    A prospective bidder has until the date and time specified in the invitation to submit a sealed bid to supply the municipality with its LAS requirements. Immediately after the bid invitation period closes, the municipality publically opens and reads aloud each bid received. Municipalities often expressly encourage bidders, the public, and reporters to attend this public opening and reading.

62.    Bids are confidential and kept sealed from both bidders and the general public until the public opening. Thus, bidders are not privy to the content of their competitors' bids any sooner than the general public.

63.    Many municipalities also require that bidders execute and submit an affidavit of non-collusion with their bid to certify that the bidder has not divulged or discussed their bid with any other bidders, or compared their bid with the bids of any other bidders.

### C.    The Market For Alum Is Mature And
### Demand Growth Was Weak During the Class Period

64.    In mature industries, a firm's ability to increase sales is limited to population growth and the replacement of existing products. This means that slow growth rates often exist in mature industries because new distribution channels which might raise sales have typically

been exhausted.  Consequently, the only way for firms in operating in mature industries, where demand growth is slow, to capture additional market share is by competing with each other on the basis of price.  This factor is exacerbated in industries for commodity products, such as LAS, since product differentiation would not be an alternative way to gain market share.

65.     Kemira's parent company in its 2008 annual report described demand as follows: "Only modest growth can be expected in the Municipal & Industrial segment's relevant market in Europe and North America, as water treatment infrastructure is already largely built and growth in demand is therefore restricted."

66.     One 2001 article described the aluminum sulfate market as "very mature, with a projected annual growth rate of roughly 2 percent."  A 2004 Chemical Market Reporter article noted that aluminum sulfate is a mature commodity market.  Similarly, a 2015 analyst report notes that the "technologies currently used in water treatment are mature."  As a mature market, future sales of Alum are determined by population growth.  In its 2013 annual report, CLIF, which acquired General Chemical and its affiliates in 2014, noted that the "North American market for water treatment chemicals generally tracks GDP and population growth."

67.     A 2003 article in ICIS included an interview with GenChem's Marketing Manager Karla Doremus-Tranfield, noting "[t]he Alum market is generally balanced, 'No new suppliers have come into the marketplace, and its end users are well understood. . . And it's a mature market, one of the most mature,' she adds, noting that ancient Egyptians used alum."

### D.     Despite Stable Or Declining Costs, The Prices For Alum Increased During The Class Period

68.     Similar indicia of a pricing conspiracy include that LAS prices increased in an environment where its input costs either declined or held steady during the Class Period.  The cost of bauxite ore, which is used to produce aluminum trihydrate, a primary input for LAS,

declined almost 50% during the period from 1991 to 2003. From 2003 to 2007, bauxite ore costs rose around $6 per ton, but leveled off and declined slightly by the end of 2007. From 2008 to 2010, bauxite ore costs declined a further $3-$4 per ton.

69.     Further, the cost of sulfuric acid, another main component used in LAS production, was relatively stable from 1997 to 2007. After a brief spike in 2008, sulfuric acid costs began to fall in early 2009, leveling off at historic lows for the remainder of 2009 and 2010.

70.     Despite generally stable or falling input costs, LAS prices increased significantly during the early part of the Class Period. During this period, ICIS, which purports to be "the world's largest petrochemical market information provider," publicly reported numerous examples of parallel price increases by Defendants. For example:

a.     GenChem and GEO announced identical Alum price increases of $15 per ton on August 10 and August 31, 1998.

b.     GenChem and GEO announced identical Alum price increases of $15 per ton on October 4 and October 18, 1999.

c.     Southern Ionics, GEO, and GenChem announced almost identical Alum price increases of $8-$9 per ton around December 2000.

d.     Kemira, GenChem, and GEO announced identical Alum price increases of $10 per ton between November 21 and December 12, 2003.

e.     USALCO and GenChem both announced Alum price increases effective December 1, 2004, which were subsequently reported by ICIS on December 3, 2004.

(i.)     For instance, in the December 3, 2004 ICIS article "Aluminum Sulfate Prices Rise with Demand and Costs," Rich Fedison, director of sales and marketing for

Defendant General Chemical Performance Products LLC, signaled to the market that demand for aluminum sulfate was stable and beginning to strengthen.

        (ii.)    He stated: "The pulp and paper sector is finally beginning to recover after several years of poor performance as sustainable price increases and the recovering global economy are driving margin improvement. On the municipal water side, tightening federal regulations on total organic compounds and disinfection by-products are contributing favorably to the overall demand for inorganic coagulants." Fedison stated, "[a]ll announced price increases for aluminum-based inorganic coagulants are continuing to hold in all end-use markets."

        (iii.)    This statement was a signal to co-Defendants, providing a pretext for maintaining the artificially inflated price level for aluminum sulfate.

        (iv.)    Contemporaneously, Defendant General Chemical Performance Products LLC raised its list prices for commercial-grade aluminum sulfate to $335 per ton on the East and Gulf Coasts and $370 on the West Coast. Liquid material in tanks was $214 per ton, iron-free liquid material in tanks was $331 per ton, and dry iron-free aluminum sulfate was $425 per ton.

        71.    A 2009 report by the Water Research Foundation analyzed a survey about the rising costs of water treatment chemicals during the period between January of 2008 and January of 2009 that was administered by the Association of Metropolitan Water Agencies and to which forty-seven United States drinking water utilities responded. Twenty-five of those entities reported using Alum and, during the period of that single year, reported an average 53% price increase, with maximum increases being as high as 168%. While raw material cost increases

were cited as a major cause of these increases, as noted above, the report noted the "boom" in commodities prices was over by mid-2008.

72.    As GenTek reported in its 2009 Form 10-K for the year, price increases on products such as LAS contributed significantly to the profits earned by GenTek on successful bids or responses to RFPs in the water treatment market[2]: "[s]ales into the water treatment market increased by $67 million [$482 million in 2008, as opposed to $397 million in 2007] driven by $59 million resulting from increases in selling prices.…"

73.    The marked rise of LAS prices in the midst of falling or steady input costs supports the conclusion that Defendants' illegal conspiracy resulted in Plaintiffs and Class Members paying artificially-inflated prices.

### E.    High Barriers To Entry Exist In The Alum Market

74.    High barriers to entry constitute a third factor which increased the likelihood of anti-competitive conduct in the LAS market.  There are significant barriers to entry which have prevented potential competitors from effectively competing in the U.S. Alum market during the Class Period.  An August 2009 article in *WaterWorld* noted that "[t]he North American water treatment chemicals market is mature with high entry barriers."  These barriers include production, manufacturing, and transportation costs, as well as satisfaction of regulatory requirements.  High barriers to entry also exist because only a determined competitor with specialized technical knowledge, the capital necessary to build costly manufacturing facilities, and access to distribution channels could have competed in this market.

75.    For instance, supplies of liquid aluminum sulfate are transported to the customer by rail or truck from the manufacturing plant of the supplier that is closest to the customer.  The

---

[2] Municipalities primarily procured LAS through a bidding process while paper companies and distributors primarily utilized the RFP or Request For Proposal process.

cost of freight is a significant component of the price of liquid aluminum sulfate charged to municipal customers and pulp and paper manufacturers. One factor suppliers of liquid aluminum sulfate consider in deciding whether to bid or quote on a contract is whether the business is "freight logical," that is, whether the liquid aluminum sulfate supplier can make a profit on the business taking into account the distance from the supplier's plant to the customer and the corresponding cost of freight.

76.     In 2003, GenChem's Marketing Manager Karla Doremus-Tranfield noted that no new suppliers have come into the marketplace. Since 2010, the only significant new entrant in the Alum industry is Affinity Chemical LLC. Affinity Chemical LLC was formed in 2011 by Reichl, who agreed to plead guilty to price-fixing Alum on October 27, 2015.

**F.      The Alum Market Is Highly Concentrated**

77.     Defendants are the major water treatment chemicals manufacturers in North America, including the United States, and all together they control and share a majority of the market for LAS. Moreover, the industry experienced heavy consolidation in the period leading up to and including 1997. Industry concentration was also enhanced throughout the Class Period by agreements among Defendants to distribute one another's products. Such swaps, trades, and selling and distribution agreements among competitors in a consolidated market such as LAS in the United States also facilitate the formation of collusion among purported competitors.

