# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### Newark Division

Appomattox River Water Authority;
21300 Chesdin Road
South Chesterfield, VA  23803

County of Chesterfield;
9901 Lori Road
Chesterfield, VA  23832

County of Henrico;
4301 East Parham Road
Henrico, VA  23228

City of Lynchburg;
900 Church Street
Lynchburg, VA  24504

City of Newport News;
2400 Washington Avenue
Newport News, VA  23607

City of Norfolk;
810 Union Street
Norfolk, VA  23510

Rivanna Water & Sewer Authority;
695 Moores Creek Lane
Charlottesville, VA  22902

South Central Wastewater Authority;
900 Magazine Road
Petersburg, VA  23803

City of Springfield;
840 Boonville Avenue
Springfield, MO  65802

*Plaintiffs*,

v.

General Chemical Corporation;
90 East Halsey Road

Civil Action No.: 2:16-md-2687 (JLL)
(JAD) (MDL 2687)

**[CORRECTED] AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

Parsippany, NJ 07054, USA
Serve: The Corporation Trust
300 E. Lombard Street
Baltimore, MD 21202, USA

General Chemical Performance Products, LLC;
90 East Halsey Road
Parsippany, NJ 07054, USA
Serve: Corporation Trust Company
820 Bear Tavern Road
West Trenton, NJ 08628, USA

General Chemical LLC;
90 East Halsey Road
Parsippany, NJ 07054, USA
Serve:  General Chemical LLC
90 East Halsey Road
Parsippany, NJ 07054

GenTek Inc.;
90 East Halsey Road
Parsippany, NJ 07054, USA
Serve: Edward E. Obstler
233 East Redwood Street
Baltimore, MD 21202, USA

Chemtrade Logistics Income Fund;
155 Gordon Baker Road, Suite 300
North York, M2H 3N5, Canada
Serve: Susan Pare, General Counsel &
Corporate Secretary
155 Gordon Baker Road, Suite 300
North York, M2H 3N5, Canada

Chemtrade Logistics Inc.;
155 Gordon Baker Road, Suite 300
North York, M2H 3N5, Canada
Serve: CSC-Lawyers Incorporating Service
Company
11 E. Chase Street
Baltimore, MD 21202, USA

Chemtrade Chemicals Corporation;
155 Gordon Baker Road, Suite 300
North York, M2H 3N5, Canada
Serve: Susan Pare, General Counsel &

Corporate Secretary
155 Gordon Baker Road, Suite 300
North York, M2H 3N5, Canada

Chemtrade Chemicals US, LLC;
1421 Wills Avenue
Syracuse, NY 13204, USA
Serve: CT Corporation System
4701 Cox Road, Suite 285
Glen Allen, VA 23060, USA

Chemtrade Solutions, LLC;
90 East Halsey Road
Parsippany, NJ 07054, USA
Serve: CT Corporation System
4701 Cox Road, Suite 285
Glen Allen, VA 23060, USA

American Securities LLC;
299 Park Avenue, 34th Floor
New York, NY 10017
Serve: Aaron Rubinstein
Arnold & Porter Kaye Scholer
250 West 55th Street
New York, NY 10019

GEO Specialty Chemicals, Inc.;
340 Mathers Road
Ambler, PA 19002-3420, USA
Serve: CT Corporation System
4701 Cox Road, Suite 285
Glen Allen, VA 23060, USA

C & S Chemicals, Inc.;
4180 Providence Road, Suite 310
Marietta, GA 30062-6194, USA
Serve: Robert L. Chandler
4180 Providence Road, Suite 310
Marietta, GA 30062, USA

C & S Chemicals (of Georgia) Inc.;
4180 Providence Road, Suite 310
Marietta, GA 30062-6194, USA
Serve: Jean C. Chandler
4180 Providence Road, Suite 310
Marietta, GA 30062, USA

RGM Chemical, LLC;
4180 Providence Road, Suite 310
Marietta, GA 30062-6194, USA
Serve: Robert L. Chandler
4180 Providence Road, Suite 310
Marietta, GA 30062, USA

RGM of Georgia, Ltd.;
4180 Providence Road, Suite 310
Marietta, GA 30062-6194, USA
Serve: Robert L. Chandler
4180 Providence Road, Suite 310
Marietta, GA 30062, USA

USALCO, LLC;
2601 Cannery Avenue
Baltimore, MD 21226, USA
Serve: Resagent, Inc.
3190 Fairview Park Drive, Suite 300
Falls Church, VA 22042, USA

Delta Chemical Corporation;
120 E. Baltimore Street, Suite 2100
Baltimore, MD 21202
Serve: James E. Baker, Jr., Esq.
120 E. Baltimore Street
Suite 2100
Baltimore, MD 21202

Kemira Chemicals, Inc.;
1000 Parkwood Circle, Suite 500
Atlanta, GA 30339, USA
Serve: CT Corporation System
4701 Cox Road, Suite 285
Glen Allen, VA 23060, USA

Southern Ionics Incorporated;
1250 Neosho Ave.
Baton Rouge, LA 70802, USA
Serve:  The Corporation Trust Inc.
351 West Camden Street
Baltimore, MD 21201, USA

Frank A. Reichl;
82 Crenshaw Drive

Flanders, NJ 07836-4725, USA

Vincent J. Opalewski;
7 Beresford Place
Rockaway, NJ 07866-1322, USA

Brian C. Steppig;
17920 Lake Ridge Point
Alexander, AR 72002-9298, USA

Alex Avraamides;
279 Maywood Avenue
Maywood, NJ 07607, USA

Amita Gupta;
c/o BASF Corporation, 100 Park Avenue
Florham Park, NJ 07932

Matthew F. LeBaron;
81 Hemlock Hill Road
New Cannan, CT 06840

Scott M. Wolff;
51 Kerry Lane
Chappaqua, NY 10514

Kenneth A. Ghazey;
154 W. Brookline St.
Boston, MA 02118

Milton Sundbeck;
37 Town Creek Road
West Point, MS 39773

John D. Besson;
321 Ocean Drive, #501
Miami Beach, FL 33139

and John Doe Nos. 1 – 50,

*Defendants.*

## [CORRECTED] AMENDED COMPLAINT
## JURY TRIAL DEMANDED

Plaintiffs Appomattox River Water Authority ("Appomattox"), County of Chesterfield ("Chesterfield"), County of Henrico ("Henrico"), City of Lynchburg ("Lynchburg"), City of Newport News ("Newport News"), City of Norfolk ("Norfolk"), Rivanna Water and Sewer Authority ("Rivanna"), and South Central Wastewater Authority ("South Central"), (collectively, the "Virginia Plaintiffs"), by and through their undersigned counsel, bring this action alleging claims, under the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq*. and the Clayton Antitrust Act, 15 U.S.C. §§ 12-17 & 29 U.S.C. §§ 52-53 (Count I); under the Virginia Antitrust Act, VIRGINIA CODE ANN. § 59.1-.5 (Count II); and under the common law of Virginia for restitution/disgorgement/unjust enrichment (Count III), fraud (Count VI), and breach of contract (Count VII). Plaintiff City of Springfield ("Springfield"), by and through its undersigned counsel, brings this action alleging claims, under the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq*. and the Clayton Antitrust Act, 15 U.S.C. §§ 12-17 & 29 U.S.C. §§ 52-53 (Count I); under Missouri Antitrust Law, MO. REV. STAT. § 416.011-.161 (Count IV); and under the common law of Missouri for restitution/disgorgement/unjust enrichment (Count V), fraud (Count VIII), and breach of contract (Count IX). (Springfield and the Virginia Plaintiffs are collectively referred to herein as "Plaintiffs"). Plaintiffs allege these claims against Defendants General Chemical Corporation; General Chemical Performance Products, LLC; General Chemical LLC; GenTek Inc.; Chemtrade Logistics Income Fund; Chemtrade Logistics, Inc.; Chemtrade Chemicals Corporation; Chemtrade Chemicals US, LLC; Chemtrade Solutions, LLC; American Securities LLC; GEO Specialty Chemicals, Inc.; C & S Chemicals, Inc.; C & S Chemicals (of Georgia) Inc.; RGM Chemical, LLC; RGM of Georgia, Ltd.; USALCO, LLC; Delta Chemical Corporation, Kemira Chemicals, Inc.; Southern Ionics Incorporated; Frank A. Reichl; Vincent J.

1

Opalewski; Brian C. Steppig; Alex Avraamides; Amita Gupta; Matthew LeBaron; Scott Wolff;

Kenneth A. Ghazey; Milton Sundbeck; John D. Besson; and John Doe Nos. 1 – 50 jointly and

severally (collectively hereinafter "Defendants").

In support of its claims, Plaintiffs allege as follows:

## INTRODUCTION

1.      This is an action under the Sherman Antitrust Act and the Clayton Antitrust Act,

and the laws of the Commonwealth of Virginia and the State of Missouri, for compensatory

damages, restitution, disgorgement, treble damages, punitive damages, injunctive relief, and

other relief, including but not limited to an award of attorneys' fees and expenses, as well as pre-

judgment and post-judgment interest on the damages awarded, against Defendants, jointly and

severally, for conspiring to suppress and eliminate competition in the sale and marketing of

aluminum sulfate ("Alum") by agreeing to rig bids and allocate customers for, and to fix,

stabilize, inflate, and maintain the price of Alum sold to counties, cities, authorities and

companies in the United States from January 1, 1997 through at least February 2011 and until

such time as to be determined (the "Conspiracy Period").  Defendants' actions caused localities

and authorities across the United States to overpay by many millions of dollars for the Alum they

needed.  Plaintiffs, which have paid millions of dollars to purchase Alum, seek to recover

damages they suffered from the initiation of the conspiracy until the cessation of the

anticompetitive effects resulting therefrom (the "Injury Period").[1]

---

[1] The conspiracy continued to cause anticompetitive harm even after any potential end to the Conspiracy Period because, among other reasons, many of the Alum supply contracts executed during the Conspiracy Period remained in effect until they expired according to their terms or were renegotiated.

2.      Defendant companies are manufacturers and distributors of Alum used by localities and authorities to treat potable water and/or wastewater by pulp and paper manufacturers as part of their manufacturing process, and in lake treatment to reduce phosphorous levels contributing to degraded water quality.  The individual defendants were executives at these companies.

3.      During the Conspiracy Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize the prices at which Alum would be sold.  As more fully detailed infra, Frank A. Reichl, a former senior executive at Defendant General Chemical Corporation, and Defendant GEO Specialty Chemicals, Inc., each already have agreed to plead guilty to participating in the conspiracy.  General Chemical Corporation has been granted conditional amnesty by the United States Department of Justice ("Department of Justice") for its conduct relating to the Alum conspiracy, which conditional amnesty, as described further below, required that General Chemical Corporation admit to engaging in criminal-anticompetitive conduct with its competitors.  Two other senior executives of Defendants General Chemical Corporation and GEO Specialty Chemicals – Vincent J. Opalewski and Brian C. Steppig, respectively – were indicted by the United States on February 17, 2016, for participating in the conspiracy.  Upon information and belief, Opalewski, as Reichl's superior at General Chemical Corporation during at least a portion of the Conspiracy Period, authorized, conducted, oversaw, participated in, and/or was aware of the illegal conduct to which Reichl has pleaded guilty.  Upon information and belief, Steppig, authorized, conducted, oversaw, participated in, and/or was aware of the illegal conduct to which GEO Specialty Chemicals, Inc. has pleaded guilty.  On January 3, 2018, Steppig pleaded guilty to participating in the conspiracy.

4.      In order to facilitate the conspiracy, Defendants engaged in regular communications throughout the Conspiracy Period, to discuss customer allocation and prices for Alum.  Upon information and belief, evidence in the form of phone records and emails between top executives at the Defendant companies and their co-conspirators demonstrate that they furthered the conspiracy by (a) meeting or otherwise communicating to discuss their respective Alum businesses, including the prices quoted or bid to their customers, (b) agreeing to allocate customers and "stay away" from each other's historical customers, (c) agreeing to rig bids by submitting intentionally high "throw-away" bids to a particular customer to ensure that their co-conspirator, the existing seller to that customer, would continue to "win" that customer's business (or to help the co-conspirator to raise the prices paid by that customer), and (d) withdrawing a winning bid or price quote in cases where a bid was inadvertently submitted.

5.      As a result of Defendants' unlawful conduct, Plaintiffs paid more for Alum than they would have if a competitive market had determined Alum prices.

6.      Plaintiffs sustained damages as a result of Defendants' and co-conspirators' anticompetitive conduct as alleged herein.

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 4 (Sherman Antitrust Act jurisdiction), 15 U.S.C. §§ 15 & 26 (Clayton Antitrust Act jurisdiction), 28 U.S.C. § 1331 (general federal question jurisdiction), & 28 U.S.C. § 1337 (antitrust jurisdiction).  The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 (pendent jurisdiction).

8.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d), because during the Conspiracy Period, one or more of the Defendants resided in, transacted business in, was found in, or had agents in this District.

9.      This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:  (a) transacted business in this District; (b) participated in the manufacturing and/or distribution of Alum in this District; (c) had substantial aggregate contacts with this District; and/or (d) engaged in an unlawful conspiracy with regard to Alum described herein that was directed at, and had the effect of causing injury to, persons and entities residing in, located in, and/or doing business in this District.

## PARTIES

### A.      PLAINTIFFS

10.      Plaintiff Appomattox River Water Authority is a public body politic and corporate created pursuant to the Virginia Water and Waste Authorities Act in 1960, Va. Code § 15.2-5100 *et seq.*, to provide drinking water to the Cities of Colonial Heights and Petersburg and the Counties of Chesterfield, Dinwiddie, and Prince George.  It has its principal place of business at 21300 Chesdin Road, S. Chesterfield, VA 23803.  During the Injury Period, Appomattox directly purchased Alum from one or more of the Defendants, or their co-conspirators, and has suffered antitrust injury as a result of Defendants' illegal conduct as alleged in this Amended Complaint.

11.      Plaintiff County of Chesterfield is a county located in the Commonwealth of Virginia.  It has its principal place of business at 9901 Lori Road, Chesterfield, Virginia  23832.  During the Injury Period, Chesterfield directly purchased Alum from one or more of the Defendants, or their co-conspirators, and has suffered antitrust injury as a result of Defendants' illegal conduct as alleged in this Amended Complaint.

12.      Plaintiff County of Henrico is a county located in the Commonwealth of Virginia.  It has its principal place of business at 4301 East Parham Road, Henrico, Virginia  23228.  During the Injury Period, Henrico directly purchased Alum from one or more of the Defendants,

or their co-conspirators, and has suffered antitrust injury as a result of Defendants' illegal conduct as alleged in this Amended Complaint.

13.     Plaintiff City of Lynchburg is a municipal corporation chartered by the Commonwealth of Virginia.  It has its principal place of business at 900 Church Street, Lynchburg, Virginia 24504.  During the Injury Period, Lynchburg directly purchased Alum from one or more of the Defendants, or their co-conspirators, and has suffered antitrust injury as a result of Defendants' illegal conduct as alleged in this Amended Complaint.

14.     Plaintiff City of Newport News is a municipal corporation chartered by the Commonwealth of Virginia.  It has its principal place of business at 2400 Washington Avenue, Newport News, Virginia 23607.  During the Injury Period, Newport News directly purchased Alum from one or more of the Defendants, or their co-conspirators, and has suffered antitrust injury as a result of Defendants' illegal conduct as alleged in this Amended Complaint.

15.     Plaintiff City of Norfolk is a municipal corporation chartered by the Commonwealth of Virginia.  It has its principal place of business at 810 Union Street, Norfolk, Virginia 23510.  During the Injury Period, Norfolk directly purchased Alum from one or more of the Defendants, or their co-conspirators, and has suffered antitrust injury as a result of Defendants' illegal conduct as alleged in this Amended Complaint.

16.     Plaintiff Rivanna Water and Sewer Authority is a public body politic and corporate created pursuant to the Virginia Water and Waste Authorities Act in 1972, Va. Code § 15.2-5100 *et seq.*, to provide drinking water and wastewater services to the City of Charlottesville and the County of Albemarle.  It has its principal place of business at 695 Moores Creek Lane, Charlottesville, VA 22902.  During the Injury Period, Rivanna directly purchased

Alum from one or more of the Defendants, or their co-conspirators, and has suffered antitrust injury as a result of Defendants' illegal conduct as alleged in this Amended Complaint.

17.     Plaintiff South Central Wastewater Authority is a public body politic and corporate created pursuant to the Virginia Water and Waste Authorities Act in 1996, *see* Va. Code § 15.2-5102, to provide wastewater services to the Cities of Colonial Heights and Petersburg and the Counties of Chesterfield, Dinwiddie, and Prince George.  South Central principal office is located at 900 Magazine Road, Petersburg, Virginia 23803. During the Injury Period, South Central directly purchased Alum from one or more of the Defendants, or their co-conspirators, and has suffered antitrust injury as a result of Defendants' illegal conduct as alleged in this Amended Complaint.

18.     Plaintiff City of Springfield is a constitutional charter city under the constitution and law of the State of Missouri and, by its charter, has delegated the power of operation and management of its utilities to the Board of Public Utilities of Springfield, Missouri, designated as "City Utilities of Springfield, Missouri."  The City of Springfield has its principal place of business at the Busch Municipal Building at 840 Boonville Avenue, Springfield, Missouri 65802, and the Board of Public Utilities of Springfield, Missouri has its principal place of business at the office of its Board of Public Utilities, 301 East Central, Springfield, Missouri 65802.  During the Injury Period, Springfield directly purchased Alum from one or more of the Defendants, or their co-conspirators, and has suffered antitrust injury as a result of Defendants' illegal conduct as alleged in this Amended Complaint.

