**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE LIQUID ALUMINUM SULFATE ANTITRUST LITIGATION<br><br>*This Document Relates to: Civ. Action Nos. 18-9781, 18-3440, 18-11027, and 18-9231* | Civil Action No.: 16-md-2687 (JLL)<br><br>**OPINION** |

**LINARES**, Chief District Judge.

This matter comes before the Court by way of several motions to dismiss by various Defendants in differing underlying actions. These motions are as follows:

- Defendant USALCO, LLC ("USALCO") moves to dismiss the City of Akron ("Akron")'s Complaint filed in Civil Action Number 18-9781 pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 1100).[1]

- Defendants Brenntag Mid-South, Inc., Brenntag Southeast, Inc., and Brenntag North America (collectively "Brenntag") move to dismiss the Commissioners of Public Works of the City of Charleston (*d.b.a* Charleston Water System) and Grand Strand Water & Sewer Authority ("GSWSA") (collectively "the Charleston Plaintiffs")'s Complaint filed in Civil Action Number 18-3440 pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 1116).

- Brenntag moves to dismiss the Commission of Public Works of the City of

---

[1] The ECF numbers cited to herein refer to the main consolidated docket: 16-md-2687.

Greenville (*d.b.a.* Greenville Water) ("Greenville")'s Complaint filed in Civil Action Number 18-11027 pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 1117).

- USALCO moves to dismiss the Charleston Plaintiffs, Greenville, and the Commission of Public Works of the City of Spartanburg, the City of Winston-Salem, and the South Carolina Public Service authority (*d.b.a.* Santee Cooper) (collectively "the Spartanburg Plaintiffs" and all together "the South Carolina Plaintiffs")'s Complaints filed in Civil Action Numbers 18-3440, 18-11027, and 18-9231 pursuant to Federal Rule of Civil Procedure 12(b)(2). (ECF No. 1143).

- Delta Chemical Corporation and John D. Besson (the "Delta Defendants") move to dismiss the South Carolina Plaintiffs' Complaints filed in Civil Action Numbers 18-3440, 18-11027, and 18-9231 pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (ECF Nos. 1144–46).

All Plaintiffs named above have submitted oppositions (ECF Nos. 1101, 1118, 1147–48), to which all Defendants named above have replied. (ECF Nos. 1104, 1120, 1149, 1152). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. Because of the similarity of the facts in these complaints and the similarity of the arguments set forth in the motions and oppositions, the Court will consolidate the analysis where feasible. For the reasons set forth below, the Court denies Defendants' motions to dismiss.

## I.     BACKGROUND[2]

The Court has set forth, at length, the factual and procedural background as it pertains to this Multidistrict Litigation in its Opinion dated July 20, 2017. (ECF No. 405 at 1–24). Accordingly, the Court need not restate, and hereby incorporates, that factual and procedural background herein. Thus, the Court will set forth only the relevant factual and procedural background as it pertains to these specific Defendants and their motions.

Plaintiffs brought these actions seeking to recover monetary damages and injunctive relief against Defendants for conspiring to suppress and eliminate competition in the sale and marketing of aluminum sulfate ("Alum"), pursuant to the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, the Clayton Antitrust Act, 15 U.S.C. §§ 12–17 & 29 U.S.C. §§ 52–53, and the laws of the State of South Carolina and North Carolina.[3] (FAC ¶ 1; Civ. No. 18-9231, ECF No. 1 ("Spartanburg Compl.") ¶ 1). Plaintiffs contend that Defendants agreed to "rig bids and allocate customers for, and to fix, stabilize, inflate, and maintain the price of Alum sold to companies and municipal authorities in the United States from January 1, 1997 through at least February 2011 . . . ." (FAC ¶ 1). Specifically, Plaintiffs allege that Defendants met to "discuss their respective Alum businesses," agreed to "'stay away' from each other's historical customers," submitted "intentionally high," or "throw away" bids, and withdrew winning bids "in cases where a bid was inadvertently submitted." (FAC ¶ 4).

