# EXHIBIT 3

FILED
9/27/2018 12:02 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2016L011383

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| CITY OF CHICAGO, *ex rel.* | ) |
| | ) |
| LAWRENCE MCSHANE, | ) |
| | ) |
| Plaintiff-Relator, v. | ) |
| | ) |
| FRANK A. REICHL, VINCENT J. | ) 2016 L 011383 |
| OPALEWSKI, BRIAN C. STEPPIG, AMITA | ) Hon. Patrick J. Sherlock |
| GUPTA, ALEX AVRAAMIDES, BILL | ) |
| REDMOND, GENERAL CHEMICAL | ) |
| CORPORATION, GENERAL CHEMICAL | ) |
| LLC, GENERAL CHEMICAL | ) |
| PERFORMANCE PRODUCTS, LLC, | ) |
| GENTEK, INC., CHEMTRADE CHEMICALS | ) Jury Trial Demanded |
| CORPORATION, CHEMTRADE | ) |
| CHEMICALS US LLC, CHEMTRADE | ) |
| SOLUTIONS, LLC, CHEMTRADE | ) |
| LOGISTICS INCOME FUND, CHEMTRADE | ) |
| LOGISTICS, INC., GEO SPECIALTY | ) |
| CHEMICALS, INC., C&S CHEMICALS, | ) |
| INC., USALCO, LLC, DELTA CHEMICAL | ) |
| CORPORATION, ALCHEM INC., | ) |
| AMERICAN SECURITIES LLC, UNKNOWN | ) |
| ADDITIONAL DEFENDANTS, UNKNOWN | ) |
| ADDITIONAL CO- CONSPIRATORS. | ) |
| | ) |
| Defendants. | ) |

FILED DATE: 9/27/2018 12:02 AM   2016L011383

# AMENDED
# COMPLAINT

Now comes the CITY OF CHICAGO, on the relation of Lawrence McShane, directly as Plaintiff, and complains of Defendants Frank A. Reichl, Vincent J. Opalewski, Brian C. Steppig, Amita Gupta, Alex Avraamides, Bill Redmond, General Chemical LLC, General Chemical Corporation, General Chemical Performance Products, LLC, GenTek, Inc., Chemtrade Chemicals Corporation, Chemtrade Chemicals US LLC, Chemtrade Solutions, LLC, Chemtrade Logistics Income Fund, Chemtrade Logistics, Inc., GEO Specialty Chemicals, Inc., C&S Chemicals, Inc., USALCO, LLC, Delta Chemical Corporation, Alchem Inc., American Securities LLC, Unknown Additional Defendants, and Unknown Additional Co-Conspirators (collectively, "Defendants") as follows:

## Introduction

1.      This action seeks damages and civil penalties arising from violations of the Chicago False Claims Act.

2.      Lawrence McShane ("Relator") is a former Business Manager and Director of Defendants Chemtrade Chemicals Corporation, Chemtrade Chemicals US LLC, Chemtrade Solutions, LLC, and Chemtrade Logistics, Inc. ("Chemtrade"). He learned the facts alleged herein through his work in that position. As a result, he has direct and independent knowledge of the fraud committed by the Defendants.

3.      Defendants committed a systematic pattern of fraud, engaging in a nationwide conspiracy to cheat the City of Chicago and other municipalities and governmental entities out of millions of dollars by rigging bids for contracts for liquid aluminum sulfate, a chemical critical to water treatment. In furtherance of the scheme, Defendants submitted fraudulent statements to

2

FILED DATE: 9/27/2018 12:02 AM   2016L011383

municipalities and governmental entities regarding the bids.

4.      Defendants have been criminally prosecuted by the United States Department of Justice for this fraudulent scheme and have pled guilty. Relator McShane has played a critical role in the government's investigation, bringing the fraud to the government's attention, providing essential information for the government's case, and cooperating with the government for over 2 years. Upon information and belief, Relator was the first source to report this fraud. Without Relator making the government aware of Defendants' criminality, this widespread fraud and cover-up would likely still be continuing today.

<u>Parties</u>

5.      Relator Lawrence McShane learned of Defendants' bid-rigging scheme as a result of his position as Business Manager and Director of Chemtrade, where he was employed for over seven years. Prior to bringing this suit and prior to any public disclosure, Relator McShane reported his concerns about collusion to the United States Department of Justice and the Federal Bureau of Investigation and worked with these agencies until a formal investigation was commenced in approximately 2011. The investigation focused upon the market for inorganic coagulants, particularly, aluminum sulfate (commonly referred to as "Alum"). The investigation focused especially on the scheme implemented by Directors and VP-level employees at General Chemical and Chemtrade in conjunction with the other competitors in the Alum market.

6.      Defendant Frank A. Reichl resides in Flanders, New Jersey. During the relevant timeframe, Reichl was actively involved with Defendants and co-conspirators in an illegal price-fixing and bid-rigging conspiracy. During the relevant period, with the exception of the period from approximately July 2005 to approximately December 2006, Reichl occupied upper-level executive positions with Defendant General Chemical. On October 27, 2015, Reichl agreed to enter a guilty plea for his role in the conspiracy as described herein. *See* Reichl Plea Agreement,

FILED DATE: 9/27/2018 12:02 AM   2016L011383

incorporated hereto and attached hereto as Exhibit 1. As the Vice President for Marketing, Reichl was a key coordinator of the conspiracy. The conspiracy was well underway prior to when Relator arrived at General Chemical, and Relator quickly learned of the existence of the conspiracy through the statements and actions of co-workers like Amita Gupta upon starting at General Chemical in 2008. Alex Avraamides worked at General Chemical and then moved to a position at GEO Specialty Chemicals, Inc. in or about 2005, prior to Relator's arrival at General Chemical. The conspiracy was likely underway at General Chemical no later than Avraamides's departure to GEO, and likely earlier given reports within the office that Avraamides would meet with competitors in the General Chemical parking lot. Reichl worked closely and was close friends with Avraamides, and the conspiratorial coordination between GEO and General Chemical began no later than when Avraamides went to GEO in or around 2005 (as detailed below at ¶ 10, Avraamides returned to General Chemical and furthered the conspiracy in his role as a VP in or around mid-2009). Reichl was an early adopter of the conspiracy, and he and Amita Gupta, Director of Water Chemicals for General Chemical, worked very closely. Reichl guided Gupta in the development of the conspiracy and directed her activities and collaborated and worked closely with her with regard to developing and carrying out the conspiracy. Reichl was clearly aware of the conspiracy and the discussions that Gupta was having related to the conspiracy. Reichl allowed Gupta to run the conspiracy from day-to-day. Reichl had direct input on larger bids, and there was a threshold dollar amount or ceiling whereby Gupta had to get Reichl's approval for bids. Gupta would have been required to obtain Reichl's approval in order to submit bids in Chicago, and Reichl had the expectation and knowledge that his subordinates would engage in the Alum business in Illinois. Reichl's raises and bonuses were tied to the performance of the Alum business, and he could have received greater than 100% of his target bonus based on the Alum results. Relator worked with Reichl on a regular basis and his office

4

FILED DATE: 9/27/2018 12:02 AM   2016L011383

was located in close physical proximity to Reichl's office. Relator's position required him to know what information to provide to Reichl and upper management.

7.      Defendant Vincent J. Opalewski is a resident of the United States. During the relevant period, Opalewski was actively involved in a conspiracy with Defendants and co-conspirators involving illegal price-fixing and bid-rigging. From 2000 through 2011, Opalewski occupied upper-level executive positions at Defendant General Chemical, including holding the position of General Manager of the Sulfur Products business group from 2000 to 2005, Vice President of Sales and Marketing from in or about 2005 to 2006, Vice President and General Manager from in or about 2006 to 2009, and President from in or about 2009 to 2011. On February 17, 2016, the United States indicted Opalewski for his participation in the price-fixing and bid-rigging of the sale of Alum. As the General Manager of General Chemical, Opalewski was aware of the performance of the Alum business. He was aware of the conspiracy and approved the actions and activities of both Gupta and Reichl. Opalewski knew Alex Avraamides from Avraamides's original role at General Chemical prior to 2005, and Opalewski knew all of the individuals involved in the conspiracy very well. Opalewski had a great deal to gain from the success of the Alum business since he received very large bonuses tied directly to the performance of Alum. As Gupta was operating the conspiracy on a day-to-day and bid-to-bid basis and Reichl was directing her activity and collaborating with her with regard to the conspiracy, Opalewski was monitoring their progress. Opalewski would have provided input on the largest bids, which would include bids submitted for Chicago, and he had the expectation and knowledge that his subordinates would engage in the Alum business in Illinois. Relator worked with Opalewski on a regular basis, and Relator's position required him to know what information to provide to Opalewski and upper management.

8.      Defendant Brian C. Steppig is a resident of the Little Rock, Arkansas, area.

5

FILED DATE: 9/27/2018 12:02 AM   2016L011383

During the relevant period, Steppig actively participated with Defendants and co-conspirators in an illegal price-fixing and bid-rigging conspiracy. From 1998 through at least 2011, Steppig occupied upper-level executive positions at Defendant GEO Specialty Chemicals, which included serving as National Sales Manager from in or about 1997 through August 2006 and as Director of Sales and Marketing from August 2006 through at least 2011. On February 17, 2016, the United States indicted Steppig for his participation in the price-fixing and bid-rigging of the sale of Alum, and he has since pled guilty to these charges. *See* Steppig Plea Agreement, incorporated hereto and attached hereto as Exhibit 2. He had the expectation and knowledge that his subordinates would engage in the Alum business in Illinois. Steppig was actively involved in developing and furthering the conspiracy with Alex Avraamides when Avraamides worked at GEO, and Steppig engaged in extensive communications and coordination with Defendants in carrying out the conspiracy, including frequent communications with Amita Gupta to coordinate the anti-competitive bids, swaps of business territory, and agreements to stay away from co-conspirators' territory, which were all elements of the conspiracy. As described more fully below, GEO was actively involved in the conspiracy in Illinois by submitting numerous sham bids in order to inflate the price of Alum so that a co-conspirator would win the bid at an inflated price per the conspiratorial arrangement; upon information and belief, given his involvement in the conspiracy and Relator's knowledge of Steppig's counterparts at General Chemical, Steppig, similar to his counterparts at General Chemical, worked closely with his subordinates to coordinate the conspiracy, including but not limited to directing the conspiracy toward Illinois, as well as approving sham bids and agreements to refrain from bidding on certain contracts, including Chicago, in furtherance of the conspiracy. Upon information and belief, Steppig would have directly benefited from the performance of the Alum business with bonuses and other forms of financial compensation tied directly to the performance of the Alum business.

6

FILED DATE: 9/27/2018 12:02 AM   2016L011383

9.      Defendant Amita Gupta is a resident of the United States.  During the relevant period, Gupta actively participated with Defendants and co-conspirators in an illegal price-fixing and bid-rigging conspiracy. During the relevant period, Gupta held the position of Director of Marketing for Water Chemicals at Defendant General Chemical and directly supervised Relator. Relator observed Gupta having discussions with the owner of competitor Chameleon Industries, Inc. in which Gupta and the owner of Chameleon colluded and engaged in efforts to rig the price of bids for liquid aluminum sulfate. In her role as the Director for Water Chemicals, Gupta was responsible for the aluminum sulfate business in all of North America, including Illinois and Chicago, as well as having responsibility for pricing and strategy. She had the expectation and knowledge that her subordinates would engage in the Alum business in Illinois. All pricing went through her and was monitored and approved by her, especially for bids. She provided pricing direction to the aluminum sulfate business managers that reported to her which included Relator and Lisa Brownlee (who managed the Water Chemicals business for the Northern U.S., West Coast, and Canada), and had direct involvement with bidding related to Chicago. Gupta was also responsible for the overall Alum strategy in North America. Her compensation was tied to the success of the Alum business, and her raises and bonuses were linked to the profitability of the Alum business. She could and did receive more than 100% of her target bonus based on the financial results of the business. Gupta was very aware of and active in the conspiracy. Gupta was in direct contact with several competitors on a regular basis including but not limited to Brian Steppig, Alex Avraamides, Chino Garza (owner of Chameleon Industries, Inc.), and Randall Andrews, owner of Alchem, Inc., and she discussed the plan to stay away from customers and actual bid prices with each of these people. Gupta took a lead role in overseeing the conspiracy and drove it forward.  As one example of Gupta's role in the conspiracy, in February 2009, Gupta ordered McShane to submit a bid that would *not* win a contract with

FILED DATE: 9/27/2018 12:02 AM   2016L011383

Dekalb County, Georgia, after she learned that the current supplier was actually a distributor for C&S Chemicals, a co-conspirator: General Chemical and C&S Chemicals, Inc. were engaging further in the conspiracy by coordinating bids for DeKalb County, Georgia. In February 2009, Relator expressed interest in bidding on the DeKalb County account that had been awarded to RGM of Georgia in the past. Upon learning that RGM of Georgia was a distributor selling on behalf of C&S, and given his knowledge of the conspiracy furthered by his superiors at General Chemical, Relator emailed Gupta "so I assume we don't want to take it." Gupta replied "Don't take.  Thx." Relator worked with Gupta on a daily basis, and his office was located in close physical proximity to Gupta's office.

