EXHIBIT 4

## IN THE CIRCUIT COURT OF NORFOLK, VIRGINIA

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA,<br>*ex rel.* LAWRENCE MCSHANE<br><br>Plaintiff,<br><br>v.<br><br>FRANK REICHL, *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)  CL17000944-00<br>)<br>)  Jury Trial Demanded<br>)<br>)  Honorable Judge Everett A. Martin, Jr.<br>)<br>)<br>)<br>) |

---

## THIRD AMENDED COMPLAINT[1]

Now comes the COMMONWEALTH OF VIRGINIA, on the relation of Lawrence McShane, directly as Plaintiff, and complains in this action under the Virginia Fraud Virginia Fraud Against Taxpayers Act ("VFATA"), Virginia Code §§ 8.01-216.1–216.19, of Defendants Frank A. Reichl, Vincent J. Opalewski, Amita Gupta, Alex Avraamides, Bill Redmond, General Chemical LLC, General Chemical Corporation, General Chemical Performance Products, LLC, GenTek, Inc., Chemtrade Chemicals Corporation, Chemtrade Chemicals US LLC, Chemtrade Solutions, LLC, Chemtrade Logistics Income Fund, Chemtrade Logistics, Inc., GEO Specialty Chemicals, Inc., C&S Chemicals, Inc., USALCO, LLC, Delta Chemical Corporation, Alchem Inc., Unknown Additional Defendants, and Unknown Additional Co-Conspirators (collectively, "Defendants"), as follows:

---

[1]     This complaint is actually only Relator's second substantive amendment to his original complaint. Relator filed a corrected complaint that contained no substantive amendments shortly after filing his original complaint, and the corrected complaint has been termed an "amended complaint." For that reason, this complaint is styled Relator's third amended complaint.

**Introduction**

1.      This VFATA action concerns a fraud scheme built upon an antitrust scheme. Defendants are manufacturers and sellers of liquid aluminum sulfate ("alum"), a crucial water treatment chemical that municipalities and water authorities use to ensure safe drinking water for their residents. For years, Defendants conspired to keep the price of alum high in Virginia and elsewhere by secretly allocating customers between them and rigging the bids they submitted for alum contracts. Defendants' scheme crossed the line from standard antitrust into fraud when they falsely certified to their governmental customers—both explicitly and implicitly—that the prices they offered were untainted by collusion.

2.      Plaintiff-Relator Lawrence McShane ("Relator" or "McShane") joined General Chemical in 2008 as a Business Manager in the company's water chemicals division. He believed he was beginning a rewarding phase of his career that would utilize his degrees in chemical engineering and business. But McShane had not been at General Chemical long before he learned of the company's anticompetitive conduct in its sales of alum. His employer had no interest in competing in a free market when it came to alum. Instead, the company had a longstanding agreement with many of its ostensible competitors—an agreement that was in effect nationwide—to inflate the price of alum and rig their bids for alum sales contracts. This arrangement was no secret at General Chemical; it was discussed openly in McShane's presence among his superiors.

3.      Defendants' anticompetitive practices included staying away from each other's historical customers in some instances and, in other instances, rigging the bids for contracts to sell alum by submitting "throwaway" bids—meaning bids that were not intended to win—to give governmental purchasers the false appearance of competition, lulling them into the false belief that they were getting a fair price on alum for their citizens. The conspirators also utilized distributor relationships to disguise which companies stood to gain from alum sales and to

increase the false appearance of competition in the alum market.

4.      The leaders of this scheme to obtain taxpayer money through fraud were two of the largest alum producers in the country: Defendants General Chemical and GEO Specialty Chemicals, Inc. These companies ultimately were joined in their scheme by several smaller producers. Although other alum sellers also were operating in the market, Defendants collectively controlled such a substantial share of the alum market that their conspiracy impacted the cost of alum—meaning the cost of clean water—for each of their governmental customers and those customers' taxpayers. General Chemical alone controlled over 50% of the alum market, and even some of the non-Defendant alum sellers were actually just distributors for Defendants.

5.      McShane recognized the illegality of his employer's conspiracy with its ostensible competitors to inflate the price of alum. He disapproved of this illegal scheme on moral and ethical grounds, but Relator naturally also wanted to avoid facing criminal or civil liability himself. Motivated by his sense of justice and his understandable desire for self-preservation, McShane confidentially reported the scheme to the Department of Justice in 2009 and continued to provide valuable information to federal investigators for more than two years.

6.      Upon information and belief, McShane was the first source to report Defendants' misconduct to any governmental authority. Without his decision to inform the government of Defendants' criminality, this widespread fraud would likely still be continuing today. But his decision to come forward ultimately cost him his job and temporarily derailed his career.

7.      Certain Defendants have now been criminally prosecuted by the United States Department of Justice for the antitrust component of this scheme and have pleaded guilty. Additionally, Defendants have settled federal class action and individual lawsuits brought against them for violations of federal and state antitrust law in connection with their alum scheme. The resolution of these criminal and civil cases shows Defendants' culpability, but those cases did

not redress the fraud component of Defendants' scheme, nor did those cases provide the Commonwealth with the recompense to which it is entitled under VFATA for fraud committed in this state against governmental entities.

8.      Defendants defrauded the Commonwealth as part of their alum scheme by targeting its political subdivisions, including but not limited to Augusta County Service Authority, Caroline County, City of Chesapeake, City of Covington, City of Danville, City of Emporia, City of Harrisonburg, City of Lexington, City of Martinsville, City of Portsmouth, City of Suffolk, City of Williamsburg, County of Spotsylvania, Greensville County Water and Sewer Authority, Town of Broadway, and Town of Culpeper.[2]

9.      Defendants' systematic pattern of fraud against governmental purchasers of alum throughout the Commonwealth of Virginia and other states cheated the governmental purchasers—and by extension taxpayers—out of millions of dollars. Because Defendants have yet to provide the Commonwealth of Virginia with recompense for the fraud against taxpayers that they committed in this state, McShane, acting on behalf of himself and the Commonwealth, seeks to enforce this state's laws against Defendants' fraud.

## Parties

*Lawrence McShane*

10.     Relator Lawrence McShane has an undergraduate degree in chemical engineering from Purdue University and a Master of Business Administration from the University of Texas (Austin). He currently works for a chemical company based in New Jersey that, fortunately,

---

[2]      In his initial complaint, Relator also alleged that Defendants had defrauded eight additional Virginia entities: City of Richmond, City of Newport News, City of Norfolk, City of Lynchburg, County of Chesterfield, County of Henrico, Appomattox River Water Authority, and Rivanna Water & Sewer Authority. Since then, the Attorney General authorized these entities to pursue alternative remedies. Allegations regarding those entities remain relevant to the scheme Defendants perpetrated in Virginia, but Relator excludes those allegations here in compliance with the Court's Order directing Relator to refrain from including detailed allegations about those entities in this amended complaint.

4

abides by the law.

11.     McShane learned of Defendants' bid-rigging scheme as a result of his former position as Business Manager and Director of General Chemical and its successor Chemtrade, where he was employed for over seven years. He worked closely with Defendants Reichl, Opalewski, Gupta, and Avraamides, allowing him to gain first-hand insight into how the anticompetitive conspiracy alleged herein operated. He also worked closely with Lisa Brownlee, his fellow Business Manager whose territory covered Virginia, allowing him to see that the conspiracy was being implemented in Virginia and the rest of Brownlee's territory just as it was in his territory.

12.     Prior to bringing this suit and prior to any public disclosure, Relator McShane reported his concerns about collusion to the United States Department of Justice and the Federal Bureau of Investigation and worked with these agencies until a formal investigation was commenced in approximately 2011. The investigation focused on the market for inorganic coagulants, particularly, aluminum sulfate. The investigation focused especially on the scheme implemented by Directors and VP-level employees at General Chemical and Chemtrade in conjunction with their ostensible competitors in the alum market. Relator also provided his allegations and evidence to the Commonwealth of Virginia prior to filing suit, which materially added to any evidence that had been made public.

_Frank A. Reichl_

13.     Defendant Frank A. Reichl resides in Flanders, New Jersey. During the relevant timeframe, Reichl was actively involved with Defendants and co-conspirators in an illegal price-fixing and bid-rigging conspiracy. With the exception of the period from approximately July 2005 to approximately December 2006, Reichl occupied upper-level executive positions with Defendant General Chemical. In October 2015, Reichl agreed to enter a guilty plea for his role in the conspiracy described herein. As the Vice President for Marketing, Reichl was a key

coordinator of the conspiracy. The conspiracy was well underway before Relator arrived at

General Chemical in 2008, and Relator learned of the existence of the conspiracy through the

statements and actions of co-workers like Amita Gupta soon after his arrival. Alex Avraamides

worked at General Chemical and then moved to a position at GEO Specialty Chemicals, Inc. in

or about 2005, before Relator's arrival at General Chemical. The conspiracy was likely

underway at General Chemical no later than Avraamides's arrival at GEO, and likely earlier,

given reports within the office that Avraamides would meet with competitors in the General

Chemical parking lot while he was employed there. Reichl worked closely and was close friends

with Avraamides, who returned to General Chemical and furthered the conspiracy in his role as a

VP in or around mid-2009. Reichl was an early adopter of the conspiracy, and he and Amita

Gupta, Director of Water Chemicals for General Chemical, worked together closely. Reichl

guided Gupta in the development of the conspiracy and directed her activities in carrying it out,

and he was aware of the discussions that she regularly had with ostensible competitors in

furtherance of the conspiracy. Reichl allowed Gupta to run the conspiracy from day-to-day, but

he had direct input on larger bids. Moreover, Reichl had the expectation and knowledge that his

subordinates were engaging in the alum business in Virginia. Reichl's raises and bonuses were

tied to the performance of the alum business, and he could have received greater than 100% of

his target bonus based on the alum results. Relator worked with Reichl on a regular basis, and his

office was located in close physical proximity to Reichl's office.