**EVIDENCE OF THE CONSPIRACY**

**I.      Several Defendants Have Pled Guilty Or Have Been Indicted**

78.     In February 2011, the FBI appeared at GenChem to investigate a "tip" from Gupta regarding anticompetitive activity. As a result of this investigation, GenChem began discussing the details of the conspiracy with the Department of Justice and formally became an amnesty

applicant in March 2011.  GenChem has been in communications with the Department of Justice regarding its anticompetitive activity in the Alum industry for more than five years.

79.    Two Defendants have already pled guilty to the conspiracy.  Two more have been indicted and are awaiting trial.  GenChem, in turn, has sought conditional amnesty and leniency with the Department of Justice concerning its role in the conspiracy.

80.    Reichl was the first Defendant to plead guilty to the conspiracy.  He was a former executive of GenChem.  On October 27, 2015, Reichl pled guilty for his role in the conspiracy, and admitted to agreeing not to compete for contracts for LAS.  *See United States v. Frank A. Reichl*, No. 2:15-cr-00554- JLL, Dkt. No. 5 (D.N.J. Oct. 27, 2015).  He admitted that he "did knowingly and intentionally conspire and agree with others not to compete for each other's historical business by rigging bids, allocating customers and fixing the price for liquid aluminum sulfate."  He further admitted that he and others he supervised and co-conspirators did submit "intentionally losing bids … in order for the intended winner to be awarded the contract," and that "that agreement came about as a result of meetings and conversations… that [he] had with [his] co-conspirators in which [he] discussed each other's liquid aluminum sulfate business." According to the plea agreement, the volume of commerce attributable to Reichl was between $100 million and $300 million.

81.    GEO has also pled guilty to the conspiracy.  On June 16, 2016, it pled guilty to knowingly and intentionally conspiring with co-conspirators, from at least 1997, to rig bids and allocate customers for, and to fix, stabilize and maintain the price of, LAS supplied to municipalities and pulp and paper manufacturers in the United States.  To carry out the conspiracy, GEO "submit[ed] or cause[d] to be submitted intentionally losing bids or price quotations to certain liquid aluminum sulfate customers that were historically supplied by the co-

conspirator in order for the intended winner to be awarded contracts."  The conspiracy was an unreasonable restraint of interstate trade in violation of the Sherman Act.  As a condition of its guilty plea, GEO agreed to pay a fine of $5,000,000.

82.    The Department of Justice also has filed indictments in the District of New Jersey against Opalewski and Steppig.  Opalewski was a high-level employee at GenChem.  Steppig was a high-level employee at GEO.  The indictments assert that they conspired to suppress and eliminate competition by agreeing to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of LAS sold in the United States during the Class Period.  *See United States v. Vincent J. Opalewski and Brian C. Steppig*, No. 2:16-cr-00065-JLL, Dkt. No. 1 (D.N.J. Feb. 17, 2016).

83.    CLIF has stated publically that it "is cooperating with the [DOJ] investigation" and claims to have the "benefit of the conditional amnesty and a leniency 'marker' from the U.S. Department of Justice."  Critically, the DOJ only affords such amnesty where the leniency applicant admits there is evidence suggesting that a criminal violation of the antitrust laws has occurred.

## II.    Defendants Had An Incentive To Conspire

84.    Prior to Defendants' conspiracy, the market for the sale of LAS in the United States was marked by competition.  In the mid-1990s, for example, there was a "price war" between GenChem and GEO in which each company bid aggressively for the accounts of the other company.

85.    As reflected in the GEO guilty plea and criminal indictments discussed in greater detail above, this era of competition and price wars ended in 1997 when the conspiracy began with a meeting between GenChem and GEO.

### III.    The Conspiracy Was Hatched With A Meeting In 1997

86.    To end the price war, Defendants agreed to "stay away" from each other's "historical" customers by not pursuing the business of those customers, and to engage in related bid-rigging.

87.    Specifically, in 1997, Avraamides and Reichl (who at the time were working for GenChem as the Director of Sales and Marketing and the General Manager of Water Chemicals, respectively) met with Dennis Grandle (who was GEO's Senior Vice President and General Manager) in Little Rock, Arkansas.  They agreed that GenChem and GEO (the two largest LAS suppliers) would no longer fight for each other's customers.

88.    This collusive arrangement proved to be so beneficial that other LAS suppliers joined and/or participated in the anticompetitive scheme during the Class Period.

### IV.    Defendants Participated In And Furthered The Conspiracy In Several Ways

89.    Defendants and their co-conspirators carried out the conspiracy throughout the Class Period in several ways, including by:

a.    meeting in person and agreeing to allocate customers and fix prices;

b.    repeatedly communicating their commitment to conspire with one another;

c.    using code words to conceal and further the conspiracy;

d.    rigging bids;

e.    allocating customer accounts to ensure market stabilization;

f.    relying on throw-away bids to further the conspiracy; and

g.    policing and enforcing the conspiracy.

## A.    Meetings Between Supposed Competitors

90.    Documentary evidence and Plaintiffs' investigation reveal that Defendants used "business" meetings" with supposed competitors and trade association conferences to continue and reaffirm the conspiracy during the Class Period.

91.    For instance, Reichl was a frequent participant in industry conferences for many years, including the Arkansas Water Works & Water Environment Association and Georgia Association of Water Professionals, where his co-Defendants, including Kemira, were also in attendance, giving all of them the opportunity to in fact collude.

92.    Some specific examples of such meetings are as follows:

a.    In 1999, GenChem's Avraamides and GEO's Grandle met at a restaurant in New Orleans to reconfirm their agreement to conspire.  The very next day, Avraamides met with Kemiron's Fred Simms at Cajin Café in New Orleans.

b.    In 2005, GenChem's Fedison met with GEO's Grandle at Lawry's steakhouse in Chicago, Illinois.  The very next day, Fedison met with Jorge Goytisolo of USALCO at Joe's Crab Shack in Schaumberg, Illinois.

c.    In 2005, Avraamides met with Southern Ionics's President & CEO (since 1980), Milton Sundbeck, and confirmed the conspiracy by agreeing that it would "be[] better business for everyone to work together instead of competing and ruining the market price."

d.    In mid-2008, Gupta and Michael Housel (both from GenChem) met for lunch with Scot Lang and Brian Steppig (both from GEO), as a "get to know you meeting" designed to introduce Gupta to senior staff at GenChem's "friendly 'competitor'" GEO, and to discuss unlawful market and supply agreements.

e.      In June 2010, Peter Bailey (USALCO's Vice President of Sales and Marketing) met with Steppig and Scot Lang from GEO, and GenChem's Avraamides met with John Besson, who was Delta's President until 2011.

f.      In August 2010, GenChem's Avraamides met with Jay Richie, who was Kemira Water Solutions President until December 2013.

### B.    Defendants Repeatedly Affirmed Their Commitment To Conspire With Each Other

93.    Documentary evidence also shows that in-person meetings were not the only way that Defendants confirmed their commitment to conspire.

94.    For instance, documentary evidence shows that Southern Ionic's Sundbeck called Avraamides in 2005, who at that time was working for GEO, to ensure that the conspiracy was maintained and that their companies "not bring down market price."

95.    Further documentary evidence establishes that during his time at GEO, Avraamides repeatedly communicated with GenChem's Richard Fedison concerning Alum pricing, and that based upon those communications, Avraamides instructed GEO's Steppig to bid high "so that [GEO] would not take [GenChem's] business."

96.    Similarly, telephone call logs reveal that GEO's Steppig and GenChem's Gupta communicated very frequently with each other by telephone between 2009-2011.