**B.     DEFENDANTS**

19.     Defendant General Chemical Corporation was a corporation existing under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey, 07054.  General Chemical Corporation maintained Alum manufacturing and distribution

7

facilities throughout the United States and was a leading manufacturer and supplier of water treatment chemicals, including Alum.  During the Injury Period, directly or through its subsidiaries and affiliates, General Chemical Corporation sold Alum throughout the United States.

20.     Defendant General Chemical Performance Products, LLC, was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey, 07054.  During the Injury Period, directly or through its subsidiaries and affiliates, General Chemical Performance Products, LLC sold Alum throughout the United States.  At all relevant times, General Chemical Performance Products, LLC was a wholly-owned subsidiary of General Chemical Corporation.

21.     Defendant General Chemical LLC was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey, 07054.  At all relevant times, General Chemical LLC was a wholly-owned subsidiary of General Chemical Performance Products, LLC.

22.     Defendants General Chemical Corporation, General Chemical Performance Products, LLC, and General Chemical LLC, are referred to collectively herein as "General Chemical."

23.     As the legal successors-in-interest to General Chemical, Defendants Chemtrade Logistics Income Fund, Chemtrade Logistics, Inc., Chemtrade Chemicals Corporation, Chemtrade Chemicals US, LLC, and Chemtrade Solutions, LLC assumed General Chemical's liability for General Chemical's participation in the unlawful Alum conspiracy described herein.

24.     Defendant GenTek, Inc. ("GenTek") is a corporation existing under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey,

07054.  General Chemical was a wholly-owned and controlled subsidiary of GenTek from approximately 1999 to October 2009.  Upon information and belief, GenTek, as General Chemical's parent company, was aware of, authorized, and acquiesced in General Chemical's role and participation in the unlawful conspiracy described herein.  During the Injury Period, directly or through its subsidiaries and affiliates, GenTek sold Alum throughout the United States.

      25.     In 2002, GenTek, General Chemical, and their then-existing related corporate entities filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware, including bankruptcy filings on behalf of its subsidiaries, including General Chemical.  GenTek and General Chemical were active participants in the conspiracy before and at the time they filed for bankruptcy.  Accordingly, GenTek and General Chemical were aware of the conspiracy at the time they filed for bankruptcy.  Notwithstanding their knowledge and participation in the conspiracy, they did not disclose any claim arising out of the unlawful conspiracy as a liability on their applicable bankruptcy schedules.  GenTek and General Chemical continued to participate in the conspiracy during the time their bankruptcy petition was pending.  Effective October 7, 2003, GenTek and General Chemical emerged from bankruptcy under a plan of reorganization.  After emerging from bankruptcy, GenTek and General Chemical continued to participate in the conspiracy and reaffirmed their participation through specific post-bankruptcy actions taken by GenTek and General Chemical in furtherance of the conspiracy, as alleged below.  GenTek and General Chemical also reaffirmed its participation in the conspiracy by continuing to engage in the conduct described herein with respect to Alum.

26.     American Securities LLC ("American Securities") is a limited liability company existing under the laws of New York, with its principal place of business at 299 Park Avenue, 34th Floor, New York, New York, 10017.

27.     In October 2009, American Securities acquired GenTek.

28.     American Securities participated in the conspiracy alleged herein throughout the period it owned GenTek.

29.     Defendant Chemtrade Logistics Income Fund is a limited purpose trust established in 2001 under the laws of the Province of Ontario, and has its principal place of business in Toronto, Canada.  Chemtrade Logistics Income Fund's operating subsidiaries provide industrial chemicals and services to customers throughout Canada, the United States, and Europe.  Chemtrade Logistics Income Fund's Water Solutions and Specialty Chemicals segment manufactures and markets a variety of inorganic coagulants for water treatment applications, including Alum.

30.     In January 2014, Defendant Chemtrade Logistics Income Fund acquired General Chemical for $860 million from American Securities.

31.     Defendant Chemtrade Logistics, Inc. is a Canadian corporation incorporated under the laws of the Province of Ontario, and has its principal place of business in Toronto, Canada.  Chemtrade Logistics, Inc. is a subsidiary of Chemtrade Logistics Income Fund.

32.     Defendant Chemtrade Chemicals Corporation is a Delaware corporation with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey, 07054.  Chemtrade Chemicals Corporation is a wholly-owned subsidiary of Defendant Chemtrade Logistics, Inc. During the Injury Period, Chemtrade Chemicals Corporation sold Alum directly to purchasers in the United States.

33.     Defendant Chemtrade Chemicals US, LLC, is a Delaware limited liability company with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey, 07054.  Chemtrade Chemicals US, LLC is a wholly-owned subsidiary of Defendant Chemtrade Logistics, Inc.  During the Injury Period, Chemtrade Chemicals US, LLC sold Alum directly to purchasers in the United States.

34.     Defendant Chemtrade Solutions, LLC is a Delaware corporation with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey, 07054.  Chemtrade Solutions LLC is a wholly-owned subsidiary of Defendant Chemtrade Chemicals Corporation.

35.     General Chemical, under the ownership of Chemtrade Logistics, Inc., operates as Chemtrade Chemicals Corporation and Chemtrade Chemicals US, LLC.

36.     Defendants Chemtrade Logistics Income Fund, Chemtrade Logistics, Inc., Chemtrade Chemicals Corporation, Chemtrade Chemicals US, LLC, and Chemtrade Solutions, LLC are collectively referred to herein as "Chemtrade" unless otherwise indicated.  Chemtrade manufactures and sells water treatment chemicals, including Alum, throughout the United States. Chemtrade is the legal successor-in-interest to General Chemical.  As the legal successor-in-interest to General Chemical, Chemtrade assumed General Chemical's liability for General Chemical's participation in the unlawful Alum conspiracy described herein.

37.     Defendant GEO Specialty Chemicals, Inc. ("GEO") is an Ohio corporation with its principal place of business at 340 Mathers Road, Ambler, Pennsylvania, 19002.  GEO manufactures, markets, and distributes specialty chemicals, including Alum, for customers throughout the United States and internationally.  GEO has water treatment chemical production facilities in Alabama, Arkansas, Georgia, Louisiana, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, and Texas.  During the Injury Period, directly or through its

subsidiaries and affiliates, GEO sold Alum throughout the United States.  On June 16, 2016, GEO pleaded guilty for its role in the unlawful conspiracy with regard to Alum described herein. Upon information and belief, at all relevant times, GEO was aware of, authorized, and acquiesced in Defendant Steppig's participation in the unlawful Alum conspiracy described herein.

38.    On or about March 18, 2004, GEO filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey.  GEO was an active participant in the conspiracy before and at the time, it filed for bankruptcy.  Accordingly, GEO was aware of the conspiracy at the time it filed for bankruptcy.  Notwithstanding its knowledge and participation in the conspiracy, GEO did not disclose any claim arising out of the unlawful conspiracy as a liability on the applicable bankruptcy schedule.  GEO continued to participate in the conspiracy during the time its bankruptcy petition was pending.  Effective December 20, 2004, GEO emerged from bankruptcy under a plan of reorganization.  After emerging from bankruptcy, GEO continued to participate in the conspiracy and reaffirmed its participation through specific post-discharge actions taken by GEO in furtherance of the conspiracy, as alleged below.  GEO also reaffirmed its participation in the conspiracy in part by continuing to engage in the conduct described herein with respect to Alum.  GEO participated in the conspiracy alleged herein throughout the Conspiracy Period through the actions of GEO's senior executives.

39.    Defendant C & S Chemicals, Inc. ("C & S Chemicals") is a Delaware corporation with its principal place of business at 4180 Providence Road, Marietta, Georgia, 30062.  C & S Chemicals specializes in the production of Alum and sodium aluminate, and currently operates six manufacturing facilities located in Florida, Georgia, South Carolina, Illinois, and Minnesota.

During the Injury Period, directly or through its subsidiaries and affiliates, C & S Chemicals sold Alum throughout the United States.

40.     Defendant C & S Chemicals (of Georgia), Inc. ("C & S of Georgia") is a Georgia corporation with its principal place of business at 4180 Providence Road, Marietta, Georgia, 30062.  C & S of Georgia is an affiliate of C & S Chemicals.  During the Injury Period, directly or through its subsidiaries and affiliates, C & S of Georgia sold Alum throughout the United States.

41.     Defendants C & S Chemicals and C & S of Georgia are collectively referred to herein as "C & S" unless otherwise indicated.

42.     Defendant RGM Chemical, LLC ("RGM Chemical") is a Georgia limited liability company with its principal place of business at 4180 Providence Road, Marietta, Georgia, 30062.  During the Injury Period, directly or through its subsidiaries and affiliates, RGM Chemical sold Alum throughout the United States.

43.     Defendant RGM of Georgia, Ltd. ("RGM of Georgia") is a Georgia corporation with its principal place of business at 4180 Providence Road, Marietta, Georgia, 30062.  RGM of Georgia is an affiliate of RGM Chemical.  During the Injury Period, RGM of Georgia sold Alum throughout the United States.

44.     Defendants RGM Chemical and RGM of Georgia are collectively referred to herein as "RGM" unless otherwise indicated.

45.     Defendant USALCO, LLC ("USALCO") is a Maryland corporation with its principal place of business at 2601 Cannery Avenue, Baltimore, Maryland, 21226.  USALCO manufactures and distributes aluminum-based chemical products, including Alum, throughout North America.  USALCO has manufacturing facilities in Indiana, Louisiana, Maryland, and

Ohio.  During the Injury Period, directly and/or through its subsidiaries and affiliates, USALCO sold Alum throughout the United States.

46.     Defendant Delta Chemical Corporation ("Delta Chemical") is a Maryland corporation with its principal place of business at 120 East Baltimore Street, Suite 2100, Baltimore, Maryland, 21202.  On November 17, 2011, USALCO combined with Delta Chemical.  USALCO described its combination with Delta Chemical as creating a "new organization" that "combined [the] valued customers and suppliers" of USALCO and Delta Chemical.  USALCO further stated that this transaction would result in "the integration of the two companies."  USALCO also assumed Delta Chemical's rights and obligations under Delta Chemical's then-operative Alum supply contracts.  From the beginning of the Conspiracy Period to the date USALCO combined with Delta Chemical on November 17, 2011, Delta Chemical was an active participant in, and benefitted from, the conspiracy.  As a result of Delta Chemical's combination with USALCO, Delta Chemical ceased to be a potential competitor in the sale and marketing of Alum.  USALCO became the successor in interest to all of Delta Chemical's liabilities when it combined with Delta Chemical on November 17, 2011.  During the Injury Period, Delta Chemical, as to which USALCO is the successor in interest, sold Alum throughout the United States.  Plaintiffs sue USALCO both for its own illegal conduct and, as a successor in interest to Delta Chemical, for Delta Chemical's illegal conduct.

47.     Upon information and belief, the November 17, 2011 combination of Delta Chemical with USALCO was made in furtherance of, and intended to reinforce, the Defendants' unlawful conspiracy.  The Delta Chemical-USALCO combination entrenched the conspiracy by increasing USALCO's market power and eliminating the possibility of competition emerging if an independent Delta Chemical had subsequently withdrawn from the conspiracy.  Defendant

14

John Besson was responsible for overseeing and effectuating Delta Chemical's combination with USALCO, which reinforced and entrenched the conspiracy.

48.    Defendant Kemira Chemicals, Inc. ("Kemira") is a Georgia corporation with its principal place of business at 1000 Parkwood Circle, Suite 500, Atlanta, Georgia, 30339. Kemira is a subsidiary of Kemira Oyj, a Finnish company with its principal place of business in Helsinki, Finland. Kemira is the successor company to Kemiron Companies, Inc. ("Kemiron").[2] Kemira manufactures, formulates, and supplies specialty and process chemicals, including Alum, for water treatment and industrial applications in the United States and internationally. Kemira has water treatment chemical manufacturing facilities in Alabama, California, Florida, Georgia, Kansas, Missouri, North Carolina, Ohio, Texas, and Washington. During the Injury Period, directly or through its subsidiaries and affiliates, Kemira sold Alum throughout the United States.

49.    Defendant Southern Ionics Incorporated ("Southern Ionics") is a Mississippi corporation with its principal place of business located at 1250 Neosho Ave., Baton Rouge, Louisiana, 70802. Southern Ionics manufactures and sells water treatment chemicals, including Alum

50.    Defendant Frank A. Reichl ("Reichl") is a citizen of the State of New Jersey, residing in Flanders, New Jersey. During the Conspiracy Period, Reichl was employed by General Chemical Corporation and General Chemical Performance Products, LLC. Prior to July 2005, Reichl was the General Manager of Water Chemicals. From approximately 2006 through

---

[2] Kemiron was a large manufacturer of aluminum-based chemicals, including Alum, headquartered in Barstow, Florida. Kemira held a large ownership interest in Kemiron during the first part of the Conspiracy Period, and eventually purchased the remainder of Kemiron in approximately May 2005.

2010, Reichl was the Vice President of Sales and Marketing.  As both General Manager and Vice President, Reichl oversaw the sale and marketing of water treatment chemicals, including Alum, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bid and price proposals, and supervising other sales and marketing employees.[3]  On October 27, 2015, Reichl pleaded guilty for his role in the unlawful conspiracy with regard to Alum described herein.  Reichl joined, participated in, and benefitted from the unlawful conspiracy described herein.

51.    Defendant Vincent J. Opalewski ("Opalewski") is a citizen of the State of New Jersey, residing in the Rockaway, New Jersey area.  Upon information and belief, Opalewski actively conspired with other Defendants and co-conspirators in their unlawful conspiracy.  Opalewski also benefitted from this unlawful conspiracy.  From approximately 2005 through 2011, Opalewski held high-level executive positions at Defendant General Chemical in which he was responsible for the sale and marketing of water treatment chemicals, including Alum.  Opalewski was the Vice President of Sales and Marketing from approximately 2005 to 2006, Vice President and General Manager from approximately 2006 to 2009, and President from approximately 2009 to 2011.

52.    Defendant Brian C. Steppig ("Steppig") is a citizen of the State of Arkansas, residing in the Little Rock, Arkansas area.  Upon information and belief, Steppig actively conspired with other Defendants and co-conspirators in their unlawful conspiracy.  Steppig also benefitted from this unlawful conspiracy.  From approximately 1997 through 2011, Steppig held

---

[3] Upon information and belief, between January 1997 and July 2010, Reichl held positions in which he was responsible for the sale and marketing of water treatment chemicals, including Alum, except for the period from approximately July 2005 to approximately December 2006, when he was employed in other roles that were not engaged in the sale and marketing of water treatment chemicals.

high-level executive positions at Defendant GEO Specialty Chemicals in which he was responsible for the sale and marketing of water treatment chemicals, including Alum. Steppig was a National Sales Manager for pulp and paper water treatment chemicals from approximately 1997 to August 2006, and Director of Sales and Marketing for water treatment chemicals from approximately August 2006 to the present. On February 17, 2016, Steppig was indicted by the United States for his role in the unlawful Alum conspiracy described herein. On January 3, 2018, Steppig pleaded guilty to participating in the conspiracy.

53.     Defendant Alex Avraamides ("Avraamides") resides in Maywood, New Jersey. From 1994 through 2011, Avraamides held high-level executive positions at General Chemical and GEO Specialty Chemicals, Inc., including Director of Sales and Marketing at General Chemical from 1994 to 2005, Senior Vice President and General Manager of GEO Specialty Chemicals, Inc. from 2005 to 2010, and Vice President of Sales and Marketing at General Chemical from 2010 to 2011. In these positions, Avraamides's responsibilities included directing the sale and marketing of Alum. Avraamides joined, participated in, and benefitted from the unlawful conspiracy described herein.

54.     Defendant Amita Gupta ("Gupta") is a resident of the United States. From April 2008 until September 2012, Gupta was the Director of Sales and Marketing for Water Treatment Chemicals for General Chemical. In this position, Gupta's responsibilities included directing the sale and marketing of Alum. Gupta joined, participated in, and benefitted from the unlawful conspiracy described herein.

55.     Defendant Matthew LeBaron ("LeBaron") is a resident of New Canaan, Connecticut. LeBaron joined American Securities in 1999. From 2009 through 2014, LeBaron

was a Managing Director for American Securities.  LeBaron joined, participated in, and benefitted from the unlawful conspiracy described herein.

56.    Defendant Scott Wolff ("Wolff") is a resident of Chappaqua, New York.  Wolff joined American Securities in 2002.  From 2009 through the present, Wolff has been a Managing Director for American Securities.  Wolff joined, participated in, and benefitted from the unlawful conspiracy described herein.

57.    Defendant Kenneth A. Ghazey ("Ghazey") resides in the Commonwealth of Massachusetts.  Beginning in early 2005, soon after Defendant GEO Specialty Chemicals, Inc. was discharged from its Chapter 11 bankruptcy, and continuing until the present, Ghazey has held the position of President and Chief Executive Officer of Defendant GEO Specialty Chemicals, Inc.  Ghazey has also served on GEO Specialty Chemicals, Inc.'s Board of Directors since 2005.  Ghazey joined, participated in, and benefitted from the unlawful conspiracy described herein.