Defendant John D. Besson is presently a resident of Miami Beach, Florida. (FAC ¶ 21). He was the president of Delta Chemical and "oversaw its sale and marketing of water treatment

---

[2] For purposes of brevity, the Court will cite only to the Charleston Plaintiffs' Amended Complaint whenever the Akron, Greenville, and/or Spartanburg Complaints allege similar facts. Hence, this background is generally derived from Charleston Plaintiffs' Amended Complaint ("FAC"), which was docketed on the consolidated docket, 16-md-2687. (ECF No. 839). The Court must accept the allegations therein as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

[3] Akron does not bring state law claims. (Civ. No. 18-9781, ECF No. 1 ("Akron Compl.")).

chemicals, including Alum," in addition to "effectuating attempts" to sell or merge Delta Chemical

with another company. (FAC ¶ 21). Plaintiffs allege that Defendant John Besson "joined,

participated in, and benefitted from the unlawful [Alum] conspiracy." (FAC ¶ 21). After Delta

Chemical combined with USALCO in November 2011, Defendant John Besson became a

USALCO consultant. (FAC ¶ 21).

Defendant Delta Chemical is a Maryland corporation with a principal place of business in

Baltimore, Maryland. (FAC ¶ 49). Delta Chemical sold Alum throughout the United States. (FAC

¶ 49). Plaintiffs allege that "[f]rom the beginning of the Conspiracy Period to the date USALCO

combined with Delta Chemical on November 17, 2011, Delta Chemical was an active participant

in, and benefitted from, the conspiracy." (FAC ¶ 49). Moreover, "[a]s a result of Delta Chemical's

combination with USALCO, Delta Chemical ceased to be a potential competitor in the sale and

marketing of Alum." (FAC ¶ 49). Plaintiffs contend that the combination "was made in

furtherance of, and intended to reinforce, the Defendants' unlawful conspiracy . . . by increasing

USALCO's market power and eliminating the possibility of competition emerging . . . ." (FAC ¶

50). Plaintiffs also argue that Defendant John Besson "profited handsomely" from the

combination of the two firms. (FAC ¶ 51).

Defendant USLALCO is a Maryland corporation with a principal place of business in

Baltimore, Maryland. (FAC ¶ 48). USALCO manufactures and distributes Alum throughout

North America. (FAC ¶ 48). After the combination of Delta Chemical and USALCO, USALCO

"assumed Delta Chemical's rights and obligations under Delta Chemical's then-operative Alum

supply contracts." (FAC ¶ 49). Thus, USALCO became the successor in interest to Delta

Chemical's liabilities. (FAC ¶ 49).

Brenntag Mid-South and Brenntag Southeast are wholly owned subsidiaries of Brenntag North America, which are Kentucky and North Carolina corporations with principal places of business in Kentucky and North Carolina, respectively. (FAC ¶¶ 54, 56). Brenntag North America is a Delaware corporation with a principal place of business in Reading, Pennsylvania. (FAC ¶ 55). Brenntag distributes Alum throughout the United States and is alleged to have participated in the conspiracy. (FAC ¶ 55).

Akron alleges that USALCO was part of a conspiracy to fix Alum prices, allocate consumers, and reduce competition amongst the members of the conspiracy. (Akron Compl. ¶ 5). In order to further and effectuate the conspiracy, Akron contends that USALCO met and communicated in secret to exchange confidential, competitive information regarding their business with other members of the conspiracy. (Akron Compl. ¶ 5). Those meetings and conversations resulted in agreements to: (1) "stay away" from each firm's historical customers, (2) track the bid and pricing histories of the co-conspirators for the purposes of rigging bids, (3) actually submit those rigged—or "throw away"—bids to intentionally lose the bid for a coconspirator's customer, (4) set price floors for the price of Alum, (5) compensate the losing firm where one of the other firms could not withdraw a bid that it was not supposed to win, (6) teach new employees how to figure out how to comply with the bid rigging arrangement, and (7) sell Alum to customers at non-competitive rates. (Akron Compl. ¶¶ 5–6, 56–74).