10.     Defendant Alex Avraamides is a resident of the United States.  During the relevant period, Avraamides actively participated with Defendants and co-conspirators in an illegal price-fixing and bid-rigging conspiracy. The conspiracy was well underway prior to when Relator arrived at General Chemical, and Relator quickly learned of the existence of the conspiracy through the statements and actions of co-workers like Amita Gupta upon starting at General Chemical in 2008. Alex Avraamides worked at General Chemical and then moved to a position at GEO Specialty Chemicals, Inc. in or about 2005, prior to Relator's arrival at General Chemical. The conspiracy was likely underway at General Chemical no later than Avraamides's departure to GEO, and likely earlier given reports within the office that Avraamides would meet with competitors in the General Chemical parking lot. Reichl worked closely and was close friends with Avraamides, and the conspiratorial coordination between GEO and General Chemical began no later than when Avraamides went to GEO in or around 2005. Avraamides returned to General Chemical and furthered the conspiracy in his role as a VP in or around mid-2009. During the relevant period, Avraamides held the position of Vice President after Frank Reichl at Defendant General Chemical. Relator observed Avraamides having discussions with

8

FILED DATE: 9/27/2018 12:02 AM   2016L011383

competitor companies in which Avraamides and the competitors colluded and engaged in efforts to rig the price of bids for liquid aluminum sulfate. When Avraamides took over for Reichl and assumed the role as Vice President of Marketing, it quickly became clear that Avraamides was aware of the conspiracy and fully engaged in it. Avraamides instructed Relator to interpret bid results based on individual motives. From this direction, it was clear that Avraamides knew key individuals at each competitor and communicated with them frequently. Like Reichl, Avvraamides allowed Gupta to run the conspiracy from day-to-day. Avraamides was very active in advising General Chemical personnel to contact competitors. For instance, Avraamides wanted all Business Managers, including but not limited to Relator, Lisa Brownlee, Kathy Baker, and Andrew Hoffman to become familiar with General Chemical's competition and pushed them to contact competitors.  Since Avraamides had previously worked at GEO Specialty Chemicals, Inc. prior to returning to General Chemical, he knew the relevant people involved in the conspiracy, and had worked at GEO to develop and further the conspiracy in collaboration with GEO executive, Brian Steppig. Avraamides had direct input on larger bids, and there was a threshold dollar amount or ceiling whereby Gupta had to get Avraamides's approval for bids. Gupta would have been required to obtain Avraamides's approval in order to submit bids in Chicago, and Avraamides had the expectation and knowledge that his subordinates would engage in the Alum business in Illinois. Avraamides's compensation would have been impacted in the same manner as Opalewski's compensation in that Avraamides had a great deal to gain from the success of the Alum business since he received very large bonuses tied directly to the performance of Alum. Relator worked with Avraamides on a regular basis and his office was located in close physical proximity to Avraamides's office.  Relator's position required him to know what information to provide to Avraamides and upper management.

11.     Defendant Bill Redmond is a resident of the United States.  Redmond was the

9

FILED DATE: 9/27/2018 12:02 AM   2016L011383

CEO of GenTek from the time Relator was hired in August 2008 through the sale to Chemtrade. Vince Opalewski, Alex Avraamides, Frank Reichl, and Amita Gupta all reported to Redmond while they were at General Chemical. While his subordinates actively participated with Defendants and co-conspirators in an illegal price-fixing and bid-rigging conspiracy, Redmond knew or acted in reckless disregard or deliberate ignorance of the bid-rigging conspiracy.

American Securities LLC is a private equity firm with its principal place of business located at 299 Park Avenue, New York City, New York 10171. In October 2009, it acquired General Chemical in conjunction with its acquisition of GenTek, Inc. Relator contacted management for American Securities on multiple occasions to report the bid-rigging scheme and specifically detailed Redmond's knowledge or reckless disregard and deliberate ignorance of the conspiracy. In or around 2011, Relator raised concerns about the bid-rigging conspiracy directly with David Cohen, Director of Human Capital for American Securities, but no action was taken to prevent, halt, or rectify the damage caused by the conspiracy. Relator specifically raised concerns about Bill Redmond, CEO of GenTek, Inc., who oversaw General Chemical, and the fact that he had knowledge of the Alum conspiracy but failed to take any action to prevent or halt the conspiracy. American Securities and its management chose to ignore Relator's concerns. In or about August 2012, Relator wrote a letter to Michael Fisch, senior executive of American Securities, informing him that Relator had raised concerns with David Cohen a year earlier but that his concerns were never addressed. Relator's letter to Mr. Fisch raised similar concerns to those Relator had raised with Mr. Cohen a year earlier, including the collusive bid-rigging conspiracy and the failure of American Securities or Bill Redmond to do anything to halt, prevent, or rectify the damage inflicted by the conspiracy. Once again, the situation did not improve and no action was taken to make any changes in response to Relator's concerns. Redmond was aware of the dramatic increase in profitability of the Alum business, a direct result

10

FILED DATE: 9/27/2018 12:02 AM   2016L011383

of the conspiracy, and Redmond had the expectation and knowledge that his subordinates would engage in the Alum business in Illinois. Redmond ratified and approved the conspiracy, including by failing to investigate or inquire about it when he was clearly aware of it. Redmond would have been in charge of setting raises and bonuses and paying them out in accordance with the Alum business performance. Thus, he was willing to pay large bonuses for results and performance that was a direct product of the conspiracy. Redmond would have received significant bonuses as well directly tied to the Alum business and its increased profitability due to the conspiracy. Relator worked with Redmond on a regular basis, and Relator's position required him to know what information to provide to Redmond and upper management. Moreover, General Chemical partially acquired Alchem, Inc. in 2011. General Chemical did not take over Alchem's plant, but instead acquired Alchem to obtain Alchem's customer lists and remove Alchem from the market, allowing General Chemical, GEO, and C&S to increase pricing. Bill Redmond indicated that General Chemical and GenTek were pursuing as many as six similar acquisitions, and General Chemical had the backing of American Securities in these acquisitions as American Securities was willing to provide financing to buy market dominance. Since General Chemical already had approximately 50% of the Alum market, these acquisitions were intended to severely limit competition and result in substantially higher prices for consumers. Relator reported these concerns to his contact at the FBI in May 2012 in an effort to block further anti-competitive conduct by Defendants.

12.     Defendant General Chemical Corporation was a corporation operating under the laws of Delaware, with a principal place of business located at 90 East Halsey Road, Parsippany, New Jersey. General Chemical Corporation had Alum manufacturing and distribution facilities throughout the United States and was one of the leading manufacturers and suppliers of water treatment chemicals, which included Alum. During the relevant period, either directly or through

11

FILED DATE: 9/27/2018 12:02 AM   2016L011383

subsidiaries and affiliates, General Chemical Corporation sold Alum throughout the United States, including in Illinois. General Chemical Group, Inc. owned General Chemical Corporation until April 30, 1999, when it was spun off into a holding company that became known as GenTek, Inc. Defendant Chemtrade Logistics Income Fund, an entity based in Canada, came into possession of all of the business of General Chemical and its subsidiaries, including all of General Chemical's assets and liabilities, after an acquisition on January 23, 2014 ("Chemtrade Acquisition"). The United States Department of Justice has granted conditional amnesty for the General Chemical Corporation for its activities relating to the Alum conspiracy; this granting of conditional amnesty entailed General Chemical admitting to participating in criminal anticompetitive conduct with its competitors. The Justice Department only offers such amnesty where the leniency applicant admits there is evidence suggesting that a criminal violation of the antitrust laws occurred. These admissions directly show that General Chemical engaged in anti-competitive conduct, and, thus, certifications submitted to Illinois municipalities and governmental entities by General Chemical in order to secure Alum contracts were false. See ¶¶ 100-107.

13.     Defendant General Chemical LLC was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 Halsey Road, Parsippany, New Jersey.

14.     Defendant General Chemical Performance Products LLC was a limited liability company operating under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey. During the relevant timeframe, either directly or through subsidiaries and affiliates, General Chemical Performance Products sold Alum throughout the United States. General Chemical Performance Products was sold in the Chemtrade Acquisition.

Defendants General Chemical Corporation, General Chemical LLC, and General

FILED DATE: 9/27/2018 12:02 AM   2016L011383

Chemical Performance Products, LLC, are referenced collectively herein as "General Chemical." During the relevant period, General Chemical gave full authorization to or ordered Reichl's, Opalewski's, Gupta's, Avraamides's, and Redmond's involvement in the conspiracy alleged in this complaint. Defendants General Chemical, USALCO, GEO, C&S, Delta, and Alchem entered into a conspiratorial agreement no later than 2005 to fix prices and rig bids for Alum contracts. The conspiracy was propelled into action in part due to Alex Avraamides coordinating with competitors in his role at General Chemical in 2005 or earlier, and then leaving General Chemical in 2005 to work for GEO. From there, he and close friend and former colleague Frank Reichl, among others, developed and carried out the conspiracy. The conspiracy lasted until at least the commencement in 2011 of the Justice Department's criminal investigation into the collusive scheme. Particular communications and coordination amongst the specific Defendants are detailed at ¶ 37 ("Relator's Knowledge of the Conspiracy"). The conspiracy entailed an agreement to drive up the price of Alum through submitting sham or throwaway bids such that the conspirators would either win a particular contract at an inflated price or allow a co-conspirator to win a contract at an inflated price, or through an agreement to have other co-conspirators submit bids in furtherance of the conspiracy as certain co-conspirators would intentionally stay away from bidding for certain Alum contracts that they otherwise would have bid upon if not for the conspiracy. The details of the specific inflated bids submitted in Illinois by the Defendants, and instances in which competitors agreed to allow others to submit bids while staying away from certain Illinois municipalities is detailed in ¶¶ 53-99, along with particulars as to why certain Defendants would have bid on Alum contracts if not for the conspiratorial agreement and specifics of the inflated bids submitted. ¶¶ 39-45 explain the degree to which the bid prices are inflated and, along with ¶¶ 46-51 show increases in prices and bidding behavior that could only be explained by collusive activity. Having laid out in detail this conspiracy and

FILED DATE: 9/27/2018 12:02 AM   2016L011383

how it transpired in Illinois and Chicago, Relator specifically details at ¶¶ 100-109 the false certifications that the conspirators submitted and/or caused to be submitted in order to fraudulently secure Alum contracts. As detailed further below, General Chemical secured contracts in Illinois while also submitting sham bids and purposely refraining from bidding in certain contracts in Illinois, including in Chicago, that they otherwise would have bid on had there not been an anti-competitive conspiracy in effect.

15.     Defendant GenTek Inc. ("GenTek") is a publicly-traded Delaware corporation, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey. From in or about 1999 until October 2009, General Chemical was a wholly owned and controlled subsidiary of GenTek. During the relevant period, GenTek, General Chemical's parent company, was fully aware of and authorized and ratified General Chemical's involvement in its illegal price-fixing and bid-rigging conspiracy as described herein. During the relevant timeframe, either directly or through subsidiaries and affiliates, GenTek sold Alum throughout the United States.

a)     On or about October 11, 2002, GenTek filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware, including bankruptcy filings on behalf of subsidiaries such as General Chemical Corporation. As of October 7, 2003, GenTek and General Chemical Corporation were discharged from bankruptcy pursuant to a plan of reorganization. GenTek and General Chemical Corporation were involved in the conspiracy alleged herein throughout the relevant period through the activities of numerous GenTek and General Chemical senior executives.

b)     After being discharged from bankruptcy, GenTek and General Chemical continued to participate in the conspiracy, including by continuing to take part in the conduct described herein relating to Alum. GenTek and General

14

FILED DATE: 9/27/2018 12:02 AM   2016L011383

Chemical's specific post-discharge actions undertaken in furthering the conspiracy are detailed herein and are consistent with the actions undertaken by all of the Defendants throughout the relevant period.

c) Irrespective of whether GenTek and General Chemical took part in the conspiracy throughout the relevant period or commenced and/or rejoined participation in the conspiracy immediately upon being discharged from bankruptcy, this complaint is seeking to recover damages from GenTek and General Chemical exclusively for GenTek's and General Chemical's post-discharge conduct, and does not seek to violate any orders of the Bankruptcy Court. Additionally, this complaint seeks damages from the remaining Defendants for GenTek's and General Chemical's pre-discharge conspiratorial activities, and damages as to GenTek and General Chemical are subject to the doctrine of joint and several liability.

16.     In approximately January 2014, Defendants Chemtrade Chemicals Corporation, Chemtrade Chemicals US LLC, Chemtrade Solutions, LLC, Chemtrade Logistics Income Fund, and Chemrade Logistics Inc. (collectively, "Chemtrade") absorbed General Chemical, and assumed all rights and obligations of General Chemical in a transaction valued at roughly $860 million. As the legal successor in interest to General Chemical, Chemtrade assumed the liability for damages caused by General Chemical's participation in the conspiracy to fix prices and rig bids for Alum.

17.     Defendant Chemtrade Logistics Income Fund ("CLIF") is a limited-purpose trust that was established on July 11, 2001, pursuant to the laws of the Province of Ontario, Canada with its principal place of business at Suite 300, 155 Gordon Baker Road, Toronto, Ontario M2H 3N5. As stated above, in 2014, CLIF completed the Chemtrade Acquisition and thus acquired the

15

FILED DATE: 9/27/2018 12:02 AM   2016L011383

assets and liabilities of General Chemical and its subsidiaries. Consequently, it bears financial responsibility for the pre-acquisition actions described herein and has accepted that it might be sued for such actions. Additionally, CLIF has acknowledged that GenTek has agreed to indemnify it, at least partially.

18.      Defendant Chemtrade Logistics Inc. is a publicly-traded Canadian corporation, with its principal places of business located at 90 East Halsey Road, Parsippany, New Jersey and Ontario, Canada. General Chemical became part of Chemtrade through the Chemtrade Acquisition in January 2014, with Chemtrade assuming all rights and obligations of General Chemical. As the legal successor-in-interest to General Chemical, Chemtrade is liable for damages caused by General Chemical's conspiratorial conduct to fix prices and rig bids.

19.      Defendant Chemtrade Solutions LLC, based in Parsippany, New Jersey, is a subsidiary of the Ontario-based Chemtrade Logistics Inc. Chemtrade Solutions LLC was Relator's employer. Chemtrade Solutions LLC, along with Chemtrade Logistics Inc., fell under the ownership of General Chemical after the January 2014 Chemtrade Acquisition. As the legal successor-in-interest to General Chemical, Chemtrade Solutions LLC is liable for damages caused by General Chemical's conspiratorial conduct to fix prices and rig bids.