*Vincent J. Opalewski*

14.     Defendant Vincent J. Opalewski is a resident of the United States. During the

relevant period, Opalewski was actively involved in a conspiracy with Defendants and other co-

conspirators involving illegal price-fixing and bid-rigging in the alum market. From 2000

through 2011, Opalewski occupied upper-level executive positions at Defendant General

Chemical, including holding the position of General Manager of the Sulfur Products business

group from 2000 to 2005, Vice President of Sales and Marketing from in or about 2005 to 2006, Vice President and General Manager from in or about 2006 to 2009, and President from in or about 2009 to 2011. On February 17, 2016, the United States indicted Opalewski for his participation in the price-fixing and bid-rigging of the sale of alum. As the General Manager of General Chemical, Opalewski was aware of the performance of the alum business. He was aware of the conspiracy and approved the actions and activities of both Gupta and Reichl. Opalewski knew Alex Avraamides from Avraamides's pre-2005 role at General Chemical, and Opalewski knew all of the individuals involved in the conspiracy well. Opalewski had a great deal to gain from the success of the alum business since he received large bonuses tied directly to the performance of alum. As Gupta was operating the conspiracy on a day-to-day basis under Reichl's direction, Opalewski was monitoring their progress. Opalewski provided input on the largest bids, and he had the expectation and knowledge that his subordinates would engage in the alum business in Virginia. Relator worked with Opalewski on a regular basis.

*Amita Gupta*

15.    Defendant Amita Gupta is a resident of the United States.  During the relevant period, Gupta held the position of Director of Marketing for Water Chemicals at Defendant General Chemical and directly supervised Relator. In this role, Gupta was responsible for the aluminum sulfate business in all of North America, including Virginia, and had responsibility for pricing and strategy. She knew and intended that her subordinates would engage in the alum business in Virginia. All pricing went through her and was monitored and approved by her, especially for bids. She personally directed the pricing strategies of the aluminum sulfate business managers who reported to her, including Relator and Lisa Brownlee (who managed the Water Chemicals business for Virginia, states in the Midwest, and other regions). Gupta was also responsible for the overall alum strategy in North America. Her compensation was tied to the success of the alum business, and her raises and bonuses were linked to the profitability of the

7

alum business. She could and did receive more than 100% of her target bonus based on the financial results of the business. Gupta was active in the conspiracy, and she was in direct contact with several competitors on a regular basis, including but not limited to Brian Steppig (of GEO), Alex Avraamides, Chino Garza (owner of Chameleon Industries, Inc.), and Randall Andrews (owner of Alchem, Inc.). From time to time, she discussed plans to stay away from certain customers and discussed actual bid amounts with each of these people.

*Alex Avraamides*

16.    Defendant Alex Avraamides is a resident of the United States.  Avraamides worked for General Chemical before moving to a position at GEO Specialty Chemicals, in or about 2005, before Relator's arrival at General Chemical. Avraamides then returned to General Chemical in mid-2009 as a Vice President. The antitrust and fraud conspiracy was likely underway at General Chemical no later than Avraamides's departure to GEO, and likely earlier given reports within the office that Avraamides would meet with competitors in the General Chemical parking lot during his first stint there. Defendant Reichl was friends with Avraamides and worked with him closely. Avraamides had a great deal to gain from the profitability of the alum business because he received very large bonuses tied directly to the performance of alum. Relator worked with Avraamides on a regular basis, and his office was located in close physical proximity to Avraamides's office.

*Bill Redmond*

17.    Defendant Bill Redmond is a resident of the United States. Redmond was the CEO of GenTek from the time Relator was hired in August 2008 through the sale to Chemtrade. Vince Opalewski, Alex Avraamides, Frank Reichl, and Amita Gupta all reported to Redmond while they were at General Chemical. While his subordinates actively participated with the other Defendants and other co-conspirators in an illegal price-fixing and bid-rigging conspiracy, Redmond knew or acted in reckless disregard or deliberate ignorance of the bid-rigging

8

conspiracy.

18.     Specifically, Redmond was aware of the dramatic increase in profitability of the alum business, which was a direct result of the conspiracy, and Redmond had the expectation and knowledge that his subordinates would engage in the alum business in Virginia. Redmond ratified and approved the conspiracy in multiple ways, including by failing to investigate or inquire about it despite being aware of it. Redmond would have been in charge of setting raises and bonuses and paying them out based on the performance of the alum business. Thus, he was willing to pay large bonuses for results that were a direct product of the conspiracy. Redmond also would have received significant bonuses himself tied to the alum business and its increased profitability due to the conspiracy. Relator worked with Redmond on a regular basis.

*General Chemical Defendants*

19.     Defendant General Chemical Corporation was a corporation operating under the laws of Delaware, with a principal place of business located at 90 East Halsey Road, Parsippany, New Jersey. General Chemical Corporation had alum manufacturing and distribution facilities throughout the United States and was one of the leading manufacturers and suppliers of water treatment chemicals, which included alum. During the relevant period, either directly or through subsidiaries and affiliates, General Chemical Corporation sold alum throughout the United States, including in Virginia. General Chemical Group, Inc. owned General Chemical Corporation until April 30, 1999, when it was spun off into a holding company that became known as GenTek, Inc. Defendant Chemtrade Logistics Income Fund, an entity based in Canada, came into possession of all of the business of General Chemical and its subsidiaries, including all of General Chemical's assets and liabilities, after an acquisition on January 23, 2014 ("Chemtrade Acquisition"). The United States Department of Justice has granted conditional amnesty to the General Chemical Corporation for its activities relating to the alum conspiracy, which means that General Chemical has admitted to participating in criminal anticompetitive

9

conduct with its ostensible competitors.

20.     Defendant General Chemical LLC was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 Halsey Road, Parsippany, New Jersey.

21.     Defendant General Chemical Performance Products LLC was a limited liability company operating under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey. During the relevant timeframe, either directly or through subsidiaries and affiliates, General Chemical Performance Products sold alum throughout the United States, including in Virginia. General Chemical Performance Products was sold in the Chemtrade Acquisition.

22.     Defendants General Chemical Corporation, General Chemical LLC, and General Chemical Performance Products, LLC, are referenced collectively herein as "General Chemical." During the relevant period, General Chemical gave full authorization to or ordered Reichl's, Opalewski's, Gupta's, Avraamides's, and Redmond's involvement in the conspiracy alleged in this complaint. General Chemical was able to supply alum anywhere in Virginia from its large plant in Hopewell, Virginia.

*GenTek, Inc.*

23.     Defendant GenTek, Inc. is a publicly-traded Delaware corporation, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey. From in or about 1999 until October 2009, General Chemical was a wholly owned and controlled subsidiary of GenTek. During the relevant period, GenTek, General Chemical's parent company, was fully aware of and authorized and ratified General Chemical's involvement in its illegal price-fixing and bid-rigging conspiracy as described herein. During the relevant timeframe, either directly or through subsidiaries and affiliates, GenTek sold alum throughout the United States.

24.     GenTek filed a voluntary Chapter 11 petition in the United States Bankruptcy

Court for the District of Delaware on or about October 11, 2002, including bankruptcy filings on behalf of subsidiaries such as General Chemical Corporation. As of October 7, 2003, GenTek and General Chemical Corporation were discharged from bankruptcy pursuant to a plan of reorganization. GenTek and General Chemical Corporation were involved in the conspiracy alleged herein throughout the relevant period through the activities of numerous GenTek and General Chemical senior executives. After being discharged from bankruptcy, GenTek and General Chemical participated in the conspiracy that is the subject of this case. GenTek and General Chemical's specific post-discharge actions undertaken in furthering the conspiracy are detailed herein and are consistent with the actions undertaken by all of the Defendants throughout the relevant period. This complaint seeks to recover damages from GenTek and General Chemical exclusively for GenTek's and General Chemical's post-discharge conduct and does not seek to violate any orders of the Bankruptcy Court. This complaint seeks damages from the remaining Defendants for any of GenTek and General Chemical's pre-discharge conspiratorial activities on the basis that all Defendants are subject to the doctrine of joint and several liability.

*Chemtrade Defendants*

25.     In approximately January 2014, Defendants Chemtrade Chemicals Corporation, Chemtrade Chemicals US LLC, Chemtrade Solutions, LLC, Chemtrade Logistics Income Fund, and Chemtrade Logistics Inc. (collectively, "Chemtrade") absorbed General Chemical, and assumed all rights and obligations of General Chemical in a transaction valued at roughly $860 million. As the legal successor in interest to General Chemical, Chemtrade assumed the liability for damages caused by General Chemical's participation in the conspiracy to fix prices and rig bids for Alum.

26.     Defendant Chemtrade Logistics Income Fund ("CLIF") is a limited-purpose trust that was established on July 11, 2001, pursuant to the laws of the Province of Ontario, Canada

with its principal place of business at Suite 300, 155 Gordon Baker Road, Toronto, Ontario M2H 3N5. As stated above, in 2014, CLIF completed the Chemtrade Acquisition and thus acquired the assets and liabilities of General Chemical and its subsidiaries. Consequently, CLIF bears financial responsibility for the pre-acquisition actions described herein and has accepted that it might be sued for such actions. Additionally, CLIF has acknowledged that GenTek has agreed to indemnify it, at least partially.

27.    Defendant Chemtrade Logistics Inc. is a publicly-traded Canadian corporation, with its principal places of business located at 90 East Halsey Road, Parsippany, New Jersey and Ontario, Canada. General Chemical became part of Chemtrade through the Chemtrade Acquisition in January 2014, with Chemtrade assuming all rights and obligations of General Chemical. As the legal successor-in-interest to General Chemical, Chemtrade is liable for damages caused by General Chemical's conspiratorial conduct to fix prices and rig bids.

28.    Defendant Chemtrade Solutions LLC, based in Parsippany, New Jersey, is a subsidiary of the Ontario-based Chemtrade Logistics Inc. Chemtrade Solutions LLC was Relator's employer. As the legal successor-in-interest to General Chemical, Chemtrade Solutions LLC is liable for damages caused by General Chemical's conspiratorial conduct to fix prices and rig bids.