### C.    Defendants' Internal Documents Demonstrate A Commitment To Conspire

97.    Numerous internal documents confirm Defendants' understanding of their overarching agreement:

a.      Internal documents created by GenChem in 2003 show that its business strategy with supposed competitors, including USALCO, was not to gain market share from

them but to "work together" or "work in conjunction" in order to "protect market stability and maintain market pricing."

      b.    A March 31, 2003 GenChem internal marketing strategy memorandum stated GenChem's strategy for its supposed competitor, USALCO, as follows: "Continue to work in conjunction at Akron, OH and Western Michigan accounts."

      c.    An internal GEO memo written by Steppig in 2005 reveals that Opaleweski and GenChem agreed to "stay away intentionally" from USALCO's customers.

      d.    A March 2006 GEO internal business review concluded that both GenChem and Southern Ionics were "[r]emaining non-aggressive, consistently favoring price increases over share gain strategy."

      e.    In a September 21, 2007 email, a Vice President from USALCO told USALCO's President, David Askew: "I would recommend telling GEO that you do not want to rock the boat in the area in which you have major interests and emphasize that General [Chemical] is much closer to Minneapolis anyway… I do not believe that General [Chemical] wants to set off a price war…."[3]

      f.    In April 2008, Gupta from GenChem replaced Housel as the Director of Marketing for Water Chemicals at GenChem, and Housel gave Gupta a summary of the market that included which individuals from different would-be competitors discussed and coordinated pricing.

---

[3] GenChem's internal documents indicate that, in fact, GenChem did not ultimately submit a bid to the City of Minneapolis, Minnesota in 2007.

D.  **Defendants Used Code Phrases To Hide And Further The Conspiracy**

98.     Documentary evidence also demonstrates that Defendants, including Kemira, Southern Ionics, USALCO, GEO, and GenChem, used the same code phrase to describe and hide their conspiracy.  One such frequently used code phrase to describe the cooperation among the supposed competitors was "peace in the valley."

99.     For example, documentary evidence shows that Southern Ionic's Sundbeck called GEO's Avraamides in November, 2005, to indicate that Southern Ionics wanted to maintain "'peace in the valley' and not bring down market price."

100.    As another example, on December 20, 2005, Ghazey sent Avraamides (both at GEO) an email about their strategic plans, which stated: "[L]ook forward to … having some 'peace in the valley.'"

101.    As another example, on April 14, 2006, Avraamides sent Ghazey an email about companies that GEO might consider acquiring.  Avraamides explained that one potential acquisition company, Gulbrandsen, "has historically been the main company that has prevented price increases," and he told Ghazey that acquiring Gulbrandsen would make GEO "more of a potential threat to General Chemical, Delta, Summit.  Deterrent helps maintain peace in the valley."

102.    Defendants even used this same code phrase "peace in the valley" to describe conspiratorial efforts with regard to other sulfate water treatment chemicals.  For example, in April 2005, Kemira's Product Manager, John Cowan, had expressed concerns in an internal email chain to Kemira's Vice President of Sales & Logistics Bill Wowchuk and others at Kemira about the fact that GenChem might try to bid on Kemira's St. Louis, Missouri account.  Two months later, in a July 20, 2005 email, Bill Wowchuk wrote the following to John Cowan: "John,

30

this [Gulf Coast Water Authority bid] and [a] St. Louis [Missouri bid] will test our theory whether there will be 'peace in the valley.'"

103.    Additional examples of the use of this code phrase are found in the specific examples of conspiratorial conduct below.

### E.    Specific Examples Of Defendants Rigging Bids And Allocating Customers

104.    Documentary evidence shows that Defendants maintained and furthered the conspiracy by coordinating bids, trading customers, withdrawing winning bids, and not bidding on a competitor's historic customer. Examples of such conduct by Defendants include the following:

#### a.    Rochester, MN (2005)

105.    In 2005, C&S and GenChem furthered the conspiracy by rigging bids to the City of Rochester, Minnesota.

106.    In December 2005, GenChem submitted the winning bid for a one-year supply contract for the City of Rochester, Minnesota.

107.    GenChem's winning bid was then withdrawn, leaving C&S as the winning bidder for the 2006 calendar year.

#### b.    Mahrt, AL (2006)

108.    In April and May 2006, GenChem and GEO used coordinated bids to swap their historical accounts at a MeadWestvaco paper mill in Mahrt, Alabama and the municipality of Fayetteville, North Carolina.

109.    GenChem had been the historical supplier of Alum to the Mahrt paper mill until 2006, when the owners of the mill sought a new supplier.

110.    Opalewski or Reichl at GenChem told GEO's Avraamides about the situation.

111.    In exchange for this and after GEO won the Mahrt paper mill account, a GenChem employee called GEO and asked for the Fayetteville, North Carolina Alum account.

112.    GenChem subsequently won the Fayetteville contract, which had historically been a GEO account.

113.    In an email exchange dated May 22, 2006 between Steppig and Avraamides, they agreed that they needed to work out "The Swap" with GenChem "before we take Mahrt."

114.    Absent this coordination, GEO would not have bid aggressively for what was a historical GenChem account.

### c.    Akzo Nobel and Mead-Westvaco (2006)

115.    In 2006, GEO and Southern Ionics met to coordinate and allocate customers in furtherance of the conspiracy.

116.    In an email exchange dated April 30, 2006, Avraamides and Ghazey (both at GEO) corresponded via Ghazey's personal email account about a request for pricing to customer Akzo Nobel. Avraamides explained: "As you know, I have been holding off to assess if we are experiencing any competitive threat from Southern Ionics on our Mead-Westvaco quotation. So far, it does not appear as though we have a threat… Milton Sundbeck—Southern Ionics, welcomed a meeting and proposed May 15th in Houston."

### d.    Pittsburg, CA (2008 & 2009)

117.    In 2008 and 2009, GenChem coordinated with its co-conspirators so that they would not submit bids to Pittsburg, California in furtherance of the conspiracy.

118.    When Pittsburg, CA solicited bids in both 2008 and 2009 for Alum, GenChem's was the sole bid received despite the City's efforts to send bid requests to 13 other vendors.

119.    Between 2007 and 2008, GenChem increased the price charged to Pittsburg 60%, and misrepresented to the City that the price increases were due to increased worldwide

competition and fuel and energy cost used to manufacture and transport the chemicals in large quantities.

### e.    Dekalb County, GA (2009)

120.    In 2009, GenChem and C&S furthered the conspiracy by coordinating bids to Dekalb County, Georgia.

121.    In February 2009, GenChem's Larry McShane expressed interest in the DeKalb County account, which previously had been awarded to RGM of Georgia.

122.    After learning that RGM of Georgia was selling for fellow conspirator C&S, McShane emailed Gupta: "RGM of GA turned out to be C&S (Austell) so I assume we don't want to take it."

123.    Gupta responded, "Don't take. Thx."

### f.    City of Frankfort, KY (2009)

124.    In 2009, GenChem coordinated with its co-conspirators so that they would not submit bids to the City of Frankfort in furtherance of the conspiracy.

125.    In 2009, when the City of Frankfort solicited bids, it received no responses to its request for bids and so was forced to purchase Alum from GenChem, which declared itself "the regional Liquid Alum distributor for th[e] area."

### g.    Henderson and Charlotte, NC (2009)

126.    In 2009, GenChem and Alchem, Inc.[4] furthered the conspiracy by coordinating bids for the municipalities of Henderson and Charlotte, North Carolina.

---

[4] Alchem, Inc., which was a manufacturer of Alum, is not presently named as a Defendant. GenChem subsequently acquired Alchem's customer list.

127.    GenChem initially quoted a support price of $294 for a bid to Henderson. GenChem's Gupta then ordered McShane from GenChem to bid the account aggressively.  As a result, McShane lowered the quote to $270.

128.    In the meanwhile, Gupta met with Robert Wolcott of Alchem and was in the process of negotiating an agreement for a Charlotte, North Carolina account that GenChem was trying to get back from Alchem.

129.    As a consequence, Gupta told McShane to abstain from going after Henderson to benefit Alchem's bid for Henderson, and McShane then quoted the higher amount – $294 – instead for the Henderson bid.

130.    Alchem ultimately came in lower than GenChem and won the Henderson account.

### h.    Maryville, TN (2009 – 2010)

131.    In 2009 and 2010, GenChem and GEO furthered the conspiracy by coordinating bids for the municipality of Maryville, Tennessee.