58.    Defendant Milton Sundbeck ("Sundbeck") resides in Clay County, Mississippi. Sundbeck has been the President and Chief Executive Officer of Southern Ionics during the entire Conspiracy Period.  Sundbeck joined, participated in, and benefitted from the unlawful conspiracy described herein.

59.    Defendant John D. Besson ("Besson") is currently a resident of the State of Florida, residing in Miami Beach, Florida.  Upon information and belief, Besson conspired with other Defendants and co-conspirators in the unlawful conspiracy described herein.  During his participation in that unlawful conspiracy, Besson was a resident of the State of Maryland, and engaged in unlawful conduct in and affecting the Commonwealth of Virginia.  From the beginning of the Conspiracy Period through at least November 2011, Besson was the President

18

and a major stockholder of Delta Chemical. As Delta Chemical's President, Besson oversaw its sale and marketing of water treatment chemicals, including Alum, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bid and price proposals, and supervising sales and marketing employees. Besson was also responsible for exploring and effectuating attempts to sell Delta Chemical or to merge all or part of Delta Chemical with another company. After Delta Chemical combined with USALCO in November 2011, Besson became a consultant for USALCO. Besson joined, participated in, and benefitted from the unlawful conspiracy described herein. Besson benefitted from this unlawful conspiracy both during his ownership of Defendant Delta Chemical and upon the sale of Delta Chemical to USALCO in November 2011.

60.    Defendants John Doe Nos. 1 – 50 are other entities or individuals whose identities are currently unknown to Plaintiffs. John Doe Nos. 1 – 50 conspired to suppress and eliminate competition in the sale and marketing of Alum by agreeing to rig bids and allocate customers for, and to fix, stabilize, increase, and maintain the price of, Alum sold in the United States during the Injury Period.

61.    The acts alleged herein to have been committed by Defendants were authorized, ordered, or performed by Defendants' directors, officers, managers, employees, agents, and/or representatives in the course of their employment and while actively engaged in the management of Defendants' business.

## CO-CONSPIRATORS AND UNIDENTIFIED CO-CONSPIRATORS

62.    Other individuals and entities, not named as Defendants in this Amended Complaint, participated as co-conspirators with Defendants in the violations alleged herein, and aided and abetted Defendants and performed acts and made statements, all in furtherance of the conspiracy.

63.     The true names and capacities of these unidentified co-conspirators, whether individual, corporate, associate, or representative, are unknown to Plaintiffs at this time. Plaintiffs may seek to further amend this Amended Complaint, as necessary, to allege the true names and capacities of additional co-conspirators as their identities become known through discovery or additional criminal indictments.

64.     At all relevant times, other individuals and entities referred to herein as "unidentified co-conspirators," the identities of which are presently unknown, conspired with Defendants in the unlawful conspiracy described herein.

65.     The acts alleged herein that were performed by each of the unidentified co-conspirators were fully authorized by each of these unidentified co-conspirators, or were ordered, or committed by duly authorized officers, managers, agents, employees, or representatives of each unidentified co-conspirator, while actively engaged in the management, direction, or control of its affairs.

## INTERSTATE TRADE AND COMMERCE

66.     Throughout the Injury Period, there was a continuous and uninterrupted flow of interstate trade and commerce throughout the United States in the sale of Alum by Defendants to their customers located throughout the United States.

67.     Throughout the Injury Period, Defendants' unlawful conspiracy and agreement took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce throughout the United States.

## RELEVANT MARKET

68.     The relevant product market alleged herein is the market for Alum.

69.     The relevant geographic market is the United States, or, in the alternative, is the market for Alum sold in the Eastern United States.  Local and/or regional geographic sub-markets may exist due to transportation costs associated with the sale and delivery of Alum.

## ALLEGATIONS OF FACT COMMON TO ALL CLAIMS

A.     ALUM INDUSTRY BACKGROUND

70.     According to 2015 market research reports, total global sales of water treatment chemicals, including Alum, are expected to amount to approximately $25 billion yearly as of 2020.  North America accounts for approximately 29% of the global purchases of all water treatment chemicals.

71.     Alum is a versatile chemical that can function as a coagulant, flocculant, precipitant, and emulsion breaker.  Alum removes turbidity, suspended solids, and total organic carbon, and reduces biochemical oxygen demand.  Alum is used in both municipal and industrial applications.

72.     Alum is the salt of sulfuric acid and aluminum hydroxide known by its chemical name $Al_2(SO_4)_3$.  In municipal water treatment and paper making applications, Alum is used as a source of $Al_3+$, which is a highly charged ionic "species" that attracts negative particles (such as those that discolor raw water supplies), reacts with negative particles, and then precipitates those particles out of the solution as ionic solids.

73.     Alum is produced and sold in both liquid and dry forms.

74.     Liquid Alum is produced by mixing aluminum ore with sulfuric acid and water.

75.     Dry Alum is produced by removing the water from liquid Alum by evaporation before crushing, grinding, and screening the resulting product.

76.     The United States International Trade Commission has determined that liquid and dry Alum are the "same like product."  The United States International Trade Commission based

its determination on the "nearly identical uses of both forms, common channels of distribution, and common methods of production, production facilities, and employees among domestic producers who produce both forms."  The United States International Trade Commission's determination was supported by, *inter alia*, testimony from Delta Chemical's then-President Robert Farmer.

77.     Much of the Alum produced today is used for water and wastewater treatment for clarification and phosphorous removal, and as an agent in the purification of drinking water.  In water purification, Alum causes impurities to coagulate into larger particles or clump together before settling to the bottom of the container, allowing them to be filtered out more easily.  This process is called coagulation or flocculation.

78.     One of the reasons Alum has become widely accepted as a water treatment chemical is because of its chemical efficacy and stability.  Compared to its alternatives, such as anhydrous or aqueous ammonia, which are hazardous and require pressurized storage tanks and special handling and safety procedures, the storage and handling of Alum is significantly safer and easier.

79.     Alum is typically sold by the ton and transported to customers by rail or truck.

80.     One factor Alum suppliers consider in deciding whether to bid or quote on a contract is whether providing the product to the specific buyer is "freight logical," that is, whether the supplier can make a profit on the contract taking into account the distance from the supplier's plant to the customer and the corresponding cost of freight.

81.     Localities and authorities, such as Plaintiffs, routinely purchase Alum to treat potable water and/or wastewater.  Localities and authorities typically acquire Alum through a

22

publicly-advertised bidding process, as Plaintiffs did here, and the resulting contracts for Alum are often one year in duration with options to renew for a certain period of time.

82.    Typically, prospective bidders for Alum contracts learn of a locality's or authority's Alum needs and requirements through public notice of an invitation to bid disseminated by the locality or authority, or an agent acting on its behalf.

83.    A prospective bidder has until the date and time specified in the invitation to submit a sealed bid to supply the locality or authority with its Alum requirements.

84.    These bids are kept confidential from both the bidders and the general public until the public opening.  Thus, bidders should not be privy to the content of their competitors' bids any sooner than the general public.

85.    Many localities and authorities also include provisions in requests for bids that bidders have not violated federal or state laws by submitting responsive bids and have not colluded with others to fix alum price.

86.    The awards of such contracts are typically made public.

87.    Sales of Alum by Defendants and their co-conspirators in the United States during the Injury Period totaled in the billions of dollars.

## B.    THE ALUM MARKET IN THE UNITED STATES IS SUSCEPTIBLE TO COLLUSION

88.    Publicly available data on the Alum market in the United States demonstrate that it is susceptible to cartelization by the Defendants and their co-conspirators.  Factors that made the Alum market susceptible to collusion during the Conspiracy Period include:  (1) a standardized product for which competition was principally on the basis of price; (2) stable or declining input costs for much of the Conspiracy Period; (3) weak demand in a mature market; (4) the lack of available economic substitutes; (5) high barriers to entry; (6) industry

concentration and consolidation; (7) price increase announcements following opportunities to collude; and (8) a history of collusive conduct in the water treatment chemicals industry.

### A.  Alum Is a Commodity Product With a High Degree of Interchangeability

89.   Typically, when a product is characterized as a commodity, market participants compete principally on the basis of price, rather than attributes such as product quality.  When competition occurs principally on the basis of price, it is easier to implement and monitor a cartel because price is more often objectively measureable and observable than non-price factors.

90.   The bidding process by which suppliers are supposed to compete to provide Alum to a locality or authority demonstrates that Alum is a commodity product that is interchangeable across suppliers, and competition in the market is driven principally by price.

91.   Alum is a commodity product with specific specifications for iron content, specific gravity, density, and color, as shown below.[4]

---

[4] Chart from http://www.usalco.com/products/aluminum-sulfate-solution-alum.

## Typical Properties

| Property | UM | Alum |
|---|---|---|
| Al2O3 | Wt.% | 8.28 |
| Fe2O3 | ppm | 50 max |
| Specific Gravity@ 60°F | – | 1.33 |
| Baume @ 60°F | – | 35.77 |
| Density | – | 11.08 |
| Color | Lbs/Gal | Clear to Amber or Light Green |
| Dry 17% Alum | Wt.% | 48.20 |

92.     A 2006 report noted the increased commoditization of Alum and other chemicals in North America.  A 2009 report by the Water Research Foundation stated, "Alum is a commodity chemical."  A 2012 analyst report described inorganic coagulants such as Alum as "commodity chemicals that are relatively easy to manufacture."  A 2015 analyst report noted that water management chemicals are split into two major categories:  specialty chemicals and "[c]ommodity chemicals such as [A]lum."

**B.      Input Costs for Alum Were Stable or Declining for Much of the Conspiracy Period**

93.     Rising input costs for Alum cannot explain the significant price increases Defendants imposed on their customers during the Conspiracy Period.

94.     Alum is manufactured by combining sulfuric acid with aluminum trihydrate (also known as alumina or ATH).  Aluminum trihydrate is purified from bauxite by dissolving the bauxite ore in strong caustic soda to form sodium aluminate, which is then precipitated by neutralization to form aluminum trihydrate.

95.     As shown by the graph below, bauxite (the raw material for alumina) prices fell markedly during the period from 1991 to 2003, declining almost 50%.  From 2003 to 2007, bauxite prices rose around $6 per ton, but leveled off and declined slightly by the end of 2007.[5] From 2008 to 2010, bauxite prices declined a further $3-4 per ton.



96.     According to a 2014 article by Forbes, alumina pricing is traditionally about 12-14% of the price quoted for aluminum on the London Metal Exchange.  Aluminum prices were relatively stable for much of the Conspiracy Period from 1997 to early 2006, with a large increase in 2007 and 2008, and then a rapid crash in prices in late 2008 and early 2009.[6]

---

[5] Graph available at http://www.australianbauxite.com.au/site_folders/232/images/ Metallurgical%20Bauxite/Graph2.jpg.

[6] Graph available at http://www.morningstar.com.au/s/images/6718-AWC-1.gif.



97.    Sulfuric acid costs were also relatively stable from 1997 to 2007.  A brief spike in sulfuric acid prices in 2008 was followed by a crash in prices by early 2009 and historically low prices for the remainder of 2009 and 2010.  However, Defendants maintained higher prices in 2009 despite decreasing commodity prices.

98.    During the early part of the Conspiracy Period from 1997 to 2004, Alum prices experienced significant price increases.  During the period from 1998 to 2004, there were numerous parallel price increases by Defendants, including, but not limited to, the following announcements publicly reported by the chemical industry publication *ICIS*:

a.    General Chemical and GEO announced identical Alum price increases of $15 per ton on August 10 and August 31, 1998.

b.    General Chemical and GEO announced identical Alum price increases of $15 per ton on October 4 and October 18, 1998.

c.    Southern Ionics, GEO, and General Chemical announced Alum price increases of $8-9 per ton around December 2000.

d.    Kemiron, General Chemical, and GEO announced identical Alum price increases of $10 per ton between November 21 and December 12, 2003.

e.    USALCO and General Chemical both announced Alum price increases effective December 1, 2004, which were subsequently reported by *ICIS* on December 3, 2004.

99.    The declining pricing of the primary input costs of Alum – alumina and sulfuric acid – necessarily cannot explain the rise in Alum prices from 1998 to 2004. Instead, these price increases were the result of Defendants' illegal conspiracy to fix the price of and rig bids for Alum.

100.    A 2009 report by the Water Research Foundation analyzed a survey conducted about the rising costs of water treatment chemicals during the period between January 2008 and January 2009. The survey was administered by the Association of Metropolitan Water Agencies, and forty-seven United States drinking water utilities responded. Twenty-five of these utilities reported using Alum and incurring an average 53% price increase over the preceding year, with maximum price increases reaching as high as 168%. Although raw material cost increases were cited as a major cause of these increases, as noted above, the report noted that the "boom" in commodities was over by mid-2008.

101.    In its publicly-filed 2009 Form 10-K, GenTek reported that price increases on products such as Alum contributed significantly to the profits GenTek earned on successful bids and RFP responses in the water treatment market: "Sales into the water treatment market increased by $67 million driven by $59 million resulting from increases in selling prices . . . ." GenTek's increased revenues in 2008 largely resulted from Defendants' conspiracy to increase the price of Alum in the United States.

**C.    Alum Experienced Weak Demand in a Mature Market During the Conspiracy Period**

102.    Static or declining demand makes the formation of a collusive arrangement more likely. In a competitive market, when faced with static or declining demand conditions, firms

often attempt to increase sales by taking market share from competitors at decreasing prices.  For this reason, firms faced with static or declining demand have greater incentive to collude to avoid price competition with competitors and protect against poor financial results and/or bankruptcy.

103.     Demand for Alum is driven by demand in end-use markets in which it is employed.  These markets include water treatment and the pulp and paper industry.  According to one 2004 article, "demand for [A]lum has slowed due to retraction and consolidation in the pulp and paper market, a major market for [A]lum."

104.     In its 2008 annual report, Kemira's parent company described demand as follows: "Only modest growth can be expected in the Municipal & Industrial segment's relevant market in Europe and North America, as water treatment infrastructure is already largely built and growth in demand is therefore restricted."

105.     One 2001 article described the Alum market as "very mature, with a projected annual growth rate of roughly 2 percent."  A 2004 *ICIS* article noted that Alum is a mature commodity market.  Similarly, a 2015 analyst report notes that the "technologies currently used in water treatment are mature."  Given this mature market, future sales of Alum will be determined by population growth.  In its 2013 annual report, Chemtrade noted that the "North American market for water treatment chemicals generally tracks GDP and population growth."

106.     In mature industries, firms' ability to increase sales is limited to population growth and replacement of existing products.  This means that slow growth rates often exist in mature industries because new distribution channels, which might raise sales, have typically been exhausted.  Consequently, the only way for firms to capture additional market share in mature industries, where demand growth is slow or nonexistent, is by competing with each other on the basis of price.

107.    The lack of significant demand growth was further exacerbated by the presence of excess capacity.  Upon information and belief, none of Defendants' plants to manufacture water treatment chemicals was working at or near capacity during the Conspiracy Period.  Thus, the lack of capacity cannot explain Defendants' decisions not to compete for Alum business during the Conspiracy Period.  Absent an antitrust conspiracy, the presence of excess capacity, particularly for a commodity product, means that firms are incentivized to increase their sales by maintaining or even lowering prices, not increasing them.

**D.    There Are No Apparent Economic Substitutes for Alum**

108.    Economists regard products as economic substitutes for one another if a nominal change in price for one product results in increased demand for the other product.  The change in price necessary to cause consumers to switch to a substitute good is often considered to be around five percent.  The lack of available economic substitutes for a product facilitates collusion among producers, because customers are not reasonably able to avoid supra-competitive prices by switching to another product.

109.     Other chemicals are not economic substitutes for Alum at water treatment facilities because, *inter alia*, each chemical is dosed and applied differently at water treatment facilities.  Therefore, there are substantial infrastructure and other costs associated with switching the treatment chemical used by any particular water treatment facility.

**E.    There Are Significant Barriers to Entry in the Alum Market**

110.    Supra-competitive pricing in a market typically attracts additional competitors attempting to avail themselves of the inflated prices.  Significant barriers to entry, however, make new competition more difficult and facilitate the formation and maintenance of a cartel.

111.    There were significant barriers to entry which have prevented potential competitors from effectively competing in the Alum market in the United States during the

Injury Period.  An August 2009 article in *WaterWorld* noted that "[t]he North American water treatment chemicals market is mature with high entry barriers."  These barriers include production, manufacturing, and transportation costs, as well as satisfaction of regulatory requirements.  High barriers to entry also exist because only a competitor with specialized technical knowledge, the capital necessary to build costly manufacturing facilities, and access to distribution channels could have competed in this market.

112.    According to industry experts, the Alum market had no new entrants during the Conspiracy Period.  In 2003, Karla Doremus-Tranfield, General Chemical's Marketing Manager, noted that no new suppliers had entered the marketplace.  Since 2010, the only significant new entrant in the Alum industry is Affinity Chemical, LLC ("Affinity").  Affinity was formed in 2011 by Defendant Reichl, who pled guilty to participating in an unlawful conspiracy on October 27, 2015.