The South Carolina Plaintiffs assert similar allegations against Defendants. For example, they point to an example from March 2005, where USALCO entered into a three-year contract with Grand Rapids, Michigan at a price of $149.52 per ton. (FAC ¶ 185(a)). The other two bidders were General Chemical and C&S Chemicals which submitted bids that were 25% and 55% higher than USALCO's, indicating a practice of "throw-away" bidding. (FAC ¶ 185(a)). On top of these

anomalous bidding practices, a study of forty-seven United States drinking water utilities indicated an average 53% price increase over the preceding year from 2008 to 2009. (FAC ¶ 99). These stark price jumps can be seen in Brenntag's winning bid for a contract with GSWSA in 2009. (FAC ¶ 244). Brenntag's bid—at $359.75 per ton of Alum—constituted a 94% increase in price from 2007. (FAC ¶ 244). Plaintiffs also contend that Defendants' bidding history with respect to Alum contracts was not "freight-logical," because Defendants did not bid (or submitted higher bids) on customers that were close to their production plants, which would have reduced shipping costs. (FAC ¶ 181–84).

"As a result of the conspiracy among Defendants," the Plaintiffs were allegedly "forced to pay supra-competitive prices for Alum." (FAC ¶ 264). The Charleston Plaintiffs, for example, saw their cost for Alum quadruple over a decade rising from $95.34 per ton in 1998 to $319.10 per ton in 2011. (FAC ¶ 264). Plaintiffs argue that Defendants "used non-public means of communication . . . to eliminate competition by, *inter alia*, fixing prices, rigging bids, and allocating customers for Alum in the United States." (FAC ¶ 271). Moreover, Defendants allegedly "took additional affirmative acts of concealment, including ensuring that there were few written communications regarding their conspiracy and agreement." (FAC ¶ 282).

Accordingly, Plaintiffs assert the following contested claims: Conspiracy in Restraint of Trade in violation of the Sherman Act against all Defendants;[4] Arrangements, Contracts, Agreements, Trusts and Combinations Adversely Affecting Competition or Price in violation of South Carolina Code Ann. § 39-3-10 against all Defendants; Common Law Fraud against Brenntag; Breach of Contract against Brenntag (by GSWSA only); and Restitution, Disgorgement, and Unjust Enrichment against the Delta Defendants.[5]

---

[4] This is the only count Akron asserts in its Complaint.
[5] This claim is not being brought by the Spartanburg Plaintiffs.

Defendants now seek to dismiss Plaintiffs' complaints for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and for failure to state a claim upon which relief can be granted under Federal Rules of Civil Procedure 12(b)(6).

## II.     LEGAL STANDARD

### A. 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

In a multi-district litigation such as this, the "transferee court can exercise personal jurisdiction to the same extent that the transferor court could." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 297 n.11 (3d Cir. 2004). In this case, that would be the District Court for the District of South Carolina.

Once a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the burden shifts to the plaintiff to prove that jurisdiction exists. *In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997). Where, as here, there is no evidentiary hearing, a plaintiff need only establish a prima facie case of personal jurisdiction and the court must construe the facts and draw inferences in favor of the plaintiff. *Id.*

A federal court sitting in South Carolina has jurisdiction over parties to the extent provided under South Carolina state law. *Gracious Living Corp. v. Colucci & Gallaher, PC*, 216 F. Supp. 3d 662, 667 (D.S.C. 2016). "South Carolina's long-arm statute extends to the outer limits allowed by the Due Process Clause." *Id.* A district court sitting in South Carolina may therefore exercise personal jurisdiction over a non-resident defendant if the defendant has "certain minimum contacts [with South Carolina] such that the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)).