20.      Defendant Chemtrade Chemicals Corporation is a Delaware corporation, with its principal place of business at 90 E. Halsey Road, Parsippany, New Jersey, and is a wholly owned and controlled subsidiary of Defendant Chemtrade Holding Partnership. It is a successor-in-interest to General Chemical.

21.      Defendant Chemtrade Chemicals US LLC is a limited liability company organized under Delaware law, with its principal place of business at 90 E. Halsey Road, Parsippany, New Jersey. It is a wholly owned and controlled subsidiary of Defendant Chemtrade Chemicals Corporation and a successor-in-interest to General Chemical.

FILED DATE: 9/27/2018 12:02 AM   2016L011383

22.     GEO Specialty Chemicals, Inc. is a privately-held Ohio corporation with its principal place of business located at 340 Mathers Road, Ambler, Pennsylvania. GEO Specialty manufactures, supplies, and markets specialty chemicals, which include water treatment chemicals, for customers in the United States and worldwide. GEO Specialty has water treatment chemical production facilities located in Alabama, Arkansas, Georgia, Louisiana, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, and Texas. During the relevant timeframe, either directly or through its subsidiaries and affiliates, GEO Specialty sold Alum throughout the United States. At all times throughout the relevant period, GEO Specialty gave full authorization to or mandated Steppig's participation in the conspiracy alleged in this complaint.

a)  On or about March 18, 2004, GEO Specialty filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey. As of December 20, 2004, GEO Specialty was discharged from bankruptcy pursuant to a plan of reorganization. GEO Specialty took part in the conspiracy alleged herein throughout the relevant timeframe through the conduct of numerous GEO Specialty senior executives.

b)  After being discharged from bankruptcy, GEO Specialty confirmed its participation in the conspiracy, partly by continuing to engage in the actions described herein regarding Alum. Specific post-discharge actions of GEO Specialty in furthering the conspiracy are consistent with the conduct undertaken by all of the Defendants and GEO Specialty throughout the relevant timeframe.

c)  Irrespective of whether GEO Specialty took part in the conspiracy during the relevant timeframe or joined and/or confirmed membership in the conspiracy

17

FILED DATE: 9/27/2018 12:02 AM   2016L011383

immediately following its being discharged from bankruptcy, this complaint seeks to recover damages from GEO Specialty solely for GEO Specialty's post-discharge actions, and does not seek to violate any orders of the Bankruptcy Court. However, pursuant to the law, the damages from GEO Specialty's post-discharge actions may include damages throughout the relevant period. Additionally, this complaint seeks damages from the remaining Defendants for GEO Specialty's pre-discharge conspiratorial actions, and damages as to GEO Specialty are subject to the doctrine of joint and several liability.

d)  On June 16, 2016, GEO Specialty entered into a plea agreement (incorporated hereto and attached hereto as Exhibit 3) with the Antitrust Division of the United States Department of Justice in which GEO Specialty entered a guilty plea in the United States District Court for the District of New Jersey to charges of violating 15 U.S.C., section 1 in conjunction with a conspiracy to rig bids and allocate customers for, and to fix the price of, liquid aluminum sulfate supplied to municipalities and pulp and paper manufacturers throughout the United States from at least as early as 1997 and continuing until in or about February 2011.

As detailed in the "Sham Bids Submitted in Illinois" section at ¶¶ 53-82 below, GEO was actively involved in the conspiracy in Illinois by submitting numerous sham bids in order to inflate the price so that a co-conspirator would win the bid at an inflated price per the conspiratorial arrangement. Moreover, GEO has refrained from submitting Alum bids in Illinois municipalities, including in Chicago, in furtherance of the conspiracy, (See "Agreement to Have Others Submit Bids in Illinois in Furtherance of the Conspiracy" at ¶¶ 83-99 below) to allow co-

FILED DATE: 9/27/2018 12:02 AM  2016L011383

conspirators to win Alum contracts at an inflated price, even though GEO is capable of and has supplied Alum to Illinois municipalities and entities: in 2014, GEO won the Alum contract in Taylorville, Illinois, and supplied that contract, and could supply other Illinois municipalities and entities from its Counce, Tennessee plant.

23.     C&S Chemicals, Inc. is a privately-held Pennsylvania corporation with its principal place of business located at 4180 Providence Road, Marietta, Georgia. The specialty of C&S Chemicals is the production of Liquid Aluminum Sulfate and Sodium Aluminate and currently has six manufacturing facilities in Florida, Georgia, South Carolina, Illinois, and Minnesota. During the relevant timeframe, either directly or through its subsidiaries and affiliates, C&S Chemicals sold Alum throughout the United States. As detailed in the "Sham Bids Submitted in Illinois" and "Agreement to Have Others Submit Bids in Illinois in Furtherance of the Conspiracy" sections at ¶¶ 53-99 below, C&S secured contracts in Illinois while also submitting sham bids and purposely refraining from bidding on certain contracts in Illinois, including in Chicago, that they otherwise would have bid on had there not been an anti-competitive conspiracy in effect. C&S submitted bids other than those described below, including a bid for $143.00 per dry ton in the Village of Wilmette in 2005.

24.     Delta Chemical Corporation was a Maryland-based producer of aluminum-based water and wastewater treatment chemicals such as liquid aluminum sulfates, sodium aluminates, and polyaluminum chlorides. Its products were sold to industrial and municipal clients, as well as to federal agencies such as the United States Army. On November 17, 2011, Delta Chemical Corporation and its distribution company, Delta Transport, Inc., were acquired by USALCO, LLC. Delta owned an Alum plant or plants located in the Midwest, including but not limited to a plant located in Ashtabula, Ohio, and thus was capable of supplying Illinois municipalities and entities, including Chicago, due to the location of this Alum facility. However, as outlined

19

FILED DATE: 9/27/2018 12:02 AM   2016L011383

below and per the conspiracy outlined further below, Delta agreed to have co-conspirators submit inflated bids in Illinois and to refrain from submitting bids in Illinois and Chicago as part of the conspiratorial arrangement. Moreover, Delta engaged in sham bidding for Alum contracts in Illinois, including in the City of Woodstock as detailed below.

25.     USALCO, LLC is a privately-held Maryland corporation with its principal place of business located at 2601 Cannery Avenue, Baltimore, Maryland. USALCO manufactures and distributes aluminum-based chemical products to industrial and municipal markets in North America. USALCO is also the successor to Delta Chemical, another Alum producer. USALCO has manufacturing facilities located in Indiana, Louisiana, Maryland and Ohio. During the relevant timeframe, either directly or through its subsidiaries and affiliates, USALCO sold Alum throughout the United States, including to the City of Chicago. As detailed in the "Sham Bids Submitted in Illinois" and "Agreement to Have Others Submit Bids in Illinois in Furtherance of the Conspiracy" sections below at ¶¶ 53-99, USALCO secured contracts in Illinois, including Chicago, while also submitting sham bids and purposely refraining from bidding in certain contracts that they otherwise would have bid on had there not been an anti-competitive conspiracy in effect.

26.     Alchem Incorporated is a privately-held industrial chemical producer with its principal places of business located at 2042 Buie Philadelphus Road, Red Springs, North Carolina 28377 and 8135 Red Road, Rockwell, NC 28138. Its products include various chemicals used for industrial, drinking, and waste water treatment. Alchem was actively involved in the nationwide conspiracy as detailed below, including direct coordination with Amita Gupta and General Chemical to rig bids in North Carolina. This included an agreement to stay away and allow General Chemical to win certain Alum contracts, including allowing General Chemical to win the Alum contract in Charlotte, North Carolina in 2009 and after.

FILED DATE: 9/27/2018 12:02 AM   2016L011383

Alchem also refrained from bidding on certain Alum accounts in furtherance of the conspiracy, including agreeing to have co-conspirators submit inflated bids and refraining from bidding for Alum contracts in Newport News, Virginia throughout the course of the conspiracy. This agreement caused false certifications, falsely claiming that there was no bid-rigging or collusion involved in the bidding process, to be submitted to Illinois municipalities and entities in order to secure Alum contracts on a fraudulent basis. Alchem's agreement to refrain from bidding on contracts, such as those in North Carolina and Virginia, allowed General Chemical the ability to profit disproportionately. These profits allowed General Chemical to refrain from bidding on certain lucrative contracts, including Alum contracts in Illinois and Chicago, in furtherance of the conspiracy as they were accumulating undue and substantial profits in other regions nationwide through coordinated efforts with co-conspirators like Alchem. Moreover, General Chemical partially acquired Alchem, Inc. in 2011. General Chemical did not take over Alchem's plant, but instead acquired Alchem to obtain Alchem's customer lists and remove Alchem from the market, allowing General Chemical, GEO, and C&S to increase pricing. Bill Redmond indicated that General Chemical and GenTek were pursuing as many as six similar acquisitions, and General Chemical had the backing of American Securities in these acquisitions as American Securities was willing to provide financing to buy market dominance. Since General Chemical already had approximately 50% of the Alum market, these acquisitions were intended to severely limit competition and result in substantially higher prices for consumers. Relator reported these concerns to his contact at the FBI in May 2012 in an effort to block further anti-competitive conduct by Defendants. Alchem's acquisition marked a further extension of the conspiracy with the acquiescence and approval of Alchem itself.

27.     American Securities LLC is a private equity firm with its principal place of business located at 299 Park Avenue, New York City, New York 10171. In October 2009, it

21

acquired General Chemical in conjunction with its acquisition of GenTek, Inc. In December 2013, it announced that it had entered into an agreement to sell General Chemical Corporation and related entities to Chemtrade Logistics Income Fund for $860 million. Relator contacted management for American Securities on multiple occasions to report the bid-rigging scheme and specifically detailed Redmond's knowledge or reckless disregard and deliberate ignorance of the conspiracy, but no action was taken in response to Relator's reports. From approximately 2009 until the end of 2013, American Securities owned General Chemical and GenTek, Inc., which was General Chemical's parent company. During this time period, American Securities and its management were aware of and in control of General Chemical's Alum business nationwide, including in the State of Illinois. For instance, Relator's direct supervisor, Amita Gupta, Director of Marketing for Water Chemicals, provided reports to American Securities and its management about Alum bidding. Moreover, American Securities had at least two individuals assigned to manage General Chemical and to watch over the business. Thus, upon information and belief, American Securities exerted control over the submission of bids inflated by the price-fixing scheme, including in Illinois.

During its ownership of General Chemical and prior to 2011, American Securities was aware of the bid-rigging conspiracy related to Alum and directly profited from Alum sales, including sales to municipalities and entities in Illinois. As a direct result of the conspiracy, American Securities reaped increased profits from sales due to the inflated prices resulting from the conspiracy. American Securities had authority and control over General Chemical and all other subsidiaries such that American Securities could have prevented and/or halted the bid-rigging conspiracy, but chose not to.

Moreover, upon information and belief, American Securities became aware of the bid-rigging conspiracy prior to its acquisition of General Chemical in 2009, when, during the due

FILED DATE: 9/27/2018 12:02 AM   2016L011383

FILED DATE: 9/27/2018 12:02 AM   2016L011383

diligence process during the acquisition, American Securities reviewed historical financial information and interviewed management prior to taking General Chemical private. During this due diligence process, American Securities would have become aware of increased profitability from roughly 2007 to 2009 that resulted directly from the bid-rigging conspiracy and would have been too large of an increase to be justified by non-collusive activity, as, for instance, American Securities utilized debt to improve their returns on the investment such that they needed to understand the reliability of the cash flow to secure loans.

In or around 2011, Relator raised concerns about the bid-rigging conspiracy directly with David Cohen, Director of Human Capital for American Securities, but no action was taken to prevent, halt, or rectify the damage caused by the conspiracy. Relator specifically raised concerns about Bill Redmond, CEO of GenTek, Inc., who oversaw General Chemical, and the fact that he had knowledge of the Alum conspiracy but failed to take any action to prevent or halt the conspiracy. Bill Redmond was directly controlled by American Securities, but American Securities and its management chose to ignore Relator's concerns.

In or about August 2012, Relator wrote a letter to Michael Fisch, senior executive of American Securities, informing him that Relator had raised concerns with David Cohen a year earlier but that his concerns were never addressed. Relator's letter to Mr. Fisch raised similar concerns to those Relator had raised with Mr. Cohen a year earlier, including the collusive bid-rigging conspiracy and the failure of American Securities or Bill Redmond to do anything to halt, prevent, or rectify the damage inflicted by the conspiracy. Once again, the situation did not improve and no action was taken to make any changes in response to Relator's concerns.

Moreover, General Chemical partially acquired Alchem, Inc. in 2011. General Chemical did not take over Alchem's plant, but instead acquired Alchem to obtain Alchem's customer lists

and remove Alchem from the market, allowing General Chemical, GEO, and C&S to increase pricing. Bill Redmond indicated that General Chemical and GenTek were pursuing as many as six similar acquisitions, and General Chemical had the backing of American Securities in these acquisitions as American Securities was willing to provide financing to buy market dominance. Since General Chemical already had approximately 50% of the Alum market, these acquisitions were intended to severely limit competition and result in substantially higher prices for consumers. Relator reported these concerns to his contact at the FBI in May 2012 in an effort to block further anti-competitive conduct by Defendants.