29.    Defendant Chemtrade Chemicals Corporation is a Delaware corporation, with its principal place of business at 90 E. Halsey Road, Parsippany, New Jersey, and is a wholly owned and controlled subsidiary of Defendant Chemtrade Holding Partnership. It is a successor-in-interest to General Chemical.

30.    Defendant Chemtrade Chemicals US LLC is a limited liability company organized under Delaware law, with its principal place of business at 90 E. Halsey Road, Parsippany, New Jersey. It is a wholly owned and controlled subsidiary of Defendant Chemtrade Chemicals Corporation and a successor-in-interest to General Chemical.

12

*GEO Specialty Chemicals, Inc.*

31.     Defendant GEO Specialty Chemicals, Inc. ("GEO") is a privately-held Ohio corporation with its principal place of business located at 340 Mathers Road, Ambler, Pennsylvania. GEO Specialty manufactures, supplies, and markets specialty chemicals, which include water treatment chemicals, for customers in the United States and worldwide. GEO Specialty has water treatment chemical production facilities located in Alabama, Arkansas, Georgia, Louisiana, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, and Texas. During the relevant timeframe, either directly or through its subsidiaries and affiliates, GEO Specialty sold alum throughout the United States. At all times throughout the relevant period, GEO Specialty gave full authorization to or mandated Steppig's participation in the conspiracy alleged in this complaint. GEO was able to supply alum anywhere in Virginia from its plants in Plymouth, North Carolina and Baltimore, Maryland.

32.     GEO filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey on or about March 18, 2004. As of December 20, 2004, GEO was discharged from bankruptcy pursuant to a plan of reorganization. GEO took part in the conspiracy alleged herein throughout the relevant timeframe through the conduct of numerous GEO senior executives. After being discharged from bankruptcy, GEO confirmed its participation in the conspiracy, partly by continuing to engage in the actions described herein regarding alum. Specific post-discharge actions of GEO in furthering the conspiracy are consistent with the conduct undertaken by all of the Defendants and GEO throughout the relevant timeframe. Irrespective of whether GEO took part in the conspiracy during the relevant timeframe or joined and/or confirmed membership in the conspiracy immediately following its being discharged from bankruptcy, this complaint seeks to recover damages from GEO solely for GEO's post-discharge actions and does not seek to violate any orders of the Bankruptcy Court. However, pursuant to the law, the damages from GEO's post-discharge actions may include

damages throughout the relevant period. Additionally, this complaint seeks damages from the remaining Defendants for GEO's pre-discharge conspiratorial actions, and damages as to GEO Specialty are subject to the doctrine of joint and several liability.

33.     On June 16, 2016, GEO entered into a plea agreement with the Antitrust Division of the United States Department of Justice in which GEO Specialty entered a guilty plea in the United States District Court for the District of New Jersey to charges of violating 15 U.S.C., section 1 in conjunction with a conspiracy to rig bids and allocate customers for, and to fix the price of, liquid aluminum sulfate supplied to municipalities and pulp and paper manufacturers throughout the United States from at least as early as 1997 and continuing until in or about February 2011.

*C&S Chemicals, Inc.*

34.     Defendant C&S Chemicals, Inc. ("C&S") is a privately-held Pennsylvania corporation with its principal place of business located at 4180 Providence Road, Marietta, Georgia. C&S produces liquid aluminum sulfate. The company currently has six manufacturing facilities in Florida, Georgia, South Carolina, Illinois, and Minnesota. The plants in Greenwood and Darlington, South Carolina, were able to supply alum to anywhere in Virginia, but C&S purposely refrained from bidding on contracts in Virginia that the company could have supplied and that it otherwise would have bid on had there not been an anti-competitive conspiracy in effect.

*Delta Chemical Corporation*

35.     Defendant Delta Chemical Corporation ("Delta") was a Maryland-based producer of aluminum-based water and wastewater treatment chemicals such as liquid aluminum sulfates, sodium aluminates, and polyaluminum chlorides. Its products were sold to industrial and municipal clients, as well as to federal agencies such as the United States Army. On November 17, 2011, Delta Chemical Corporation and its distribution company, Delta Transport, Inc., were

14

acquired by USALCO, LLC. Delta owned an alum plant or plants located in Baltimore, Maryland, and thus was capable of supplying any Virginia municipality or entity with alum. Delta secured alum contracts in Virginia at inflated prices, submitted sham bids, and refrained from bidding on other contracts that it would have bid on if not for the conspiratorial arrangement.

*USALCO, LLC*

36.     Defendant USALCO, LLC ("USALCO") is a privately-held Maryland corporation with its principal place of business located at 2601 Cannery Avenue, Baltimore, Maryland. USALCO manufactures and distributes aluminum-based chemical products to industrial and municipal markets in North America. USALCO is also the successor to Defendant Delta Chemical, another alum producer. USALCO has manufacturing facilities located in Indiana, Louisiana, Maryland and Ohio. During the relevant timeframe, either directly or through its subsidiaries and affiliates, USALCO sold alum throughout the United States, including to Virginia municipalities. Prior to USALCO's 2011 acquisition of ostensible competitor Delta Chemical, the company would have supplied Virginia from a plant in Ohio. With the 2011 Delta acquisition, USALCO acquired a plant in Baltimore, Maryland, and began bidding more broadly in Virginia.

*Alchem Incorporated*

37.     Defendant Alchem Incorporated ("Alchem") is a privately-held industrial chemical producer with its principal places of business located at 2042 Buie Philadelphus Road, Red Springs, North Carolina 28377 and 8135 Red Road, Rockwell, NC 28138. Its products include various chemicals used for industrial, drinking, and wastewater treatment. Alchem was actively involved in the nationwide conspiracy. This included an agreement to stay away and allow General Chemical to win certain alum contracts. General Chemical partially acquired Alchem, Inc. in 2011. General Chemical did not take over Alchem's plant but instead acquired

15

Alchem to obtain Alchem's customer lists and to remove Alchem from the market, allowing

General Chemical, GEO, and C&S to increase pricing.

<u>**Jurisdiction and Venue**</u>

38.    The Court has jurisdiction over this action under the Code of Virginia § 8.01-

328.1 and §8.01-216.5. This action seeks damages and civil penalties arising from violations of

the VFATA, Virginia Code §§ 8.01-216.1–216.19. This law, which is the Commonwealth's

analogue to the federal False Claims Act, permits an individual with direct knowledge of a fraud

against the Commonwealth or its subdivisions to bring a civil suit against the offending party or

parties in the name of the Commonwealth. *Id.* Money recovered through such a suit is paid to the

Commonwealth itself, with a share going to the relator who brought the suit. The

Commonwealth, the real party in interest in all suits brought under VFATA, traditionally has

opted to share its recovery with any political subdivision that was the direct victim of the fraud in

question, despite having no legal obligation to do so.

39.    The allegations and transactions upon which this action is based have not been

publicly disclosed within the meaning of Virginia Code § 8.01-216.8. Relator also has direct and

independent knowledge of the information on which the allegations are based and voluntarily

provided this information to the Commonwealth of Virginia before filing these claims. He

learned this information during his employment with Defendant General Chemical Corporation,

as evidenced in part by his contemporaneous communications with the United States Department

of Justice about the illegal scheme. Relator has unique, direct, and first-hand knowledge of the

conspiracy and fraud perpetrated by Defendants. Relator worked closely with active participants

in the conspiracy at General Chemical, including Defendants Amita Gupta, Alex Avraamides,

Frank Reichl, Vincent Opalewski, and Bill Redmond. Relator's office was physically near to

major players in the conspiracy, allowing him to observe the conspiracy in action. The

conspiracy likely would not have been uncovered if not for Relator's decision to contact the

Antitrust Division of the Department of Justice in May 2009.

40.     Venue is proper pursuant to the Code of Virginia§ 8.01-261, § 8.01-262, and § 8.01-263.

**Facts[3]**

### I.     The Market for Liquid Aluminum Sulfate

41.     Liquid aluminum sulfate, or alum, is a coagulant used in the removal of impurities and other substances from water. The primary customers for alum are municipalities and water authorities, which use it in potable water and wastewater treatment, and pulp and paper companies, which use it in their manufacturing processes.

42.     Municipalities and other governmental entities typically acquire their supply of alum via a publicly advertised, competitive bidding process. In most cases, municipal contracts for alum are one year in duration, but some contracts provide for renewal for a longer period of time.

43.     Alum is delivered to customers in liquid form using tanker trucks. Transportation costs are included in alum bid prices, and these costs historically have been a major factor in the price of alum. Normally, it is not cost effective for alum manufacturing plants that are located far away from a potential customer to supply that customer. However, the inflated alum prices caused by Defendants' conspiracy made transporting alum greater distances profitable.

44.     A number of factors make the alum market particularly susceptible to illegal collusion. The number of alum sellers is relatively small and insular as the result of

---

[3]     Relator presents the following detailed allegations in compliance with the particularity requirements of Federal Rule of Civil Procedure 9(b), which Virginia courts apply to fraud claims brought under VFATA. But, notably, courts have long recognized that conspiracies, by their very nature, conceal certain facts and so cannot be strictly subject to Rule 9(b), as acknowledged in the Court's Opinion Letter of August 14, 2020, at 6. Additionally, Rule 9(b) specifies that "[m]alice, intent, knowledge, and other conditions of a person's mind" need not be alleged with particularity but instead "may be alleged generally."

17

consolidation. Alum is also more or less fungible, meaning that the only factor that distinguishes one seller's alum from another's is price, which limits the potential for competition to that factor alone. Additionally, alum manufacturers have entered into arrangements over the years with a web of distributors that can easily be used to create the false appearance of competition in the market. This use of distributors played a major role in the alum scheme Defendants perpetrated in Virginia, as explained below in Section III.B.