132.    Maryville had historically been supplied with GEO's Alum. In 2009, GenChem submitted a low bid for Maryville, and GEO's Steppig called GenChem's Gupta to complain that GenChem was in breach of their agreement.

133.    Following the conversation, GenChem withdrew its original bid.  In an email dated June 18, 2009, Gupta wrote to another GenChem employee "this was a geo account. Had we known this, we would have bid differently. I need you to call them asap and … we have to withdraw our bid. Please ensure there are no repercussions." In response, the GenChem employee reported back to Gupta: "Maryville accepted that General Chemical withdraws its bid for liquid aluminum sulfate."

134.    In 2010, consistent with Steppig and Gupta's conversation the previous year, GenChem submitted another high bid for the Maryville account, which GEO won.

### i.  High Point, NC (2010)

135.    In 2010, C&S, GEO, and GenChem furthered the conspiracy by coordinating bids for High Point, North Carolina.

136.    In late 2010, GenChem's Avraamides learned that GenChem was planning on acquiring Alchem.  So, GEO's Steppig called Avraamides to see what GenChem had planned to do with Alchem's historical account at High Point.

137.    GenChem's Gupta told Avraamides that GenChem was interested in taking the High Point account.  Gupta also spoke with GEO's Scot Lang and told him to stay away from this account, as GenChem was going to take over Alchem's customer list soon thereafter, so it would become a "[GenChem] customer account" after the anticipated acquisition of Alchem in January 2011.

138.    Avraamides also informed C&S that GenChem was going to purchase Alchem's customer list, so Alchem's customers would become GenChem's.  In turn, C&S did not bid on the High Point account in 2011.

139.    GenChem won the account, despite the fact that Alchem bid $255/T and GenChem bid $315/T.

140.    Just after GenChem's acquisition of Alchem, GenChem furthered the conspiracy by having their co-conspirators C&S and GEO no longer compete with each other and GenChem on pricing to Alchem's former customers.

141.    GenChem's Avraamides told Gupta, "Alchem's customer base is accustomed to shopping between GEO & C&S, and consequently prices have suffered.  I expect under our management this will stop... Our goal should be to eventually bring stability to this market."

### j.    Maysville, KY (2010)

142.    In 2010, USALCO and GenChem furthered the conspiracy by allocating customers in Maysville, KY and elsewhere.

143.    An internal USALCO memorandum, dated January 12, 2010, summarized a telephone call between USALCO and a distributor named Univar. In that memorandum, a USALCO employee reports the following: "Mercurio [a Sales Manager at Univar who was on the call] asked about going after Temple Island in Maysville, KY (General [Chemical customer]). Explained that there is peace in the valley..."

144.    In an apparent attempt to police the conspiracy and punish Southern Ionics and Delta for non-compliance, the memorandum further states that USALCO explained to Univar on the call that "we would rather work with [Univar] to pursue Southern Ionics and Delta business."

145.    Internal GenChem documents reveal that, in 2010 and 2011, GenChem indeed continued to supply Temple Island in Maysville, KY.

### k.    Sulphur Springs, TX (2010)

146.    In 2010, GEO and GenChem furthered the conspiracy by coordinating bids for Sulphur Springs, Texas and inflating prices for its resellers.

147.    In a May 7, 2010 email, Patsy Hale from GEO told Steppig (and others) from GEO: "Sulphur Springs is a bid supplied by General Chemical. I would suggest that we not bid this aggressively." She then recommended: "For resellers, I suggest the same price of $450.38/DT for FTL of liquid alum and a price of $510.38/DT for FTL of liquid alum/3% copper sulfate."

148.    Defendants' internal documents reveal that in May 2010, GEO did, in fact, bid a price of $450.38/DT of LAS to Sulphur Springs. And GenChem, indeed, bid lower, but at a supra-competitive price nonetheless, of $285.

### l.     Hickory, NC (2010)

149.     In 2010, C&S and GenChem furthered the conspiracy by allocating customers in Hickory, North Carolina and elsewhere.

150.     In June 2010, in response to a request to submit a bid to GenChem's customer in Hickory, North Carolina, Mike Chandler, C&S's Vice President of Sales, replied: "I am not wanting to do Hickory at this time and, if you could, double check that Alchem has Richmond Co., as it is historically a General [Chemical] account."

### m.     Somerset, KY (2010)

151.     In 2010, USALCO and GenChem furthered the conspiracy by allocating customers in Somerset, Kentucky and elsewhere.

152.     In 2010, GenChem won an account in Somerset, Kentucky that had historically been USALCO's. When GenChem won, USALCO's Peter Bailey called GenChem's Gupta to complain, and Gupta said that she would look into it.

153.     An internal USALCO email dated July 12, 2010 notes: "General [Chemical] did not pull their bid at Somerset, KY. Dave, did you send the letter to Vince Opalewski?"

154.     Later and in exchange for the Somerset account, USALCO obtained a different account from GenChem.

### n.     Columbia, SC (2010)

155.     In 2010, GenChem and C&S furthered the conspiracy by coordinating bids in Columbia, South Carolina.

156.     In June 2010, GenChem's McShane recommended that it bid aggressively for an account in Columbia, South Carolina because C&S had been bidding aggressively in the area.

157.     GenChem's Avraamides reviewed McShane's recommendation and called Rob Chandler of C&S.

158.    After their discussion, GenChem increased its bid so that C&S would be the lower bidder of the two.

### o.    Sidney, OH (2010)

159.    In 2010, GenChem and USALCO furthered the conspiracy by coordinating bids for the municipality of Sidney, Ohio.

160.    As of the end of 2010, Sidney, Ohio was a USALCO customer. When the bid for this customer was coming up in December 2010, GenChem's Lisa Brownlee emailed Gupta asking her if "you want to take this one too?" and noting that "US Alco supplies at $418.42. GCC bid $494.00. No history of Delta or Thatcher bidding here. Volume is only 65 tons. To take, I would bid $374 ($308 net for US Alco). To stay away, up $32.00." Gupta responded, "No. up 32," confirming GenChem decided to "stay away" from USALCO's historical customer.

### p.    Monteregie & St. Jean sur Richlieu (2010)

161.    In November 2010, GC and Kemira furthered the conspiracy by coordinating bids for Monteregie and St. Jean Sur Richlieu.

162.    In November 2010, GC's Gupta recommended "to bid a non-aggressive price of of $426/MT on Monteregie and St. Jean sur Richlieu, both currently supplied by Kemira…to help foster a more stable, mutually beneficial and profitable market environment."  GC's Opalewski agreed to "bidding high" as "Significant money left on the table can be very instructive [to Kemira]."

### q.    Domtar Paper Company (2010-2011)

(i)    In 2010, GenChem and GEO furthered the conspiracy by coordinating bids for Domtar Paper Company.

(ii)    In December 2010, GenChem's Gupta and GEO's Steppig discussed potential nationwide price increases on Alum to Domtar ensure that what they were going to quote would

38

not be out of line with each other. GenChem was initially going to raise its prices by $11/T or $19/T; GEO then told GenChem that it was planning on announcing a $35/T price increase. In turn, GenChem proposed increasing prices by $19/T or $29/T, and, in the end, prices went up $29/T.

(iii)    In early 2011, Martin Denoit, the purchasing agent at Domtar, was unhappy because of GenChem's 23% price increase, so he called GenChem to ask, "How can anyone justify that [price increase]?" Upon hearing this complaint, GenChem's Avraamides stated to another GenChem employee that Domtar "is not referencing a competitive condition… Regardless, we need to come up with a reasonable story."

(iv)    Domtar also called GEO's Steppig to demand competitive pricing for its Ashdown, Arkansas plant.  In turn, Steppig called GenChem's Gupta to ask if GEO should bid $300 to look competitive but at the same time not take the business away from GenChem.  Gupta agreed.  So, GEO bid higher than GenChem, thereby allowing GenChem to continue to supply the Ashdown plant.

### r.    Georgia Pacific Paper Company (2011)

(i)    In 2011, GenChem and GEO furthered the conspiracy by coordinating bids for the Georgia-Pacific paper company.