**F.    The Alum Industry Is Highly Concentrated and Has Experienced Heavy Consolidation**

113.    The Alum industry is dominated by a small number of companies.

114.    The Alum industry experienced heavy consolidation in the years leading up to and including 1997.

115.    GEO, in particular, made several acquisitions between 1993 and 1997.  In June 1993, GEO acquired the Gulf Coast Alum business and customer list of Rhone Poulenc, a large French chemical company that exited the United States market after the sale.  In July 1994, GEO acquired the aluminum chemicals business of Courtney Industries.  In December 1996, GEO acquired the Alum business of Cytec Industries, Inc. ("Cytec"), which included seven Alum plants in the Southeastern U.S.  GEO's purchase of Cytec made GEO a major national supplier of Alum immediately before the start of the Conspiracy Period.  In March 1997, GEO announced

that it was acquiring the United States and Canadian paper chemicals business of Henkel Corporation.  In September 1998, Denny Grandle, the Vice President and General Manager of GEO's Aluminum Products Division, commented that "[t]he consolidation has helped capacity," noting that GEO had recently closed an Alum plant located in Spring Hill, Louisiana.

116.    In June 1997, General Chemical purchased Peridot Holdings, Inc. ("Peridot"), a manufacturer and supplier of various water treatment chemicals, including Alum.  In September 2006, General Chemical acquired GAC MidAmerica, Inc., a producer of Alum and bleach.  In February 2007, General Chemical acquired Chalum, Inc., which produced Alum for the greater Phoenix area.  In December 2007, General Chemical acquired Bay Chemical and Supply Company, a producer and distributor of Alum and other water treatment chemicals in south Texas.  In early 2011, General Chemical acquired certain Alum-related assets of Alchem, including Alchem's customer list.

117.    General Chemical and GEO's acquisitions immediately before the start of the Conspiracy Period left them with the largest Alum market shares by 1998.  According to an October 1999 *ICIS* article, "[p]rior to 1998, the [A]lum industry went through a period of stiff competition that triggered a downturn in its major markets."  According to the same article, however, Alum prices started shifting upwards around 1998.

118.    The acquisitions continued throughout the Conspiracy Period.  In August 2003, Kemira expanded its holdings in Kemiron from 15% to 60%.  In 2004, Kemiron acquired Eaglebrook International Group, Ltd. ("Eaglebrook"), a leading manufacturer and distributor of water treatment chemicals located in Matteson, Illinois.  In May 2005, Kemira strengthened its position in North America by purchasing the remaining 40% of Kemiron's shares.  In November

2011, USALCO and Delta Chemical combined.  As a result of this combination, Delta Chemical ceased to be a potential competitor in the sale and marketing of Alum.

119.    The concentration in the Alum industry was further exacerbated by agreements among Defendants to distribute one another's products.  Such swaps, trades, and selling and distribution agreements among competitors in a consolidated market facilitate collusion among ostensible competitors.

### G.    Opportunities To Collude Facilitated Defendants' Conspiracy

120.    As noted in Reichl's indictment, there were countless opportunities for Defendants to communicate and conspire with each other and their co-conspirators.  Defendants and their co-conspirators regularly met and discussed each other's business, entered into "no compete" agreements, allocated customers, and submitted artificially-inflated bids.

121.    Notably, representatives from General Chemical, including Reichl, frequently attended national and local industry conferences where they had the opportunity to meet with Defendants and their co-conspirators to collude.

122.    The American Water Works Association ("AWWA") also provides numerous water industry meetings and events where the Defendants had opportunities to meet with one another and their co-conspirators to collude.  In addition to national level meetings, trainings, and networking events, there are over forty state and regional AWWA sections that hold their own meetings, training, and networking events.  For instance, the Southwest Section of the AWWA includes Alum producers Chemtrade and Kemira.  Other Defendants participate in other regional AWWA sections.

123.    The American Chemistry Council ("ACC") is America's oldest trade association of its kind and includes companies engaged in the business of chemistry.  Upon information and

belief, Defendants attended ACC's regular meetings and conferences, including executives from Chemtrade, GenTek, and Kemira.

124.    Reichl had the opportunity to meet and collude with other Alum manufacturers and suppliers for many years as a frequent participant at conferences conducted by, among others, the Arkansas Water Works & Water Environment Association, the Southwest Section of the American Water Works Association, and the Georgia Association of Water Professionals. Reichl attended such conferences with representatives from many competitors.

125.    For example, on July 16, 2009, General Chemical executive Michael Housel contacted Gupta and Reichl regarding a conversation that he had had with Southern Ionics' founder Milton Sundbeck. Housel stated, "Just spoke to Milton [Sundbeck]. He will be attending the SWFC [Southwestern Fertilizer Conference] in San Antonio. He's going to send me his schedule next week . . . they have a suite. Amita - anything you would like me to discuss with him?"

126.    Defendants' attendance at industry conferences and trade associations facilitated their coordinated price increase announcements. For instance, on December 3, 2004, *ICIS*, which purports to be "the world's largest petrochemical market information provider," published an article titled "Aluminum Sulfate Prices Rise with Demand and Costs." Through this publication, Rich Fedison, Director of Sales and Marketing for General Chemical, signaled to the market that demand for Alum was stable and beginning to strengthen. Fedison stated: "The pulp and paper sector is finally beginning to recover after several years of poor performance as sustainable price increases and the recovering global economy are driving margin improvement. On the municipal water side, tightening federal regulations on total organic compounds and disinfection byproducts are contributing favorably to the demand for inorganic coagulants."

Significantly, Fedison stated, "*[a]ll announced price increases for aluminum based inorganic coagulants are continuing to hold in all end-use markets*."  (Emphasis added).  This statement was a signal to Defendants and other Alum suppliers, providing a pretext for maintaining the artificially-inflated price level for Alum.

127.    Contemporaneously, Defendant General Chemical raised its list prices for commercial-grade Alum to $335 per ton on the East and Gulf Coasts and $370 on the West Coast.  Liquid material in tanks was $214 per ton, iron-free liquid material in tanks was $331 per ton, and dry iron-free Alum was $425 per ton.

128.    At the same time, USALCO raised its prices for Alum by $10 per ton, effective December 1, 2004, or as contracts permitted.

129.    Also at the same time, Kemiron raised its prices for all grades of polyaluminum chloride, aluminum chloride, aluminum chlorohydrate, sodium aluminate, and polyaluminum sulfate by $40 per ton, effective December 1, 2004.

130.    Sample public responses to bid requests by water districts during the Conspiracy Period illustrate what appear to be the types of sham "throw away" bids discussed in the Reichl indictment.  Examples include public documents published by the City of Columbia, South Carolina in June 2009, the City of Texarkana, Arkansas in August 2009, the Emerald Coast Utilities Authority (in Florida) in June 2010, and the City of Bellingham, Washington in 2006, all of which show disparities between the winning bids of General Chemical and those of GEO or other bidders that are consistent with the use of "throw away" bids.

**H.    There Is a History of Collusive Conduct in the Water Treatment Chemicals Industry**

131.    The water treatment chemicals industry has a history of collusion.

132.    In the 1980s, manufacturers of chlorine allegedly conspired to rig bids submitted to municipal water facilities, including by submitting non-competitive bids to municipalities for customers they had agreed to allocate to competitors in the Southeast.

133.    Similarly, two other chemicals used by water treatment facilities and paper companies – hydrogen peroxide and sodium chlorate – were the subject of alleged antitrust conspiracies.  First, from 1994 to 2005, producers of hydrogen peroxide settled claims that they unlawfully conspired to fix the price of hydrogen peroxide for tens of millions of dollars. Significantly, Defendant Kemira contributed $5 million to the hydrogen peroxide class action settlement, in addition to settling with a number of direct action litigants for undisclosed sums.[7] Second, in 2008, Kemira was fined EUR 10.15 million by the European Commission for anticompetitive conduct in its sodium chlorate business from 1994 to 2000.[8]

## C.    DEFENDANTS' MARKET ALLOCATION AND RELATED BID-RIGGING ACTIVITIES

134.    Prior to the Defendants' conspiracy, the market for the sale of Alum in the United States was marked by competition.  In the mid-1990s, for example, there was a "price war" between General Chemical and GEO in which each company bid aggressively for the accounts of the other company.

135.    As reflected in the GEO guilty plea and criminal indictments discussed herein, this era of competition and price wars ended in 1997 when Defendants entered into this antitrust conspiracy and agreed to, *inter alia*, "stay away" from each other's "historical" customers by not pursuing the business of those customers, and to engage in bid-rigging.

---

[7] *In Re Hydrogen Peroxide Antitrust Litig*., MDL Docket No. 1682, Dkt No. 474.

[8] http://www.kemira.com/en/newsroom/whats-new/pages/1226984_20080611125213.aspx

136.    Upon information and belief, the conspiracy was hatched at this time when GEO's Avraamides, General Chemical's Reichl, and General Chemical's CEO Denny Grandle met and reached an agreement that they would no longer compete and instead collude to allocate customers.  Thereafter, others joined the conspiracy and abided by that agreement.  For example, as reflected by communications between executives at GEO and Southern Ionics during the Conspiracy Period, the purpose of Defendants' conspiracy was to keep "peace in the valley" in order to "not bring down market price" because Defendants agreed that it would be "better business for everyone to work together instead of competing and ruining the market price."

137.    Throughout the Conspiracy Period, Defendants engaged in a conspiracy to allocate customers among themselves.

138.    Numerous documents confirm Defendants' understanding of their overarching conspiracy.  For example, based on the information currently available to Plaintiffs:

    a.    A March 31, 2003 General Chemical internal marketing strategy memorandum outlined General Chemical's strategy for its nominal competitor, USALCO:  "Continue to work in conjunction at Akron, OH and Western Michigan accounts."

    b.    A March 2006 GEO internal business review concluded that both General Chemical and Southern Ionics were "[r]emaining non-aggressive, consistently favoring price increases over share gain strategy."

    c.    In September 2008, a General Chemical executive arranged for a meeting with himself and Gupta from General Chemical and Steppig and Scot Lang of GEO, a "get to know you meeting" designed to introduce Gupta to senior staff of their friendly "competitor" GEO, and to discuss market and supply agreements.

139.    Throughout the Conspiracy Period, Defendants were in regular communication in order to facilitate the conspiracy.  These communications included discussions of specific bids and accounts.

## I.    Regular Inter-Defendant Meetings and Communications

140.    Defendants' executives and employees regularly communicated with each other over the telephone, email, and during face-to-face meetings.  As admitted by the criminal pleas and confirmed by numerous documents, Defendants discussed their overarching market allocation agreement, as well as specific customer accounts that were off-limits to other companies, and how to handle the bidding process as it related to customer accounts.

141.    On multiple occasions during the Conspiracy Period, Delta Chemical President Besson met with co-conspirators Avraamides and Reichl as part of and in furtherance of the conspiracy.

142.    In November 2005, Sundbeck, the President and CEO of Southern Ionics, called Avraamides, then-Senior Vice President and General Manager at GEO, to indicate that Southern Ionics wanted to maintain "'peace in the valley' and not bring down the market price."

143.    On December 20, 2005, Ghazey, the President and CEO of GEO, sent Avraamides an email about their strategic plans which stated, "look forward to . . . some 'peace in the valley.'"

144.    On April 14, 2006, Avraamides sent Ghazey an email about companies that GEO might want to consider acquiring.  Avraamides explained that one potential target company, Gulbrandsen, "has historically been the main company that has prevented price increases," and that acquiring Gulbrandsen would make GEO "more of a potential threat to General Chemical, Delta, Summit.  Deterrent helps maintain peace in the valley."

145.    In April 2008, Gupta, the then-recently hired Director of Marketing for Alum at General Chemical, began the role of coordinating and enforcing the agreement among the Defendants.  On May 28, 2008, Gupta exchanged contact information via email with Steppig, the Director of Sales and Marketing at GEO who is currently under indictment for his role in the

38

conspiracy.  Gupta promised to get "back to [him] with the other info we discussed," and later called Steppig on his mobile phone.

146.    In addition, on January 14, 2010, Opalewski, Vice President and General Manager of Sales and Marketing for General Chemical, emailed Milton Sundbeck, President of Southern Ionics, to discuss arrangements for a dinner meeting.  Opalewski wrote, "With regard to dinner, happy to include the entire team or keep it to you and me.  If we do get everyone together, would still like to slip away at some point to discuss the larger issue we touched on."

147.    Telephone call logs reveal that GEO's Steppig and General Chemical's Gupta communicated very frequently with each other by telephone between 2009 and 2011.

### J.    Specific Instances of Bid Coordination

148.    Based on information currently available to Plaintiffs, the following are specific instances where Defendants coordinated their bids for Alum contracts.  Although illustrative of how Defendants implemented their scheme, the specific instances discussed below are not an exhaustive list of Defendants' activities in furtherance of their conspiracy.

#### 1.    Rochester, Minnesota (2005)

149.    In 2005, C & S Chemicals and General Chemical furthered the conspiracy by rigging bids to Rochester, Minnesota.

150.    In December 2005, General Chemical and C & S Chemicals submitted bids for a one-year supply contract for Rochester.  General Chemical submitted the low and winning bid.

151.    General Chemical subsequently withdrew its bid, leaving C & S as the winning bidder for the 2006 calendar year.

#### 2.    Potlatch-McGehee, Arkansas (2005)

152.    In 2005, General Chemical and GEO furthered the conspiracy by coordinating bids for the paper mill of Potlatch-McGehee, Arkansas.

153.    In December 2005, GEO's Avraamides asked General Chemical's Rich Fedison what price GEO should bid for the Potlatch-McGehee account.  Following that conversation, Avraamides instructed his colleague Steppig to bid $198.73 so that GEO would not take the account from General Chemical.

### 3.    Columbiana, Alabama (2006)

154.    In 2006, General Chemical and GEO furthered the conspiracy by coordinating bids for the municipality of Columbiana, Alabama.

155.    In January 2006, GEO's Avraamides spoke with an employee of General Chemical.  Avraamides instructed General Chemical to bid above $260 per ton for Columbiana's Alum business, so that GEO would win the business.

### 4.    Mahrt Paper Mill and Fayetteville, North Carolina (2006)

156.    In 2006, General Chemical and GEO furthered the conspiracy by using coordinated bids to swap their historical accounts at MeadWestvaco paper mill in Mahrt, Alabama and the municipality of Fayetteville, North Carolina.

157.    General Chemical had been the historical supplier of Alum to the Mahrt paper mill until 2006, when the owners of the mill sought a new supplier.  Opalewski or Reichl at General Chemical told GEO's Avraamides about the situation.  An April 11, 2006 email from Fedison of GEO to Avraamides identified Fayetteville as a location where General Chemical would be more freight logical than GEO and could "take a dent out of our swap imbalance."

158.    In an email exchange dated May 22, 2006 between Steppig and Avraamides, they agreed that they needed to work out "The Swap" with General Chemical "before we take Mahrt." Absent this coordination, GEO would not have bid aggressively for what was a historical General Chemical account.

40

159.    In exchange for this and after GEO won the Mahrt paper mill account, a General Chemical employee called GEO and asked for the Fayetteville, North Carolina Alum account. General Chemical subsequently won the Fayetteville contract, which had historically been a GEO account.  For the September 2005 through September 2006 contract year, GEO, bidding through distributor Southern States, had been the winning bidder for Fayetteville's Alum business.  For the September 2006 through September 2007 contract year, General Chemical's bid was over $50 per ton lower than GEO's bid, $191.90 per ton for General Chemical versus $248.55 per ton for GEO.

### 5.    DeKalb County, Georgia (2009)

160.    In 2009, General Chemical and C & S Chemicals furthered the conspiracy by coordinating bids for DeKalb County, Georgia.

161.    In February 2009, General Chemical's Larry McShane expressed interest in the DeKalb County account, which had previously been awarded to RGM of Georgia.  After learning that RGM of Georgia was a distributor selling for C & S Chemicals, McShane emailed Gupta "so I assume we don't want to take it."  Gupta responded, "Don't take.  Thx."

### 6.    Charlotte and High Point, North Carolina (2009)

162.    In 2009, General Chemical and Alchem[9] furthered the conspiracy by coordinating bids for the municipalities of Charlotte and High Point in North Carolina.  High Point and Charlotte are approximately 80 miles apart on Interstate 85.

163.    High Point was historically Alchem's account, but General Chemical placed a low, winning bid in 2009.  Alchem's Robert Wolcott called General Chemical's Gupta to complain, and they later agreed that Alchem would not bid competitively for the Charlotte

---

[9] Alchem is a manufacturer of Alum that is not presently named as a Defendant.

account if General Chemical withdrew its High Point bid.  Gupta later withdrew the bid.  Gupta provided Mark Paul of General Chemical with contact information for the buyer at High Point and noted that there was a typo in their bid, stating that they meant to bid $324 per ton rather than $224 per ton.

164.    In June 2009, consistent with the agreement, General Chemical submitted a high bid for the Charlotte account.  Alchem did not uphold its end of the bargain, underbidding General Chemical by $5 per ton to win the account.  After General Chemical's Gupta called Alchem's Wolcott to complain, Alchem withdrew its winning bid and General Chemical was awarded the Charlotte account.

165.    In 2010, GEO wanted to take the High Point account.  In late 2010, General Chemical acquired Alchem's list of Alum customers, effective January 31, 2011.  General Chemical's Avraamides advised GEO and C & S Chemicals of this development and explained that it would treat former Alchem customers, including High Point, as General Chemical's own "historic" customers.  On the next High Point bid, GEO bid high and C & S Chemicals did not bid at all, despite previously expressing interest in the contract.  Alchem had been supplying High Point at $255 per ton.  GEO bid at $400 per ton, and General Chemical won the account at more than $300 per ton.