A court's personal jurisdiction over a non-resident defendant is either specific or general. *ESAB Grp. v. Centricut, Inc.* 126 F.3d 617, 623–24 (4th Cir. 1997). General jurisdiction results

from systematic and continuous contact between a non-resident defendant and the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & nn. 8–9 (1984).[6] Specific jurisdiction over a defendant exists where the suit is related to the defendants conduct in the forum. *Id.*

The Fourth Circuit has established a three-part test for specific jurisdiction: first, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum; second, the plaintiff's claims must arise out of those activities related to the forum; and third, the exercise of jurisdiction must be "constitutionally reasonable." *Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 216 (4th Cir. 2001).

## B. Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

To withstand a motion to dismiss for failure to state a claim, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To determine the sufficiency of a complaint under Twombly and Iqbal in the Third Circuit, the Court must take three steps. "First, it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.' Second, it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, '[w]hen there are well-pleaded

---

[6] Plaintiffs are not asserting general jurisdiction, so the Court will not go into detail regarding that legal standard.

factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court can review the record of prior actions between the parties and take judicial notice of the same in considering a motion to dismiss. *See Toscano v. Conn. Gen. Life Ins. Co.*, 288 F. App'x 36, 38 (3d Cir. 2008).

### III.   ANALYSIS

#### A. Personal Jurisdiction

USALCO and the Delta Defendants move to dismiss the South Carolina Plaintiffs' complaints for lack of personal jurisdiction pursuant to Rule 12(b)(2).

   i.   *USALCO*

USALCO argues that this Court lacks personal jurisdiction over it because the South Carolina Plaintiffs' complaints "are devoid of any . . . factual allegations sufficient to establish personal jurisdiction" and instead "make two sweeping, generalized, bare and conclusory allegations that they fail to back up with supporting facts." (ECF No. 1143-2 at 7–8). USALCO contends that the South Carolina Plaintiffs have failed to establish jurisdiction by lumping all Defendants together in their allegations, and that the allegations specific to USALCO are vague and conclusory. (ECF No. 1143-2 at 8). The South Carolina Plaintiffs respond that USALCO is subject to personal jurisdiction on three grounds: (1) under the national contacts doctrine

applicable in federal antitrust actions, (2) as a co-conspirator in the Alum conspiracy, and (3) under the doctrine of pendant personal jurisdiction for the state law claims. (ECF No. 1147 at 5–6).

The South Carolina Plaintiffs are correct that personal jurisdiction in federal antitrust lawsuits is assessed under the national contacts doctrine, which bases personal jurisdiction on a defendant's aggregate contacts with the United States where the relevant statute authorizes nationwide service of process. *See e.g.*, *ESAB Grp.*, 126 F.3d at 626–27 (applying the national contacts doctrine to a RICO suit, where Congress has authorized nationwide service of process); *see also In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 299 ("We hold that personal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole."). This means that personal jurisdiction must comply with the due process requirements of the Fifth Amendment, which requires only that the South Carolina Plaintiffs show that USALCO had minimum contacts with the United States as a whole. *ESAB Grp.*, 126 F.3d at 626–27. The South Carolina Plaintiffs allege that USALCO is a Maryland corporation, with a principal place of business in Maryland, that manufactured, distributed and sold Alum throughout the United States from January 1, 1997 through at least February 2011. (FAC ¶ 48). Plaintiffs also allege that USALCO has manufacturing facilities in Indiana, Louisiana, Maryland, and Ohio. (FAC ¶¶ 1, 48). Such contacts are sufficient to establish personal jurisdiction.[7] *See In re Celotex Corp.*, 124 F.3d at 630 (holding that there is "no doubt" that a Delaware corporation with a principal place of business in New York has sufficient contacts with the United States so as not to offend the Due Process Clause of the Fifth Amendment). With

---

[7] The Court need not analyze service of process and venue, as USALCO waived service of process, (ECF No. 804), and it does not challenge venue.

respect to the state law antitrust claims, this Court has pendant jurisdiction over those claims, as those claims arise out of the "same nucleus of operative fact." *ESAB Grp.*, 126 F.3d at 628.[8]

  ii. *The Delta Defendants*

  The Delta Defendants make the same arguments regarding lack of personal jurisdiction as USALCO, and the South Carolina Plaintiffs respond in the same manner with one exception: individual defendant John Besson. (ECF Nos. 1144-1 at 17–20; 1145-1 at 17–20; 1146-1 at 17–20; 1148 at 16–22). The South Carolina Plaintiffs allege that Delta Chemical is a Maryland Corporation, with a principal place of business in Maryland and that throughout the injury period, Delta Chemical sold Alum across the United States. (FAC ¶ 49). For the same reasons that these allegations established personal jurisdiction over USALCO, they establish personal jurisdiction over Delta Chemical for both the federal and state antitrust claims.