Jurisdiction and
Venue

28.     The Court has jurisdiction of this action pursuant to Article VI § 9 of the Illinois Constitution and Municipal Code of Chicago Chapter 1-22-030. The allegations and transactions upon which this action is based have not been publicly disclosed. Relator also has direct and independent knowledge of the information on which the allegations are based. He learned this information during his employment with Defendant General Chemical Corporation, as evidenced in part by his contemporaneous communications with the United States Department of Justice about the illegal scheme. Relator has unique, direct, and first-hand knowledge relating to the conspiracy and fraud perpetrated by Defendants. As outlined above and below, Relator worked closely with active participants in the conspiracy at General Chemical like Amita Gupta, Alex Avraamides, Frank Reichl, Vincent Opalewski, and Bill Redmond. Relator's office was physically near to major players in the conspiracy, allowing him to observe the intricacies of the conspiracy in action. Given the nature of his job duties and that the office Relator worked in was small in size, he also worked closely with Lisa Brownlee, General Chemical's Business Manager

FILED DATE: 9/27/2018 12:02 AM   2016L011383

24

FILED DATE: 9/27/2018 12:02 AM   2016L011383

for the Midwest region, allowing him to gain first-hand knowledge and insight into how the conspiracy was being implemented in Illinois and Chicago. The conspiracy likely would not have been uncovered if not for Relator directly contacting the Antitrust Division of the Department of Justice in May 2009. The "Relator's Knowledge of the Conspiracy" section at ¶ 37 herein details much of the content that Relator conveyed to his government contacts, an attorney at the Antitrust Division of the DOJ and an FBI investigator, through extensive email communications from May 2009 until at least 2012. Thus, he provided all of the information to the government before filing suit. The DOJ investigation into the conspiracy, which culminated in the indictments and guilty pleas of Reichl, Steppig, and GEO began in earnest in 2011 as a direct result of the unique information shared, selflessly and at great risk and cost to his career, with the government. When General Chemical got wind of the formal criminal investigation commenced by the Justice Department in 2011 based on Relator's disclosures, General Chemical hired the law firm Weil, Gotshal & Manges to conduct an internal investigation. Relator was interviewed as part of the internal investigation, and he was forthcoming about his knowledge of the Alum scheme and provided detailed information of his knowledge. Relator also voluntarily provided this information to the City of Chicago before filing these claims.

29.     Venue is proper pursuant to 735 ILCS 5/2-101 and 735 ILCS 5/2-102 because some of the transactions complained of herein occurred in Cook County, Illinois.

## **Background**

30.     Liquid aluminum sulfate, or Alum, is a coagulant utilized in the removal of impurities and other substances from water. The primary customers for liquid aluminum sulfate are municipalities, which use it in potable water and wastewater treatment, and pulp and paper companies, which use it in the course of their manufacturing processes.

31.     Municipalities typically acquire their supplies of liquid aluminum sulfate via a

FILED DATE: 9/27/2018 12:02 AM   2016L011383

publicly-advertised, competitive bidding process. In most cases, municipal contracts for liquid aluminum are one year in duration, but some contracts provide for renewal for a longer period of time.

32.     Pulp and paper companies typically acquire their supplies of liquid aluminum sulfate through "requests for price" that are issued to suppliers of liquid aluminum sulfate. The particulars of the resulting contracts are subject to negotiation between the suppliers, who respond to the requests for price, and the pulp and paper companies. Contracts relating to the supply of liquid aluminum sulfate to pulp and paper companies can last for a year or more. The results of the negotiations between the liquid aluminum sulfate suppliers and the pulp and paper companies are usually not made public.

**Facts**

**A.  Commencement of the Conspiracy**

33.     From, at minimum, as early as the dates alleged herein, and beginning no later than 2005 and continuing through at least February 2011, Defendants and their co-conspirators (collectively, "Defendants") entered into and participated in a conspiracy for the purposes of suppressing and eliminating competition in the selling and marketing of liquid aluminum sulfate by entering into an agreement to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of liquid aluminum sulfate sold to municipalities and pulp and paper companies throughout the United States. From his personal knowledge from working at General Chemical, including his analysis of bid data (which he reviewed and had access to pursuant to his position and job duties at General Chemical and Chemtrade) from prior to his employment at General Chemical, Relator has knowledge that the conspiracy was in effect by no later than 2005 and lasted through at least February 2011. The effects of the conspiracy in terms of inflated prices may have manifested themselves at different times depending upon the locale, but the

26

FILED DATE: 9/27/2018 12:02 AM   2016L011383

conspiracy typically manifested itself in the form of a sharp increase in prices in or around the mid-to-late 2000s.

34.    No official of the City of Chicago charged with responsibility to act on the conspiracy alleged herein knew or reasonably should have known of the conspiracy or the related false statements prior to the announcement of the prosecution of Frank Reichl on October 27, 2015.

**B.  The Conspiratorial Agreement**

35.    The conspiracy entailed a continuing agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of liquid aluminum sulfate sold to the City of Chicago and other municipalities and entities throughout the State of Illinois and nationwide, and pulp and paper companies in the United States.

36.    For the purpose of forming and carrying out the conspiracy, the Defendants and their co-conspirators carried out the plans that they conspired to do, including, among other things:

> (a) taking part in meetings and conversations for the purpose of discussing each other's liquid aluminum sulfate business;
>
> (b) agreeing to "stay away" from each other's "historical" customers by not attempting to attract the business of those customers;
>
> (c) keeping track of bid and pricing histories in order to determine which accounts were the "historical" customers of each co-conspirator or other supplier of liquid aluminum sulfate, for the purpose of determining whether to seek a specific contract or to submit an intentionally-losing or "throw away" bid or price quote;

(d) placing intentionally-losing or "throw away" bids or price quotes to each other's "historical' liquid aluminum sulfate customers;

(e) periodically, communicating about the price to be quoted to a customer by the intended winner for the purpose of determining the amount of the intended loser's intentionally-losing or "throw away' bid or price quotation;

(f) in certain instances, subject to a request of a co-conspirator, withdrawing an inadvertently-winning bid submitted to that co-conspirator's "historical" customer;

(g) where a co-conspirator was unable to withdraw its inadvertently-winning bid, bidding to lose on one of its own customers to make up for the loss of that "historical" customer; and

(h) telling new employees how to determine whether and how to bid on, or quote a price for, the business of liquid aluminum sulfate customers in order to comply with the agreement between the Defendants not to compete.

### C.  Relator's Knowledge of the Conspiracy

37.    Upon becoming a Business Manager at General Chemical in 2008, Relator soon thereafter learned of the conspiracy to rig bids and fix prices in the Alum industry. Within the small office in which McShane worked, Defendants Amita Gupta and Alex Avraamides openly discussed General Chemical's agreement not to compete with certain suppliers in exchange for a reciprocal benefit, and they frequently directed Relator to act in accordance with that agreement. Some of the instances in which Relator witnessed the execution of the nationwide conspiracy first-hand and gained unique knowledge into the conspiracy include:

a)    In 2008, the conspiracy was underway, but a misunderstanding between Defendants General Chemical and Alchem about bidding strategy caused

General Chemical to lose the Charlotte, North Carolina, account to Alchem. In response, General Chemical took the High Point, North Carolina, account from Alchem in April 2009. These events caused Gupta and Randall Andrews, owner of Alchem, to meet and agree that Alchem would not bid on Charlotte in 2009 and General Chemical would let Alchem win High Point back. (Gupta may also have offered Alchem the Henderson, North Carolina, account to sweeten the deal.) By no later than the following week, Gupta relayed the purpose and result of this meeting to McShane.

b)  In February 2009, Gupta ordered McShane to submit a bid that would *not* win a contract with Dekalb County, Georgia, after she learned that the current supplier was actually a distributor for C&S Chemicals, a co-conspirator: General Chemical and C&S Chemicals, Inc. were engaging further in the conspiracy by coordinating bids for DeKalb County, Georgia. In February 2009, Relator expressed interest in bidding on the DeKalb County account that had been awarded to RGM of Georgia in the past. Upon learning that RGM of Georgia was a distributor selling on behalf of C&S, a co-conspirator with General Chemical, and given his knowledge of the conspiracy furthered by his superiors at General Chemical, Relator emailed Gupta (in February 2009) "so I assume we don't want to take it." Gupta replied "Don't take. Thx."

c)  In September 2009, Gupta informed McShane that she and a representative of Chameleon Industries, a co-conspirator, had agreed on a bidding strategy for a contract with Trinity River Authority in Texas. Gupta then ordered McShane not to bid competitively. McShane reported this incident to his contact at the

29

FILED DATE: 9/27/2018 12:02 AM   2016L011383

FILED DATE: 9/27/2018 12:02 AM   2016L011383

Department of Justice.

d) In 2009 or 2010, McShane attended the Texas Water tradeshow with Gupta and other General Chemical employees. While there, they spoke with Defendant Chino Garza, owner of Chameleon Industries, who stated openly, "We need to talk more before bids."

e) In June 2010, after McShane pointed out to Avraamides that C&S Chemicals had shown signs of becoming more aggressive toward General Chemical's accounts, Avraamides expressed confidence that C&S would not actually compete aggressively with General Chemical.

f) Also in June 2010, Avraamides expressed his frustration to McShane that a company outside of the conspiracy, Kemira, had unexpectedly won a contract in Columbia, South Carolina, that co-conspirator C&S Chemicals had agreed would be allocated to General Chemical. McShane promptly reported this incident to his contact at the Department of Justice.

g) In November 2010, after a conversation with representatives of GEO Specialty Chemicals and C&S Chemicals, Avraamides told McShane and Gupta that the companies would be raising their Alum prices by $25/dry ton. McShane promptly reported this incident to his contact at the Department of Justice.

h) Also in November 2010, McShane explained to his contact at the Department of Justice that prices were high in the Midwest because General Chemical's competitors in the region—"US Alco and C&S"— "don't go after our business and we don't go after theirs." McShane had learned this information from Gupta and his fellow Business Manager, Lisa Brownlee, whose region

FILED DATE: 9/27/2018 12:02 AM   2016L011383

covered the Midwest.

i)  In January 2011, Gupta told McShane that a representative of GEO Specialty Chemicals had apologized to Gupta for bidding too low for a contract in Graham, North Carolina. McShane promptly reported this incident to his contact at the Department of Justice.

j)  Also in January 2011, Avraamides told McShane that he had advised representatives of GEO Specialty Chemicals and C&S Chemicals to stay away from customers supplied by Alchem, an Alum supplier that General Chemical had just acquired. McShane promptly reported this incident to his contact at the Department of Justice.

k)  In January 2011 as well, General Chemical, GEO Specialty Chemicals, and USALCO announced similar Alum price increases—increases that were only partially explained by a rise in costs—suggesting continued collusion. McShane promptly reported this incident to his contact at the Department of Justice.

l)  By 2011, the Department of Justice had begun a formal criminal investigation based on McShane's disclosures. When General Chemical got wind of the formal criminal investigation commenced by the Justice Department in 2011 based on Relator's disclosures, General Chemical hired the law firm Weil, Gotshal & Manges to conduct an internal investigation. Relator was interviewed as part of the internal investigation, and he was forthcoming about his knowledge of the Alum scheme and provided detailed information of his knowledge.

FILED DATE: 9/27/2018 12:02 AM   2016L011383

**D.  The Conspiracy Carried Into Fruition and Its Impact**

38.     As exemplified in the tables provided below at ¶¶ 47-51, Defendants carried out their conspiracy by submitting inflated Alum bids and throwaway bids to municipalities and by not competing for each other's historical customers. This conspiracy inflated the price of liquid aluminum sulfate nationwide.

39.     Based on knowledge derived from his employment at Chemtrade and from analysis of documents containing pricing information for various municipalities, Relator has accurately estimated a fair market price for Alum during the relevant period. Relator estimates that the cost to produce a dry ton of liquid aluminum sulfate is about $100.[1] Relator estimates that freight costs roughly $30-$50 per dry ton and a fair profit would range from $20-$40 per dry ton. While fixed costs vary by plant depending on the demand in a given year, they are probably about $30 per dry ton. Adding these figures to the $100 cost to produce a dry ton of liquid aluminum sulfate, a fair price for Alum during the relevant period would have ranged from $180 per dry ton to $220 per dry ton. However, based on Relator's knowledge and experience in the industry, Alum could easily be produced for less than $100/dry ton, giving a lower range of $140 to $180 per dry ton. The conspiracy was nationwide and prices were inflated above the fair price for Alum ($140 to $180 per dry ton) in numerous states, including but not limited to Illinois, North Carolina, Virginia, and Georgia. Each municipality or local governmental entity that purchased Alum bought hundreds of dry tons of Alum annually during the relevant period.

40.     $450 per dry ton represents an average composite figure for the amount that Illinois municipalities and local governmental entities were paying for liquid aluminum sulfate

---

[1] The $100 per dry ton estimate is rooted in an assumption, based upon Relator's experience in the industry, that sulfuric acid typically costs $120 per dry ton, with a consumption factor of  0.495, and bauxite (aluminum) usually costs $110 per dry ton at a consumption factor of 0.4. Thus, the material cost of a dry ton of Alum is roughly $100.

FILED DATE: 9/27/2018 12:02 AM   2016L011383

during the relevant period, so Illinois municipalities and entities, by paying $450 per dry ton on average, were routinely overcharged between $270 to $310 per dry ton during the relevant period. On average, these prices were 150% to 221% above the fair market price.

41.     $300 per dry ton represents an average composite figure for the amount that North Carolina municipalities and local governmental entities were paying for liquid aluminum sulfate during the relevant period, so North Carolina municipalities and entities, by paying $300 per dry ton on average, were overcharged between $120 and $160 per dry ton. On average, these prices 67% to 114% above the fair market price.

42.     $350 per dry ton represents an average composite figure for the amount that Virginia municipalities and local governmental entities were paying for liquid aluminum sulfate during the relevant period, so Virginia municipalities and entities, by paying $350 per dry ton on average, were overcharged between $170 to $210 per dry ton. On average, these prices were 94% to 150% above the fair market price.

43.     $350 per dry ton represents an average composite figure for the amount that Georgia municipalities and local governmental entities were paying for liquid aluminum sulfate during the relevant period, so Georgia municipalities and entities, by paying $350 per dry ton on average, were overcharged between $170 to $210 per dry ton. On average, these prices were 94% to 150% above the fair market price.