## II.    Defendants' Broad Alum Conspiracy

45.    By no later than 2005, Defendants and others had entered into a conspiratorial agreement to fix prices and rig bids for alum contracts, including contracts with governmental entities in Virginia, and to defraud those customers by concealing their anticompetitive actions with false certifications that they had not engaged in collusion. The goal of these conspirators was to increase profits by inflating alum prices to a supra-competitive level, rather than profiting by gaining market share through real competition. Their conspiracy operated everywhere these companies supplied alum and did not respect state borders.

46.    Upon becoming a Business Manager with General Chemical in 2008, Relator was quickly informed of the conspiracy. Within the small office in which Relator and his colleagues worked, Defendants Amita Gupta and Alex Avraamides openly discussed General Chemical's agreement not to compete with other Defendants for alum sales in exchange for a reciprocal benefit, and they frequently directed Relator to act in accordance with that agreement.

47.    For the purpose of forming and carrying out the conspiracy, Defendants and their co-conspirators:

(a)  took part in meetings and conversations for the purpose of discussing each other's liquid aluminum sulfate business;

(b)  agreed to "stay away" from each other's "historical" customers by not

18

attempting to attract the business of those customers;

(c) kept track of bid and pricing histories in order to determine which accounts were the "historical" customers of each co-conspirator or other supplier of liquid aluminum sulfate, for the purpose of determining whether to seek a specific contract or to submit an intentionally losing or "throw away" bid or price quote;

(d) placed intentionally losing or "throw away" bids or price quotes to each other's "historical' liquid aluminum sulfate customers;

(e) periodically, communicated about the price to be quoted to a customer by the intended winner for the purpose of determining the amount of the intended loser's intentionally losing or "throwaway" bid or price quotation;

(f) in certain instances, subject to a request of a co-conspirator, withdrew an inadvertently winning bid submitted to that co-conspirator's "historical" customer;

(g) when a co-conspirator was unable to withdraw its inadvertently winning bid, intentionally bid so as to lose on one of its own customers to make up for the coconspirator's loss;

(h) told new employees, including Relator, how to determine whether and how to bid on, or quote a price for, the business of liquid aluminum sulfate customers in order to comply with the agreement between the Defendants not to compete;

(i) used distributor relationships to create the illusion of greater competition;

(j) kept track of which alum distributors were selling alum for co-conspirators in different markets so as to avoid inadvertent competition; and

(k) secretly engaged in horse-trading of customers to maximize their own profits,

19

leaving customers ignorant that bidders were working together to push them

to particular alum suppliers.

48.     Defendants' conspiracy had begun with two major players in the world of water

treatment chemicals, Defendants General Chemical and GEO Specialty Chemicals, which

together controlled a majority of the alum market. From the personal knowledge of the scheme

that Relator gained while working at General Chemical, including from bid data that he accessed,

reviewed, and analyzed as part of his position and job duties at General Chemical and

Chemtrade, Relator learned that the conspiracy was in effect by no later than 2005. On

information and belief, however, an anticompetitive agreement between General Chemical and

GEO with respect to the sale of alum was likely first formed in 1997, when representatives of

General Chemical and GEO, including individual Defendants Frank Reichl and Alex

Avraamides, explicitly agreed not to go after each other's alum customers, declaring "peace in

the valley."

49.     In any case, the scheme was propelled to new heights in 2005 when Defendant

Avraamides, then working for General Chemical, left to work for ostensible competitor GEO.

From there, Defendants Avraamides and Reichl, close friends and former colleagues at General

Chemical, along with others, continued to develop and carry out the conspiracy. And the

conspiracy soon came to involve additional players, including the other Defendants.

50.     Relator knew who the conspirators were (at least some of them) because he was

instructed, primarily by Defendants Gupta and Avraamides, on which companies to avoid

competing with for alum contracts. He was also instructed to avoid competition with any

distributor of a co-conspirator's alum, and he came to understand that distributor relationships

were being used to create a false appearance of competition in the alum market.

51.     Defendants communicated with each other to further their conspiracy with some

regularity, but generally they did not need to talk with each other before routine bids. As is true of most broad antitrust conspiracies entered into by sophisticated players, this one did not require Defendants to communicate with each other in advance of every move they made. Their general agreement to avoid competition—combined with their mutual knowledge of the alum market and their ostensible competitors' bidding history—allowed them to carry out their scheme in most instances without discussion in advance of bids.

52.     To an even greater extent, Defendants had no need to discuss whether each individual false certification denying collusion should be made. Once having agreed to so certify, they made these false certifications to customers as a matter of course.

53.     Relator personally experienced how the scheme operated without constant communication between the conspirators. For example, Defendant Gupta sometimes directed Relator to lose certain bids, and normally this feat could be accomplished without consulting an ostensible competitor about the specific bid, as with a February 2009 bid for a contract with DeKalb County, Georgia. In that instance, Gupta ordered McShane to submit a bid that would not win the contract after she learned that the current supplier was actually a distributor for Defendant C&S, a co-conspirator. Relator did not need to speak to anyone from C&S to submit a bid that would lose.

54.     This mode of operating the conspiracy without having to communicate about every bid is confirmed by documentary evidence as well. The direction from Defendant Gupta described above came via email. On information and belief, another example can be found in a 2010 email exchange that Defendants produced to plaintiffs in separate litigation. In that exchange, Defendant Amita Gupta advised Lisa Brownlee, Relator's counterpart Business Manager whose region covered Virginia, to "stay away" from a customer in Ohio by bidding at a particular price derived from past bids so that co-conspirator Defendant USALCO would win the

bid. No communication with USALCO about that particular bid was necessary for the scheme to operate smoothly.

55.     On occasion, however, Defendants' scheme would misfire. Sometimes, when Defendants had not discussed a particular bid, a conspirator who intended to submit a throwaway bid would inadvertently win. In those circumstances, Defendants would have to talk to fix the problem. Examples include:

a)  In 2008, a misunderstanding between Defendants General Chemical and Defendant Alchem about bidding strategy caused General Chemical to lose the Charlotte, North Carolina, account to Alchem. In response, General Chemical took the High Point, North Carolina, account from Alchem in April 2009. These events caused Gupta and Randall Andrews, owner of Alchem, to meet and agree that Alchem would not bid on Charlotte in 2009 and General Chemical would let Alchem win High Point back. Gupta relayed the purpose and result of this meeting to McShane.

b)  In 2010, Defendant Avraamides expressed his frustration to McShane that a company apparently outside of the conspiracy, Kemira, had unexpectedly won a contract in Columbia, South Carolina, that co-conspirator C&S had agreed would be allocated to General Chemical.

c)  On information and belief, in an email from June 2009, Defendant Gupta told another General Chemical employee the following about an account in Tennessee: "this was a geo account. Had we known this, we would have bid differently. I need you to call them asap and … we have to withdraw our bid. Please ensure there are no repercussions."

56.     The above examples show that lack of communication among Defendants before

a particular bid is not evidence that the conspiracy had not tainted that particular bid. To the contrary, in this particular conspiracy, lack of communication about individual bids suggests that the conspiracy was operating smoothly and efficiently, to the detriment of alum customers and taxpayers across the country, including in Virginia.

57.     Additional instances in which Relator witnessed the execution of the nationwide conspiracy firsthand and gained unique knowledge into the conspiracy include:

a)  In September 2009, Gupta informed McShane that she and a representative of Chameleon Industries, [4] a co-conspirator, had agreed on a bidding strategy for a contract with Trinity River Authority in Texas. Gupta then ordered McShane not to bid competitively.

b)  In 2009 or 2010, McShane attended the Texas Water tradeshow with Gupta and other General Chemical employees. While there, they spoke with Chino Garza, owner of co-conspirator Chameleon Industries, who stated openly, "We need to talk more before bids."

c)  In June 2010, after McShane pointed out to Avraamides that C&S had shown signs of becoming more aggressive toward General Chemical's accounts, Avraamides expressed confidence that C&S would stick to the agreement and not actually compete aggressively with General Chemical.

d)  In November 2010, after a conversation with representatives of GEO and C&S, Avraamides told McShane and Gupta that the companies would be raising their alum prices by $25/dry ton.

e)  Also in November 2010, McShane explained to his contact at the Department

---

[4]     Chameleon Industries and its owner China Garza formerly were defendants in this case. They were dismissed on personal jurisdiction grounds, and no decision was made on the merits with respect to Relator's claims against them. Relator maintains that these former defendants conspired with Defendants to manipulate the alum market.

23

of Justice that prices were high across the Midwest because General
Chemical's competitors in the region—"US Alco and C&S"— "don't go after
our business and we don't go after theirs." McShane knew this information
from Gupta and his fellow Business Manager, Lisa Brownlee, whose region
covered the Midwest as well as Virginia.

f)  In January 2011, Gupta told McShane that a representative of GEO Specialty
Chemicals had apologized to Gupta for bidding too low for a contract in
Graham, North Carolina.

g)  Also in January 2011, Avraamides told McShane that he had advised
representatives of GEO and C&S to stay away from customers supplied by
Alchem, an alum supplier that General Chemical had just acquired.

h)  In January 2011 as well, General Chemical, GEO, and USALCO announced
similar alum price increases—increases that were only partially explained by a
rise in costs—suggesting continued collusion. McShane promptly reported
this incident to his contact at the Department of Justice.

i)  By 2011, the Department of Justice had begun a formal criminal investigation
based on McShane's disclosures. When General Chemical got wind of the
formal criminal investigation commenced by the Justice Department in 2011
based on Relator's disclosures, General Chemical hired the law firm Weil,
Gotshal & Manges to conduct an internal investigation. Relator was
interviewed as part of the internal investigation.

58.    Another component of Defendants' scheme was the use of distributor
relationships to disguise Defendants' financial interest in bids. Defendants were able to control
the prices distributors offered to customers because Defendants controlled the prices the

24

distributors paid to Defendants. Defendants could then submit bids for the same alum contracts themselves, choosing whether to win or lose to their own distributor and profiting from the sale either way. This use of distributors concealed from customers just how little real competition was occurring.