(ii)    In January 2011, GenChem wanted to recommend a $23/T price increase for all of Georgia-Pacific's paper mills.  However, after GenChem's Avraamides and Gupta coordinated with GEO's Lang, Opalewski, and Steppig on pricing, GEO increased its pricing by $35/T, and GenChem followed by imposing a $32/T price increase.

### s.    Manatee County, Tampa Bay & Peace River Manasota Regional Water Supply

163.    For more than a decade, GenChem, Kemira, and C&S furthered the conspiracy by coordinating bids in the Tampa area.

164.    In March 2013, Thatcher urged Manatee County to "examine pricing history over the last 10 to 15 years in the Tampa area and pay particular attention to the interplay between General Chemical and C&S Chemical as related to your own bids and those of the Peace River Manasota Regional Water Supply Authority.  Interesting trends can be seen and will raise an eyebrow or two."

165.    Later that year, Thatcher also notified Tampa Bay that "both Kemira and General Chemical are aligned in their efforts to snuff out competition."

### F.    To Maintain The Conspiracy, Defendants Also Allocated Customers Involving Other Sulfate-Based Water Treatment Chemical Products

166.    Documentary evidence shows that Defendants also allocated customer accounts concerning other sulfate-based water treatment chemicals sold by the Defendants in order to maintain their agreement to allocate customers.

167.    In April 2009, Reichl told Opalewski (both at GenChem) the following regarding a bid for ferric sulfate in Clayton County, Georgia: "The $480 we bid last year [against Kemira] was a throw away price." However, to explain why GenChem took the account in 2009, Reichl explained: "They [Kemira] took a few accounts from us and this one made sense for us to have."

168.    Similarly, in January 2010, Reichl emailed Opalewski regarding a bid for ferric sulfate to Denton, Texas. Reichl explained: "Bid opened yesterday. We lost. Was in plan."

Water Elements, which was acquired by Kemira later that year (in September 2010),[5] continued to supply ferric sulfate to Denton, Texas that year.

### G. Defendants Relied Upon Throw-Away Bids To Further The Conspiracy

169.    Documentary evidence also shows that numerous purchasers of Alum received bids that made no economic sense:

a.    In March 2005, USALCO entered into a three-year contract with Grand Rapids, Michigan, at a price of $149.52 per ton.  The only other two bidders were GenChem and C&S, which submitted bids of $186.94 and $232, or 25% and 55% higher than the winning bid, respectively.

b.    In October 2008, GenChem won a bid for Fayetteville, Arkansas, at a price of $184.20 per ton.  The second-lowest bidder was C&S, with a bid of $247.60 per ton, or 34.4% higher than GenChem's bid. Similar, the only two other bidders, Kemira and GEO, bid 37% and 43% higher, respectively.

c.    In May 2009, GenChem received a contract with Milwaukee, Wisconsin, at a price of $429 per ton.  The only other bidder, USALCO, submitted a bid of $562 per ton, or 31% higher than GenChem's winning bid.

d.    In June 2010, GenChem received a contract to supply Pensacola, Florida, at a price of $212.93 per ton. While the second-lowest bidder, a small regional producer named Southern States, submitted a bid of $219 per ton, the other large national Alum producers,

---

[5] Indeed, when Kemira acquired Water Elements, Kemira's co-conspirator GenChem, reported that Water Elements had "aggressively pursued Kemira's business since its inception" so GenChem "view[ed] this transaction very positively" and as "a significant move toward market stability."

GEO and C&S, bid prices which were an astounding 117.7% and 162% higher than GenChem's winning bid.

170.    Defendants' bid-rigging, collusion and other anticompetitive behavior was designed to, and did, result in artificially inflated and supra-competitive prices to wholesalers, distributors, and resellers. Those artificially inflated and supra-competitive prices were, in turn, passed on to Plaintiffs.

## H.    Defendants Policed And Enforced The Conspiracy

171.    Defendants also undertook specific efforts to monitor and enforce the conspiracy. As indicated in some of the specific examples above, if, either intentionally or accidentally, a "competitor" submitted a lower bid to another Defendant's historic customer, that would often prompt a complaint that resulted in the "competitor's" withdrawal of the lower bid.

172.    In addition, where a Defendant gained business at the apparent expense of its "competitor," that Defendant would often allow that "competitor" to win business from another customer to keep their respective levels of business and the conspiracy intact.

173.    For example, in 2006, GenChem bid for and won an account in Carthage, Texas for 200 tons of Alum, an account which historically belonged to GEO. Following discussions between GEO's Avraamides and GenChem's Housel, GEO and GenChem agreed that GEO would take an account of the same size from GenChem in order to "mak[e] the playing field even again."

## CLASS ACTION ALLEGATIONS

174.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following class with respect to claims under the antitrust and/or consumer protection and unfair and deceptive trade practices statutes of each of

the jurisdictions below and/or under common law principles of unjust enrichment recognized in each of those jurisdictions:

> All persons or entities in Alabama, Arkansas, Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, who indirectly purchased liquid aluminum sulfate, not for resale, which was manufactured, produced or supplied by Defendants or their unnamed co-conspirators from January 1997 and continuing until the anticompetitive effects of Defendants' unlawful conduct ceases.[6] Excluded from the Class are Defendants, their co-conspirators, whether or not named this Consolidated Complaint, and their representatives, parents, subsidiaries and affiliates, and all federal governmental entities.

175.    Joinder of all members of the Class is impracticable. While the size of the Class is not yet known with certainty, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that the Class numbers in the thousands. Class members are geographically dispersed throughout the United States. There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

    a.    Whether Defendants entered into a contract, combination or conspiracy to fix, raise, maintain, or stabilize LAS prices or otherwise restrain trade in the United States;

    b.    The identities of the participants in the alleged conspiracy;

    c.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

    d.    Whether Defendants engaged in fraudulent concealment;

---

[6] Plaintiffs reserve the right to amend the class period after they have obtained discovery in this action.

e.       The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

f.       Whether the conduct of Defendants, as alleged in this Complaint, caused injury to Plaintiffs and other Class Members;

g.       The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

176.    Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs and the Class paid artificially inflated prices for LAS that was produced, manufactured, or supplied by one or more of the Defendants and were thus injured by the same wrongful conduct of Defendants and their co-conspirators in violation of antitrust laws, and the relief sought is common to the Class.

177.    Defendants' conduct either occurred, or its effects were felt, in each of the States whose antitrust, consumer protection or unjust enrichment laws are being asserted herein. Defendants' nationwide price-fixing, bid-rigging, and customer allocation scheme injured both Plaintiffs and the Class throughout the country in the same way. Defendants' illegal course of conduct as alleged herein may be established with common proof, and such common proof gives rise to liability under of each of the state antitrust, consumer protection, unfair competition, and unjust enrichment laws asserted herein.

178.    As representatives of the Class, Plaintiffs will fairly and adequately protect the interests of all Class Members.

179.    Plaintiffs are represented by attorneys who are competent and experienced in the prosecution of antitrust and class action litigation.

180.    The questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual Class members, including legal and factual issues related to liability and damages. Whatever possible difficulties may exist in the management of the class action are greatly outweighed by the advantages of the class action procedure.  Those advantages include, but are not limited to, providing Class Members with a method for redress of claims that might otherwise not warrant individual litigation.

181.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute his or her common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  A class action enables injured persons or entities to obtain redress on claims that might not be practicable to pursue individually.  Class treatment also eliminates the potential for inconsistent adjudications.

### PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST AND CONSUMER PROTECTION INJURY

182.    The conspiracy in this case had the following effects, among others:

a.    Price competition was restrained or eliminated with respect to LAS.

b.    The prices of LAS were fixed, raised, maintained, or stabilized at artificially inflated and supra-competitive levels; and

c.    Plaintiffs and the Class were deprived of the benefits of free, open, and unrestricted competition in the market for LAS.

183.    Plaintiffs and other indirect purchasers of LAS were similarly affected by the conspiracy and its impact on the stream of commerce, in that the conspiracy among Defendants

was intended to, and did, cause Plaintiffs and other members of the Class to pay artificially inflated and supra-competitive prices for LAS.