### 7.    Maryville, Tennessee (2009 - 2010)

166.    In 2009 and 2010, General Chemical and GEO furthered the conspiracy by coordinating bids for the municipality of Maryville, Tennessee.

167.    Maryville had historically been supplied by Dycho, a distributor supplied by GEO.  In 2009, General Chemical submitted a low bid for Maryville, and GEO's Steppig called General Chemical's Gupta to complain.  Following the conversation, General Chemical withdrew its original bid and/or resubmitted a losing bid at a higher price.

42

168.    In 2010, consistent with Steppig and Gupta's conversation the previous year, General Chemical submitted a high bid for the Maryville account, which GEO won.

### 8.    Hickory, North Carolina (2010)

169.    In 2010, C & S Chemicals and General Chemical furthered the conspiracy by allocating customers in Hickory, North Carolina and elsewhere.

170.    In June 2010, in response to a request to submit a bid to General Chemical's customer in Hickory, North Carolina, Mike Chandler, C & S Chemicals' Vice President of Sales, replied, "I am not wanting to do Hickory at this time and, if you could, double check that Alchem has Richmond Co., as it is historically a General [Chemical] account."

### 9.    Somerset, Kentucky (2010)

171.    In 2010, USALCO and General Chemical furthered the conspiracy by allocating customers in Somerset, Kentucky and elsewhere.

172.    In 2010, General Chemical won an account in Somerset, Kentucky that had historically been USALCO's.  When General Chemical won, USALCO's Peter Bailey called General Chemical's Gupta to complain, and Gupta said that she would look into it.

173.    An internal USALCO email dated July 12, 2010 notes, "General [Chemical] did not pull their bid in Somerset, KY.  Dave, did you send the letter to Vince Opalewski?"

174.    Later and in exchange for the Somerset account, USALCO obtained a different account from General Chemical.

### 10.    Domtar Paper Company (2010 - 2011)

175.    In 2010, General Chemical and GEO furthered the conspiracy by coordinating bids for the Domtar Paper Company.

176.    In December 2010, General Chemical's Gupta and GEO's Steppig discussed upcoming Alum price increases for Domtar across the United States so that the companies' price

increases would be in line with each other.  Following the conversation with Steppig, General Chemical submitted bids to Domtar that were higher than the previous year's and higher than it had intended to before speaking with GEO, and it was awarded Domtar business at a $29 per ton increase.

177.    In early 2011, Domtar's purchasing agent was unhappy with General Chemical's pricing and called GEO's Steppig to encourage GEO to be competitive at Domtar's Ashdown, Arkansas mill.  Steppig then called General Chemical's Gupta to ask how GEO should bid in order to look competitive without taking business from General Chemical.  GEO bid higher than General Chemical, which continued to supply the Ashdown mill.

### 11.    Sidney, Ohio (2010)

178.    In 2010, General Chemical and USALCO furthered the conspiracy by coordinating bids for the municipality of Sidney, Ohio.  As of the end of 2010, Sidney, Ohio was a USALCO customer.  When the bid for this customer was coming up in December 2010, General Chemical's Lisa Brownlee emailed Gupta asking her if "you want to take this one too?" and noting that "US Alco supplies at $418.42.  GCC bid $494.00.  No history of Delta or Thatcher bidding here.  Volume is only 65 tons.  To take, I would bid $374 ($308 net for US Alco).  To stay away, up $32.00."  Gupta responded, "No.  up 32," confirming General Chemical decided to "stay away" from USALCO's historic customer.

### 12.    Georgia Pacific Paper Company (2011)

179.    In 2011, General Chemical and GEO furthered the conspiracy by coordinating bids for the Georgia Pacific Paper Company.

180.    In January 2011, General Chemical's Avraamides and Gupta and GEO's Scot Lang, Opalewski, and Steppig spoke with each other about upcoming Alum price increases for Georgia Pacific across the United States so that the companies' price increases would be in line

with each other.  After General Chemical learned that GEO would increase prices by $35 per ton, General Chemical raised its price increase to $32 per ton, instead of the $23 per ton increase originally planned before coordinating with GEO.

### K.    Widespread Anomalous Bidding Behavior

181.    Defendants enjoyed supra-competitive profit margins during the Conspiracy Period.  Thus, sellers of Alum could have submitted, but chose not to submit, bids at considerably lower prices and still make a profit.  Among the reasons for Defendants to agree to allocate customers was to protect their supra-competitive profit margins.

182.    A significant part of the price for Alum is the cost of shipping.  It is standard practice in the industry for suppliers of Alum to include in the quoted price the cost of shipping.  Because shipping costs are a significant part of the price of Alum, a supplier that is "freight logical," i.e., the supplier that is closest to the customer, has a built-in economic advantage over other suppliers which are materially farther away from the customer, because the freight logical supplier's shipping costs should be less than those of its competitors.  The freight logical supplier can offer a lower price at the same profit margin as other suppliers and/or a non-freight logical supplier must cut its profit margin in order to sell at a competitive price.

183.    During the Conspiracy Period, members of the conspiracy were able to maintain contracts because "competitors" with plants sufficiently close to the customer refused to bid or submitted higher bids to customers than shipping costs would have required, in order to ensure the contracts were awarded according to the conspiracy's allocation decisions.

184.    For example, GEO has a water treatment chemical plant in Baltimore, Maryland, but rarely bid for Alum business in the Mid-Atlantic region.

185.    Additional examples include the following:

a.  Gadsden, Alabama:  General Chemical (205 miles away) won this bid throughout the period from 2007 through 2011 despite being significantly further away than GEO (90 miles away), C & S Chemicals (97 miles away) and Southern Ionics (131 miles away), some or all of whom also bid throughout this period.

b.  Mount Clemens, Michigan:  USALCO (246 miles away) maintained this customer from 2006 through 2012 despite the fact that a GAC plant (which was acquired by General Chemical in 2006) was only 84 miles away.  General Chemical consistently bid much higher on this account from 2007 through 2012 and lost.

c.  El Dorado, Arkansas:  General Chemical (90 miles away) held this customer from 2004 through 2011 despite the fact that GEO (72 miles away) was closer.  GEO's bids were consistently significantly higher than General Chemical's.

186.  Defendants also frequently utilized throw-away bids to further the conspiracy.

Examples of Defendants' throw-away bids include the following:

a.  In March 2005, USALCO entered into a three-year contract with Grand Rapids, Michigan, at a price of $149.52 per ton.  The only other two bidders were General Chemical and C & S, which submitted bids of $186.94 and $232.00, or 25% and 55% high than USALCO's winning bid, respectively.

b.  In October 2008, General Chemical won a bid for Fayetteville, Arkansas, at a price of $184.20 per ton.  The second-lowest bidder was C & S Chemicals, with a bid of $247.60 per ton, or 34.4% higher than General Chemical's bid.  Similarly, the only two other bidders, Kemira and GEO, bid 37% and 43% higher, respectively.

c.  In May 2009, General Chemical received a contract with Milwaukee, Wisconsin at a price of $429.00 per ton.  The only other bidder, USALCO, submitted a bid of $562.00 per ton, or 31% higher than General Chemical's winning bid.

d.  In June 2010, General Chemical received a contract to supply Pensacola, Florida, at a price of $212.93 per ton.  While the second-lowest bidder, a small regional producer named Southern States, submitted a bid of $219.00 per ton, the large national Alum producers GEO and C & S Chemicals submitted bids that were an astounding 118% and 162% higher than General Chemical's winning bid.

e.  In October 2010, Washington Suburban Sanitary Commission awarded Delta Chemical a contract to supply Alum at a price of $304.00 per ton.

The second-lowest bidder was C & S Chemicals, with a bid of $537.00 per ton, more than 76% higher than Delta Chemical's bid.

    f.    In October 2014, Washington Suburban Sanitary Commission awarded USALCO a contract to supply Alum at a price of $314.19 per ton.  The only other bidder, Chemtrade (the successor in interest to General Chemical), submitted a bid of $422.00 per ton, or more than 34% higher than USALCO's bid.

## L.    Policing and Enforcement Efforts

187.    Defendants also undertook specific efforts to monitor and enforce the conspiracy. If, either intentionally or accidentally, a "competitor" submitted a lower bid to its "competitor's" historic customer, that would often prompt a complaint that resulted in the withdrawal of the lower bid.

188.    For example, in 2009, General Chemical submitted a low bid for the Maryville account held by distributor Dycho, which was supplied by GEO.  GEO's Steppig called GCC's Gupta to complain that she was in breach of the agreement, and General Chemical withdrew the bid via telephone call.  General Chemical then resubmitted a much higher bid so that GEO would win the account.

189.    In addition, where a Defendant gained business at the apparent expense of its "competitor," that Defendant would often allow that "competitor" to win business from another customer to keep their respective levels of business and the conspiracy intact.

190.    For example, in 2006, General Chemical bid for and won an account in Carthage, Texas to supply 200 tons of Alum, an account which had historically belonged to GEO. Following discussions between Avraamides and General Chemical's Housel, GEO and General Chemical agreed that GEO would take an account of the same size from General Chemical in order to "mak[e] the playing field even again."

M.    **American Securities' Role**

191.    American Securities, through LeBaron and Wolff, was intimately involved with General Chemical's water chemicals business, including reviewing and authorizing significant Alum bids and overseeing its announced intent to "optimize" Alum prices within the market.

192.    Shortly after taking control of General Chemical, American Securities required that all bids over a certain amount receive approval by American Securities. Often the price approved by American Securities was determined by whether General Chemical was submitting a bid for one of its incumbent accounts that, in accordance with the conspiracy, General Chemical was predestined to "win," or whether General Chemical would be submitting an intentionally losing "throw-away" bid in furtherance of the conspiracy, such as for an account that was deemed to be "owned" by another conspirator or "owed" as a payback under the conspiracy.

193.    American Securities requested monthly reports that allowed it to monitor the conspiracy. These reports allowed American Securities, LeBaron, and Wolff to track whether bids were won by the "incumbent" manufacturer or whether a challenger had won an Alum bid. These reports also tracked whether other members of the conspiracy submitted intentionally losing or "no bids" conforming to the conspiracy, and therefore allowed American Securities to monitor and enforce the anticompetitive conspiracy.

194.    American Securities, through LeBaron and Wolff in particular, engaged in multiple overt acts in furtherance of the conspiracy.

195.    For example, in 2010, LeBaron asked General Chemical executives to confirm that General Chemical would not seek to bid against incumbent competitors for certain large accounts.

48

196.    LeBaron also personally sought to ensure that bids submitted by General Chemical conveyed the correct signals by distinguishing bid amounts for accounts at which General Chemical was the historical incumbent and those that were historically supplied by a co-conspirator.

197.    Likewise, in 2010, LeBaron specifically asked Opalewski about recent "signals" in bidding.  When Opalewski responded that General Chemical would be announcing a price increase through industry publications that was 20% higher than the price charged by General Chemical's competitors, LeBaron agreed to the plan to signal price increases to General Chemical's competitors.

198.    Similarly, in 2010, Wolff indicated that he and LeBaron had spoken and that they both agreed that General Chemical should bid high on two accounts that were then supplied by another manufacturer, instead of competing to try to win the accounts, but that they would reevaluate if the manufacturer moved aggressively to try to take an account that General Chemical was then supplying, even though the other manufacturer was "freight logical."

199.    American Securities also directly participated in the conspiracy by coordinating efforts to police the conspiracy and bring "competitors" into compliance.  For example, in 2009, LeBaron personally requested information about a competitor's largest accounts so that American Securities could determine how best to send a "message" to that competitor because the competitor had recently bid low against an account historically supplied by General Chemical.

200.    LeBaron subsequently monitored this General Chemical "competitor's" bidding to see whether the "competitor" had received the message, as demonstrated by its less aggressive bidding.

201.    By the summer of 2010, LeBaron was optimistic that Opalewski had taken steps (namely, a subcontracting agreement) to bring this competitor into compliance.

202.    American Securities also directly engaged with other Defendants.  For example, in the Spring of 2010, representatives of American Securities met with USALCO to discuss areas of "mutual interest."

### N.    Defendants' Actions Increased Prices Across the Industry

203.    During the Conspiracy Period, Defendants were able to maintain or increase the price of Alum at supra-competitive levels.

204.    Throughout the Conspiracy Period, Defendants told customers that the price increases for Alum flowed entirely from increases in manufacturing costs, such as the costs of raw materials.  For example, in December 2004, a representative of General Chemical told one customer that the industry was facing an "emerging alumina crisis and its impact on raw material costs.  In a nutshell, alumina is short globally and producers are accelerating price increases at unprecedented levels."

205.    In reality, however, Defendants' supra-competitive prices stemmed from their anticompetitive conduct described herein, including their direct and indirect discussions about prices.  In 2010, for example, General Chemical acknowledged internally that it was publicly announcing price increases which were above any raw material cost increases.

206.    As a result of Defendants' efforts described herein, including their coordination of price increases, the price of Alum increased to supra-competitive levels across the United States during the Injury Period.  For example, according to the Chemical Market Reporter, the prices of Alum increased approximately 33.8% to 38% between 1998 and 2004.

207.    These price increases contributed to Defendants' bottom-lines.  For example, between 2007 and 2008, Defendant General Chemical's sales to the water treatment market rose

34% due to, *inter alia*, higher prices for its water treatment chemicals. The following year, price increases on Alum contributed significantly to General Chemical's profits as reported on GenTek's 2009 Form 10-K.

208.    These supra-competitive prices did not end with any cessation of the conspiracy, but rather, Defendants continued to impose supra-competitive prices on customers because, among other reasons, many of the Alum supply contracts executed during the Conspiracy Period remained in effect until they expired according to their terms or were renegotiated.

**O.    Defendants Maintained, and Continued to Cause Injury Through and Benefit from, Their Unlawful Conspiracy Well Beyond 2011**

209.    Defendants, each having joined and participated in the unlawful conspiracy described herein, and each having performed overt acts in furtherance of this unlawful conspiracy, needed to affirmatively withdraw from the unlawful conspiracy in order to terminate their participation therein.

210.    None of the defendants did so, at least until 2015. To the contrary, well beyond 2011 they continued to communicate with each other about the subject matter of the conspiracy, continued to conceal the conspiracy from customers and the general public, and continued to substantially maintain (and, in some cases, even increase) the supra-competitive prices they charged for Alum. Only in 2015 did information about the conspiracy become public, as a result of a guilty plea by one of the individual defendants.

211.    For example, despite becoming aware that it was the subject of a Department of Justice investigation, General Chemical did not withdraw from the conspiracy, but instead continued to go along with, and benefit from, the conspiracy.

212.    General Chemical's Gupta continued to exchange emails with Defendants Reichl and Steppig concerning, *inter alia*, Alum throughout and beyond 2011. Also, General

Chemical's Avraamides discussed General Chemical's Alum contracting (with the City of Detroit) with David Askew, the President of USALCO, in or around August 2011.

213.    After becoming aware that the Department of Justice was investigating the unlawful conspiracy, William Redmond, the President and CEO of Defendant General Chemical, wrote to LeBaron and Wolff of American Securities expressing his desire that General Chemical remain silent on this topic, "move on with no external communication," and avoid disclosing the Department of Justice's investigation into the unlawful conspiracy to customers, co-conspirators, or the general public.

214.    Pursuant to Redmond's direction, a letter that General Chemical sent to all of its employees on April 27, 2011 made no mention of the Department of Justice's investigation into Defendants' unlawful conspiracy.  Instead, this letter further concealed the Defendants' unlawful conspiracy by stating that Defendants Opalewski and Avraamides had recently left General Chemical, "to pursue career interests outside the company."

215.    Concealing the conspiracy from their customers and the general public enabled Defendants to maintain, and continue to cause injury through and benefit from, their unlawful conspiracy concerning Alum well beyond 2011 as evidenced, *inter alia*, by Defendants' ability to substantially maintain, or even increase, the supra-competitive prices they charged their customers for Alum.

216.    Defendants' late- and post-2011 Alum pricing behavior cannot be justified by higher raw material costs, as the prices for raw materials used to manufacture Alum decreased during this time.

217.    The price of bauxite decreased 17.3% from 2011 to 2015, dropping from $30.50 per metric ton to $26.00 per metric ton.[10]

218.    The price of sulfuric acid decreased 8.5% from January 2011 to December 2016, dropping from 138.2 to 125.7 on the Bureau of Labor Statistics producer price index.[11]

219.    The price of Aluminum on the London Metal Exchange decreased 44.2% from January 2011 to December 2016, dropping from $2,471 per metric ton to $1,713 per metric ton.[12]

220.    Defendants' supra-competitive prices did not end with any cessation of the conspiracy, but, rather, Defendants continued to impose supra-competitive prices on customers because, among other reasons, many of the Alum supply contracts executed during the Conspiracy Period remained in effect beyond that period.

### D.    UNITED STATES DEPARTMENT OF JUSTICE INVESTIGATIONS

221.    Beginning in 2013, several members of the conspiracy admitted to participation in criminal antitrust violations including, *inter alia*, price fixing, bid rigging and the division of sales territory.