  As to John Besson, the Delta Defendants argue that he is not subject to personal jurisdiction as an officer of Delta Chemical. (ECF No. 1144-1 at 19). Personal jurisdiction over an officer of a defendant corporation is established where there is a "showing of direct, personal involvement by the corporate officer in some decision or action which is causally related to the plaintiff's injury." *Magic Toyota, Inc. v. Se. Toyota Distribs., Inc.*, 784 F. Supp. 306, 315 (D.S.C. 1992) (quoting *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 907 (1st Cir. 1980)). This Court has already found that John Besson participated in the conspiracy, (ECF No. 1030 at 10, 12), and as such there has been a showing of Besson's direct and personal involvement that was causally related to the plaintiff's injury.

---

[8] USALCO also moves in the alternative for a more definite statement concerning the pleading of certain facts related to the Court's personal jurisdiction analysis. (ECF No. 1143-2 at 12–14). As the Court finds that the South Carolina Plaintiffs have established personal jurisdiction without relying on those facts, USALCO's motion for a more definite statement is denied as moot.

## B. Failure to State a Claim

For the following reasons, Defendants' motions to dismiss Plaintiffs' complaints are denied.

### i.   *Conspiracy in Restraint of Trade in Violation of the Sherman Act*

To survive a motion to dismiss, Plaintiffs must prove two essential elements for a claim of conspiracy in restraint of trade in violation of the Sherman Act.  Plaintiffs must show that (1) a contract, combination, or conspiracy existed and that (2) such contract, combination, or conspiracy "imposed an unreasonable restraint on trade." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (quoting *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008)).

Preliminarily, this Court has already found that, at least at the pleading stage, a conspiracy existed. (ECF No. 405 at 45–65).  In addition to the specific examples of alleged bid-rigging and collusive behavior detailed above, Plaintiffs allege that Defendants conspired to suppress and eliminate competition in the sale and marketing of Alum. (FAC ¶ 1).  Specifically, Plaintiffs allege that Defendants agreed to "rig bids and allocate customers for, and to fix, stabilize, inflate, and maintain the price of Alum sold to companies and municipal authorities in the United States from January 1, 1997 through at least February 2011 . . . ." (FAC ¶ 1).  Furthermore, Plaintiffs allege Defendants met to "discuss their respective Alum businesses," agreed to "'stay away' from each other's historical customers," submitted "intentionally high," or "throw away" bids, and withdrew winning bids "in cases where a bid was inadvertently submitted." (FAC ¶ 4).  These allegations are sufficient to support a prima facie claim that Defendants engaged in a conspiracy which imposed an unreasonable restraint on the trade of Alum in violation of the Sherman Act.  Hence, the claim must survive Defendants' motions to dismiss.

As to USALCO's argument that they have been improperly lumped together with other Defendants in the Akron Complaint, that argument fails. "If 'inferences can be fairly drawn from the behavior of the alleged conspirators' which indicate that they participated in the conspiracy, the Court should construe the Complaint 'liberally in the plaintiffs' favor' at the motion to dismiss stage and allow the case to proceed. *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 312 (D.N.J. 2004) (quoting *Jung v. Assoc. of Am. Med. Colleges*, 300 F. Supp. 2d 119, 157–58) (D.D.C. 2004)). Given the Court's preliminary findings about the existence of a conspiracy, (ECF No. 405 at 45–65), Akron's Complaint sufficiently ties USALCO to that wide-ranging conspiracy in that it alleges that USALCO manufactures and sells Alum in a market that is conducive to collusion and that has seen guilty pleas from other participants in that same market who are involved in this litigation, (Akron Compl. ¶¶ 3–4, 8–9, 27, 44–55).