44.     On average, the City of Chicago paid approximately $350 per dry ton during the relevant period, so the City of Chicago was overcharged between $170 to $210 per dry ton. On average, these prices were 94% to 150% above the fair market price. More precisely, prior to USALCO winning the Alum contract for Chicago in 2009, Azteca Supply Co. provided Alum to Chicago with a winning bid of $150.13/dry ton, modifying the price to $189.13/dry ton in 2006. The $150/dry ton amount represents a baseline price that likely represents a fair Alum price that

FILED DATE: 9/27/2018 12:02 AM   2016L011383

Chicago should have been paying throughout the period from roughly 2005 to 2011, instead of the inflated prices it paid to USALCO. In paying approximately $350 per dry ton to USALCO during the relevant period, Chicago was overcharged approximately $200 per dry ton, or overpaid by 133%.

45.     The impact of the conspiracy and false representations continues to this day as the price paid by municipalities and entities in the State of Illinois for liquid aluminum sulfate is vastly inflated above the fair market price. For instance, upon information and belief based upon Relator's knowledge and experience in the industry and relevant bid documents, (which he reviewed and had access to pursuant to his position and job duties at General Chemical and Chemtrade), the current price paid by municipalities and entities in the State of Illinois for liquid aluminum sulfate is, at minimum, $250 per dry ton above a proper fair market price as a direct result of the collusive activity and false representations. Additionally, the current price paid by the City of Chicago for liquid aluminum sulfate is, at minimum, $100 per dry ton above a proper fair market price as a direct result of the collusive activity and false representations

### *Specific Examples of Conspiracy's Nationwide Reach and Impact*

46.     The following data provide illustrative examples that further demonstrate collusion in the Alum market. As each table shows, the price of Alum increased sharply between 2007 and 2008 and then remained high. Although the original jump in price partly reflected increases in raw material costs, that rise did not fully justify the high bid prices, particularly for suppliers like General Chemical, who had contracts locking in raw material costs for 2008. More tellingly, exceptionally high Alum bid prices persisted in 2009, despite the fact that raw material costs plunged that year. The price of sulfur, the raw material used to make sulfuric acid (one of the two main components of alum), was hit particularly hard. But for collusion in the market, prices for Alum would have reached historic lows beginning in 2009. Instead, they remained

FILED DATE: 9/27/2018 12:02 AM   2016L011383

well above a fair market price, as illustrated by the examples below. The winning bids in each chart are indicated with boldface type.

<u>North Carolina: Charlotte and High Point</u>

47.

### Charlotte, NC

| Bid Open Date | Bidder | Plant Location | Bid Price |
|---|---|---|---|
| 6/15/2007 | General Chemical | Catawba (32 miles) | **$223.45** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| 7/31/2008 | Alchem | Rockwell, NC (43 miles) | **$391.00** |
| | General Chemical | Catawba (32 miles) | $406.00 |
| | C&S | Greenwood, SC (142 miles) | $466.00 |
| 6/4/2009 | General Chemical | Catawba (32 miles) | **$343.00** |
| | Kemira | Savannah, GA (252 miles) | $386.00 |
| | C&S | Greenwood, SC (142 miles) | $485.00 |
| | GEO | Georgetown, SC (188 miles) | $498.58 |
| | Alchem | Rockwell, NC (43 miles) | no bid |
| 4/1/2010 | General Chemical | Catawba (32 miles) | **$335.00** |
| | | | |
| | | | |
| | | | |
| 6/24/2011 | General Chemical | Catawba (32 miles) | **$355.00** |

### High Point, NC

| Bid Open Date | Bidder | Plant Location | Bid Price |
|---|---|---|---|
| 7/5/2007 | C & S | Greenwood, SC (222 Miles) | **$205.00** |
| | Alchem | Rockwell, NC (44 Miles) | $223.05 |
| | GEO | Georgetown, SC (221 Miles) | $249.00 |
| | Delta | Baltimore, MD (381 Miles) | $256.40 |
| | General Chemical | Catawba, SC (107 Miles) | $259.04 |
| | Kemira | Savannah, GA (335 Miles) | $280.00 |
| 6/4/2008 | Alchem | Rockwell, NC (44 Miles) | **$335.00** |
| | C & S | Greenwood, SC (222 Miles) | $335.00 |
| | GEO | Georgetown, SC (221 Miles) | $449.00 |
| | General Chemical | Catawba, SC (107 Miles) | $409.00 |
| 4/29/2009 | General Chemical | Catawba, SC (107 Miles) | **$224.00** |
| | Alchem | Rockwell, NC (44 Miles) | $261.00 |
| | Key Chem / GEO | Georgetown, SC (221 Miles) | $379.00 |
| | Kemira | Savannah, GA (335 Miles) | $390.00 |
| | Delta | Baltimore, MD (381 Miles) | $436.00 |
| | C & S | Greenwood, SC (222 Miles) | $463.00 |
| 2/16/2010 | Alchem | Rockwell, NC (44 Miles) | **$285.00** |
| | General Chemical | Catawba, SC (107 Miles) | $298.00 |
| | Kemira | Savannah, GA (335 Miles) | $336.00 |
| | GEO | Georgetown, SC (221 Miles) | $375.58 |
| | Thatcher | Deland, FL (555 Miles) | $377.00 |
| | C & S | Greenwood, SC (222 Miles) | $463.00 |
| 1/19/2011 | General Chemical | Catawba, SC (107 Miles) | **$315.47** |
| | Kemira | Savannah, GA (335 Miles) | $329.16 |
| | Colonial Chemical | Georgetown, SC (221 Miles) | $395.34 |
| | GEO | Georgetown, SC (221 Miles) | $400.58 |
| | Delta | Baltimore, MD (381 Miles) | $430.00 |

The bid data above show that, in 2007, both Charlotte and High Point were paying relatively low prices for alum. (Charlotte's Alum price in 2007 was an extension of the contract from 2006.) In 2008, bids went up by roughly 60%, though increased raw material costs did not justify such a jump, indicating collusion. These data also show throw-away bids from GEO Specialty Chemicals and C&S Chemicals beginning in 2009, indicating that those companies were intentionally staying away from the accounts. Additionally, the data show that the inflated prices allowed suppliers like Thatcher and Kemira to make competitive bids despite the fact that

large disadvantages in freight, under normal circumstances, would have discouraged them from bidding for these accounts.

### Newport News, Virginia

48.

| Newport News, VA | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| General Chemical | Hopewell, VA (85 miles) | $ 179.75 | $ 186.40 | $ 203.17 | $ 410.00 | $ 318.00 | $ 320.77 |
| GEO | Plymouth, NC (102 miles) | | | | $ 503.00 | | |
| Delta | Baltimore, MD (226 miles) | | | | | $ 384.00 | |
| Alchem | Rockwell, NC (298 miles) | | | | | | |
| Kemira | Savannah, GA (484 miles) | | | | | | |
| Thatcher | Williamson, NY (555 miles) | | | | | | |

Newport News, Virginia, seeks bids for multi-year contracts. Therefore, after winning the bid in 2004, General Chemical was able to renew the contract multiple times with price increases until the next bid in 2008. Although Newport News is a large account which uses several thousand tons of Alum per year, only General Chemical and GEO Specialty Chemicals bid in 2008 even though Delta and Alchem could have bid and supplied these contracts. GEO's throw-away bid allowed General Chemical to more than double the price. Because of the tremendous increase, Newport News did not renew the contract in 2009 and instead sought bids. While General Chemical reduced the price to protect the account, the price was still substantially inflated.

### Richmond, Virginia

49.

| Richmond, VA | | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|
| General Chemical | Hopewell, VA (22 Miles) | $ 115.80 | $ 131.80 | $ 151.80 | $ 176.60 | $ 191.60 | $ 401.60 | $ 375.00 |
| GEO | Plymouth, NC (161 Miles) | $ 150.00 | | | | | | |

Richmond, Virginia, sought bids from Alum suppliers in 2003. General Chemical won the contract, which was for one year with the option to extend annually for four more. When Richmond again sought bids in 2008, General Chemical raised its bid price dramatically, well above the fair market price. No other Alum suppliers attempted to compete for the contract,

FILED DATE: 9/27/2018 12:02 AM   2016L011383

FILED DATE: 9/27/2018 12:02 AM   2016L011383

despite the fact that GEO Specialty Chemicals could have supplied Richmond from its plant in Plymouth, North Carolina, and Delta Chemical could have supplied Richmond from its plant in Baltimore, Maryland.

### Decatur, Illinois

50.

| Decatur, IL | | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| USALCO | Michigan City, IN (203 Miles) | $ 160.00 | | $ 201.00 | | $ 251.00 | $ 315.52 | **$ 424.00** | **$ 413.72** | **$ 421.32** |
| Thatcher | Williamson, NY (772.5 miles) | | | | | | | | $ 490.89 | $ 448.00 |
| GEO | Counce, TN (391 Miles) | | | | | | $ 456.25 | $ 505.17 | $ 505.17 | $ 540.17 |
| General Chemical | East St Louis, IL (132 Miles) | $ 150.85 | | $ 210.85 | | $ 250.85 | $ 325.85 | $ 525.85 | $ 525.85 | $ 525.85 |
| C & S | Joliet, IL (148 Miles) | **$ 134.85** | **$ 134.85** | **$ 152.00** | **$ 152.00** | **$ 227.00** | **$ 277.00** | | | |
| GAC | Indianapolis, IN (152 Miles) | $ 137.29 | | $ 176.28 | | | | | | |
| GS Robins | | $ 159.00 | | $ 215.00 | | | | | | |

The bid pattern for the City of Decatur, Illinois shows how pricing was impacted by the conspiracy. C&S Chemicals supplied Decatur from a plant in Joliet, Illinois, from 2003 through 2008. For the first four years, pricing remained competitive. In 2008, GEO Specialty Chemicals began bidding on Decatur with an extremely high price. In 2009, General Chemical followed with an even higher price. From 2006 to 2009, the price of Alum roughly tripled during a period when it could have easily remained under $200/dry ton.

51.

### Chicago, Illinois

| Chicago, IL | | 2009 | 2012 | 2015 |
|---|---|---|---|---|
| USALCO | Michigan City, IN (58 miles) | **$383.67** | **$ 342.50** (extension of 2009 contract) | **$ 294.61** |
| Kemira | | | | $ 301.14 |
| McClendon (General Chemical Distributor) | | Withdrew bid for $235/dry ton | | $ 317.50 |

The City of Chicago is one of the largest municipal consumers of aluminum sulfate in the country. There should be healthy competition among producers for such a large customer. Yet, in 2009, USALCO won the supply agreement for the City of Chicago at a price of $383.67/dry ton. This price was roughly double what a fair price would have been to supply Chicago under

FILED DATE: 9/27/2018 12:02 AM   2016L011383

normal conditions as outlined in ¶ 44. The inflated price reflected the fact that USALCO did not have to worry about competition from other Alum manufacturers, despite the fact that others could have supplied Chicago at a much lower price. General Chemical, for example, could have supplied the City of Chicago from Alum plants in Indianapolis, East St. Louis, and Menasha, Wisconsin, at a much lower price. Additionally, McClendon submitted a bid in 2009 for $235/dry ton, but subsequently withdrew the bid, allowing USALCO to win the contract for $383.67. McClendon is an authorized distributor of liquid aluminum sulfate manufactured by General Chemical. On information and belief, the bid of $235/dry ton was likely withdrawn at the direction of General Chemical in order to maintain the anti-competitive scheme and allow USALCO to win the contract at an inflated price.

### E.  The Conspiracy's Operation in Illinois

52.     The conspiracy was directed at manipulating the Alum market in Illinois, thereby targeting the City of Chicago ("City") and all other Illinois municipalities that purchased Alum. Adding to the bid information on Chicago and Decatur cited in the tables above at ¶¶ 50-51, below are some non-exhaustive examples of some of the many forms that the conspiracy took in Illinois.

### *Sham Bids Submitted in Illinois*

53.     Illustrative examples of the Defendants colluding to submit non-competitive, sham, throwaway bids in order to inflate the Alum market and elevate the level of the winning bid include the following. In all of the following examples, the winning bidder secured lucrative Alum contracts as a result of the rigged bidding process. As outlined at ¶¶ 39-45, the prices that were submitted by Defendants and paid by the Illinois municipalities and entities, as detailed below, were inflated above what a normal, fair price for Alum should have been, further demonstrating that these inflated prices were caused by the price-fixing conspiracy.

FILED DATE: 9/27/2018 12:02 AM   2016L011383

**City of Taylorville**

54.     In the City of Taylorville in 2006, defendant General Chemical submitted an Alum bid for $225.76/dry ton, and defendant USALCO submitted a bid for $287.93/dry ton with the winning bid being awarded to General Chemical. The inflated bid submitted by USALCO allowed General Chemical's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to Taylorville paying an artificially inflated price for Alum.

55.     In the City of Taylorville in 2007, defendant General Chemical submitted a bid for $275.00/dry ton, defendant USALCO submitted a bid for $324.39/dry ton, and defendant GEO Specialty Chemicals, Inc. ("GEO") submitted a bid for $427.40/ dry ton, with the winning bid being awarded to General Chemical. The inflated bids submitted by USALCO and GEO allowed General Chemical's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to Taylorville paying an artificially inflated price for Alum.

56.     In the City of Taylorville in 2009, defendant General Chemical submitted a bid for $478.00/dry ton, defendant USALCO submitted a bid for $581.35/dry ton and defendant GEO Specialty Chemicals, Inc. submitted a bid for $652.40/ dry ton with the winning bid being awarded to General Chemical. The inflated bids submitted by USALCO and GEO allowed General Chemical's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to Taylorville paying an artificially inflated price for Alum.

57.     In the City of Taylorville in 2010, defendant General Chemical submitted a bid for $478.00/dry ton, defendant USALCO submitted a bid for $592.82/dry ton, and defendant GEO submitted a bid for $652.40/ dry ton with the winning bid being awarded to General Chemical. The inflated bids submitted by USALCO and GEO allowed General Chemical's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to Taylorville paying an artificially inflated price for Alum.