59.     On information and belief, Defendants are in possession of telephone records, emails, internal memos, and other documentary evidence that would provide further confirmation of Relator's understanding of their participation in the scheme, an understanding he derived exclusively from his personal experience and documents he obtained in the course of his employment. A few examples of the documentary evidence Relator understands Defendants to have produced in separate litigation, in addition to examples mentioned elsewhere in this complaint, include:

a)   A 2010 internal memo Defendant USALCO memorialized a phone call in which a USALCO executive used the code phrase "peace in the valley"—a phrase executive from General Chemical and GEO had used for years to describe their anticompetitive arrangement—to explain why a General Chemical customer should not be pursued;

b)   Extensive phone records confirming regular communication among Defendants, including records of extensive telephone communications between Defendant Gupta of General Chemical and Brian Steppig of GEO from 2009-11;

c)   A 2005 internal GEO memo written by Brian Steppig in which he confirms that Defendant Opalewski of General Chemical and a representative of USALCO had agreed to "intentionally stay away" from each other's alum customers.

### III.   The Conspiracy's Operation in Virginia

#### A.  Overview

60.     Virginia, of course, was not immune from Defendants' alum conspiracy, which was in effect everywhere they sold alum. Relator's knowledge to that effect comes from the uniform way General Chemical's alum business operated collusively in his own large region and from his close working relationship with his counterpart, Lisa Brownlee, whose region covered Virginia. Relator's knowledge that the scheme operated in Brownlee's territory is based on his personal experience and on documentary evidence in his possession of the collusive bids Defendants made in Virginia during the relevant period, many of which are detailed below.

61.     On information and belief, additional documentary evidence in Defendants' possession, such as the email exchange described above at ¶ 54, confirm that Brownlee was under the same instructions as Relator when it came to alum bids. Also, on information and belief, no evidence exists that Defendants carved out Virginia or any of its political subdivisions from the conspiracy.

62.     As detailed below in Section III.C. and Section VI., the prices that Defendants and their distributors submitted to Virginia municipalities and entities were inflated well above what a normal, fair price for alum would have been.

#### B.  The Role of Distributors

63.     In Virginia, Defendants' use of distributors played an especially large role in furthering and concealing Defendants' scheme. As manufacturers of alum, Defendants were able to control and anticipate the price a distributor could offer a customer by setting the price the distributor paid Defendants. Additionally, Defendants knew whether one of their distributors intended to bid on a particular contract because the distributor would need to request a "support price" on alum for that location in advance. Because Defendants profited when one of their

distributors won a contract, they could bid "against" their own distributor, either higher or lower, with minimal risk, thereby creating a false appearance of competition.

64.     As is detailed below, two distributors, Univar USA, Inc. ("Univar") and Brenntag Southeast, Inc. ("Brenntag"), regularly bid upon and won alum contracts in Virginia. But Univar, for most or all of the relevant period, was distributing alum in Virginia for Defendant General Chemical. And General Chemical regularly bid on the same contracts as Univar, adding to the false appearance of competition in the market. On information and belief, Brenntag also was acting as an alum distributor in Virginia for one or more of the Defendants during the relevant period. Other distributors may have been selling alum on behalf of Defendants in Virginia as well.

65.     Whether distributors were complicit in Defendants' scheme, merely aware of it, or actually victims of it themselves is unclear.[5] But what is clear is that Defendants' conspiracy caused governmental alum purchasers to pay inflated prices to these distributors. The class action settlements Defendants entered into in their federal antitrust cases for claims brought by "indirect purchasers" of alum, meaning those who purchased alum from Defendants' distributors, are further confirmation.

66.     Defendants are liable to the Commonwealth under the VFATA for all claims for payment from a distributor that were tainted by Defendants' fraudulent scheme, even if the distributor had no knowledge of the scheme. The VFATA holds liable anyone who "[k]nowingly presents, *or causes to be presented*, a false or fraudulent claim for payment or approval" or who

---

[5]     On information and belief, a 2010 USALCO memo documents a conversation in which a USALCO executive informed at least one employee of Univar about the "peace in the valley" arrangement. And, in Virginia, Univar may sometimes have been less than forthcoming about the source of its alum. A 2005-06 bid from Univar to Town of Culpeper notes that General Chemical was its alum supplier, but in subsequent bids to Culpeper, Univar lists itself as supplier, though the company is solely a distributor. *See* Exhibit 1. In any event, Relator's understanding is that Univar distributed alum in Virginia during the relevant period primarily or exclusively for General Chemical.

"[k]nowingly makes, uses, *or causes to be made or used*, a false record or statement material to a false or fraudulent claim." Virginia Code § 8.01-216.3 (A)(1)-(2) (emphasis added).

### C. Defendants' Collusive Bidding in Virginia

67.     The history of particular alum bids and wins that is laid out below shows how Defendants' scheme played out in practice in Virginia. Although Relator's information is extensive, it is incomplete. Only discovery will enable Relator to present a full accounting of every rigged bid.

68.     The bid histories show that Defendants dominated the market for alum in Virginia, that they charged inflated prices—at least 50% above a fair price—and that contracts rarely changed hands, all as a result of Defendants' collusive bidding behavior. (Relator's estimate of a fair alum price can be found below in Section VI.) This inflation of the price of alum occasionally invited non-conspirator bids, sometimes from far away, but the vast majority of the ostensible competition in Virginia for alum contracts was an illusion Defendants created to mislead customers.

### Augusta County Service Authority

69.     In 2010, Defendant General Chemical submitted a winning alum bid of $325/dry ton to the Augusta County Service Authority. Defendants Delta and GEO submitted losing bids.

70.     But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for this contract and others, and the Augusta County Service Authority would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

### Town of Broadway

71.     In 2011, Polytech submitted an alum bid of $457.73/dry ton to the Town of Broadway. Defendant General Chemical submitted a bid of $455.92/dry ton. Univar (on

information and belief, distributing for General Chemical) submitted a winning bid of $350.51/dry ton.

72.     But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for this contract and others, and the Town of Broadway would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

### Caroline County

73.     Relator possesses limited Caroline County bid information, but a survey the County completed, attached as Exhibit 2, identifies the following companies as bidding on alum contracts during the relevant period: Defendants GEO, Chemtrade, and USALCO, along with Univar (on information and belief, distributing for General Chemical).

### City of Chesapeake

74.     In 2005, Defendant Delta submitted an alum bid to Chesapeake of $241.84/dry ton. Defendant GEO submitted a bid of $231.50/dry ton. Suffolk Chemical submitted a bid of $225/dry ton. Defendant General Chemical submitted a winning bid of $189.40/dry ton.

75.     In 2007, Defendant General Chemical submitted a winning alum bid to Chesapeake of $189.40/dry ton.

76.     In 2008, Defendant Delta submitted an alum bid of $426.13/dry ton to Chesapeake. Defendant GEO submitted a bid of $519/dry ton. Defendant General Chemical submitted a winning bid of $391.85/dry ton.

77.     In 2009, Defendant Delta submitted an alum bid of $405/dry ton to Chesapeake. Defendant GEO submitted a bid of $519/dry ton. Defendant General Chemical submitted a winning bid of $325.35/dry ton.

78.     In 2010, Defendant GEO submitted a bid of $519/dry ton to Chesapeake. Defendant General Chemical submitted a winning bid of $339.63/dry ton.

79.     In 2011, Defendant General Chemical submitted a winning bid of $356.63/dry ton

to Chesapeake.

80.     But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the City of Chesapeake would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding

**City of Covington**

81.     In 2004, Defendant General Chemical submitted a bid of $193/dry ton to the City of Covington. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $182/dry ton. Brenntag (on information and belief, distributing for a Defendant) submitted a winning bid $179.63/dry ton.

82.     In 2005, Defendant General Chemical submitted a winning alum bid of $223/dry ton to Covington.

83.     In 2006, Brenntag (on information and belief, distributing for a Defendant) submitted an alum bid of $239.10/dry ton to Covington. Defendant General Chemical submitted a bid of $267/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $228.90/dry ton.

84.     In 2007, Brenntag (on information and belief, distributing for a Defendant) submitted an alum bid of $314/dry ton to Covington. General Chemical submitted a bid of $287/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a winning bid $256/dry ton.

85.     In 2008, Defendant General Chemical submitted an alum bid of $397/dry ton to Covington. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $372/dry ton.

86.     In 2009, Brenntag (on information and belief, distributing for a Defendant) submitted an alum bid of $526/dry ton to Covington. Defendant General Chemical submitted a

winning bid of $340/dry ton.

87.     In 2010, Defendant General Chemical submitted a winning bid of $340/dry ton to Covington.

88.     In 2011, Defendant General Chemical submitted a winning bid of $415/dry ton to Covington.

89.     In 2012, Defendant General Chemical submitted a winning bid of $415/dry ton to Covington.

90.     In 2013, Defendant General Chemical submitted a winning bid of $415/dry ton to Covington.

91.     In 2014, Defendant Chemtrade Chemicals a winning bid of $415/dry ton to Covington.

92.     But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the City of Covington would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

## Town of Culpeper

93.     In 2009, Defendant Delta Chemical Corporation submitted a winning alum bid of $297/dry ton to the Town of Culpeper.

94.     In 2010, Brenntag (on information and belief, distributing for a Defendant) submitted an alum bid of $445/dry ton to Culpeper. Univar (on information and belief, distributing for General Chemical) submitted a bid of $377/dry ton. Defendant General Chemical submitted a bid of $332/dry ton. Defendant Delta submitted a winning bid of $297/dry ton.

95.     In 2011, Univar (on information and belief, distributing for General Chemical) submitted an alum bid of $377/dry ton to Culpeper. Defendant Delta submitted a winning bid of $338.94/dry ton.

96.     In 2012, Defendant General Chemical submitted an alum bid of $392/dry ton to Culpeper. Univar (on information and belief, distributing for General Chemical) submitted a bid of $368/dry ton. Defendant USALCO submitted a winning bid of $343.24/dry ton.

97.     In 2013, Defendant General Chemical submitted an alum bid of $402/dry ton to Culpeper. Univar (on information and belief, distributing for General Chemical) submitted a bid of $355/dry ton. Defendant USALCO submitted a winning bid of $354.57/dry ton.