184.    By reason of the alleged violations of the applicable state antitrust and consumer protection and unfair competition laws during the Class Period, Plaintiffs and members of the Class sustained injury having paid higher prices for LAS than they would have paid in the absence of Defendants' illegal conduct, combination or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an injury of the type that the applicable state antitrust and consumer protection laws were meant to prevent and punish.

## TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

185.    Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until, at the earliest, October 27, 2015, when Reichl pled guilty to his participation in the conspiracy and wrongful conduct. Because Defendants' agreements, understandings and conspiracy were kept secret, Plaintiffs and the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for LAS.  None of the facts or information available to Plaintiffs or the Class prior to October 27, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to October 27, 2015.

186.    Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

187.    Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiffs and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

188.    Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

189.    Defendants' conduct was, by its nature, self-concealing and carried out in a manner that precluded detection.  Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and actively foreclosed Plaintiffs and the Class from learning of their illegal acts.

190.    By reason of the foregoing, the claims of Plaintiffs and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## FIRST CLAIM FOR RELIEF
### (Violation of State Antitrust Statutes)

191.    Plaintiffs incorporate by reference the preceding allegations contained in this Consolidated Complaint as if fully set forth herein.  At least as early as January 1, 1997, and continuing through at least mid-2011, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers and fix, raise, maintain, and/or stabilize at artificial and non-competitive levels the price of LAS. Defendants' unlawful combination and conspiracy caused prices of LAS to remain artificially inflated and supra-competitive.

192.    In furtherance of the unlawful conspiracy, each of the Defendants and their co-conspirators have committed overt acts, including, *inter alia*:

a.    agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of LAS sold in the United States, and in those States in which State claims are asserted;

b.      participating in meetings, conversations, and communications with coconspirators regarding prices to be charged for LAS;

c.      agreeing to allocate customers;

d.      meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

e.      refraining from competing by refusing to offer LAS at prices below the agreed-upon fixed price.

193.    The combination and conspiracy alleged herein has had the following effects, among others:

a.      Price competition in the sale of LAS has been restrained, suppressed, and/or eliminated;

b.      Prices for LAS sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

c.      Those who purchased LAS indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

194.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of LAS.

195.    As a direct and proximate result of Defendants' illegal agreement, contract, combination trust and/or conspiracy, Plaintiffs and the members of the Class have been injured and damaged and were forced to pay more than they would have for LAS.

196.    By engaging in the foregoing unlawful conduct, Defendants have violated the following state antitrust laws and entered into agreements in restraint of trade in violation of:

a.      Arizona Revised Stat. §§ 44-1401, et seq.

b.      California Bus. & Prof. Code §§ 16700, et seq.

c.      District of Columbia Code Ann. §§ 28-4502, et seq.

d.      Hawaii's Rev. Stat. § 480-3, et. seq.

e.      Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/7 (2)

f.      Iowa Code §§ 553.1, et seq.

g.      Kansas Stat. Ann. §§ 50-101, et seq.

h.      Maine Rev. Stat. Ann. 10, §§ 1101, et seq.

i.      Michigan Comp. Laws Ann. §§ 445.772, et seq.

j.      Minnesota Stat. §§ 325D.51, et seq.

k.      Mississippi Antitrust Act, Miss. Stat. §§ 75-21-1, et. seq.

l.      Nebraska Rev. Stat. §§ 59-801, et seq.

m.      Nevada Rev. Stat. Ann. §§ 598A.010, et seq.

n.      New Hampshire Rev. Stat. Ann. §§ 356:1, et seq.

o.      New Mexico Stat. Ann. §§ 57-1-1, et seq.

p.      New York General Business Law §§ 340, et seq.

q.      North Carolina Gen. Stat. §§ 75-1, et seq.

r.      North Dakota Century Code §§ 51-08.1-01, et seq.

s.      Oregon Rev. Stat. §§ 646.725, et seq.

t.      Puerto Rico Laws Ann. Tit. 10, § 260, et seq.

u.      Rhode Island Gen. Laws 1956 § 6-36-1, et seq.

v.      South Dakota Codified Laws Ann. §§ 37-1-3.1, et seq.

w.      Tennessee Code Ann. §§ 47-25-101, et seq.

x.      Utah Code §§ 76-10-3101, et seq.

y.      Vermont Stat. Ann. 9 §§ 2453, et seq.

z.      West Virginia Code §§ 47-18-1, et seq.; and

aa.    Wisconsin Stat. §§ 133.01, et seq.

### SECOND CLAIM FOR RELIEF

### (Violation of State Consumer Protection and Unfair and Deceptive Trade Practices Statutes)

197.    Plaintiffs incorporate by reference the preceding allegations contained in this Consolidated Complaint as if fully set forth herein.

198.    Defendants engaged in unfair competition or unfair or unconscionable acts or practices in violation of the state consumer protection and unfair and deceptive trade practices statutes listed below.

199.    There was a gross disparity between the price that Plaintiffs and Class members paid for LAS and the value of LAS received.

200.    As a direct and proximate result of Defendants' unfair competition, unfair or unconscionable acts or practices in violation of the state consumer protection and unfair and deceptive trade practices statutes below, Plaintiffs and Class members were forced to pay higher prices for LAS. By engaging in the foregoing conduct, Defendants have violated the following statutes:

**Alabama Deceptive Trade Practices Act**
**Ala. Code §§ 8-19-10 et seq.**

201.    Alabama's Deceptive Trade Practices Act bars "unconscionable" acts in the conduct of any trade or commerce.   Ala. Code §§ 8-19-5(27).

202.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

203.     As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

204.     Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Ala. Code §§ 8-19-10 et seq.

**Arkansas Deceptive Trade Practices Act**
**Arkansas Code Annotated, § 4-88-101 et seq.**

205.     The Arkansas Deceptive Trade Practices Act prohibits "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Arkansas Code Annotated, § 4-88-107(10).

206.     During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

207.     As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

208.     Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Arkansas Code Annotated, § 4-88-107(10).

**California Unfair Competition Law ("CUCL")**
**California Bus. & Prof. Code § 17200, et seq.**

209.     California's Unfair Competition Law broadly bars "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

210.     During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

211.     As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

212.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of California Bus. & Prof. Code § 17200, et seq.

**Colorado Consumer Protection Act ("CCPA")**
**Colo. Rev. Stat. § 6-1-101, et seq.**

213.    Private actions under the CCPA are available to any person who: (a) is an actual or potential consumer and is injured as a result of deceptive trade practices; or (b) is a successor in interest to an actual consumer who purchased a defendant's goods, services, or property; or (3) was injured as a result of a deceptive trade practice while in the course of his or her business or occupation. Colo. Rev. Stat. § 6-1-113(1)(a)-(c).

214.    The CCPA proscribes 43 categories of deceptive trade practices, which are non-exhaustive and are to be interpreted broadly. During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

215.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

216.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Colorado's Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, et seq.

**District of Columbia Consumer Protection Procedures Act ("DCCPPA")**
**District of Columbia Code §28-3901, et seq.**

217.    The DCCPPA "assure[s] that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices." District of Columbia Code §28-3901(b)(1).

218.    The DCCPPA identifies 35 categories of unlawful trade practices, which are non-exhaustive and are to be interpreted broadly. District of Columbia Code § 28-3904(a)-(hh).

During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

219.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

220.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of District of Columbia Code §28-3901, et seq.

**Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Florida Stat. §§ 501.201, et seq.**

221.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

222.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

223.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Fla. Stat. § 501.202(2).

**Massachusetts Consumer Protection Act ("MCPA")**
**Mass. Gen. L. Ch. 93A, et seq.**

224.    The MCPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. Ch. 93A §2(a).

225.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

226.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

227.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Massachusetts Gen. Laws Ann. Ch. 93A et. seq.

**Nebraska Consumer Protection Act ("CPA")**
**Nebraska Rev. Stat. §59-1601, et seq.**

228.    The CPA prohibits unfair competition and unfair trade practices generally "in the conduct of any trade or commerce." Nebraska Rev. Stat. §59-1602

229.    The CPA expressly prohibits "contracts, combinations, and conspiracies in restraint of trade." Nebraska Rev. Stat. §59-1603.