222.    On March 4, 2014, Defendant Chemtrade issued an Annual Information Form ("AIF")[13] for the calendar year 2013, the year it initiated its acquisition of General Chemical.  In that AIF, Chemtrade stated that it had received a leniency "marker" from the Department of

---

[10] https://minerals.usgs.gov/minerals/pubs/historical-statistics/ds140-bauxi.xlsx

[11] https://data.bls.gov/pdq/SurveyOutputServlet

[12] https://www.lme.com/Metals/Non-ferrous/Aluminium#tabIndex=2

[13] An Annual Information Form ("AIF") is an information disclosure form that public companies trading on Canadian stock exchanges must file with the Canadian Securities Administrators ("CSA") on a regular basis.  An AIF contains a wide variety of information concerning the operation of the firm, its properties, any pending or potential legal proceedings, and certain financial matters.  An AIF is roughly equivalent to a Form 10-K in the United States.

Justice for its conduct regarding sales of unspecified water treatment chemicals.  Chemtrade's

2013 AIF stated:

> Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry.  ***Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty and a leniency "marker" from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals under investigation which General Chemical had obtained prior to the General Chemical Acquisition.***  The investigation may result in separate civil litigation being initiated against Chemtrade.  In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain jurisdictions for a period of time.  Chemtrade does not anticipate that the costs associated with the investigation or related matters will have a material adverse impact on its business or operations.  The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject matter of this investigation.

Chemtrade Annual Information Form for 2013 at 46 (emphasis added).

223.     On March 5, 2015, Chemtrade issued its AIF for the calendar year 2014, again

stating that it had received "conditional amnesty" from the Department of Justice for

anticompetitive conduct relating to the sale of unspecified water treatment chemicals:

> Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry.  ***Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty from the U.S. Department of Justice for its conduct relating to the sale of the water treatment chemicals under investigation which General Chemical had obtained prior to the General Chemical Acquisition.***  The investigation may result in separate civil litigation being initiated against Chemtrade.  In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal

and other governmental water treatment chemicals business in certain jurisdictions for a period of time. Chemtrade does not anticipate that the costs associated with the investigation or related matters will have a material adverse impact on its business or operations. The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject of this investigation.

Chemtrade Annual Information Form for 2014 at 40-41 (emphasis added).

224.    On March 4, 2016, Chemtrade issued its AIF for the calendar year 2015, again stating that it had received "conditional amnesty" from the Department of Justice for anticompetitive conduct relating to the sale of unspecified water treatment chemicals:

Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry. The investigation commenced prior to Chemtrade's acquisition of General Chemical. ***Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals under investigation which General Chemical had obtained prior to the General Chemical Acquisition.*** The investigation has resulted in numerous separate class action lawsuits initiated against Chemtrade, which have been consolidated into a single New Jersey proceeding. In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain jurisdictions for a period of time. The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject of this investigation. As a result, Chemtrade does not anticipate that the damages and costs associated with the investigation, the class action law suits or related matters will have a material adverse impact on its business or operations. However, it is possible that the damages and costs could exceed the indemnification amount or that Chemtrade could be unsuccessful in collecting on its indemnity, in which case these matters would have a material adverse effect on Chemtrade's financial condition.

Chemtrade Annual Information Form for 2015 at 32-33 (emphasis added).

225.    On March 2, 2017, Chemtrade issued its AIF for the calendar year 2016, again

stating that it had received "conditional amnesty" from the Department of Justice for

anticompetitive conduct relating to the sale of unspecified water treatment chemicals:

> Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry. The investigation commenced prior to Chemtrade's acquisition of General Chemical. ***Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals which General Chemical had obtained prior to the General Chemical Acquisition.*** The investigation has resulted in numerous separate class action lawsuits initiated against Chemtrade, which have been consolidated into a single New Jersey proceeding by direct purchasers and a second proceeding by indirect purchasers. In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain jurisdictions for a period of time. The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject of this investigation. As a result, Chemtrade does not anticipate that the damages and costs associated with the investigation, the class action law suits or related matters will have a material adverse impact on its business or operations. However, it is possible that the damages and costs could exceed the indemnification amount or that Chemtrade could be unsuccessful in collecting on its indemnity, in which case these matters would have a material adverse effect on Chemtrade's financial condition.

Chemtrade Annual Information Form for 2016 at 36-37 (emphasis added).

226.    The significance of Chemtrade obtaining conditional amnesty under the

Department of Justice's corporate leniency program is explained in a Frequently Asked

Questions published by the Department of Justice as follows:

> Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?

*Yes*.  The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction.  ***Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.***  Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (November 19, 2008) at 6 (emphasis added).

227.    On October 27, 2015, the Department of Justice announced that Reichl, a former senior executive at General Chemical (which had been acquired by Chemtrade in 2014), had agreed to plead guilty to Sherman Act violations for his role in a conspiracy to suppress and eliminate competition in the sale and marketing of Alum by agreeing to rig bids and allocate customers for, and to fix, stabilize, increase, and maintain the price of, Alum.[14]

228.    As noted in Paragraph 50, *supra*, Reichl was a Vice President of Sales and Marketing at General Chemical between 2006 and 2010, and also served as the General Manager of Water Chemicals at General Chemical during the Conspiracy Period.  In both positions, Reichl oversaw the sale and marketing of Alum, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bid and price proposals, and supervising other General Chemical sales and marketing employees.[15]

---

[14] Announcement available at https://www.justice.gov/opa/pr/former-executive-admits-guilt-conspiracy-affecting-water-treatment-chemicals; see also United States v. Reichl, No. 2:15-cr-00554-JLL, Plea Agreement, Dkt. 5 (D.N.J.).

[15] *United States v. Reichl*, No. 2:15-cr-00554-JLL, Information, Dkt. 1 (D.N.J.).

229.    According to the criminal Information filed against Reichl on September 29, 2015 (which was unsealed on October 27, 2015), from at least as early as 1997 and continuing through approximately July 2010, Reichl and unidentified co-conspirators "entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the sale and marketing of [Alum] by agreeing to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of [Alum] sold to municipalities and pulp and paper companies in the United States . . . in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1."  The Information described the conspiracy that Reichl and his unidentified co-conspirators participated in as a "continuing agreement, understanding, and concert of action among Reichl and his co-conspirators."

230.    In order to form and carry out their unlawful conspiracy with regard to Alum, Reichl and his co-conspirators, as well as GEO, did those things that they combined and conspired to do, including, *inter alia*:

    a.    participating in meetings and conversations to discuss each other's Alum business;

    b.    agreeing to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

    c.    tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of Alum, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

    d.    submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" Alum customers;

    e.    discussing the price to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw away" bid or price quotation;

    f.    upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;

g.    where a co-conspirator could not withdraw its inadvertent winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer; and

h.    instructing new employees as to how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete.

231.    On February 17, 2016, a federal grand jury indicted Defendants Opalewski and Steppig – senior executives at Defendants General Chemical and GEO, respectively – on similar charges that they participated in an unlawful conspiracy to suppress and eliminate competition in the sale and marketing of Alum by agreeing to rig bids and allocate customers for, and to fix, stabilize, increase, and maintain the price of, Alum.[16]

232.    As noted in Paragraph 51, *supra*, Opalewski held high-level executive positions at Defendant General Chemical in which he was responsible for the sale and marketing of water treatment chemicals, including Alum.  These positions included:  Vice President of Sales and Marketing from approximately 2005 to 2006, Vice President and General Manager from approximately 2006 to 2009, and President from approximately 2009 to 2011.

233.    The Indictment alleged that Opalewski knowingly entered into and participated in the conspiracy from at least as early as 2005 and continuing until at least February 2011.

234.    As noted in Paragraph 52, *supra*, Steppig held high-level executive positions at Defendant GEO in which he was responsible for the sale and marketing of water treatment chemicals, including Alum.  These positions included:  National Sales Manager for pulp and paper water treatment chemicals from approximately 1997 to August 2006, and Director of Sales and Marketing for water treatment chemicals from approximately August 2006 to the present.

---

[16] *United States v. Opalewski*, 2:16-cr-00065-JLL, Indictment, Dkt. 1 (D.N.J.).

235.    The Indictment alleged Steppig knowingly entered into and participated in the conspiracy from at least as early as 1998 and continuing until at least February 2011.

236.    The Indictment described the unlawful conspiracy that Opalewski and Steppig participated in as "consist[ing] of a continuing agreement, understanding, and concert of action among [Opalewski and Steppig] and their co-conspirators, the substantial terms of which were to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of [Alum] sold to municipalities and pulp and paper companies in the United States."

237.    Similar to the Reichl Information, the Opalewski and Steppig Indictment stated that Opalewski and Steppig actually did those things that they conspired to do for the purpose of forming and carrying out their unlawful conspiracy with regard to Alum, including, *inter alia*:

    a.    participating in meetings and conversations to discuss each other's Alum business;

    b.    agreeing to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

    c.    tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of Alum, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

    d.    submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" Alum customers;

    e.    discussing the price to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw away" bid or price quotation;

    f.    upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;

    g.    where a co-conspirator could not withdraw its inadvertent winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer; and

       h.     instructing new employees as to how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete.

238.    On June 16, 2016, the Department of Justice announced that GEO had agreed to plead guilty to Sherman Act violations for its role in a conspiracy to suppress and eliminate competition in the sale and marketing of Alum by agreeing to rig bids and allocate customers for, and to fix, stabilize, increase, and maintain the price of, Alum.[17]

239.    According to the criminal Information filed against GEO on June 16, 2016,[18] from at least as early as 1997 and continuing through approximately February 2011, GEO and unidentified co-conspirators "entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the sale and marketing of [Alum] by agreeing to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of [Alum] sold to municipalities and pulp and paper companies in the United States . . . in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." The Information described the conspiracy that GEO and its unidentified co-conspirators participated in as a "continuing agreement, understanding, and concert of action among GEO and its co-conspirators."

240.    In order to form and carry out their unlawful conspiracy with regard to Alum, GEO and its co-conspirators did those things that they combined and conspired to do, including, *inter alia*:

       a.     participating in meetings and conversations to discuss each other's Alum business;

---

[17] Announcement available at https://www.justice.gov/opa/pr/water-treatment-chemicals-manufacturer-pleads-guilty-conspiracy-aimed-eliminating-competition; *see also United States v. GEO Specialty Chem. Inc.*, No. 2:16-cr-00290-JLL, Plea Agreement, Dkt. 8 (D.N.J.).

[18] *United States v. GEO Specialty Chem. Inc.*, No. 2:16-cr-00290-JLL, Information, Dkt. 4 (D.N.J.).

     b.     agreeing to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

     c.     tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of Alum, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

     d.     submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" Alum customers;

     e.     discussing the price to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw away" bid or price quotation;

     f.     upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;

     g.     where a co-conspirator could not withdraw its inadvertent winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer; and

     h.     instructing new employees as to how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete.

241.    Although Reichl and GEO were among the first identified conspirators to plead guilty to Sherman Act violations,[19] the Department of Justice has indicated that various other persons and entities participated as co-conspirators in the collusive anticompetitive scheme to fix the price of and rig bids for Alum.  In the press release announcing Reichl's guilty plea, Assistant Attorney General Bill Baer of the Department of Justice's Antitrust Division stated that the Department of Justice was "continu[ing] to work with our partners at the FBI to hold offenders in this industry criminally accountable."[20]  Similarly, in the press release announcing

---

[19] On February 24, 2016, Opalewski and Steppig both pleaded not guilty to the Sherman Act violation with which the Indictment charged them.

[20] https://www.justice.gov/opa/pr/former-executive-admits-guilt-conspiracy-affecting-water-treatment-chemicals.

the Opalewski and Steppig indictment, Assistant Attorney General Baer stated that the charges brought against Opalewski and Steppig reflected the Department of Justice's "ongoing efforts to hold accountable those who conspire to cheat their customers responsible for their crimes."[21] .

## PLAINTIFFS APPOMATTOX'S AND SOUTH CENTRAL'S ALUM PURCHASING HISTORY

242.     Plaintiffs Appomattox's and South Central's experience purchasing Alum demonstrates the profound impact of Defendants' anticompetitive conspiracy on authority budgets.  Appomattox and South Central requested bids for Alum and other chemicals jointly and purchased Alum from the same vendor according to the winning bid for each year.

243.     During the Injury Period, Appomattox and South Central purchased millions of dollars of Alum from General Chemical, Delta Chemical, and at least one other entity at increasing prices over time.

244.     In 1999, Appomattox and South Central paid $107 per ton for Alum. Between 2004 and 2005, the Alum price rose by almost 17% from $156 per ton to $183 per ton.  The following year, Appomattox's and South Central's price for Alum increased another 22% to $224 per ton.

245.     Appomattox and South Central faced an additional price increase in 2008 to $246 per ton.

246.     In 2009, the price of alum jumped over 56% to $384 per ton for Appomattox and South Central.

---

[21] https://www.justice.gov/opa/pr/two-executives-charged-conspiring-eliminate-competition-supply-water-treatment-chemicals; see also https://www.justice.gov/opa/pr/water-treatment-chemicals-manufacturer-pleads-guilty-conspiracy-aimed-eliminating-competition (In press release announcing GEO Specialty's guilty plea, Principal Deputy Assistant Attorney General Renata Hesse of the Justice Department's Antitrust Division stated:  "This prosecution continues our efforts to hold criminally responsible those who collude to cheat their customers").

247.    From 1999 to 2009, the price Appomattox and South Central paid for Alum more than tripled, from $107 per ton to $384 per ton.

248.    As a result of the conspiracy among Defendants, Appomattox and South Central have been forced to pay supra-competitive prices for Alum through the end of 2016, notwithstanding declining input prices, resulting in a total expenditure on Alum by Appomattox and South Central from 1999 through 2016 of over $8 million.

## PLAINTIFF CHESTERFIELD'S ALUM PURCHASING HISTORY

249.    Plaintiff Chesterfield's experience purchasing Alum also demonstrates the profound impact of Defendants' anticompetitive conspiracy on locality budgets.

250.    During the Injury Period, Chesterfield purchased millions of dollars of Alum from General Chemical and Chemtrade at increasing prices over time.

251.    From Fiscal Year 2008 to Fiscal Year 2009, the price of Alum from General Chemical increased from $181 per ton to $318 per ton, an increase of over 75%.

252.    The price of Alum for Chesterfield continued to increase, reaching $337 per ton in Fiscal Year 2012 and $367 per ton in Fiscal Year 2014.

253.    From Fiscal Year 2008 to Fiscal Year 2013, the price Chesterfield paid for Alum more than doubled, from $181 per ton to $367 per ton.

254.    As a result of the conspiracy among Defendants, Chesterfield has been forced to pay supra-competitive prices for Alum through the end of Fiscal Year 2016, notwithstanding declining input prices, resulting in a total expenditure on Alum by Chesterfield from Fiscal Year 2008 through Fiscal Year 2016 of over $2 million.

## PLAINTIFF HENRICO'S ALUM PURCHASING HISTORY

255.    Plaintiff Henrico's experience purchasing Alum also demonstrates the profound impact of Defendants' anticompetitive conspiracy on locality budgets.

256.     During the Injury Period, Henrico purchased millions of dollars of Alum from General Chemical and Chemtrade at increasing prices over time.

257.     In 2004, Henrico purchased Alum from General Chemical at a price of $131 per ton.

258.     Henrico continued to purchase Alum from General Chemical in 2005, at an increased price of $149 per ton, an increase in excess of 13%.

259.     General Chemical raised prices for Alum in 2006 to $199 per ton, representing an increase of more than 33% from the year prior and an increase of more than 51% from 2004.

260.     Henrico continued to purchase Alum from General Chemical in 2007 at an increased price of $229 per ton.  General Chemical's new price represented an increase of 15% from the year before, and an increase of more than 74% from 2004.

261.     Henrico continued to purchase Alum from General Chemical in 2008 at an increased price of $257 per ton.  General Chemical's new price represented an increase of more than 12% from the prior year, and an increase of more than 95% since 2004.

262.     Henrico continued to purchase Alum from General Chemical in 2009 at an increased price of $397 per ton.  General Chemical's new price represented an increase of more than 54% from the prior year, and an increase of more than 201% since 2004.

263.     As a result of the conspiracy among Defendants, Henrico has been forced to pay supra-competitive prices for Alum through the end of 2016, notwithstanding declining input prices, resulting in a total expenditure on Alum by Henrico from 1997 through 2016 of more than $7 million.

## PLAINTIFF LYNCHBURG'S ALUM PURCHASING HISTORY

264.     Plaintiff Lynchburg's experience purchasing Alum also demonstrates the profound impact of Defendants' anticompetitive conspiracy on municipal budgets.

265.    During the Injury Period. Lynchburg purchased over a million dollars of Alum from General Chemical and at least one other entity at increasing prices over time.

266.    In 2004, Lynchburg purchased Alum from General Chemical at $155 per ton.

267.    In 2005, Lynchburg purchased Alum from General Chemical at $161 per ton.

268.    In 2006, Lynchburg purchased Alum from General Chemical at $226 per ton. This represented a price increase of more than 40% from the previous year, and an almost 46% increase from 2004.

269.    Lynchburg continued purchasing Alum from General Chemical in 2007, at an increased price of $246 per ton.  This represented a price increase of approximately 9% from the previous year and approximately 59% from 2004.

270.    As a result of the conspiracy among Defendants, Lynchburg has been forced to pay supra-competitive prices for Alum through the end of 2016, notwithstanding declining input prices, resulting in a total expenditure on Alum by Lynchburg from 2004 through 2016 of more than $1.8 million.