Brenntag also makes a statute of limitations argument as well as one it claims is unique to its position as a distributor of Alum rather than a manufacturer. First, it argues that the Charleston Plaintiffs and Greenville's claims are barred by the Sherman Act's four-year statute of limitations. (ECF No. 1116-1 at 10–13).[9] Second, Brenntag argues that it had no rational economic incentive to participate in the conspiracy, and even if it did, its conduct complied with federal law. (ECF No. 1116-1 at 14–19).

The Sherman Act's statute of limitations would apply unless the Charleston Plaintiffs and Greenville have sufficiently pled fraudulent concealment. *In re Elec. Carbon Prods.*, 333 F. Supp. 2d at 315. For fraudulent concealment to toll the statute of limitations, a plaintiff must plead "(1) wrongful concealment by the party raising the statute of limitations defense, resulting in (2)

---

[9] It also argues that the Charleston Plaintiffs and Greenville's state antitrust claims are time-barred under that statute's three-year statute of limitations. (ECF No. 1116-1 at 13–14). For the same reasons that this Court finds that the Charleston Plaintiffs and Greenville's federal antitrust claims are not time-barred, their state antitrust claims are not time-barred.

13

plaintiff's failure to discover the operative facts forming the basis of his cause of action during the limitations period (3) despite the exercise of due diligence." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 523 (D.N.J. 2008).

The Court is satisfied that the Charleston Plaintiffs and Greenville have adequately pled fraudulent concealment. First, the Court has already found that the conspiracy was self-concealing and that the applicable statute of limitations may be tolled as to other defendants in the conspiracy. (ECF No. 405 at 38–40). The Charleston Plaintiffs and Greenville make very similar allegations to those that this Court already found established fraudulent concealment. They allege that Brenntag participated in a "self-concealing" conspiracy, that the participation in that conspiracy was secret, and that Brenntag included non-collusion provisions in their bid invitations to hide their conspiratorial acts. (FAC ¶¶ 270, 276, 277–79). These allegations, coupled with a detailed history of Brenntag's participation in the conspiracy, (FAC ¶¶ 241–55), are sufficient to establish a claim of fraudulent concealment. Brenntag's argument that the Charleston Plaintiffs and Greenville should have been on notice of the conspiracy because due diligence would have uncovered the obviously coordinated nature of their bids has already been rejected by this Court. (ECF No. 405 at 37–40).

As to Brenntag's economic incentive to participate in the conspiracy, the Charlotte Plaintiffs and Greenville point to emails that they allege show that Brenntag's profit was based on a percentage of the price charged for Alum. (FAC ¶¶ 250–52). As the Charlotte Plaintiffs and Greenville correctly indicate, it is a matter of mathematics that a fixed percentage of a higher sale price would result in higher profits for Brenntag, if that is indeed how the compensation structure was arranged. (ECF No. 1118 at 22). In any event, accepting those allegations as true at this stage, Brenntag had sufficient financial incentive to participate in the conspiracy. Nor was Brenntag's

conduct "equally consistent with lawful conduct," as they allege, (ECF No. 1116-1 at 17). As explained above, the Charleston Plaintiffs and Greenville have made several allegations and attached several documents indicating Brenntag's participation in the conspiracy. (*See, e.g.*, FAC ¶ 250 (purporting to show bid coordination between C&S Chemical and Brenntag); ECF No. 1118-3 at 2 (an internal GEO Specialty Chemicals report noting that they discussed with Brenntag their "concerns with competitive activity [they] have experienced at municipal accounts," and that Brenntag assured it would "work closely with GEO to eliminate the opportunity of taking any direct accounts of [theirs]")). Consistent with this Court's earlier decisions in this MDL, such allegations are sufficient to state a claim under the Sherman Act at the motion to dismiss stage.