FILED DATE: 9/27/2018 12:02 AM   2016L011383

58.     In the City of Taylorville in 2011, defendant General Chemical submitted a bid for $478.00/dry ton, defendant U.S. Alco submitted a bid for $623.62/dry ton and defendant GEO submitted a bid for $652.40/ dry ton with the winning bid being awarded to General Chemical. The inflated bids submitted by USALCO and GEO allowed General Chemical's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to Taylorville paying an artificially inflated price for Alum.

### Village of Wilmette

59.     In the Village of Wilmette in 2009, defendant USALCO submitted a bid for $395.35/dry ton, and defendant General Chemical submitted a bid for $530.00/dry ton, with the winning bid being awarded to defendant USALCO. The inflated bid submitted by General Chemical allowed USALCO's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to Wilmette paying an artificially inflated price for Alum.

60.     In the Village of Wilmette in 2011, USALCO submitted a bid for $441.98/dry ton, and Defendant General Chemical submitted a bid for $530.00/dry ton, with the winning bid being awarded to USALCO. The inflated bid submitted by General Chemical allowed USALCO's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to Wilmette paying an artificially inflated price for Alum.

### Bi-State Regional Commission/Illinois Joint Purchasing Council

61.     In the Bi-State Regional Commission/Illinois Joint Purchasing Council bid in 2007, C&S Chemicals, Inc. submitted winning bid for $249/dry ton. General Chemical submitted a bid for $288/dry ton. USALCO submitted a bid for $331.77/dry ton. Hydrite Chemical Co. submitted a bid for $302.10/dry ton. The inflated bids submitted by General Chemical and USALCO allowed C&S's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to the Bi-State Regional Commission/Illinois Joint Purchasing

FILED DATE: 9/27/2018 12:02 AM   2016L011383

Council paying an artificially inflated price for Alum.

62.     In the Bi-State Regional Commission/Illinois Joint Purchasing Council bid in 2008, C&S Chemicals, Inc. submitted a winning bid for $294/dry ton. General Chemical submitted a bid for $323/dry ton. Univar USA initially submitted a bid for $250/dry ton, but pulled out. USALCO submitted a bid for $316.15/dry ton. The inflated bids submitted by General Chemical and USALCO allowed C&S's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to the Bi-State Regional Commission/Illinois Joint Purchasing Council paying an artificially inflated price for Alum.

63.     In the Bi-State Regional Commission/Illinois Joint Purchasing Council bid in 2009, USALCO submitted a winning bid for $473.65/dry ton. General Chemical submitted a bid for $548/dry ton. The inflated bid submitted by General Chemical allowed USALCO's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to the Bi-State Regional Commission/Illinois Joint Purchasing Council paying an artificially inflated price for Alum.

64.     In the Bi-State Regional Commission/Illinois Joint Purchasing Council bid in 2010, USALCO submitted a winning bid for $470.85/dry ton. General Chemical submitted a bid for $548/dry ton.  The inflated bid submitted by General Chemical allowed USALCO's winning bid, while also inflated above a fair price, to appear to be a more reasonable price, and led to the Bi-State Regional Commission/Illinois Joint Purchasing Council paying an artificially inflated price for Alum.

65.     In the Bi-State Regional Commission/Illinois Joint Purchasing Council bid in 2011, USALCO submitted a winning bid for $441.43/dry ton. General Chemical submitted a bid for $548/dry ton. G.S. Robins submitted a bid for $554.35/dry ton. The inflated bid submitted by General Chemical allowed USALCO's winning bid, while also inflated above a fair price, to

FILED DATE: 9/27/2018 12:02 AM   2016L011383

appear to be a more reasonable price, and led to the Bi-State Regional Commission/Illinois Joint Purchasing Council paying an artificially inflated price for Alum.

## City of Carbondale

66.     In the City of Carbondale in 2008, G.S. Robins & Company submitted a winning bid for $335/dry ton. General Chemical submitted a bid for $340/dry ton. USALCO submitted a bid for $390.80/dry ton.  In the City of Carbondale in 2009, G.S. Robins & Company submitted a winning bid for $478/dry ton. General Chemical submitted a bid for $505/dry ton. USALCO submitted a bid for $617.24/dry ton. In the City of Carbondale in 2010, G.S. Robins & Company submitted a winning bid for $461/dry ton. General Chemical submitted a bid for $490.33/dry ton. Thatcher submitted a bid for $521.40/dry ton. USALCO submitted a bid for $597.63/dry ton. Non-defendant G. S. Robins and Company was able to secure Alum contracts at an inflated price due to the collusive, inflated bids submitted by General Chemical and USALCO.

## City of Carlinville

67.     In the City of Carlinville in 2007, G.S. Robins & Company submitted a winning bid for $250/dry ton. C&S Chemicals, Inc. submitted a bid for $325/dry ton. General Chemical submitted a bid for $265/dry ton. Non-defendant G. S. Robins and Company was able to secure Alum contracts at an inflated price due to the collusive, inflated bids submitted by General Chemical and C&S Chemicals, Inc.

## City of Charleston

68.     In the City of Charleston in 2008, USALCO submitted a winning bid for $323/dry ton. General Chemical submitted a bid for $360/dry ton. G.S. Robins & Company submitted a bid for $361/dry ton. In the City of Charleston in 2009, USALCO submitted a winning bid for $457.73/dry ton. General Chemical submitted a bid for $510/dry ton. USALCO secured Alum contracts at inflated prices due to the collusive, inflated bids submitted by USALCO and General

42

FILED DATE: 9/27/2018 12:02 AM   2016L011383

Chemical.

## City of Collinsville

69.     In the City of Collinsville in 2010, General Chemical submitted an inflated winning bid for $475/dry ton. USALCO submitted a bid for $589.96/dry ton. In the City of Collinsville in 2011, General Chemical submitted a winning bid for $507/dry ton. USALCO submitted a bid for $607.43. General Chemical secured Alum contracts at inflated prices due to the collusive, inflated bids submitted by USALCO and General Chemical.

## City of Crystal Lake

70.     In the City of Crystal Lake in 2007, C&S Chemicals, Inc. submitted a winning bid for $232/dry ton. General Chemical submitted a bid for $311/dry ton.  In the City of Crystal Lake in 2008, C&S Chemicals, Inc. submitted a winning bid for $282/dry ton. General Chemical submitted a bid for $521/dry ton. Alexander submitted a bid for $595/dry ton. In the City of Crystal Lake in 2009, Thatcher Co. of Montana submitted a winning bid of $449.95/dry ton. USALCO submitted a bid for $451.55/dry ton. General Chemical submitted a bid for $521/dry ton. In the City of Crystal Lake in 2010, USALCO submitted a winning bid for $420.89/dry ton. Thatcher Co. of Montana submitted a bid for $449.95/dry ton. General Chemical submitted a bid for $521/dry ton. In the City of Crystal Lake in 2011, USALCO submitted a winning bid for $445.21/dry ton. General Chemical submitted a bid for $521/dry ton. C&S and USALCO secured Alum contracts because of the collusive, inflated bids submitted by General Chemical. Crystal Lake also paid an inflated price for Alum even when non-defendant Thatcher won the contract as Thatcher's inflated price was lower than the collusive, inflated bids submitted by Defendants.

## City of Decatur

71.     In the City of Decatur in 2007, C&S Chemicals, Inc. submitted a winning bid of

43

FILED DATE: 9/27/2018 12:02 AM   2016L011383

$227/dry ton. General Chemical submitted a bid of $250.85/dry ton. USALCO submitted a bid of $251/dry ton. In the City of Decatur in 2008, C&S Chemicals, Inc. submitted a winning bid of $277/dry ton. General Chemical submitted a bid of $325.85/dry ton. GEO Specialty Chemicals submitted a bid of $456.25/dry ton. In the City of Decatur in 2009, USALCO submitted a winning bid of $424/dry ton. General Chemical submitted a bid of $525.85/dry ton. GEO Specialty Chemicals submitted a bid of $505.17/dry ton. In the City of Decatur in 2010, USALCO submitted a winning bid of $413.72/dry ton. Thatcher Co. of Montana submitted a bid of $490.89/dry ton. GEO Specialty Chemicals submitted a bid of $505.17/dry ton. General Chemical submitted a bid of $525.85/dry ton.  In the City of Decatur in 2011, USALCO submitted a winning bid of $421.32/dry ton. Thatcher Co. of Montana submitted a bid of $448/dry ton. GEO Specialty Chemicals submitted a bid of $540.17/dry ton. General Chemical submitted a bid of $525.85/dry ton. C&S and USALCO secured Alum contracts because of the collusive, inflated bids submitted by General Chemical and USALCO.

## City of Evanston

72.    In the City of Evanston in 2008, USALCO submitted a winning bid of $261.28/dry ton. General Chemical submitted a bid of $286/dry ton. In the City of Evanston in 2009, USALCO submitted a winning bid of $440.10/dry ton. General Chemical submitted a bid of $521/dry ton. In the City of Evanston in 2010, Thatcher Co. of Montana submitted a winning bid of $474.82/dry ton. USALCO submitted a bid of $770.10/dry ton. General Chemical submitted a bid of $521/dry ton. In the City of Evanston in 2011, USALCO submitted a winning bid of $431.86/dry ton. General Chemical submitted a bid of $521/dry ton. USALCO secured Alum contracts because of the collusive, inflated bids submitted by General Chemical. Evanston also paid an inflated price for Alum even when non-defendant Thatcher won the contract as Thatcher's inflated price was lower than the collusive, inflated bids submitted by Defendants.

FILED DATE: 9/27/2018 12:02 AM   2016L011383

**City of Highland**

73.     In 2007, General Chemical submitted a winning bid of $282.71/dry ton in the City of Highland. USALCO submitted a bid of $342.66/dry ton. General Chemical secured this Alum contract because of the collusive, inflated bid submitted by USALCO.

**Town of Normal**

74.     In 2011, USALCO submitted a winning bid of $409.07/dry ton in the Town of Normal. General Chemical submitted a bid of $498/dry ton. USALCO secured this Alum contract because of the collusive, inflated bid submitted by General Chemical.

**Village of Northbrook**

75.     In 2008, USALCO submitted a winning bid of $351.75/dry ton in the Village of Northbrook. General Chemical submitted a bid of $357/dry ton. In 2009, USALCO submitted a winning bid of $471.50/dry ton in the Village of Northbrook. General Chemical submitted a bid of $492/dry ton. Alexander submitted a bid of $550/dry ton. In 2010, USALCO submitted a winning bid of $436.42/dry ton in the Village of Northbrook. General Chemical submitted a bid of $492/dry ton. Alexander submitted a bid of $535/dry ton. In 2011, USALCO submitted a winning bid of $484.85/dry ton in the Village of Northbrook. General Chemical submitted a bid of $524/dry ton. USALCO secured Alum contracts because of the collusive, inflated bids submitted by General Chemical.

**City of Elgin**

76.     In 2009 in the City of Elgin, General Chemical submitted a winning bid of $343.37/dry ton. USALCO submitted a bid for $445/dry ton. In 2011 in the City of Elgin, USALCO submitted a winning bid for $379.38/dry ton. Thatcher Co. of Montana submitted a bid for $383.51/dry ton. General Chemical submitted a bid for $421.33/dry ton. General Chemical secured Alum contracts because of the collusive, inflated bids submitted by USALCO.

45

FILED DATE: 9/27/2018 12:02 AM   2016L011383

### City of Marion

77.     In 2007 in the City of Marion, General Chemical submitted a winning bid for $269.50/dry ton. USALCO submitted a bid for $288.43/dry ton.  In 2008 in the City of Marion, General Chemical submitted a winning bid for $479.50/dry ton. USALCO submitted a bid for $620.32/dry ton. General Chemical secured Alum contracts because of the collusive, inflated bids submitted by USALCO.

### Rend Lake Conservancy District

78.     In 2007 in the Rend Lake Conservancy District, General Chemical submitted a winning bid for $224/dry ton. C&S Chemicals, Inc. submitted a bid for $292/dry ton. In 2008 in the Rend Lake Conservancy District, C&S Chemicals submitted a winning bid for $327/dry ton. General Chemical submitted a bid of $393.50/dry ton. In 2009 in the Rend Lake Conservancy District, General Chemical submitted a winning bid of $439/dry ton. USALCO submitted a bid for $594.28/dry ton. GEO Specialty Chemicals submitted a bid for $652.40/dry ton. In 2010 in the Rend Lake Conservancy District, General Chemical submitted a winning bid for $400/dry ton. Thatcher Co. of Montana submitted a bid for $483/dry ton. USALCO submitted a bid for $586.60/dry ton. In 2011 in the Rend Lake Conservancy District, General Chemical submitted a winning bid of $400/dry ton. USALCO submitted a bid of $618.20/dry ton. Rend Lake Conservancy District paid inflated prices for Alum and General Chemical and C&S secured Alum contracts due to collusive, inflated bids submitted by Defendants.

### City of Waukegan

79.     In the City of Waukegan in 2009, USALCO submitted a winning bid of $465.75/dry ton. General Chemical submitted a bid for $510/dry ton. In the City of Waukegan in 2011, USALCO submitted a winning bid of $389.87/dry ton. Thatcher Co. of Montana submitted

FILED DATE: 9/27/2018 12:02 AM   2016L011383

a bid of $456.69/dry ton. General Chemical submitted a bid of $510/dry ton. USALCO secured Alum contracts because of the collusive, inflated bids submitted by General Chemical.  This also demonstrates how the price in Waukegan had risen dramatically in just a few years due to the conspiracy as the winning bids for Alum contracts in 2005 and 2006 were $118.90/dry ton and $136/dry ton respectively.

### City of West Chicago

80.     In 2011 in the City of West Chicago, USALCO submitted a winning bid for $427.24/dry ton. Pristine Water Solutions Inc. submitted a bid for $656.67/dry ton. General Chemical submitted a bid for $514/dry ton. USALCO secured Alum contracts because of the collusive, inflated bid submitted by General Chemical.