98.     But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the Town of Culpeper would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

## City of Danville

99.     In 2006, Brenntag (on information and belief, distributing for a Defendant) submitted a bid of $245.50/dry ton to Danville. Defendant General Chemical submitted a winning bid of $199.75/dry ton. Univar USA (on information and belief, distributing for General Chemical) submitted a bid of $206.72. Chemical Resources submitted a bid of $203/dry ton.

100.    In 2007, Defendant General Chemical submitted a bid of $247.10/dry ton to Danville.

101.    In 2008, Defendant General Chemical submitted a winning bid of $275.10/dry ton to Danville.

102.    In 2009, Defendant Delta submitted a bid of $432/ dry ton to Danville. Defendant General Chemical submitted a bid $384/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $372/ dry ton.

103.    But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the City of Danville would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

32

## City of Emporia

104.     In 2005, Defendant General Chemical submitted a winning alum bid of $198.50/dry ton to the City of Emporia.

105.     In 2006, Defendant General Chemical submitted a winning alum bid of $228.50/dry ton to Emporia.

106.     In 2007, Defendant General Chemical submitted an alum bid of $263.80/dry ton to Emporia. Suffolk Chemical submitted a bid of $261.41/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $257.80/dry ton.

107.     In 2010, Defendant General Chemical submitted an alum bid of $338/dry ton to Emporia. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $315.46/dry ton.

108.     In 2011, Defendant General Chemical submitted an alum bid of $370/dry ton to Emporia. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $352.58/dry ton.

109.     In 2012, Defendant General Chemical submitted a winning alum bid of $390/dry ton to Emporia.

110.     In 2013, Defendant General Chemical submitted a winning alum bid of $390/dry ton to Emporia.

111.     But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the City of Emporia would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

## Greensville County Water and Sewer Authority

112.     In the Greensville County Water and Sewer Authority in 2005, Defendant General Chemical submitted an alum bid of $254/dry ton. Univar (on information and belief, distributing

33

for General Chemical) submitted a winning bid of $234/dry ton.

113.    In 2006, Defendant General Chemical submitted an alum bid of $274/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $265/dry ton.

114.    In 2007, Defendant General Chemical submitted a winning alum bid of $302/dry ton.

115.    In 2008, General Chemical submitted an alum bid of $482/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $478/dry ton.

116.    In 2010, Defendant General Chemical submitted an alum bid of $475/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $358/dry ton.

117.    In 2011, Defendant General Chemical submitted an alum bid of $475/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $398/dry ton.

118.    In 2012, Defendant General Chemical submitted an alum bid of $475/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a bid of $411/dry ton. Brenntag (on information and belief, distributing for a Defendant) submitted a winning bid of $410.50/dry ton.

119.    But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the Greensville County Water and Sewer Authority would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

34

## City of Harrisonburg

120.     In 2012, Defendant General Chemical submitted a winning alum bid of $415/dry ton to the City of Harrisonburg. Defendants C&S and USALCO submitted losing bids.

121.     General Chemical secured the alum contract because of the collusive, inflated bids submitted by Defendants C&S and USALCO. But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the City of Harrisonburg would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

## City of Lexington

122.     In 2005, Defendant Delta Chemical Corporation submitted an alum bid of $247.42/dry ton to the City of Lexington. Defendant General Chemical submitted a winning bid of $245/dry ton.

123.     In 2007, Defendant Delta Chemical Corporation submitted an alum bid of $266.23/dry ton to Lexington. Defendant General Chemical submitted a winning bid of $255/dry ton.

124.     In 2008, Chemsolve (a distributor, possibly for a Defendant) submitted an alum bid of $421.27/dry ton to Lexington. Defendant Delta submitted a bid of $295.20/dry ton. Defendant General Chemical submitted a winning bid of $274/dry ton.

125.     In the City of Lexington in 2009, Chemsolve (a distributor, possibly for a Defendant) submitted an alum bid of $490.72/dry ton. Defendant General Chemical submitted a bid of $384/dry ton. Defendant Delta submitted a winning bid of $344.02/dry ton.

126.     In the City of Lexington in 2010, Defendant General Chemical submitted an alum bid of $384/dry ton. Defendant Delta submitted a winning bid of $321.03/dry ton.

127.     In the City of Lexington in 2011, Prochem, Inc. submitted an alum bid of

35

$577/dry ton. Brenntag (on information and belief, distributing for a Defendant) submitted a bid of $454/dry ton. Defendant General Chemical submitted a bid of $404/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a bid of $454/dry ton. Defendant Delta Chemical Corporation submitted a winning bid of $330/dry ton.

128.    But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the City of Lexington would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

### City of Martinsville

129.    In 2005, Defendant General Chemical submitted a winning alum bid of $369.60/dry ton to the City of Martinsville. Univar (on information and belief, distributing for General Chemical) submitted a bid of $397/dry ton.

130.    In 2006, General Chemical submitted a winning alum bid of $391.18/dry ton to Martinsville.

131.    In 2007, Defendant General Chemical submitted a winning alum bid of $411/dry ton to Martinsville.

132.    In 2008, Defendant General Chemical submitted an alum bid of $504.01/dry ton to Martinsville. Univar (on information and belief, distributing for General Chemical) submitted a winning bid of $437/dry ton.

133.    In 2009, Brenntag (on information and belief, distributing for a Defendant) submitted an alum bid of $342/dry ton to Martinsville. Defendant Delta submitted a bid of $467/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a bid of $354.90/dry ton. Defendant General Chemical submitted a winning bid of $314/dry ton.

134.    In 2010, Defendant General Chemical submitted a winning alum bid of $314/dry ton to Martinsville.

36

135.    In 2011, Defendant Delta submitted an alum bid of $499/dry ton to Martinsville. Defendant General Chemical submitted a winning bid of $389/dry ton.

136.    In 2012, Defendant USALCO (which had acquired Defendant Delta by that time) submitted an alum bid of $499/dry ton to Martinsville. Defendant General Chemical submitted a winning bid of $399/dry ton.

137.    In 2013, Defendant USALCO submitted an alum bid of $499/dry ton to Martinsville. Defendant General Chemical submitted a bid of $399/dry ton. Univar. (on information and belief, distributing for General Chemical) submitted a winning bid of $392/dry ton.

138.    In 2014, Defendant USALCO submitted an alum bid of $513.34/dry ton to Martinsville. Defendant GEO submitted a bid of $425.73/dry ton. Univar (on information and belief, distributing for Chemtrade) submitted a bid of $372/dry ton. Defendant Chemtrade submitted a winning bid of $340/dry ton.

139.    But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the City of Martinsville would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

**City of Portsmouth**

140.    For some years beginning not later than 2005, the City of Portsmouth was part of a cooperative procurement arrangement for purchasing alum with the City of Norfolk and the City of Suffolk. Their joint requests for bids were issued by City of Norfolk.[6]

141.    But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the City of Portsmouth would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

---

[6]    Relevant documents can be found in Appendix II.

37

## County of Spotsylvania

142.     In the County of Spotsylvania in 2013, Defendant USALCO LLC submitted an alum bid of $388.89/dry ton; Univar (on information and belief, distributing for General Chemical) submitted a bid of $385.18/dry ton; Defendant General Chemical submitted a winning bid of $365/dry ton.

143.     But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for this contract and others, and the County of Spotsylvania would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

## City of Suffolk

144.     For some years beginning not later than 2005, the City of Suffolk was part of a cooperative procurement arrangement for purchasing alum with the City of Norfolk and the City of Portsmouth. Their joint requests for bids were issued by City of Norfolk.[7]

145.     Although Relator possesses limited bid history for the City of Suffolk, invoices included in Appendix II demonstrate that, for years, Suffolk was charged inflated alum prices by Defendants, primarily General Chemical.

146.     But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the City of Suffolk would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

## City of Williamsburg

147.     In 2009, Defendant GEO submitted an alum bid of $488.50/dry ton to the City of Williamsburg. Defendant General Chemical submitted a bid of $380/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a bid of $316/dry ton. Defendant Delta Chemical Corporation submitted a winning bid of $314.24/dry ton.

---

[7]     Relevant documents can be found in Appendix II.

148.    In 2010, American Development Corporation submitted an alum bid of $441.18/dry ton to Williamsburg. Defendant GEO submitted a bid of $513.50/dry ton. Defendant General Chemical submitted a bid of $330/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a bid of $297/dry ton. Defendant Delta submitted a winning bid of $293/dry ton.

149.    In 2011, Defendant General Chemical submitted an alum bid of $390.80/dry ton to Williamsburg. Univar (on information and belief, distributing for General Chemical) submitted a bid of $319.80/dry ton. Defendant Delta submitted a winning bid of $313.70/dry ton.

150.    In 2012, Defendant GEO Specialty Chemicals submitted an alum bid of $548.50/dry ton to Williamsburg. Neo-Solutions Inc. submitted a bid of $432.80/dry ton. Univar (on information and belief, distributing for General Chemical) submitted a bid of $344.30/dry ton. USALCO submitted a bid of $313.68/dry ton. Defendant General Chemical submitted a winning bid of $310/dry ton.

151.    In 2013, Defendant GEO submitted an alum bid of $448.50/dry ton to Williamsburg. Univar (on information and belief, distributing for General Chemical) submitted a bid of $370.74/dry ton. Defendant USALCO submitted a bid of $325.47/dry ton. Defendant General Chemical submitted a winning bid of $310/dry ton.

152.    But for Defendants' conspiracy, Defendants would have submitted bona fide competitive bids for these contracts and others, and the City of Williamsburg would have paid less for alum, rather than a price that was inflated due to the lack of competitive bidding.

**IV.  False Certifications and Invoices**

153.    When Defendants submitted bids for liquid aluminum sulfate contracts to Virginia governmental entities, and when they entered into those contracts, Defendants made material false statements by certifying that they had not engaged in anti-competitive, collusive

39

conduct, when, in fact, they had engaged in such activities. They had conspired to inflate bids so that a conspirator or a conspirator's distributor would secure contracts with a lower—but still inflated—bid. They also conspired not to submit bids at all for certain liquid aluminum sulfate contracts with Virginia entities because of their agreement to stay away from the historical customers of their ostensible competitors. The submission of false certifications to Virginia municipalities and entities was necessary to secure alum contracts with these municipalities and entities at prices well above the fair market value.