230.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

231.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

232.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Nebraska Rev. Stat. §59-1601, et seq.

**New Hampshire Consumer Protection Act ("NHCPA")**
**New Hampshire Rev. Stat. §358-A:2, et seq.**

233.    The NHCPA provides that it "shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce…" New Hampshire Rev. Stat. §358-A:2.

234.    Among its prohibitions, the NHCPA bars the "pricing of goods or service in a manner that tends to create or maintain a monopoly, or otherwise harm competition." New Hampshire Rev. Stat. §358-A:2(XIV).

235.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

236.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

237.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of New Hampshire Rev. Stat. §358-A:2, et seq.

**New Mexico Unfair Practices Act ("NMUPA")**
**New Mexico Stat. §57-12-1, et seq.**

238.    The NMUPA prohibits "unconscionable trade practices[s]…in connection with the sale…of any goods or services…that to a person's detriment: result in a gross disparity between the value received by a person and the price paid."   New Mexico Stat. §57-12-2(E).

239.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

240.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.  There was a gross disparity between the price that Plaintiffs and Class members paid for LAS and the value of LAS received.

241.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of New Mexico Stat. §57-12-1, et seq.

**New York Consumer Protection Act ("CPA")**
**New York Gen Bus. Law §349, et seq.**

242.    The CPA prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service…"  New York Gen Bus. Law §349(a).

243.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

244.    This conduct deceived consumers in New York. As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

245.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of New York Gen Bus. Law §349, et seq.

**North Carolina Unfair And Deceptive Trade Practices Act ("UDTPA")**
**North Carolina Gen. Stat. §75-1.1, et seq.**

246.    The UDTPA bars unfair methods of competition and unfair acts or practices in or affecting commerce.  North Carolina Gen. Stat. §75-1.1.

247.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

248.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

249.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of North Carolina Gen. Stat. §75-1.1 et seq.

**Oregon Unfair Trade Practices Act ("OUTPA")**
**Oregon Rev. Stat. §646.605, et seq.**

250.    The OUTPA provides for recovery for an "ascertainable loss of money or property, real or personal, as a result of willful use or employment by another person of a method, act or practice declared unlawful…"  Oregon Rev. Stat. §646.638(1).

251.    OUTPA prohibits "unfair or deceptive conduct in trade or commerce." Oregon Rev. Stat. §646.608(1).

252.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

253.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

254.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Oregon Rev. Stat. §646.605, et seq.

**Rhode Island Deceptive Trade Practices Act ("DTPA")**
**Rhode Island Gen. Laws §6-13.1-1, et seq.**

255.    The DTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Rhode Island Gen. Laws §6-13.1-2.

256.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

257.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

258.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Rhode Island Gen. Laws §6-13.1-1, et seq.

**South Carolina Unfair Trade Practices Act ("UTPA")**
**South Carolina Code 1976 § 39-5-140 et seq.**

259.    The UTPA prohibits unfair methods of competition and unfair acts or practices in the conduct of any trade or commerce.

260.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

261.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

262.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of South Carolina Code 1976 § 39-5-140 et seq.

**Vermont Consumer Fraud Act ("CFA")**
**Vermont Stat. tit. 9 § 2451, et seq.**

263.    The CFA prohibits "unfair methods of competition in commerce and unlawful or deceptive acts or practices in commerce."  Vermont Stat. tit. 9 § 2453(a).

264.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

265.    As a direct and proximate result of this conspiracy, Plaintiffs and the Class were harmed by being forced to pay supra-competitive prices for LAS.

266.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Vermont Stat. tit. 9 § 2451, et seq.

### THIRD CLAIM FOR RELIEF
### (Unjust Enrichment and Disgorgement of Profits)

267.    Plaintiffs incorporate by reference the preceding allegations contained in this Complaint as if fully set forth herein.

268.    To the extent required, this claim is pled in the alternative to the other claims in this Complaint.

269.    Defendants have benefited from overcharges on the sales of LAS made possible by the unlawful and inequitable acts alleged in this Complaint.

270.    By paying more for LAS than they would have in the absence of Defendants' wrongful conduct, Plaintiffs and the Class have  conferred an economic benefit upon Defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Class.

271.    It would be futile for Plaintiffs and Class members to seek a remedy from any party with whom they had or have privity of contract.  Defendants have paid no consideration to anyone for any of the benefits they received indirectly from Plaintiffs and Class members.

272.    It would be futile for Plaintiffs and Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased LAS, as those intermediaries are not liable and would not compensate Plaintiffs and Indirect Purchaser Class members for the Defendants' unlawful conduct.

273.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

274.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, who paid anticompetitive prices that inured to the Defendants' benefit.

275.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Class.

276.    Equity demands that Defendants be required to make restitution and return the overpayment to  Plaintiffs and the Class.

277.    Plaintiffs and members of the Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution in the following States:

**Unjust Enrichment: Alabama**

278.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

279.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Alabama indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

280.    Defendants should be ordered to make restitution for the benefit of Alabama indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Arizona

281.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

282.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Arizona indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

283.    Plaintiffs and Class Members have been impoverished by the overcharges for LAS resulting from Defendants' unlawful conduct.

284.    Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants have paid no consideration to any other person for any benefit they received from Plaintiffs and Class Members.

285.    Plaintiffs and Class Members have no remedy at law.

286.    The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification. To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from the sales of LAS to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit

of Arizona indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Arkansas

287.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

288.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Arkansas indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

289.     Defendants were enriched by their illegal activities at the expense of Arkansas indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Arkansas indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: California

290.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

291.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including California indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

292.    Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

293.     Defendants were enriched by their illegal activities at the expense of California indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of California indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Colorado

294.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

295.     The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Colorado indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

296.     Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

297.     Defendants should be ordered to make restitution for the benefit of Colorado indirect purchasers because it would unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: District of Columbia

298.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

299.     The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including District of Columbia indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

300.    Defendants have accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

301.    Defendants were enriched by their illegal activities at the expense of the District of Columbia indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of the District of Columbia indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Florida

302.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

303.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Florida indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

304.    Defendants were enriched by their illegal activities at the expense of Florida indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Florida indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Hawaii

305.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

306.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Hawaii indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

307.    Defendants were enriched by their illegal activities at the expense of Hawaii indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Hawaii indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Illinois

308.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

309.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Illinois indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

310.    Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

311.    Defendants were enriched by their illegal activities at the expense of Illinois indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Illinois indirect purchasers because it would be against equity, justice, and good conscience to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Iowa

312.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

313.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Iowa indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

314.    Defendants were enriched by their illegal activities at the expense of Iowa indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Iowa indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Kansas

315.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

316.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Kansas indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

317.    Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

318.    Defendants were enriched by their illegal activities at the expense of Kansas indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the

benefit of Kansas indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Maine

319.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

320.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Maine indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

321.    Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.  Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiffs and Class Members.

322.    Defendants were enriched by their illegal activities at the expense of Maine indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Maine indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Massachusetts

323.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

324.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Massachusetts indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

325.    Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiff and Class Members.

326.    Defendants were enriched by their illegal activities at the expense of Massachusetts indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Massachusetts indirect purchasers because it would be unjust and inequitable and unfair to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Michigan

327.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

328.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Michigan indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

329.    Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

330.    Defendants were enriched by their illegal activities at the expense of Michigan indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Michigan indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Minnesota

331.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

332.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Minnesota indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

333.    Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and Class Members.

334.    Defendants were enriched by their illegal activities at the expense of Minnesota indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Minnesota indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Mississippi

335.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

336.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Mississippi indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

337.    Defendants have retained the benefit of these overcharges, which in equity and good conscience belong to Plaintiffs and the Class Members on account of Defendants' anticompetitive conduct.

338.    Defendants were enriched by their illegal activities at the expense of Mississippi indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Mississippi indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Nebraska

339.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

340.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Nebraska indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

341.    Defendants have not paid any consideration to anyone in exchange for the financial benefits bestowed upon them.

342.    Defendants were enriched by their illegal activities at the expense of Nebraska indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Nebraska indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Nevada

343.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

344.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Nevada indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

345.    Defendants appreciated the benefits bestowed upon them by Plaintiffs and Class Members, for which they have paid no consideration to any other person.