## PLAINTIFF NEWPORT NEWS' ALUM PURCHASING HISTORY

271.    Plaintiff Newport News' experience purchasing Alum also demonstrates the profound impact of Defendants' anticompetitive conspiracy on municipal budgets.

272.    During the Injury Period, Newport News purchased millions of dollars of Alum from General Chemical and Chemtrade at increasing prices over time.

273.    Between 2002 and 2003, the price per unit of Alum increased from $113 per ton to $128 per ton, an increase of approximately 13%.

274.    Between 2004 and 2005, the price per unit of Alum started at $128 per ton and rose to $155 per ton, an additional increase of approximately 21%.

275.    Between 2005 and 2007, the price of Alum from General Chemical increased from $155 per ton to $167 per ton, an additional increase of approximately 8%.

276.    Over ten years, from 1997 until 2007, the price per ton of Alum increased by almost 58%, starting at $109 per ton and ending at $172 per ton.

277.    Between 2007 and 2008 General Chemical's price for Alum increased to over $203 per ton, resulting in a price increase of over 18% from the year before and over 86% since 1997.

278.    In 2009, the price for Alum skyrocketed to $410 per ton, representing a price increase of almost 102% from the year before, and more than 276% since 1997.

279.    As a result of the conspiracy among Defendants, Newport News has been forced to pay supra-competitive prices for Alum through the end of 2016, notwithstanding declining input prices, resulting in a total expenditure on Alum by Newport News from 1997 through 2016 of more than $22 million.

## PLAINTIFF NORFOLK'S ALUM PURCHASING HISTORY

280.    Plaintiff Norfolk's Alum purchases also demonstrate the profound impact of Defendants' anticompetitive conspiracy on municipal budgets.

281.    During the Injury Period, Norfolk purchased millions of dollars of Alum from General Chemical, GEO, and Chemtrade at increasing prices over time.

282.    Between Fiscal Years 2004 and 2006, the price of Alum from GEO and General Chemical increased from $242 per ton to $340 per ton, an increase of over 40%.

283.    In Fiscal Year 2007, the price Norfolk paid for Alum from General Chemical increased by approximately 12% to $380 per ton.

284.    Similarly, in Fiscal Year 2008, the price Norfolk paid for Alum from General Chemical increased to $443 per ton, which represented a yearly increase of approximately 17%.

67

285.     As a result of the conspiracy among Defendants, Norfolk has been forced to pay supra-competitive prices for Alum through the end of 2016, notwithstanding declining input prices, resulting in a total expenditure on Alum by Norfolk from Fiscal Year 1999 through Fiscal Year 2016 of more than $11 million.

## PLAINTIFF RIVANNA'S ALUM PURCHASING HISTORY

286.     Plaintiff Rivanna's experience purchasing Alum also demonstrates the profound impact of Defendants' anticompetitive conspiracy on authority budgets.

287.     During the Injury Period, Rivanna purchased more than $1.9 million dollars of Alum from General Chemical, Chemtrade, and Delta at increasing prices over time.

288.     From Fiscal Year 2008 to Fiscal Year 2009, the price per unit of Alum increased from approximately $243 per ton to approximately $353 per ton, an increase of over 45%.

289.     In Fiscal Year 2010, the Alum price increased to approximately $368 per ton.

290.     As a result of the conspiracy among Defendants, Rivanna has been forced to pay supra-competitive prices for Alum through the end of 2016, notwithstanding declining input prices, resulting in a total expenditure on Alum by Rivanna from 1997 through 2016 of more than $1.9 million.

## PLAINTIFF SPRINGFIELD'S ALUM PURCHASING HISTORY

291.     Plaintiff Springfield's Alum purchases also demonstrate the profound impact of Defendants' anticompetitive conspiracy on municipal budgets.

292.     During the Injury Period, Springfield purchased over a million dollars of Alum from General Chemical and Chemtrade at increasing prices over time.

293.     Between December 2006 and December 2007, Springfield's data indicate that the price of Alum from General Chemical increased from $192 per ton to $220 per ton, an increase of over 14%.

294.     By June 2008, the price Springfield paid for Alum from General Chemical increased over 75% to $387 per ton.

295.     From June to December 2008, General Chemical's Alum price jumped an additional 21% to $468 per ton.

296.     As a result of the conspiracy among Defendants, Springfield has been forced to pay supra-competitive prices for Alum through the end of 2016, notwithstanding declining input prices, resulting in a total expenditure on Alum by Springfield from 2006 through 2016 of more than $1 million.

## **FRAUDULENT CONCEALMENT**

297.     Defendants and their co-conspirators engaged in a successful unlawful conspiracy which, by its very nature, was self-concealing.

298.     Defendants and their co-conspirators used non-public means of communication, such as private meetings, to conceal their agreements to eliminate competition by, *inter alia*, fixing prices, rigging bids, and allocating customers for Alum in the United States.

299.     Defendants and their co-conspirators wrongfully concealed and carried out their illegal conduct in a manner that was designed to, and did, preclude detection.

300.     Plaintiffs did not have actual or constructive knowledge of Defendants' unlawful scheme until sometime after the Reichl guilty plea was announced on October 27, 2015.

301.     Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed by Defendants, neither Plaintiffs nor any other Alum purchasers learned, or could have learned or discovered, the operative facts giving rise to this Amended Complaint until sometime after October 27, 2015, when the Department of Justice announced the Reichl guilty plea.  No information, actual or constructive, was ever made available to Plaintiffs or any

other Alum purchasers that would have led a reasonably diligent person to investigate whether an unlawful conspiracy with regard to Alum existed prior to October 27, 2015.

302.    Chemtrade's disclosures in the 2014 and 2015 AIFs it filed with Canadian securities regulators that it had received conditional amnesty and a "leniency" marker from the United States Department of Justice "for its conduct relating to the sale of water treatment chemicals" were not sufficient to put Plaintiffs or any other reasonable United States purchaser of Alum on notice that an extensive conspiracy to fix the price of and rig bids for Alum may have existed. Chemtrade's AIFs only generally referred to conduct relating to "water treatment chemicals," and did not specify Alum. Additionally, the AIFs were filed with Canadian, not United States, securities regulators. Expecting municipalities and other localities and authorities to monitor the foreign regulatory filings of parent companies of every contractor they deal with for vague allusions to potential unlawful conduct that occurred in the United States is a bridge too far.

303.    Not only did Defendants conduct their conspiracy in secret, they also affirmatively misled their customers, including Plaintiffs, as to the existence of their unlawful conspiracy.

304.    Defendants misled or falsely certified to Plaintiffs that they had arrived at their quoted prices independently, thereby concealing the Defendants' unlawful conspiracy.

305.    For example, Chesterfield's 2013 Invitation for Bids included the statements: "The accompanying bid is not the result of, or affected by, any unlawful act of collusion with another person or company engaged in the same line of business or commerce, or any act of fraud punishable under § 18.2-498.1, et. seq. of the Code of Virginia. Furthermore, I understand that fraud and unlawful collusion are crimes under the Virginia Governmental Frauds Act, the

70

Virginia Government Bid Rigging Act, the Virginia Antitrust Act, and Federal Law, and can result in fines, prison sentences, and civil damage awards."

306.    Henrico's 2000 Invitation for Bids included the following language: "The bidder represents that in . . . submission of this bid, said bidder did not, either directly or indirectly, enter into any combination or arrangement with any person, firm or corporation or enter into any agreement, participate in any collusion, or otherwise take action in the restraint of free, competitive bidding in violation of [Federal or State law]."

307.    Lynchburg's 2011 Invitation for Bids used the following language: "The accompanying bid is not the result of or affected by, any act of collusion with another person or company engaged in the same line of business or commerce, or any act of fraud punishable under, Chapter 12, Title 18.2, 498.4 of the Code of Virginia, 1950, as amended.  Furthermore, I understand that fraudulent and collusive bidding is a crime under the Virginia Governmental Frauds Act, the Virginia Government Bid Rigging Act, the Virginia Anti-Trust Act, and Federal Law and can result in fines, prison sentences, and civil damage awards."

308.    Newport News' 2008 Invitation for Bids included:

The bidder certifies by signing this Invitation for Bid that this bid is made without prior understanding, agreement, or accord with any other person or firm submitting a bid for the same goods and/or services and that this bid is in all respects bona fide, fair, and not the result of any act of fraud or collusion with another person or firm engaged in the same line of business or commerce. Any false statement hereunder may constitute a felony and can result in a fine and imprisonment, as well as civil damages.

The contractor shall keep fully informed of all federal, state and local laws, ordinances and regulations that in any manner affect the conduct of the work. The contractor shall at all times observe and comply with all such laws, ordinances and regulations.

309.    Norfolk's 2006 bid solicitation included the following anti-collusion statement:

In preparation and submission of this proposal on behalf of _____ (name of consultant), we did not either directly or indirectly enter into any combination or

71

arrangement with any person, firm or corporation, or enter into any agreement, participate in any collusion, or otherwise take any action in the restraint of free competition in violation of the Sherman Anti-Trust Act, 15 USCS Sections 1 et seq.; the Virginia Antitrust Act, Virginia Code Sections 59.1-9.1 through 59.1-9.18, and the Conspiracy to Rig Bids to Government Statutes, Virginia Code Sections 59.1-68.6 through 59.1-68.8.

The undersigned consultant hereby <u>certifies</u> that this agreement, or any claims resulting there from, is not the result of, or affected by, any act of collusion with, or any act of, another person or persons, firm or corporation engaged in the same line of business or commerce; and, that no person acting for, or employed by, the city of Norfolk has an interest in, or is concerned with, this proposal; and, that no person or persons, firm or corporation, other than the undersigned, have or are interested in this proposal.

310.    Springfield's 2013 Invitation for Bids included:

By offering a submission to this Invitation for Bid, the bidder certifies the bidder has not divulged, discussed, or compared the Bid with other bidders and has not colluded with any other bidder or parties to this IFB whatsoever. Also, the bidder certifies, and in the case of a joint Bid, each party thereto certifies as to their own organization, that in connection with this IFB:

a. Any prices and/or cost data submitted have been arrived at independently, without consultation, communication, or agreement for the purpose of restricting competition, as to any matter relating to such prices and/or cost data, with any other bidder or with any competitor.

b. Any prices and/or cost data for this Bid have not knowingly been disclosed by the bidder and will not knowingly be disclosed by the bidder prior to the scheduled opening directly or indirectly to any other bidder or to any competitor.

c. No attempt has been made or will be made by the bidder to induce any other person or firm to submit or not to submit a Bid for the purpose of restricting competition.

d. The only person or persons interested in this Bid, principal or principals are named therein and that no person other than therein mentioned has any interest in this Bid or in the contract to be entered into.

e. No person or agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee exempting bona fide employees or established commercial agencies maintained by the Purchaser for the purpose of doing business.

311.    In announcing price increases for Alum, Defendants and their co-conspirators

often falsely asserted that such increases were attributable to higher raw material and energy

costs, thereby providing an excuse concealing the true cause of these price increases – the

Defendants' unlawful conspiracy – from Alum purchasers.

312.     The affirmative misrepresentations Defendants and their co-conspirators made to Alum purchasers, were meant to, and did, prevent Plaintiffs from discovering the actual reason for the artificially-inflated prices.

313.     Upon information and belief, Defendants took additional affirmative acts of concealment, including ensuring that there were few written communications regarding their conspiracy and agreement.  For example, emails among the Defendants' officers in furtherance of the conspiracy were often sent to and from personal email addresses, asking one another to speak via telephone, and telephone calls among the various conspirators were made from personal mobile telephones rather than from office telephones.  In at least one instance, GEO's Steppig explicitly acknowledged that "the number [General Chemical's Gupta] called was [his] mobile number."

314.     Because of the self-concealing nature of Defendants' unlawful conspiracy and the affirmative acts of concealment described above, Plaintiffs were unaware of Defendants' unlawful conspiracy and were unaware that they were paying artificially inflated prices for Alum during the Injury Period.  The self-concealing nature of Defendants' conspiracy, coupled with the affirmative acts of concealment described above, prevented Plaintiffs from discovering through reasonable diligence that Defendants had engaged in the unlawful conspiracy described herein.  Accordingly, Defendants' fraudulent concealment tolled all statutes of limitations applicable to Plaintiffs' claims.  No applicable statute of limitations began to run on Plaintiffs' claims until, at the earliest, October 27, 2015, the day the Reichl guilty plea and the unlawful conspiracy was first publicly revealed.

315.     As a putative class member in the class action complaint filed by Central Arkansas Water on October 31, 2015, the statutes of limitations on Plaintiffs' claims have been tolled pursuant to *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).

## DEFENDANTS GENERAL CHEMICAL AND GEO'S BANKRUPTCY DISCHARGE ORDERS DO NOT PRECLUDE PLAINTIFFS FROM RECOVERING DAMAGES FOR THEIR ACTIONS PRIOR TO THEIR RESPECTIVE DISCHARGE ORDERS

316.     The Alum cases that have been filed throughout the country have been coordinated as a multidistrict litigation in the United States District Court for the District of New Jersey.  As the MDL Court held in its Order dated July 20, 2017 denying, *inter alia*, General Chemical and GEO's motions to dismiss claims that accrued prior to the effective date of their respective Bankruptcy discharge orders, plaintiffs that purchased Alum in the market that General Chemical and GEO conspired to cartelize were known creditors of both Defendants. D.E. 405 (Order Denying Defendants' Motions to Dismiss Complaints) at 27-28.  The Court further noted that known creditors must be given *actual notice* of a debtor's bankruptcy in order for a bankruptcy discharge order to bar claims that a known creditor may have held against the debtor.  *Id*. at 28.

317.     Plaintiffs actively solicited bids for, and purchased, Alum from at least as early as 1997 through the present.  As an active participant in the Alum market that General Chemical and GEO conspired to fix prices and rig bids in, Plaintiffs were a known creditor of both General Chemical and GEO throughout the entire conspiracy.

318.     General Chemical filed for Chapter 11 bankruptcy on October 11, 2002.

319.     General Chemical did not provide Plaintiffs with actual notice of its Chapter 11 bankruptcy proceeding.

320.     General Chemical's Plan of Reorganization became effective on November 10, 2003, and it emerged from bankruptcy on that date.

321.    GEO filed for Chapter 11 bankruptcy on March 18, 2004.

322.    GEO did not provide Plaintiffs with actual notice of its Chapter 11 bankruptcy proceeding.

323.    GEO's Plan of Reorganization became effective on December 31, 2004, and it emerged from bankruptcy on that date.

324.    Accordingly, because Plaintiffs were a known creditor of both General Chemical and GEO, they were entitled to receive actual notice of General Chemical and GEO's bankruptcy proceedings.  Because Plaintiffs were never apprised of either General Chemical or GEO's bankruptcy proceedings, the bankruptcy discharge orders do not bar Plaintiffs' ability to recover damages prior to the effective date of said orders from either General Chemical or GEO.

325.    Moreover, as the MDL Court also held in its July 20, 2017 Order, even if General Chemical and GEO had satisfied the due process requirements related to notice, their post-discharge conduct would still subject them to joint and several liability for the entirety of the alleged conspiracy because a party who withdraws from a conspiracy and later rejoins it remains jointly and severally liable for the entire conspiracy.  *Id.* at 28-29.

326.    Both General Chemical and GEO continued to be involved in the conspiracy during their respective bankruptcy periods and thereafter.

## COUNT I

### SHERMAN ACT, 15 U.S.C. § 1:
### CONSPIRACY IN RESTRAINT OF TRADE
### (Against All Defendants)

327.    Plaintiffs incorporate by reference the preceding paragraphs as though set forth fully herein.

328.    Defendants engaged in an unlawful conspiracy by agreeing to rig bids and allocate customers for, and to fix, stabilize, inflate, and maintain the price of, Alum sold to

companies,, localities and authorities in the United States, in violation of Section 1 of the

Sherman Act, 15 U.S.C. § 1.

329.    The conspiracy alleged herein is a per se violation of Section 1 of the Sherman

Act.

330.    Alternatively, the conspiracy alleged herein is a rule of reason violation of

Section 1 of the Sherman Act.

331.    There was no procompetitive business justification for Defendants' unlawful

conspiracy.  Even if there were some ostensible procompetitive justification, the Defendants'

conduct was not the least restrictive alternative method to achieve such a purpose.

332.    Defendants furthered and effectuated their conspiracy, *inter alia*, by the following

acts:

> a.    participating in secret communications, discussions, and meetings in the United States and elsewhere regarding each other's Alum business;
>
> b.    agreeing, during these communications, discussions, and meetings, to "stay away" from each other's "historical" customers by not pursuing the business of those customers;
>
> c.    tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator and Alum supplier, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;
>
> d.    submitting intentionally losing or "throw away" bids or price quotations to each other's "historical" Alum customers;
>
> e.    discussing and agreeing to set price floors that pre-determined "winning" bidders would quote to a customer, so as to aid co-conspirators in formulating intentionally losing or "throw away" bids;
>
> f.    upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;
>
> g.    where a co-conspirator could not withdraw its inadvertent winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer;

h.    instructing new employees as to how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete; and

i.    selling Alum to customers at collusive and non-competitive prices in the United States.

333.    As a result of Defendants' unlawful conspiracy, Plaintiffs sustained damages to their business or property.  The full amount of such damages will be determined after discovery and upon proof at trial.