ii. *Arrangements, Contracts, Agreements, Trusts and Combinations Adversely Affecting Competition or Price in violation of South Carolina Code Ann. § 39-3-10*

"South Carolina has long adhered to a policy of following federal precedents in matters relating to state trade regulation enforcement." *Drs. Steuer and Latham, P.A. v. Nat'l Med. Enters.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987), *aff'd* 846 F.2d 70 (4th Cir. 1988) (quoting *In re Wiring Device Antitrust Litig.*, 489 F. Supp. 79, 87 (E.D.N.Y. 1980)). As such, claims brought under South Carolina's state antitrust law will be interpreted the same as claims brought under federal antitrust law. *Id.* Because the South Carolina Plaintiffs' claims pursuant to the Sherman Act are sufficient to survive Defendants' motions to dismiss, the South Carolina Plaintiffs' claims under South Carolina state antitrust claims must also survive.[10]

iii. *Common Law Fraud as to Brenntag*

Brenntag fails to brief the Court on the requirements of a common law fraud claim in South Carolina and instead only argues that Greenville and the Charleston Plaintiffs fail to meet the

---

[10] The City of Spartanburg brings its state antitrust claims under the antitrust laws of North Carolina. The Delta Defendants admit that this analysis is substantially the same as the federal antitrust analysis. (ECF No. 1146-1 at 31).

standard of Rule 9(b). (ECF No. 116-1 at 20–21). The Court must analyze Greenville and the Charleston Plaintiffs' fraud claim in the context of the relevant state law, so the elements of a South Carolina fraud claim are as follows: (1) a representation; (2) that is false; (3) and material; (4) made with either knowledge of or reckless disregard for its truth or falsity; (5) with the intent that it be acted upon; (6) where the hearer is ignorant of the representation's falsity; (7) relies on its truth; (8) had a right to rely on its truth; (9) and was proximately injured by that reliance. *Ardis v. Cox*, 431 S.E.2d 267, 269 (S.C. 1993).

The Greenville and Charleston Plaintiffs allege that Brenntag "used deception," "made a misrepresentation," and "concealed, suppressed or omitted material facts in connection with the sale" of Alum. (FAC ¶ 319). Specifically, Defendants allegedly "represented" that Alum prices were offered based on a "competitive market" while participating in an unlawful conspiracy to "inflict monetary harm" on Plaintiffs. (FAC ¶¶ 320, 324). For example, Greenville and the Charleston Plaintiffs have set forth a number of communications that they allege show explicit bid coordination between Brenntag and C&S chemicals. (FAC ¶¶ 250–52). One such communication shows the vice president of C&S Chemicals directing the market manager of Brenntag Southeast to bid on the Greenville contract at $246.75. (FAC ¶ 250). Brenntag bid that amount, and C&S chemicals submitted a bid only 25 cents higher. (FAC ¶ 250). The Greenville and Charleston Plaintiffs also allege that Brenntag affirmatively concealed this conspiratorial behavior in their contracts, which contained sections affirming and ensuring compliance with federal, state, and local law, and assured the parties to the contract that the bids were not collusive. (FAC ¶¶ 277–79).

Greenville and the Charleston Plaintiffs' allegations, when taken as true, support the claims that Brenntag knowingly misrepresented the propriety of their Alum bidding practices with the

purpose of defrauding Greenville and the Charleston Plaintiffs and that Greenville and the Charleston Plaintiffs reasonably relied upon Brenntag's representation and suffered a resulting compensable injury. *Ardis*, 431 S.E.2d at 269. Therefore, at this juncture, Plaintiffs' claims of common law fraud must survive Brenntag's motion to dismiss.

iv.   *Breach of Contract against Brenntag*

Brenntag argues only that GSWSA's breach of contract claim fails for the same reasons that its antitrust claims fail: "no allegations plausibly suggest that Brenntag engaged in collusive conduct." (ECF No. 1116-1 at 21). As this Court has already found that there are allegations plausibly suggesting that Brenntag engaged in collusive conduct, Brenntag's argument fails and this Court will allow GSWSA's breach of contract claim to proceed.

v.   *Restitution, Disgorgement, and Unjust Enrichment*

In South Carolina, to support a claim for unjust enrichment, a "plaintiff must show: (1) he conferred a non-gratuitous benefit on the defendant; (2) the defendant realized some value from the benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value." *Inglese v. Beal*, 742 S.E.2d 687, 691 (S.C. Ct. App. 2013). "The remedy for unjust enrichment is restitution." *Id*.