### City of Woodstock

81.     In 2007 in the City of Woodstock, USALCO submitted a winning bid for $244.10/dry ton. General Chemical submitted a bid for $285.49/dry ton. In 2008 in the City of Woodstock, USALCO submitted a winning bid for $453.73/dry ton. General Chemical submitted a bid for $510/dry ton. In 2009 in the City of Woodstock, USALCO submitted a winning bid for $455.83/dry ton. Delta Chemical Corporation submitted a bid for $520/dry ton. General Chemical submitted a bid for $510/dry ton. In 2010 in the City of Woodstock, USALCO submitted a winning bid for $462.96/dry ton. General Chemical submitted a bid for $510/dry ton. In 2011 in the City of Woodstock, USALCO submitted a winning bid for $493.76/dry ton. General Chemical submitted a bid for $510/dry ton. USALCO secured Alum contracts because of the collusive, inflated bid submitted by General Chemical and Delta.

### City of Vandalia

82.     In the City of Vandalia in 2007, G.S. Robins & Co. submitted a winning bid for $222.47/dry ton. Univar USA Inc. submitted a bid for $230/dry ton. Brenntag submitted a bid for

FILED DATE: 9/27/2018 12:02 AM   2016L011383

$230.93/dry ton. General Chemical submitted a bid for $272/dry ton. USALCO submitted a bid for $230.54/dry ton. In the City of Vandalia in 2009, G.S. Robins & Co. submitted a winning bid for $428.86/dry ton. Brenntag submitted a bid for $443.30/dry ton. General Chemical submitted a bid for $475/dry ton. DPC Industries submitted a bid for $1,134/dry ton. GEO Specialty Chemicals submitted a bid for $478/dry ton. Hawkins, Inc. submitted a bid for $647.42/dry ton. In the City of Vandalia in 2010, G.S. Robins & Co. submitted a winning bid for $452.50/dry ton. General Chemical submitted a bid for $465/dry ton. GEO Specialty Chemicals submitted a bid for $512.10/dry ton. USALCO submitted a bid for $606.79/dry ton. Univar USA Inc. submitted a bid for $454.65/dry ton. In the City of Vandalia in 2011, G.S. Robins & Co. submitted a winning bid for $488/dry ton. General Chemical submitted a bid for $490/dry ton. GEO Specialty Chemicals submitted a bid for $547.10/dry ton. USALCO submitted a bid for $610.42/dry ton. Vandalia paid an inflated price for Alum even when non-defendants won the contract as Thatcher's inflated price was lower than the collusive, inflated bids submitted by Defendants.

### *Agreement to Have Others Submit Bids in Illinois in Furtherance of the Conspiracy*

83.      In many instances, Defendants who had supplied Alum customers in Illinois and were capable of providing Alum to customers agreed to allow other conspirators to submit bids and intentionally refrained from submitting bids for Alum contracts in certain Illinois municipalities and entities as part of the conspiratorial agreement to stay away from the territory of a co-conspirator to maximize the chances that the co-conspirator would achieve a winning bid. This agreement caused false certifications, falsely claiming that the there was no bid-rigging or collusion involved in the bidding process, to be submitted to Illinois municipalities and entities in in order to secure Alum contracts on a fraudulent basis. Illustrative examples are included below of instances in which Defendants stayed away and refrained from bidding on contracts that they otherwise would have bid upon in a competitive environment. This resulted in Illinois

FILED DATE: 9/27/2018 12:02 AM   2016L011383

municipalities and entities, including Chicago, paying inflated prices for Alum contracts, which would have been lower had there been an authentic, *bona fide*, competitive bidding process in which all viable competitors participated. As shown above and below, Defendants General Chemical, USALCO, and C&S had all won and supplied contracts for Alum in Illinois, and thus were capable of supplying the municipalities and entities listed below with Alum, including Chicago. Moreover, GEO has refrained from submitting Alum bids in Illinois municipalities, including Chicago, in furtherance of the conspiracy even though GEO is capable of supplying Alum to the Illinois municipalities and entities (including Chicago) in the bids described below and has supplied Alum to Illinois municipalities and entities: in 2014, GEO won the Alum contract in Taylorville, Illinois, and supplied that contract, and could supply other Illinois municipalities and entities from its Counce, Tennessee plant. Moreover, as stated above, Delta owned an Alum plant located in the Midwest and thus was capable of supplying Illinois municipalities and entities, including Chicago, due to the location of this Alum facility. In the instances in which these Defendants did not bid on the contracts below, they were doing so as part of the conspiracy to purposefully stay away from certain bids as part of the anti-competitive scheme, allowing co-conspirators to win the contracts at inflated prices per the conspiratorial arrangement. As outlined at ¶¶ 39-45, the prices that were submitted by Defendants and paid by the Illinois municipalities and entities, as detailed below, were inflated above what a normal, fair price for Alum should have been, further demonstrating that these inflated prices were caused by the price-fixing conspiracy.

**City of Chicago**

84.     Specifically, Defendant USALCO, LLC ("USALCO") submitted bids to the City that offered liquid aluminum sulfate at prices far above the fair market price.  In 2009 in Chicago, USALCO submitted a winning bid for $383.67/dry ton. This was later modified in

2011 to $342.50/dry ton. In 2009, McClendon submitted a preliminary bid for $235/dry ton.

McClendon is an authorized distributor of liquid aluminum sulfate manufactured by General

Chemical. But for the conspiracy, other Defendants would have submitted bids for this contract,

and Chicago would have paid less for the Alum contract rather than a price that was inflated due

to the conspiracy and lack of competitive bidding. The other Defendants for their part, did not

compete for liquid aluminum sulfate contracts with the City because of their agreement to stay

away from the historical customers of their ostensible competitors. General Chemical, for

example, could have supplied the City of Chicago from Alum plants in Indianapolis, East St.

Louis, and Menasha, Wisconsin, at a much lower price. Additionally, McClendon submitted a

bid in 2009 for $235/dry ton, but subsequently withdrew the bid, allowing USALCO to win the

contract for $383.67. McClendon is an authorized distributor of liquid aluminum sulfate

manufactured by General Chemical, and on information and belief, the bid of $235/dry ton was

likely withdrawn at the direction of General Chemical in order to maintain the anti-competitive

scheme and allow USALCO to win the contract at an inflated price. Prior to USALCO winning

the Alum contract for Chicago in 2009, Azteca Supply Co. provided Alum to Chicago with a

winning bid of $150.13/dry ton, modifying the price to $189.13/dry ton in 2006. The $150/dry

ton amount represents a baseline price that likely represents a fair Alum price that Chicago

should have been paying throughout the period from roughly 2005 to 2011, instead of the

inflated prices it paid to USALCO.

**City of Salem**

85.     In the City of Salem in 2007, defendant General Chemical submitted a bid for

$250.00/dry ton, and non-defendant G. S. Robins and Co. submitted a bid for $243.00/dry ton

with the winning bid being awarded to G. S. Robins and Co. But for the conspiracy, other

Defendants would have submitted bids for this contract, and Salem would have paid less for the

FILED DATE: 9/27/2018 12:02 AM   2016L011383

Alum contract rather than a price that was inflated due to the conspiracy and lack of competitive bidding.

86.     In the City of Salem in 2008, defendant General Chemical submitted a bid for $375.00/dry ton, and non-defendant G.S. Robins & Co. submitted a bid for $349.00/dry ton with the winning bid being awarded to G.S. Robins & Co. But for the conspiracy, other Defendants would have submitted bids for this contract, and Salem would have paid less for the Alum contract rather than a price that was inflated due to the conspiracy and lack of competitive bidding.

87.     In the City of Salem in 2009, defendant General Chemical submitted a bid for $504.00/dry ton, non-defendant Univar USA submitted a bid for $461.68/ dry ton, non-defendant Brenntag Mid-South, Inc. submitted a bid for 471.18/dry ton, and non-defendant G.S. Robins & Co. submitted a bid for $464.00/dry ton with the winning bid being awarded to Univar USA. But for the conspiracy, other Defendants would have submitted bids for this contract, and Salem would have paid less for the Alum contract rather than a price that was inflated due to the conspiracy and lack of competitive bidding.

88.     In the City of Salem in 2010, defendant General Chemical submitted a bid for $500.00/dry ton. G. S. Robins & Co. submitted a bid for $463.00/dry ton with the winning bid being awarded to G. S. Robins & Co.  But for the conspiracy, other Defendants would have submitted bids for this contract, and Salem would have paid less for the Alum contract rather than a price that was inflated due to the conspiracy and lack of competitive bidding.

89.     In the City of Salem in 2011, defendant General Chemical submitted a bid for $532.00/dry ton. G. S. Robins & Co. submitted a bid for $495.00/dry ton with the winning bid being awarded to G. S. Robins & Co. But for the conspiracy, other Defendants would have submitted bids for this contract, and Salem would have paid less for the Alum contract rather

FILED DATE: 9/27/2018 12:02 AM   2016L011383

than a price that was inflated due to the conspiracy and lack of competitive bidding.

### City of Carlinville

90.     In the City of Carlinville in 2008, G.S. Robins & Company submitted a winning bid for $281/dry ton. General Chemical submitted a bid for $293/dry ton. In the City of Carlinville in 2009, G.S. Robins & Company submitted a winning bid for $467/dry ton. General Chemical submitted a bid for $495/dry ton. In the City of Carlinville in 2010, G.S. Robins & Company submitted a winning bid for $467/dry ton. Brenntag submitted a bid for $486.50/dry ton. General Chemical submitted a bid for $505/dry ton.  In the City of Carlinville in 2011, G.S. Robins & Company submitted a winning bid for $492/dry ton. General Chemical submitted a bid for $505/dry ton. But for the conspiracy, other Defendants would have submitted bids for these contracts, and Carlinville would have paid less for the Alum contracts rather than prices that were inflated due to the conspiracy and lack of competitive bidding.

### City of Centralia

91.     In the City of Centralia in 2008, DSS Chemical submitted a winning bid for $.110968/lb. ($221.94/dry ton), Brenntag submitted a bid for $.242/lb. ($484/dry ton), G.S. Robins Co. submitted a bid for $.12/lb. ($240/dry ton), and GEO Specialty Chemicals, Inc. submitted a bid for $.26075/lb. ($521.5/dry ton). In the City of Centralia in 2009, Brenntag submitted a winning bid for $.10597/lb. ($211.94/dry ton), Univar USA submitted a bid for $.22/lb. ($440/dry ton),  G.S. Robins & Co. submitted a bid for $.118/lb. ($236/dry ton), and GEO Specialty Chemicals, Inc. submitted a bid for $.26075/lb. ($521.5/dry ton), DSS Chemical submitted a bid for $.1436/lb. ($287.2/dry ton), and Hawkins, Inc. submitted a bid from $.122/lb. ($244/dry ton). In the City of Centralia in 2011, DSS Chemical submitted a winning bid for .10185/lb. ($203.7/dry ton), Hawkins Water Treatment Group submitted a bid for $.1035/lb. ($207/dry ton), GEO Specialty Chemicals, Inc. submitted a bid for $.1242/lb. ($248.4/dry ton),

FILED DATE: 9/27/2018 12:02 AM   2016L011383

G.S. Robins & Co. submitted a bid for $.154/lb. ($308/dry ton), and Brenntag Mid-South, Inc. submitted a bid for $.112/lb. ($224/dry ton). But for the conspiracy, other Defendants would have submitted bids for these contracts, and Centralia would have paid less for the Alum contracts rather than prices that were inflated due to the conspiracy and lack of competitive bidding.

### City of Charleston

92.     In the City of Charleston in 2007, General Chemical submitted a winning bid for $260/dry ton. But for the conspiracy, other Defendants would have submitted bids for this contract, and Charleston would have paid less for the Alum contracts rather than prices that were inflated due to the conspiracy and lack of competitive bidding.

### City of Collinsville

93.     In the City of Collinsville in 2006, General Chemical submitted a winning bid for $319/dry ton. In the City of Collinsville in 2008, General Chemical submitted a winning bid for $341/dry ton. In the City of Collinsville in 2009, General Chemical submitted a winning bid for $491/dry ton. But for the conspiracy, other Defendants would have submitted bids for these contracts, and Collinsville would have paid less for the Alum contracts rather than prices that were inflated due to the conspiracy and lack of competitive bidding.

### City of Crystal Lake

94.     In the City of Crystal Lake in 2006, General Chemical submitted a winning bid for $283/dry ton. Alexander submitted a bid for $320/dry ton. But for the conspiracy, other Defendants would have submitted bids for this contract, and Crystal Lake would have paid less for the Alum contract rather than a price that was inflated due to the conspiracy and lack of competitive bidding.

### City of Fairfield

53

FILED DATE: 9/27/2018 12:02 AM   2016L011383

95.     In 2007, General Chemical submitted a winning bid for $259.70/dry ton in the City of Fairfield. Brenntag submitted a bid for $312.03/dry ton. In 2008, General Chemical submitted a winning bid of $379.70/dry ton in the City of Fairfield. In 2009, General Chemical submitted a winning bid of $454.70/dry ton in the City of Fairfield. In 2010, General Chemical submitted a winning bid of $428.70/dry ton in the City of Fairfield. In 2011, General Chemical submitted a winning bid of $460.70/dry ton in the City of Fairfield. But for the conspiracy, other Defendants would have submitted bids for these contracts, and Fairfield would have paid less for the Alum contracts rather than prices that were inflated due to the conspiracy and lack of competitive bidding.

### Town of Normal

96.     In 2010, USALCO submitted a winning bid of $409.07/dry ton in the Town of Normal. But for the conspiracy, other Defendants would have submitted bids for this contract, and Normal would have paid less for the Alum contract rather than a price that was inflated due to the conspiracy and lack of competitive bidding.

### City of Marion

97.     In 2009 in the City of Marion, General Chemical submitted a winning bid for $479.50/dry ton. But for the conspiracy, other Defendants would have submitted bids for this contract, and Marion would have paid less for the Alum contract rather than a price that was inflated due to the conspiracy and lack of competitive bidding.