154.    Two appendices are included with this complaint in compliance with the Court's Order and Opinion Letter of August 14, 2020. As the Court directed, Relator has included one appendix containing explicit false certifications that Defendants provided to governmental alum customers in Virginia and a second appendix of claims for payment Defendants submitted to their alum customers. The documents in the appendices are organized in the same alphabetical and chronological order as the bid information detailed above. In some instances, the bid information above covers a longer period than do the documents in the appendices; in other instances, the reverse is true.

155.    Relator has provided this supporting evidence to the extent possible before any discovery has been conducted. The false certifications included in Appendix I are not all of the relevant false certifications that exist or all that Relator can obtain through discovery and further investigation.[8] Similarly, the many invoices or other claims for payment included in Appendix II—each of which constitutes a separate false claim—are not all of the claims for payment that

---

[8]    Nor is an explicit false certification needed for VFATA liability when a defendant has made an implied false certification, which occurs when a defendant makes representations about a product that, while not technically false, conceal a violation of law. *See, e.g.*, *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1999 (2016) (approving claims under the False Claims Act when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements . . . if they render the defendant's representations misleading with respect to the goods or services provided). Here, Defendants submitted bids and made representations about their alum prices but failed to reveal that these prices were the result of violations of antitrust law.

Defendants issued to Commonwealth entities as part of their fraud scheme.

156.    Relator continues to gather supporting evidence, and he is confident that Defendants are in possession of a more complete accounting of their false certifications and false claims for payment during the relevant period.[9] Although Relator's complaint need only state a single false claim to survive demurrer, he has gone very far beyond that by providing actual evidence of a substantial number of false certifications and claims.

157.    The following are representative examples of false certifications Defendants submitted to governmental entities in Virginia. The documents from which they are extracted are included in Appendix I along with other certifications of the same nature.

a) The May 16, 2011 Invitation to Bid of the Town of Broadway submitted by General Chemical Performance Products, LLC contains the following false certifications which were incorporated into winning alum contracts and which are representative of the certifications in the counterpart contracts and agreements for all time periods relevant to this lawsuit between Defendants and Broadway as well as the other Virginia municipalities and entities on whose behalf this suit is brought:

> 6. ETHICS IN PUBLIC CONTRACTING: By submitting their proposals, all Bidders certify that their proposals are made without collusion or fraud and that they have not offered or received any kickbacks or inducements from any other Bidder, supplier, manufacturer or subcontractor in connection with their proposal.

b) The City of Chesapeake's 2010 bid form, signed by Parul Kachhia-Patel of General Chemical on November 30, 2010, includes essentially the same anti-collusion provision used by Broadway:

---

[9]     For example, a few Virginia municipalities have represented that relevant records were lost in a fire or otherwise destroyed, but records of Defendants' accounts receivable, which Relator will seek in discovery, are likely to document the invoices (each one a false claim) that Defendants issued to those municipalities.

D. ETHICS IN PUBLIC CONTRACTING: By submitting their (bids/proposals), (bidders/offerors) certify that their (bids/proposals) are made without collusion or fraud and that they have not offered or received any kickbacks or inducements from any other (bidder/offeror), supplier, manufacturer or subcontractor in connection with their (bid/proposal).

c)   The Town of Culpeper requires bidders to submit a Vendor Information

Form that includes the following certification that, on information and belief,

Defendants and their distributors who bid on Culpeper alum contracts completed,

thereby falsely certifying to non-collusion:

By my signature on this form, I certify on behalf of the Vendor I represent that this Offer is made without prior understanding, agreement, or connection with any corporation, firm, or person submitting an Offer for the same Goods, Services, Insurance or Construction, and is in all respects fair and without collusion or fraud. I understand that collusive bidding is a violation of the state and Federal law and can result in fines, prison sentences, and civil damage awards.

d)   The invitation for bids for alum contracts with the City of Danville

contains the following false certifications (the exemplar below is the invitation for

bids on the 2008 alum contract) that were incorporated into the final contract:

In compliance with Invitation to Bid No. 07/08-079 and subject to all conditions thereof and attached hereto, the undersigned offers and agrees if this bid be accepted to furnish any and all of the items for the sums as indicated on PP-2…

My signature certifies that the accompanying bid is not the result of or affected by any act of collusion with another person or company engaged in the same line of business or commerce, or any act of fraud punishable under Title 18.2, Chapter 12, Article 1.1 of the Code of Virginia, 1950, as amended. Furthermore, I understand that fraudulent and collusive bidding is a crime under the Virginia Governmental Frauds Act, the Virginia Government Bid Rigging Act, and Virginia Antitrust Act, and Federal Law and can result in fines, prison sentences, and civil damage awards. I hereby certify that I am authorized to sign this bid of the BIDDER.

d.)   The City of Harrisonburg's standard invitation for alum bids requires the

following non-collusion certification, this one taken from the 2012 invitation:

42

7.4 ETHICS IN PUBLIC CONTRACTING: By submitting their (bids/proposals), (bidders/offerors) certify that their (bids/proposals) are made without collusion or fraud and that they have not offered or received any kickbacks or inducements from any other (bidder/offeror), supplier, manufacturer or subcontractor in connection with their (bid/proposal), and that they have not conferred on any public employee having official responsibility for this procurement transaction any payment, loan, subscription, advance, deposit of money, services or anything of more than nominal value, present or promised, unless consideration of substantially equal or greater value was exchanged.

e.) A 2005 certification that was required by City of Portsmouth as part of its

cooperative procurement agreement with City of Norfolk and City of Suffolk and

signed by General Chemical's Lisa Brownlee provides:

(4) The bidder expressly warrants that the price of prices quoted herein are not the result of an agreement of understanding, express of implied, with any other bidder or bidders.

f.) The 2013 alum contract between General Chemical Performance Products,

LLC and Spotsylvania County, signed by Elizabeth Ryno, Marketing Specialist

and Authorizing Agent for General Chemical Performance Products, LLC on June

6, 2013 contains the following false certifications:

7.4. THE CONTRACTOR certifies that:

1.      The bid or offer (1) was made without prior participation, understanding, agreement, or connection with any corporation, firm or person submitting a bid/offer for the same materials, supplies, equipment, or services with respect to the allocation of the business afforded by or resulting from the acceptance of the bid or proposal, (2) was in all respects fair and without collusion or fraud, and (3) was or was intended to be competitive and free from any collusion with any person, firm or corporation[.]

g.) The City of Suffolk required the same non-collusion certification

as the City of Portsmouth, excerpted above at d.), as part of Suffolk's

cooperative procurement agreement with Portsmouth and City of Norfolk.

43

158.    All Defendants, by participating in the conspiracy, directly submitted and/or caused the submission of false certifications, explicit and implied, in the course of submitting collusive bids and/or securing alum contracts, or conspired to submit false certifications by participating in the conspiracy, which required the submission of certifications falsely attesting that there was no collusion or anti-competitive agreements made in conjunction with the alum bidding process.

159.    If the municipalities and entities on whose behalf this suit is brought had known that Defendants' non-collusion certifications were false, Defendants would not have secured alum contracts with these municipalities and entities, and certainly not at prices that were artificially inflated because of Defendants' anti-competitive scheme.

## V.    The End of the Conspiracy

160.    To Relator's certain knowledge, the conspiracy continued until at least February 2011, when the conspirators became aware of the federal antitrust investigation that his disclosures had spurred. Most likely, the conspiracy continued to operate thereafter. Relator is unaware of any conspirator ever formally withdrawing from the conspiracy, and the practices of staying away from co-conspirators' customers and submitting throwaway bids continued. Moreover, Defendants General Chemical and USALCO continued to pursue acquisitions that would reduce competition in the alum market.

161.    The impact of the conspiracy and false representations continues to this day as the price paid by municipalities and entities in the Commonwealth of Virginia for liquid aluminum sulfate is vastly inflated above the fair market price. For instance, upon information and belief and based upon Relator's knowledge and experience in the industry and relevant bid documents, (which he reviewed and had access to pursuant to his position and job duties at General Chemical and Chemtrade), the current price paid by municipalities and entities in the Commonwealth of Virginia for liquid aluminum sulfate is, at minimum, $100 per dry ton above

44

a proper fair market price as a direct result of the collusive activity and false representations.

162.    No official of the Commonwealth of Virginia charged with responsibility to act on the conspiracy alleged herein knew or reasonably should have known of the conspiracy or the related false statements prior to the announcement of the prosecution of Frank Reichl on October 27, 2015.

## VI.    The Conspiracy's Impact on the Commonwealth

163.    The conspiracy had a significant impact in Virginia. Based on Relator's professional experience, including his employment with General Chemical/Chemtrade, and from analysis of documents containing pricing information for various municipalities, Relator has accurately estimated an approximate fair market price for alum during the relevant period as follows.

164.    Relator estimates that the materials cost to produce a dry ton of liquid aluminum sulfate was around $100 on average during the relevant period.[10] Relator estimates freight costs of roughly $30-$50 per dry ton and a fair profit from $20-$40 per dry ton. While fixed costs vary by plant depending on the demand in a given year, they are generally about $30 per dry ton. Adding these figures to the $100 materials cost for a dry ton of liquid aluminum sulfate, a fair price for alum during the relevant period would have ranged from $180 per dry ton to $220 per dry ton.