346.    Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiffs and the Class Members.

347.    Defendants were enriched by their illegal activities at the expense of Nevada indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Nevada indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

**Unjust Enrichment: New Hampshire**

348.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

349.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including New Hampshire indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

350.    Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

351.    Defendants were enriched by their illegal activities at the expense of New Hampshire indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of New Hampshire indirect purchasers because it would be unjust and

inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: New Mexico

352.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

353.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including New Mexico indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

354.    Defendants have not paid any consideration to any other person for any of the benefits they received.

355.    Defendants have knowingly benefitted at the expense of Plaintiffs and Class Members from revenue resulting from unlawful overcharges for LAS.

356.    Defendants were enriched by their illegal activities at the expense of New Mexico indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of New Mexico indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: New York

357.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

358.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including New York indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

359.    Defendants were enriched by their illegal activities at the expense of New York indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of New York indirect purchasers because it would be unjust, inequitable, and against good conscience to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: North Carolina

360.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

361.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including North Carolina indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

362.    The financial benefits the Defendants derived as a result of Defendants' unlawful practices were not conferred on the Defendants officiously, gratuitously, or voluntarily.

363.    The financial benefits Defendants derived from Plaintiffs and IPP class members who paid anticompetitive prices for LAS is measurable.

364.    Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiffs and the Class Members.

365.    Defendants were enriched by their illegal activities at the expense of North Carolina indirect purchasers of LAS and thus Defendants should be ordered to make restitution

for the benefit of North Carolina indirect purchasers because it would be unjust, inequitable, and against good conscience to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: North Dakota

366.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

367.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including North Dakota indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

368.    Defendants have been enriched by revenue resulting from these unlawful overcharges for LAS.

369.    Plaintiffs and Class Members have been impoverished by paying anticompetitive overcharges for LAS as a result of Defendants' unlawful conduct.

370.    Defendants' enrichment and Plaintiff's impoverishment are connected. Defendants have paid no consideration to any other person for any benefit they received.

371.    Defendants were enriched by their illegal activities at the expense of North Dakota indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of North Dakota indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

372.    Plaintiffs and Class Members have no remedy at law.

## Unjust Enrichment: Oregon

373.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

374.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Oregon indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

375.    Defendants were aware of and have knowingly accepted and retained the benefits bestowed upon them by Plaintiffs and the Class Members.

376.    Defendants were enriched by their illegal activities at the expense of Oregon indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Oregon indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Puerto Rico

377.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

378.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Puerto Rico indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

379.    Defendants were enriched by their illegal activities at the expense of Puerto Rico indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the

benefit of Puerto Rico indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

380.     Plaintiffs and Class Members have no remedy at law.

### Unjust Enrichment: Rhode Island

381.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

382.     The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Rhode Island indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

383.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Indirect Purchaser Class.

384.     Defendants were enriched by their illegal activities at the expense of Rhode Island indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Rhode Island indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: South Carolina

385.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

386.     The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including South Carolina indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

387.    Defendants were enriched by their illegal activities at the expense of South Carolina indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of South Carolina indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: South Dakota

388.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

389.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including South Dakota indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

390.    Defendants were aware of the benefit bestowed upon them by Plaintiffs and Class Members.

391.    Defendants were enriched by their illegal activities at the expense of South Dakota indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of South Dakota indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

392.    Plaintiffs and Class Members have no remedy at law.

## Unjust Enrichment: Tennessee

393.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

394.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Tennessee indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

395.    Defendants were aware of or appreciated the benefits bestowed upon them by Plaintiffs and Class Members.

396.    Defendants were enriched by their illegal activities at the expense of Tennessee indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Tennessee indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

397.    It would be futile for Plaintiffs and Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased LAS, as those intermediaries are not liable and would not compensate Plaintiffs and the Indirect Purchaser Class members for Defendants' unlawful conduct.

## Unjust Enrichment: Utah

398.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

399.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Utah indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

400.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members.

401.    Defendants were enriched by their illegal activities at the expense of Utah indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Utah indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Vermont

402.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

403.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Vermont indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

404.    Defendants accepted the benefit bestowed upon them by Plaintiffs and Class Members

405.    Defendants were enriched by their illegal activities at the expense of Vermont indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Vermont indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: West Virginia

406.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

407.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including West Virginia indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

408.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members.

409.    Defendants were enriched by their illegal activities at the expense of West Virginia indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of West Virginia indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Wisconsin

410.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for LAS is a direct and proximate result of Defendants' unlawful practices.

411.    The financial benefits Defendants derived rightfully belong to Plaintiffs and Indirect Purchaser Class members, including Wisconsin indirect purchasers, who paid anticompetitive prices that inured to the Defendants' benefit and to the IPPs' detriment.

412.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members.

413.    Defendants were enriched by their illegal activities at the expense of Wisconsin indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Wisconsin indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment as follows:

A.  determining that this action may be maintained as a class action under Rule 23 of the  Federal Rules of Civil Procedure with Plaintiffs as the designated Class Representatives and their counsel as Class Counsel;

B.  awarding Plaintiffs and the relevant Class Members compensatory damages, restitution, and/or disgorgement under the state statutes in an amount to be proven at trial, multiple damages under the state  statutes in an amount to be proven at trial, multiple damages according to law against  Defendants, jointly and severally;

C.  awarding Plaintiffs and the relevant Class Members punitive, exemplary, statutory, and full consideration damages under the aforementioned state laws;

D.  awarding Plaintiffs and the Class pre-judgment and post-judgment interest and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E.  awarding Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees; and

F.  granting Plaintiffs and the Class such other and further relief as the Court deems just  and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

Dated: March 5, 2018                By: _s/ Jay B. Shapiro_____

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Jay B. Shapiro
Samuel O. Patmore
Abigail G Corbett
Maria A. Fehretdinov
Jenea E. Reed
Jason Koslowe
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Tel:    305.789.3200
Fax:    305.789.3395
Email:  jshapiro@stearnsweaver.com
        spatmore@stearnsweaver.com
        acorbett@stearnsweaver.com
        mfehretdinov@stearnsweaver.com
        jreed@stearnsweaver.com
        jkoslowe@stearnsweaver.com

*Interim Co-Lead Counsel for Indirect Purchasers*

**MILLER LAW LLC**
Marvin A. Miller
Matthew E. Van Tine
Andrew Szot
Kathleen E. Boychuck
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Tel:    312.332.3400
Fax:    312.676.2676
Email:  mmiller@millerlawllc.com
        mvt@millerlawllc.com
        aszot@millerlawllc.com
        kboychuck@millerlawllc.com

*Interim Co-Lead Counsel for Indirect Purchasers*

**LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK, LLP**
William L. Mentlik
600 South Avenue West
Westfield, NJ 07090-1497
Tel:    908.654.5000
Fax:    908.6547866
Email:  wmentlik@ldlkm.com

*Liaison Counsel for Indirect Purchasers*

81

**KERGER & HARTMAN, LLC**
Richard M. Kerger
33 S. Michigan Street, Suite 100
Toledo, OH 43604
Tel:     419.255.5990
Fax:     419.255.5997
Email: rkerger@kergerlaw.com

**CUNEO GILBERT & LADUCA, LLP**
Benjamin David Elga
16 Court Street
Suite 1012
Brooklyn, NY 11241
Tel:     202.789.3960
Fax:     202.789.1813
E-mail: belga@cuneolaw.com

**CUNEO GILBERT & LADUCA, LLP**
Jonathan W. Cuneo
Joel Davidow
Blaine Finley
507 C Street, N.E.
Washington, DC 20002
Tel:     202.789.3960
Fax:     202.789.1813
Email: jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com

**HUDSON, MALLANEY, SHINDLER & ANDERSON, P.C.**
J. Barton Gopelrud
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Tel:     515.223.4567
Fax:     515.223.8887
Email: jbgoplerud@hudsonlaw.net