334.    The conspiracy had its intended effect, and Defendants benefitted by reaping inflated revenues from their supra-competitive Alum pricing.

335.    Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Antitrust Act.

336.    Plaintiffs reserve the right to add additional defendants as information is developed as to other parties.

## COUNT II

### VIRGINIA ANTITRUST ACT, VA. CODE ANN. § 59.1-9.5: CONSPIRACY IN RESTRAINT OF TRADE
### (Virginia Plaintiffs Against All Defendants)

337.    Virginia Plaintiffs incorporate by reference the preceding paragraphs as though set forth fully herein.

338.    Defendants engaged in an unlawful conspiracy by agreeing to rig bids and allocate customers for, and to fix, stabilize, inflate, and maintain the price of Alum sold to companies, localities and authorities in, among other places, the Commonwealth of Virginia, in violation of the Virginia Antitrust Act, VA. CODE ANN. § 59.1-9.5.

339.    The conspiracy alleged herein is a per se violation of the Virginia Antitrust Act.

340.    Alternatively, the conspiracy alleged herein is a rule of reason violation of the Virginia Antitrust Act.

341.    There was no procompetitive business justification for Defendants' unlawful conspiracy.  Even if there were some ostensible procompetitive justification, the Defendants' conduct was not the least restrictive alternative method to achieve such a purpose.

342.    Defendants furthered and effectuated their conspiracy, *inter alia*, by the following acts:

a.    participating in secret communications, discussions, and meetings in the United States and elsewhere regarding each other's Alum business;

b.    agreeing, during these communications, discussions, and meetings, to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

c.    tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator and Alum supplier, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

d.    submitting intentionally losing or "throw away" bids or price quotations to each other's "historical" Alum customers;

e.    discussing and agreeing to set price floors that pre-determined "winning" bidders would quote to a customer, so as to aid co-conspirators in formulating  intentionally losing or "throw away" bids;

f.    upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;

g.    where a co-conspirator could not withdraw its inadvertent winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer;

h.    instructing new employees as to how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete; and

i.    selling Alum to customers at collusive and non-competitive prices in the United States, including in Virginia.

343.     Defendants' unlawful conspiracy was a willful and/or flagrant violation of the Virginia Antitrust Act.

344.     As the result of Defendants' unlawful conspiracy, Virginia Plaintiffs sustained damages to their property.  The full amount of such damages will be determined after discovery and upon proof at trial.

345.     The conspiracy had its intended effect, and Defendants benefitted by reaping inflated revenues from their supra-competitive Alum pricing.

346.     Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under the Virginia Antitrust Act.

347.     Virginia Plaintiffs reserve the right to add additional defendants as information is developed as to other parties.

## COUNT III

**RESTITUTION/DISGORGEMENT/UNJUST ENRICHMENT**
**(Virginia Plaintiffs Against Defendants General Chemical, Chemtrade, and GEO)**

348.     Virginia Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

349.     It would be inequitable for Defendants General Chemical, Chemtrade, and GEO to be allowed to retain the benefits that these Defendants obtained from their illegal agreements, manipulative acts, and other unlawful conduct described herein, at the expense of Virginia Plaintiffs.

350.     Virginia Plaintiffs are entitled to the establishment of a constructive trust impressed upon the benefits to Defendants General Chemical, Chemtrade, and GEO from their unjust enrichment and inequitable conduct.

351.    Alternatively or additionally, each of Defendants General Chemical, Chemtrade, and GEO, should pay restitution of its own unjust enrichment to Plaintiffs.

352.    Virginia Plaintiffs reserve the right to add additional defendants as information is developed as to other parties.

## COUNT IV

**MISSOURI ANTITRUST ACT, MO. REV. STAT. § 416.011-.161**
**(Springfield Against All Defendants)**

353.    Springfield incorporates by reference the preceding paragraphs as if set forth fully herein.

354.    Defendants engaged in an unlawful conspiracy by agreeing to rig bids and allocate customers for, and to fix, stabilize, inflate, and maintain the price of Alum sold to companies and municipalities in, among other places, the State of Missouri, in violation of the Missouri Antitrust Act, MO. REV. STAT. § 416.011-.161.

355.    The conspiracy alleged herein is a per se violation of the Missouri Antitrust Act.

356.    Alternatively, the conspiracy alleged herein is a rule of reason violation of the Missouri Antitrust Act.

357.    There was no procompetitive business justification for Defendants' unlawful conspiracy.  Even if there were some ostensible procompetitive justification, the Defendants' conduct was not the least restrictive alternative method to achieve such a purpose.

358.    Defendants furthered and effectuated their conspiracy, *inter alia*, by the following acts:

      a.    participating in secret communications, discussions, and meetings in the United States and elsewhere regarding each other's Alum business;

      b.    agreeing, during these communications, discussions, and meetings, to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

    c.       tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator and Alum supplier, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

    d.       submitting intentionally losing or "throw away" bids or price quotations to each other's "historical" Alum customers;

    e.       discussing and agreeing to set price floors that pre-determined "winning" bidders would quote to a customer, so as to aid co-conspirators in formulating  intentionally losing or "throw away" bids;

    f.       upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;

    g.       where a co-conspirator could not withdraw its inadvertent winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer;

    h.       instructing new employees as to how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete; and

    i.       selling Alum to customers at collusive and non-competitive prices in the United States, including in Missouri.

359.    Defendants' unlawful conspiracy was a willful and/or flagrant violation of the Missouri Antitrust Act.

360.    As the result of Defendants' unlawful conspiracy, Plaintiff Springfield sustained damages to its property.  The full amount of such damages will be determined after discovery and upon proof at trial.

361.    The conspiracy had its intended effect, and Defendants benefitted by reaping inflated revenues from their supra-competitive Alum pricing.

362.    Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under the Missouri Antitrust Act.

363.    Springfield reserves the right to add additional defendants as information is developed as to other parties

## COUNT V

### RESTITUTION/DISGORGEMENT/UNJUST ENRICHMENT
### (Springfield Against Defendants General Chemical and Chemtrade)

364.    Springfield incorporates by reference the preceding paragraphs as if set forth fully herein.

365.    It would be inequitable for Defendants General Chemical and Chemtrade to be allowed to retain the benefits that these Defendants obtained from their illegal agreements, manipulative acts, and other unlawful conduct described herein, at the expense of Springfield.

366.    Springfield is entitled to the establishment of a constructive trust impressed upon the benefits to Defendants General Chemical and Chemtrade from their unjust enrichment and inequitable conduct.

367.    Alternatively or additionally, each of Defendants General Chemical and Chemtrade should pay restitution of its own unjust enrichment to Springfield.

368.    Springfield reserves the right to add additional defendants as information is developed as to other parties.

## COUNT VI

### COMMON LAW FRAUD
### (Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk Against Defendants General Chemical and Chemtrade)

369.    Plaintiffs Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk incorporate by reference the preceding paragraphs as though set forth fully herein.

370.    Defendants General Chemical and Chemtrade used deception, used a deceptive act or practice, used fraud, used false pretense, made a false promise, made a misrepresentation,

and/or concealed, suppressed, or omitted material facts in connection with the sale of merchandise (in this case, Alum) to Plaintiffs Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk.

371.    Defendants General Chemical and Chemtrade repeatedly represented, both explicitly and implicitly, that the Alum prices being offered to Plaintiffs Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk were based on a competitive market, rather than collusively set pursuant to Defendants' unlawful conspiracy described above.

372.    Defendants General Chemical's and Chemtrade's misrepresentations as alleged herein were material, in that they concealed that Defendants had unlawfully set Alum prices through Defendants' unlawful conspiracy described above.

373.    Plaintiffs Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk detrimentally relied on Defendants General Chemical's and Chemtrade's deception, deceptive acts and practices, fraud, false pretenses, false promises, misrepresentations, and/or concealment, suppression, or omissions of material facts when each of these entities decided to execute contracts to purchase Alum.

374.    The reliance of Plaintiffs Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk was reasonable, in that Defendants' unlawful conspiracy described above extended throughout the Alum industry and had the purpose and effect of concealing the true state of affairs from Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk.

375.    Defendants General Chemical and Chemtrade committed the acts and omissions alleged herein deliberately and maliciously, and an intent to inflict monetary harm on Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk.

376.     As a result of Defendants' unlawful conspiracy described above, Plaintiffs Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk suffered damages in the form of artificially inflated prices that each of these entities paid for Alum.

377.     Plaintiffs Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk reserve the right to add additional defendants.

## COUNT VII

### BREACH OF CONTRACT
### (Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk Against Defendants General Chemical and Chemtrade)

378.     Plaintiffs Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk incorporate by reference the preceding paragraphs as if set forth fully herein.

379.     Chesterfield's Invitation for Bid included the statements: "The accompanying bid is not the result of, or affected by, any unlawful act of collusion with another person or company engaged in the same line of business or commerce, or any act of fraud punishable under § 18.2-498.1, et. seq. of the Code of Virginia. Furthermore, I understand that fraud and unlawful collusion are crimes under the Virginia Governmental Frauds Act, the Virginia Government Bid Rigging Act, the Virginia Antitrust Act, and Federal Law, and can result in fines, prison sentences, and civil damage awards."

380.     Henrico's Invitation for Bid included the statements: "By bidding in response to this invitation, the bidder represents that in the preparation and submission of this bid, said bidder did not, either directly or indirectly, enter into any combination or arrangement with any other person, firm or corporation or enter into any agreement, participate in any collusion, or otherwise take any action in the restraint of free, competitive bidding in violation of the Sherman Act (15 U.S.C. Section 1) or Sections 59.1-9.1 through 59.1-9.17 or Sections 59.1-68.6 through 59.1-68.8 of the Code of Virginia."

84

381.    Lynchburg's Invitation for Bid included the statements: "The accompanying bid is not the result of or affected by, any act of collusion with another person or company engaged in the same line of business or commerce, or any act of fraud punishable under, Chapter 12, Title 18.2, 498.4 of the Code of Virginia, 1950, as amended. Furthermore, I understand that fraudulent and collusive bidding is a crime under the Virginia Governmental Frauds Act, the Virginia Government Bid Rigging Act, the Virginia Anti-Trust Act, and Federal Law and can result in fines, prison sentences, and civil damage awards."

382.    Newport News' Invitation for Bid included the statements: "The bidder certifies by signing this Invitation for Bid that this bid is made without prior understanding, agreement, or accord with any other person or firm submitting a bid for the same goods and/or services and that this bid is in all respects bona fide, fair, and not the result of any act of fraud or collusion with another person or firm engaged in the same line of business or commerce."

383.    Norfolk's Invitation for Bid included the statements: "In preparation and submission of this proposal . . . we did not either directly or indirectly enter into any combination or arrangement with any person, firm or corporation, or enter into any agreement, participate in any collusion, or otherwise take any action in the restraint of free competition in violation of the Sherman Anti-Trust Act . . . .  The undersigned consultant hereby certifies that this agreement, or any claims resulting there from, is not a result of, or affected by, any act of collusion with, or any act of, another person or persons, firm or corporation . . . ."

384.    By submitting bids that were collusively set and predetermined as a part of the unlawful conspiracy described above, Defendants General Chemical and/or Chemtrade breached their contractual obligations to Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk.

385.     Plaintiffs Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk suffered injury by reason of such conduct and is entitled to recover damages from Defendant General Chemical therefore.

386.     Plaintiffs Chesterfield, Henrico, Lynchburg, Newport News, and Norfolk reserve the right to add additional defendants.

**COUNT VIII**

**COMMON LAW FRAUD**
**(Springfield Against Defendants General Chemical and Chemtrade)**

387.     Plaintiff Springfield incorporates by reference the preceding paragraphs as though set forth fully herein.

388.     Defendants General Chemical and Chemtrade used deception, used a deceptive act or practice, used fraud, used false pretense, made a false promise, made a misrepresentation, and/or concealed, suppressed, or omitted material facts in connection with the sale of merchandise (in this case, Alum) to Plaintiff Springfield.

389.     Defendants General Chemical and Chemtrade repeatedly represented, both explicitly and implicitly, that the Alum prices being offered to Plaintiff Springfield were based on a competitive market, rather than collusively set pursuant to Defendants' unlawful conspiracy described above.

390.     Defendants General Chemical's and Chemtrade's misrepresentations as alleged herein were material, in that they concealed that Defendants had unlawfully set Alum prices through Defendants' unlawful conspiracy described above.

391.     Plaintiff Springfield detrimentally relied on Defendants General Chemical's and Chemtrade's deception, deceptive acts and practices, fraud, false pretenses, false promises,

misrepresentations, and/or concealment, suppression, or omissions of material facts when it decided to execute contracts to purchase Alum.

392.     The reliance of Plaintiff Springfield was reasonable, in that Defendants' unlawful conspiracy described above was both self-concealing and affirmatively concealed by Defendants, extended throughout the Alum industry, and had the purpose and effect of concealing the true state of affairs from Springfield.

393.     Defendants General Chemical and Chemtrade committed the acts and omissions alleged herein deliberately and maliciously, with ill-will and an evil intent to inflict monetary harm on Springfield.

394.     As a result of Defendants' unlawful conspiracy described above, Plaintiff Springfield suffered damages in the form of artificially inflated prices that it paid for Alum.

395.     Plaintiff Springfield reserves the right to add additional defendants as information is developed as to other parties.

## COUNT IX

### BREACH OF CONTRACT
### (Springfield Against Defendants General Chemical and Chemtrade)

396.     Springfield incorporates by reference the preceding paragraphs as if set forth fully herein.

397.     Springfield's Invitation for Bid includes the following statements: "By offering a submission to this Invitation for Bid, the bidder certifies the bidder has not divulged, discussed, or compared the Bid with other bidders and has not colluded with any other bidder or parties to this IFB whatsoever…. Any prices and/or cost data submitted have been arrived at independently, without consultation, communication, or agreement for the purpose of restricting competition, as to any matter relating to such prices and/or cost data, with any other bidder or

87

with any competitor…. Any prices and/or cost data for this Bid have not knowingly been disclosed by the bidder and will not knowingly be disclosed by the bidder prior to the scheduled opening directly or indirectly to any other bidder or to any competitor."

398.    By submitting bids that were collusively set and predetermined as a part of the unlawful conspiracy described above, Defendants General Chemical and Chemtrade breached their contractual obligations to Springfield.

399.    Springfield suffered injury by reason of such conduct and is entitled to recover damages from Defendants General Chemical and Chemtrade therefore.

400.    Springfield reserves the right to add additional defendants as information is developed as to other parties.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment in their favor, and against Defendants, jointly and severally, as follows:

a.    That the Defendants' conspiracy and the acts performed in furtherance thereof be adjudged to have violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

b.    With respect to the state law claims asserted herein, that the Defendants' conduct be adjudged to have violated Virginia and Missouri state law;

c.    That the Defendants be preliminarily and permanently enjoined and restrained from continuing and maintaining the conspiracy described herein;

d.    That Defendants pay compensatory damages to Plaintiffs in an amount to be determined at trial, but believed to be in excess of $20,000,000;

e.    That Defendants pay enhanced damages to Plaintiffs of treble the amount of compensatory damages caused by Defendants' violation of federal and state antitrust laws, and in accordance with such laws;

f.    That a constructive trust be impressed upon the benefits to Defendants General Chemical, Chemtrade, and GEO from their unjust enrichment and inequitable conduct;

g.    That Defendants General Chemical and/or Chemtrade pay punitive damages to Chesterfield, Henrico, Lynchburg, Newport News, Norfolk, and Springfield for their intentional and malicious acts, in an amount to be determined at trial;

h.    That Defendants General Chemical, Chemtrade, and GEO pay restitution to appropriate Plaintiffs, in an amount to be determined at trial;

i.    That Defendants pay pre-judgment and post-judgment interest on the damages awarded;

j.    That Defendants pay Plaintiffs their costs, including their reasonable attorney's fees and expenses, associated with bringing and prosecuting this action, as provided by law; and

k.    That Plaintiffs be awarded such other relief as may be in the interests of justice.


Dated:  June 25, 2018


_s/_ Justin W. Lamson
Jay N. Fastow
Justin W. Lamson
**Ballard Spahr LLP**
1675 Broadway, 19th Floor
New York, New York 10019
Telephone: (212) 223-0200
Facsimile: (212) 223-1942
Email:
FastowJ@ballardspahr.com
LamsonJW@ballardpahr.com

Edward D. Rogers
Jason A. Leckerman
Thomas J. Gallagher IV
**Ballard Spahr LLP**
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-8500
Facsimile: (215) 864-8999
Email:
RogersE@ballardspahr.com
LeckermanJ@ballardspahr.com
GallagherT@ballardspahr.com

Constantinos Panagopoulos
(VSB No. 33356)
**Ballard Spahr LLP**

1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Facsimile: (202) 661-2299
Email:
cgp@ballardspahr.com


**Of Counsel:**


F. Paul Calamita (VSB No. 34136)
Christopher D. Pomeroy (VSB No. 40018)
Paul T. Nyffeler (VSB No. 77144)
**AQUALAW PLC**
6 South 5th Street
Richmond, VA  23219
Telephone: (804) 716-9021
Facsimile: (804) 716-9022
Email:
paul@AquaLaw.com
chris@AquaLaw.com
pnyffeler@AquaLaw.com

**<u>JURY DEMAND</u>**

Pursuant to RULE 38(b) of the FEDERAL RULES OF CIVIL PROCEDURE, Plaintiffs hereby

demand trial by jury in this action.