The South Carolina Plaintiffs assert that it would be "inequitable" for the Delta Defendants "to be allowed to retain the benefits" they "obtained from their illegal agreements, manipulative acts, and other unlawful conduct" at the expense of the South Carolina Plaintiffs. (FAC ¶ 338). Moreover, the South Carolina Plaintiffs aver that it would be equally inequitable for Defendant John Besson to be "allowed to retain the millions of dollars that he personally received . . . in connection with Delta Chemical's combination with USALCO" because of its alleged connection to the aforementioned conspiracy. (FAC ¶ 339). However, the Delta Defendants argue, and the

South Carolina Plaintiffs do not contest, that there were no contracts between the Delta Defendants and the South Carolina Plaintiffs for the sale of Alum, and thus there was no benefit conferred. (ECF No. 1144-1 at 33).[11]

The question then is whether a claim for unjust enrichment can be based on the inflated prices that the South Carolina Plaintiffs paid for Alum and the allegedly excess profits that the Delta Defendants received, albeit not directly from the South Carolina Plaintiffs, based on the conspiracy as a whole. One court, analyzing state-law unjust enrichment claims (including South Carolina) in a nationwide antitrust class action at the motion to dismiss stage, collected substantial authority indicating that the benefit conferred on the defendant need not be direct. *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 896–97 (E.D. Mich. 2014) (collecting cases and concluding that the "critical inquiry" is whether the relationship between the plaintiff's detriment and defendant's benefits "flow[s] from the challenged conduct" (quoting *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000))); *see also In re Auto. Parts Antitrust Litig.*, 12-md-2311, 2014 WL 2993753, at *36 (E.D. Mich. July 3, 2014) (finding that where the plaintiffs alleged that they "conferred a benefit to [the defendants] because they paid more than the true value of [the product] as a result of [the defendants'] conspiracy," those allegations satisfied the elements of South Carolina law at the pleading stage for a claim of unjust enrichment); Daniel R. Karon, *Undoing the Otherwise Perfect Crime – Applying Unjust Enrichment to Consumer Price-Fixing Claims*, 108 W. Va. L. Rev. 395, 418–28 (2005) (surveying unjust enrichment claims in antitrust cases across the country and concluding that the plaintiff need not pay a direct benefit to the defendant).

---

[11] It should be noted that the absence of a contract is not fatal to an unjust enrichment claim; on the contrary, it is a requirement. *Swanson v. Stratos*, 564 S.E.2d 117, 120 (S.C. Ct. App. 2002).

As discussed above, the South Carolina Plaintiffs have sufficiently alleged the existence of the Delta Defendants' collusive behavior, which contributed to higher prices of Alum across the United States and increased profits for the Delta Defendants. As such, the South Carolina Plaintiffs have adequately pled a claim for unjust enrichment against the Delta Defendants.[12]

## IV.   CONCLUSION

For the aforementioned reasons, Defendants' motions to dismiss are denied. An appropriate Order accompanies this Opinion.

Date: March __//__ , 2019

JOSE L. LINARES
Chief Judge, United States District Court

---

[12] The Delta Defendants also argue that for the South Carolina Plaintiffs to proceed on their unjust enrichment claim against John Besson, they must pierce the corporate veil. (ECF No. 1144-1 at 33–34). However, the cases cited by the Delta Defendants do not establish that this is the law of South Carolina. The Court declines to weigh in on what appears to be unsettled state law, particularly in light of the fact that it has already allowed unjust enrichment claims to proceed against John Besson based on nearly identical allegations, (ECF No. 1030 at 15).