### City of Waukegan

98.     In the City of Waukegan in 2010, Thatcher Co. of Montana submitted a winning bid for $394.44/dry ton. General Chemical submitted a bid for $510/dry ton. But for the conspiracy, other Defendants would have submitted bids for this contract, and Waukegan would

FILED DATE: 9/27/2018 12:02 AM   2016L011383

have paid less for the Alum contract rather than a price that was inflated due to the conspiracy and lack of competitive bidding.  This also demonstrates how the price in Waukegan had risen dramatically in just a few years due to the conspiracy as the winning bids for Alum contracts in 2005 and 2006 were $118.90/dry ton and $136/dry ton respectively.

### City of West Chicago

99.    In 2010 in the City of West Chicago, USALCO submitted a winning bid for $395.88/dry ton. Thatcher Co. of Montana submitted a bid of $469.63/dry ton.  But for the conspiracy, other Defendants would have submitted bids for this contract, and Waukegan would have paid less for the Alum contract rather than a price that was inflated due to the conspiracy and lack of competitive bidding.

### F.  False Representations

100.    In submitting bids for and securing liquid aluminum sulfate contracts with the City of Chicago, USALCO, LLC ("USALCO") made material misstatements by certifying that it had not engaged in bid-rigging, bid-rotation, price-fixing, or any other activity in restraint of freedom of competition, when, in fact, it had engaged in these activities in the course of securing the liquid aluminum sulfate contracts with Chicago by conspiring to artificially inflate bids for the liquid aluminum sulfate contracts with Chicago such that USALCO would have the lowest bid and win the contracts, and entering into a conspiracy in which Defendants did not compete for liquid aluminum sulfate contracts with the City because of their agreement to stay away from the historical customers of their ostensible competitor, USALCO.  The false certifications submitted to the Illinois municipalities and entities were necessary to secure liquid aluminum sulfate contracts with these municipalities.

FILED DATE: 9/27/2018 12:02 AM 2016L011383

101.    For example, the Alum contract, entered from June 1, 2009 to May 31, 2012 between USALCO and the City of Chicago, contains the following false certifications (See Exhibit 4):

2.43. CONTRACTOR CERTIFICATION
**The Contractor or each joint venture partner, if applicable, must complete the appropriate subsections in the attached Economic Disclosure Statement and Affidavit (the Affidavit) under: Certification By Applicant, which certifies that the Contractor or each joint venture partner, its agents, employees, officers and any subcontractors** (a) **have not been** engaged in or been convicted of bribery or attempted bribery of a public officer or employee of the City of Chicago, the State of Illinois, any agency of the federal government or any state or local government in the United States or **engaged in or been convicted of bid-rigging or bid-rotation activities as defined in this section as required by the Illinois Criminal Code**; (b) do not owe any debts to the State of Illinois, in accordance with 65 ILCS 5/11-42.1-1 and (c) are not presently debarred or suspended: Certification Regarding Environmental Compliance; Certification Regarding Ethics and Inspector General; and Certification Regarding Court-Ordered Child Support Compliance. (See Exhibit 4 at pp. 17-18) (emphasis added)

17. PROPOSAL TO BE EXECUTED BY A CORPORATION

The undersigned, hereby acknowledges having received Specification No. 72762 containing a full set of Contract Documents, including, but not limited to, 1) General Conditions, 2) Special Conditions, 3) Contract Plans or Drawings (if applicable) 4) Detailed Specifications or Scope of Services, Evaluation/Selection Criteria and Submittal Requirements (If RFP/LRFQ), 5) Proposal Pages, 6) Certifications and 7) Addenda Nos. (none unless indicated here) _#1_____, and affirms that the corporation shall be bound by all the terms and conditions contained in the Contract Documents, regardless of whether a complete set thereof is attached to this proposal, except only to the extent that the corporation has taken express written exception thereto in the sections of this specification designated for that purpose. **Further, the undersigned being duly sworn deposes and says on oath** that no disclosures of ownership interests have been withheld and the information provided therein to the best of its knowledge is current and **the undersigned has not entered into any agreement with any other bidder (proposer) or prospective bidder (proposer) or with any other person, firm or corporation relating to the price named in this proposal or any other proposal, nor any agreement or arrangement under which any act or omission in restraining of free competition among bidders (proposers) and has not disclosed to any person, firm or corporation the terms of this bid (proposal) or the price named herein.** (See Exhibit 4 at p. 79) (emphasis added)

102.    Additionally, all bidders for the 2009 Chicago contract (including USALCO), had to submit the following certification:

FILED DATE: 9/27/2018 12:02 AM   2016L011383

Neither the Disclosing Party, nor any Applicable Party, nor any Affiliated Entity of either the Disclosing Party or any Applicable Party nor any Agents have, during the five years before the date this EDS is signed, or, with respect to an Applicable Party, an Affiliated Entity, or an Affiliated Entity of an Applicable Party during the five years before the date of such Applicable Party's or Affiliated Entity's contract or engagement in connection with the Matter:
a. bribed or attempted to bribe, or been convicted or adjudged guilty of bribery or attempting to bribe, a public officer or employee of the City, the State of Illinois, or any agency of the federal government or of any state or local government in the United States of America, in that officer's or employee's official capacity;
b. agreed or colluded with other bidders or prospective bidders, or been a party to any such agreement, or been convicted or adjudged guilty of agreement or collusion among bidders or prospective bidders, in restraint of freedom of competition by agreement to bid a fixed price or otherwise; or
c. made an admission of such conduct described in a. or b. above that is a matter of record, but have not been prosecuted for such conduct….

*See* Exhibit 5 at page 72 of "USALCO Certifications," signed by USALCO in 2009.

103.    The liquid aluminum sulfate contract between USALCO and the Village of Wilmette contains the following false certifications, which are representative of the certifications in the counterpart contracts and agreements between Defendants and the other Illinois municipalities and entities (See Exhibit 6 at p. 28):

FURTHER, IN SUBMITTING THIS BID PROPOSAL BIDDER CERTIFIES THAT:
1. the prices in this bid proposal have been arrived at independently, without consultation, communication, or agreement, for the purpose of restricting competition, as to any matter relating to such prices with any other bidder or with any competitor;
2. unless otherwise required by law, the prices which have been quoted in the bid have not
knowingly been disclosed by Bidder, prior to opening, directly or indirectly to any other bidder or to any competitor;
3. this bid proposal has not been made in the interest of or on behalf of any undisclosed person, firm or corporation and is not submitted in conformity with any agreement or rules of any group, association, organization or corporation; and,
4. has not directly or indirectly induced or solicited any other bidder to submit a false or sham bid; has not solicited or induced any person, firm or corporation to bid or refrain from bidding; and has not sought by collusion to obtain for Itself any advantage over any other bidder or over the Village.

104.    Numerous Defendants, including USALCO, signed the following certification in submitting bids and securing contracts with the Village of Wilmette between 2005 and 2017:

The BIDDER certifies that the prices contained in the proposal have been established without knowledge of any other proposal on this item and the BIDDER has not colluded, conspired, connived or agreed, directly or indirectly, with any other BIDDER, VILLAGE employee or any person, to fix the bid price submitted by the BIDDER or any other BIDDER, and agrees to also certifies that the BIDDER, its agents, owners, officers or employees have not been convicted or pleaded nolo contendere to bribery, bid rigging, price fixing or defrauding a unit of government in violation of Section 33E-3 or 33-4 of the State of Illinois Criminal Code.

*See, e.g.*, Exhibit 7, Contract No. 08-M-0019 at pg. 11, signature of USALCO on pg. 14.

105.    In course of making bids and securing contracts for Alum in Decatur, numerous

Defendants signed the following certification, including General Chemical in 2008, 2009, and

2010, GEO Specialty Chemicals, Inc. from 2007-2012, and USALCO from 2007-2010:

The price or prices quoted in the attached bid are fair and proper and are not tainted by any collusion, conspiracy, connivance or unlawful agreement on the part of the bidder or any of its agents, representatives, owners, employees, or parties in interest, including this affiant.

*See, e.g.* Ex. 8, GEO for 0809-38 from 2009--Non-Collusion Affidavit at p. 25; Ex. 9, GENERAL CHEMICAL for 0708-40 from 2008--Non-Collusion Affidavit at p. 23; and Ex. 10, C&S for 0708-40 from 2008--Non-Collusion Affidavit at p. 4.

106.    In the course of making bids and securing contracts for Alum, in Evanston,

numerous Defendants, including General Chemical and Chemtrade, signed the following

certification between 2010 and the present:

It is agreed that no person(s) or company other than the firm listed below or as otherwise indicated hereinafter has any interest whatsoever in this bid or the Contract that may be entered into as a result thereof, and that in all respects the bid is legal and fair, submitted in good faith, without collusion or fraud.

*See* Exhibit 11,  BID 10-81 at Section D. 1.04, signed by General Chemical in 2009

107.    Additional examples of false certifications made by Defendants in the course of

bidding on and securing Alum contracts include:

**Carbondale**

Carbondale requires its bidders to sign anti-collusion statements certifying that the signed bidder "has not divulged to, discussed or compared his bid with other bidders and has not

58

colluded with any other bidder or parties to bid whatsoever."

### Collinsville

"In submitting this proposal, the undersigned declares that the only persons or parties interested in the proposal as principals are those named herein and that the proposal is made without collusion with any other person, firm or corporation."

### Woodstock

1) The prices in the Bid have been arrived at independently, without consultation, communication, or agreement, for the purposes of restricting competition, as to any matter relating to such prices with any other Bidder or with any competitor.
2) Unless otherwise required by law, the prices which have been quoted in the Bid have not knowingly been disclosed by the Bidder, prior to opening, directly or indirectly to any other Bidder or to any competitor.
3) No attempt has been made or will be made by the Bidder to induce any other person or firm to submit or not submit a bid for the purpose of restricting competition.

108.    The certifications listed above at paragraphs 101 to 107 are simply illustrative examples of the false certifications made by Defendants in order to secure Alum contracts. Based upon Relator's knowledge and experience with the bidding process and Alum contracts and bid documents, Relator has knowledge that substantially similar or identical certifications were made by Defendants in making bids and securing Alum contracts with all of the named municipalities and entities on whose behalf this suit is brought.

109.    All Defendants, by participating in the conspiracy, directly submitted false certifications in the course of submitting collusive bids and/or securing Alum contracts, or conspired to submit false certifications by participating in the conspiracy, which involved the submission of certifications falsely attesting that there was no collusion or anti-competitive agreements made in conjunction with the Alum bidding process.

110.    If the municipalities and entities on whose behalf this suit is brought had known that the certifications were false, Defendants would never have secured the Alum contracts with these municipalities and entities, let alone securing the contracts at prices that were artificially

FILED DATE: 9/27/2018 12:02 AM   2016L011383

inflated due to the anti-competitive scheme.

111.     The impact of the conspiracy and false representations continues to this day as the price paid by municipalities and entities in the State of Illinois for liquid aluminum sulfate is vastly inflated above the fair market price. For instance, upon information and belief based upon Relator's knowledge and experience in the industry and relevant bid documents, (which he reviewed and had access to pursuant to his position and job duties at General Chemical and Chemtrade), the current price paid by municipalities and entities in the State of Illinois for liquid aluminum sulfate is, at minimum, $250 per dry ton above a proper fair market price as a direct result of the collusive activity and false representations. Additionally, the current price paid by the City of Chicago for liquid aluminum sulfate is, at minimum, $100 per dry ton above a proper fair market price as a direct result of the collusive activity and false representations

**Count I – Chicago False Claims Act, Municipal Code of Chicago Chapter 1-22-020(1) and 1-22-020(2)**

112.     Relator incorporates each paragraph of this Complaint as if fully set forth herein.

113.     As described above, Defendants knowingly presented, or caused to be presented, to an official or employee of the City of Chicago, false or fraudulent claims for payment or approval, in violation of Municipal Code of Chicago Chapter 1-22-020(1).

114.     As described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the City of Chicago, in violation of Municipal Code of Chicago Chapter 1-22-020(2).

115.     As a result of these claims, the City of Chicago paid Defendants and suffered damages to be determined at trial.

**Count II – Chicago False Claims Act, Municipal Code of Chicago Chapter 1-22-020(3)**

Relator incorporates each paragraph of this Complaint as if fully set forth herein.

FILED DATE: 9/27/2018 12:02 AM  2016L011383

116.     Defendants conspired to defraud the City of Chicago by getting false or fraudulent claims allowed or paid, and/or conspired to commit a violation of Municipal Code of Chicago Chapter 1-22-020(1) or 1-22-020(2), in violation of Municipal Code of Chicago Chapter 1-22- 020(3).

117.     As a result of their acts or omissions, Defendants caused the City of Chicago to sustain damages in an amount to be determined at trial.

## Jury Trial Demanded

The City of Chicago, on the relation of Lawrence McShane, hereby demands trial by jury on all issues so triable.

WHEREFORE, Relator Lawrence McShane, respectfully requests that the Court enter judgment in his favor and in favor of the City of Chicago against Defendants, awarding treble damages, penalties, and all appropriate relief for violations of the Chicago False Claims Act, and awarding relator Lawrence McShane, thirty percent of the government's recovery as well as costs and attorney fees.

Respectfully submitted,

Frank Newell
*Counsel for Plaintiff Relator*

Mike Kanovitz
Frank Newell
Julia Rickert
LOEVY & LOEVY
311 N Aberdeen St., 3rd Fl.
Chicago, IL 60607
Ph: 312-243-5900
Fax: 312-243-5902
mike@loevy.com
frank@loevy.com
Julia@loevy.com

Louis Clark
Tom Devine
Karen Gray
Government Accountability Project
1612 K Street NW, Suite 1100
Washington, DC 20006
Ph: (202) 457-0034
*Attorneys for Relator*

FILED DATE: 9/27/2018 12:02 AM   2016L011383

*Attorneys for Relator*

September 26, 2018