165.    The conspiracy was nationwide, and prices were inflated above the fair price for alum ($180 to $220 per dry ton) in numerous states, including Virginia. Each municipality or local governmental entity that purchased alum bought hundreds of dry tons of alum annually

---

[10]    The $100 per dry ton estimate is rooted in an assumption, based upon Relator's experience in the industry, that sulfuric acid typically costs $120 per dry ton, with a consumption factor of  0.495, and bauxite (aluminum) usually costs $110 per dry ton at a consumption factor of 0.4. Thus, the material cost of a dry ton of alum is roughly $100.

during the relevant period. $350 per dry ton represents an average composite figure for the amount that Virginia municipalities and local governmental entities were paying for liquid aluminum sulfate during the relevant period, so Virginia municipalities and entities, by paying $350 per dry ton on average, were overcharged between $130 to $170 per dry ton.

166.    The impact of the conspiracy and false representations continues to this day, as the price paid by municipalities and entities in the Commonwealth of Virginia for liquid aluminum sulfate is still vastly inflated above the fair market price. For instance, upon information and belief based upon Relator's knowledge and experience in the industry and relevant bid documents (which he reviewed and had access to pursuant to his position and job duties at General Chemical and Chemtrade), the price paid by municipalities and entities in the Commonwealth of Virginia for liquid aluminum sulfate is, at minimum, $100 per dry ton above a proper fair market price as a direct result of the collusive activity and false representations.

167.    The price of alum increased sharply between 2007 and 2008 and then remained high. Although the original jump in price partly reflected increases in raw material costs, that rise did not fully justify the high bid prices, particularly for suppliers like General Chemical, who had contracts locking in raw material costs for 2008. More tellingly, exceptionally high alum bid prices persisted in 2009, despite the fact that raw material costs plunged that year. The price of sulfur, the raw material used to make sulfuric acid (one of the two main components of alum), was hit particularly hard. But for collusion in the alum market, prices for alum would have reached historic lows beginning in 2009; instead, they remained well above a fair market price.

## VII.  Resulting Criminal Prosecutions and Lawsuits

168.    As a result of the federal investigation Relator triggered into collusion in the alum market, numerous Defendants were exposed to criminal liability. Ultimately, individual

Defendant Frank Reichl of General Chemical, Brian Steppig[11] of GEO, and corporate Defendant GEO pleaded guilty to criminal violations of the Sherman Act for their role in the scheme. *See* Exhibits 3-5. Defendant General Chemical admitted to criminal violations and cooperated with the federal investigation in exchange for conditional amnesty from prosecution.

169.    After the criminal indictments became public, many civil suits were filed against Defendants and other alleged co-conspirators for violations of state and federal antitrust law. These cases were collected into a federal multidistrict litigation styled *In re Liquid Aluminum Sulfate Antitrust Litigation*, 16-md-2687 (D.N.J.) ("Federal MDL"). The cases were brought against Defendants on behalf of customers that directly purchased alum from them and on behalf of customers that indirectly purchased alum from them by buying from one of Defendants' distributors. A handful of Virginia entities also brought separate suits against Defendants in the Federal MDL.

170.    Following extensive discovery in those cases, the federal court approved several multimillion-dollar class action settlements under Federal Rule of Civil Procedure 23, which required the court to assess the weight of the evidence. Those class actions alleged that Defendants' antitrust scheme operated everywhere they sold alum, and the federal court did not carve out any state or municipality as unaffected by the conspiracy when approving the settlements. Additionally, Defendants have settled the separate lawsuits brought by certain Virginia entities for undisclosed sums.

171.    None of the criminal cases or settled lawsuits compensated the Commonwealth of Virginia for the fraud Defendants committed in this state against the Commonwealth's political subdivisions. Moreover, Relator calculates that the settlement amounts Defendants have paid to date, though totaling tens of millions of dollars, allowed them to retain much of their ill-gotten

---

[11]    Brian Steppig was a defendant in this case but was dismissed on grounds of personal jurisdiction. His deep involvement with Defendants' scheme is beyond question, as his guilty plea confirms.

alum profits.

### Count I – Virginia Fraud Against Taxpayers Act, Code of Virginia §8.01-216.3(A)(l) and (A)(2)

172.    Relator incorporates each paragraph of this Complaint as if fully set forth herein.

173.    As described above, Defendants knowingly presented, or caused to be presented, to an official or employee of the Commonwealth of Virginia or one of its subdivisions, false or fraudulent claims for payment or approval, in violation of Code of Virginia §8.01-216.3(A)(l).

174.    As described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the Commonwealth of Virginia, in violation of Code of Virginia §8.01-216.3(A)(2).

175.    As a result of these claims, municipalities and other governmental entities in the Commonwealth of Virginia paid Defendants and suffered damages to be determined at trial.

### Count II - Virginia Fraud Against Taxpayers Act, Code of Virginia §8.01-216.3(A)(3)

176.    Relator incorporates each paragraph of this Complaint as if fully set forth herein.

177.    Defendants conspired to defraud the Commonwealth of Virginia by getting false or fraudulent claims allowed or paid, and/or conspired to commit a violation of Code of Virginia §8.01-216.3(A)(l) or (A)(2), in violation of §8.01-216.3(A)(3).

178.    As a result of their acts or omissions, Defendants caused the Commonwealth of Virginia to sustain damages in an amount to be determined at trial.

179.    WHEREFORE, Plaintiff-Relator by counsel, moves the Court for judgment against the Defendants, in the sum of $350,000,000 (THREE HUNDRED FIFTY MILLION DOLLARS) and costs with pre-judgment and post-judgment interest.

### <u>Jury Trial Demanded</u>

The Commonwealth of Virginia, on the relation of Lawrence McShane, hereby demands trial by jury on all issues so triable.

WHEREFORE, Relator Lawrence McShane, respectfully requests that the Court enter judgment in his favor and in favor of the Commonwealth of Virginia against Defendants, awarding treble damages, penalties, and all appropriate relief for violations of the Virginia Fraud Against Taxpayers Act, and awarding relator Lawrence McShane thirty percent of the government's recovery as well as costs and attorney fees pursuant to Virginia Code § 8.01-216.7(A).

Respectfully submitted,

_____
Julia Rickert
*Counsel for Plaintiff Relator*

Mike Kanovitz (pro hac vice)
Frank Newell (pro hac vice)
Julia Rickert (pro hac vice)
LOEVY & LOEVY
311 N Aberdeen St., 3rd Fl.
Chicago, IL 60607
Ph: 312-243-5900
Fax: 312-243-5902
mike@loevy.com
frank@loevy.com
julia@loevy.com
*Attorneys for Relator*

Louis Clark
Tom Devine
Karen Gray
Government Accountability Project
1612 K Street NW, Suite 1100
Washington, DC 20006
Ph: (202) 457-0034
*Attorneys for Relator*

Dated: November 23, 2020

Respectfully submitted,
COMMONWEALTH OF VIRGINIA
(collectively, "Commonwealth of Virginia") on the relation of
Lawrence McShane

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was emailed this 23rd day of November,

2020, to the following:

James A. Segall

Julia Rickert
*Counsel for Plaintiff Relator*


Peter Broadbent III
Office of the Attorney General
202 North 9th Street
Richmond, VA 23219
*Counsel for the Commonwealth of Virginia*

Nicole Sprinzen
Bruce Maffeo
Cozen O'Connor
1200 19th Street NW, 3rd Floor
Washington, DC 20036
*Counsel for Brian Steppig*

Eric Heyer
Thompson Hine, LLP
1919 M Street, NW, Suite 700
Washington, DC 20036
*Counsel for GEO Specialty Chemicals, Inc.*

Robert Ware
Thompson Hine LLP
3900 Key Center
127 Public Center
Cleveland, OH 44114
*Counsel for GEO Specialty Chemicals, Inc.*

Kevin Martingayle
Bischoff Martingayle, P.C.

3704 Pacific Avenue, Suite 300
Virginia Beach, VA 23451
*Counsel for Frank Reichl, Amita Gupta, Alex Avraamides, Vincent Opalewski, and Bill Redmond*

Alchem, Inc. (Via U.S. Mail only)
2042 Buie Philadelphus Road
Red Springs, NC 28377

Jeremiah Denton III
Jeremiah Denton IV
Jeremiah Denton II, P.C.
3300 South Building, Suite 208
397 Little Neck Road
Virginia Beach, VA 23452
*Counsel for Chemtrade Solutions, LLC, General Chemical Performance Products, LLC, GenTek, LLC, Chemtrade Logistics Income Fund, Chemtrade Logistics, Inc.*

Kayleigh Golish
Steven Reiss
Adam Hemlock
Weil, Gotshal, & Manges, LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for General Chemical Corporation, General Chemical Performance Products, LLC, GenTek Inc., Chemtrade Logistics Income Fund, Chemtrade Logistics, Inc., and Chemtrade Solutions, LLC.*

William F. Ryan, Jr.
Aaron L. Casagrande
Whiteford Taylor Preston
7 Saint White Street
Baltimore, MD 21202
*Counsel for USALCO, LLC*

Thomas Mugavero
Kathleen W. Panagis
Whiteford Taylor Preston
3190 Fairview Park Drive, Suite 800
Falls Church, VA 22042
*Counsel for USALCO, LLC*

Aaron Rubinstein
Arnold & Porter
250 West 55th Street
New York, NY 10019
*Counsel for American Securities, LLC*

Alan D. Albert
O'Hagan Meyer, PLLC

411 East Franklin Street, Suite 500
Richmond, VA 23219
*Counsel for C&S Chemicals, Inc.*

Robert McFarland
McGuire Woods, LLP
9000 World Trade Center
101 W Main Street
Norfolk, VA 23510
*Counsel for American Securities, LLC*

Charles O. Monk II
Saul Ewing Arnstein & Lehr, LLP
500 E Pratt Street, Suite 900
Baltimore, MD 21202
*Counsel for Delta Chemical Corporation*

Robert C. Gill
Saul Ewing Arnstein & Lehr, LLP
1919 Pennsylvania Ave. NW, Suite 550
Washington, DC 20006
T: (202) 295-6605
Fax: (202)331-8330
Fax: (202)295-6705
*Counsel for Delta Chemical Corporation*

John D. "Randy" Dalbey
Chilivis Cochran Larkins & Bever, LLP
3127 Maple Drive, NE
Atlanta, GA 30305
*Counsel for C&S Chemicals, Inc.*