# EXHIBIT 9

1               UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
2                 Civil No. 2:16-md-02687(JLL)


3
        - - - - - - - - - - - - - - - -X
4                                      :
        LIQUID ALUMINUM SULFATE        :      TRANSCRIPT OF
5       ANTITRUST LITIGATION           :        PROCEEDINGS
                                       :      November 14, 2018
6       - - - - - - - - - - - - - - -X       Newark, New Jeresy

7

8

9

10

11      B E F O R E:

12                  THE HONORABLE JOSE L. LINARES,
                              CHIEF JUDGE
13

14

15

16

17

18

19          Pursuant to Section 753 Title 28 United States Code, the
        following transcript is certified to be an accurate record
20      as taken stenographically in the above-entitled proceedings.

21      s/Phyllis T. Lewis, CCR, CRCR
        - - - - - - - - - - - - - - - - - - - - - - - - - - - -
22               PHYLLIS T. LEWIS, C.C.R., C.R.C.R.
        Official Court Reporter - United States District Court
23                  Newark, New Jersey  07101
                         (732) 735-4522
24

25

```
 1      A P P E A R A N C E S:

 2              CARRELLA, BYRNE, CECCHI,
                OLSTEIN, BRODY & AGNELLO, PC
 3              5 Becker Farm Road
                Roseland, New Jersey 07068
 4              973-994-1700
                BY:  JAMES E. CECCHI, ESQ.,
 5              Attorneys for Direct Purchaser Class Plaintiffs.

 6

                LITE, DE PALMA, GREENBERG
 7              570 Broad Street
                Newark, New Jersey 07102
 8              973-623-3000
                BY:  BRUCE D. GREENBERG, ESQ.
 9              Attorneys for Plaintiffs.

10

                MILLER LAW, LLC
11              115 S. LaSalle Street
                Chicago, Illinois 60603
12              312-332-3400
                BY:  MARVIN A. MILLER, ESQ.
13              Attorneys for the Indirect Purchaser Plaintiffs.

14

                STEARNS, WEAVER, MILLER,
15              WEISSLER, ALHADEFF & SITTERSON, PA
                150 West Flagler Street
16              Miami, Florida 33130
                305-769-4102
17              BY:  JAY SHAPIRO, ESQ.
                Attorneys for the Indirect Class Plaintiffs.
18

19              MILBERG, LLP
                One Pennsylvania Plaza
20              New York, New York 101119
                212-594-5300
21              BY:  SANFORD P. DUMAIN, ESQ.
                Attorneys for Charlotte Plaintiffs.
22

23

24

25
```

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

```
 1        A P P E A R A N C E S  (Continued)

 2              BALLARD SPAHR, LLP
                1735 Market Street
 3              Philadelphia, Pa 19103
                215-864-8170
 4              BY:  JAY N. FASTOW, ESQ.
                     JASON A. LECKERMAN, ESQ.
 5              Attorneys for Virginia Direct Action Plaintiffs.

 6
                KIRKLAND & ELLIS, LLP
 7              300 North LaSalle Street
                Chicago, Illinois 60654
 8              312-882-2350
                BY:  JAMES H. MUTCHNIK, ESQ.
 9              Attorneys for Defendants,
                GEO Specialty Chemicals and Brian Steppig.
10

11              FOLEY HOAG, LLP
                1555 Seaport Boulevard
12              Boston, Ma. 02219
                617-832-1163
13              BY:  NICHOLAS THEODOROU, ESQ.
                Attorneys for Defendant,
14              Kenneth Ghazey.

15
                FRANK NEWELL, ESQUIRE (Via telephone)
16              312-588-7085
                Attorney for Objector/Intervenor,
17              Lawrence McShane.

18

19

20

21

22

23

24

25
```

```
 1                    THE CLERK:  All rise.
 2                    THE COURT:  Counsel, you may be seated.
 3                    I'll be right with you.  I am trying to figure out,
 4          this objector wanted to dial in and participate, and I was
 5          trying to figure that out in there before I came out.
 6                    MR. CECCHI:  Thank you, Judge.
 7                    MR. MUTCHNIK:  Thank you, your Honor.
 8                    THE COURT:  Are you going to call him from here
 9          now?
10                    THE CLERK:  Yes.
11                    (Phone call placed to Frank Newell, Esquire)
12                    MR. NEWELL:  This is Frank Newell.
13                    THE COURT:  Yes.  Hi, Mr. Newell.
14                    This is Judge Linares.  I am on the bench now, so
15          we got you on the phone.
16                    MR. NEWELL:  Great.
17                    Thank you, your Honor.
18                    THE COURT:  All right.
19                    We are going to lower the volume here.  You are the
20          loudest guy in the courtroom.  That's not good --
21                    MR. NEWELL:  Oh, sorry.
22                    THE COURT:  -- I need to be the loudest guy.
23                    (Laughter)
24                    All right.  So this is In The Matter of Liquid
25          Aluminum Sulfate Antitrust Litigation, Docket No.
```

```
 1        2:16-MD-2687, and today is the scheduled date for the final
 2        fairness hearing in connection with this proposed
 3        settlement.
 4              Counsel, your appearances for the record, please.
 5              Mr. Newell, we will get to you last.
 6              Go ahead.
 7              MR. CECCHI:  Good morning, your Honor.
 8              James Cecchi, Carella, Byrne on behalf of the
 9        direct purchaser class.
10              MR. MILLER:  Good morning, your Honor.
11              Marvin Miller on behalf of the indirect purchaser
12        class.
13              MR. SHAPIRO:  Good morning, your Honor.
14              Jay Shapiro from the Stearns Weaver firm also on
15        behalf of the indirect purchaser class.
16              THE COURT:  All right.  Let's all just keep your
17        voices up, so Mr. Newell can hear you on the phone, okay?
18              MR. FASTOW:  Good morning, your Honor.
19              Jay Fastow from Ballard Spahr on behalf of direct
20        action plaintiffs, and in particular today I think we have
21        ten Virginia direct action plaintiffs.
22              THE COURT:  Good morning.
23              MR. MUTCHNIK:  I'm Jim Mutchnik, your Honor, from
24        Kirkland & Ellis on behalf of GEO Specialty Chemicals, the
25        defendant, and an individual defendant, Brian Steppig as
```

```
 1        well.
 2                   MR. THEODOROU:  Good morning, your Honor.
 3             Nicholas Theodorou representing defendant, Ken
 4        Ghazey.
 5                   THE COURT:  All right.
 6                   And, Mr. Newell, do you want to enter your
 7        appearance?
 8                   MR. NEWELL:  Yes.
 9             Frank Newell on behalf of objector/intervenor,
10        Lawrence McShane.
11                   THE COURT:  Okay.
12             So I want to place on the record just a little
13        background information before we begin, and I give the floor
14        to first the plaintiffs' side, and then the defense
15        regarding this matter.
16                   As we all know, this case is an MDL based
17        litigation.  The allegations here are that the defendants
18        participated in a conspiracy to allocate customers and fix
19        prices in the market for liquid aluminum sulfate from
20        January of 1997 through or about the end of February of
21        2011.
22             The direct purchasers I think filed a complaint
23        back in October of 2015, and the indirect purchasers filed
24        their complaint in May of 2017.
25                   In December of 2016, many of the defendants moved
```

```
 1          to dismiss the indirect purchasers and direct purchasers'
 2          consolidated class action complaints.  The Court eventually
 3          denied those motions, and following the Court's denial of
 4          the defendants' motion to dismiss, in July of 2017 the
 5          parties engaged in discovery and eventually went through a
 6          settlement process, including formal mediation and a Court
 7          led settlement conference as well.  Throughout this process,
 8          it is worth noting that the defendant, GEO, was in the midst
 9          of Chapter 11 bankruptcy proceedings.
10                  In June of this year, the settling parties advised
11          the Court that they had finalized the terms of the direct
12          purchasers' settlement agreement.  The direct purchasers'
13          agreement was filed with the Court on June 15th of 2018.
14          The Court granted preliminary approval of that settlement
15          agreement on July 19th of 2018.
16                  Then the indirect purchasers' agreement was
17          finalized on June 15th of this year, and it was filed with
18          the Court on June 29th of this year, and it was
19          preliminarily approved by the Court on July 19th of 2018.
20                  The settlement involves defendant, GEO.  I believe
21          Ghazey, am I pronouncing that correctly?
22                  MR. MUTCHNIK:  Yes, your Honor.
23                  THE COURT:  -- Ghazey and Mr. Steppig, which I
24          guess we will refer to them as the GEO settling parties
25          today.
```

```
1              That is where we are, and the Court then received
2       an objection by Mr. Newell on behalf of his client and has
3       considered same and will consider any comments Mr. Newell
4       wants to make.
5              I have no received no other objections.
6              Has either side received any other objections,
7       other than the one filed by Mr. Newell?
8              MR. CECCHI:  No, your Honor.
9              MR. MUTCHNIK:  No, your Honor.
10             MR. MILLER:  No, your Honor.
11             THE COURT:  Okay.  So that is where we stand today.
12             I also understand that the settlement may be
13      affected in terms of value I think depending on the
14      reorganization of what ends up happening with the GEO
15      reorganization.
16             Is that correct, Mr. Cecchi?
17             MR. CECCHI:  It is, your Honor.
18             THE COURT:  So when you make your presentation, you
19      may want to highlight to the Court exactly how that would
20      work out, okay?
21             MR. CECCHI:  Right.
22             THE COURT:  So without further ado, I will let you
23      speak.
24             MR. CECCHI:  Thank you, Judge.
25             The process that led to the settlement, which we
```

```
 1        are pleased to present to your Honor, started right outside
 2        of this courtroom in June of 2016 in a meeting between Mr.
 3        Mutchnik and myself.
 4              I think in terms of highlighting the reasonableness
 5        and fairness of this settlement, I just want to briefly
 6        focus because there are no substantive objections either to
 7        the fairness of the settlement or to the request for fees,
 8        which I will briefly touch upon.  But under Girsh, one of
 9        the most important factors your Honor looks at is ability to
10        pay, withstand a greater judgment.
11              From the beginning, as your Honor pointed out, GEO
12        indicated that there was a significant concern on behalf of
13        GEO about ability to pay a large judgment in terms of its
14        ability to continue as a going concern.
15              What the direct purchaser class and myself, Mr.
16        Neuwirth and Mr. Winston from the Quinn Emanuel firm did is
17        we had a long process with Mr. Mutchnik and his client, both
18        through Mr. Mutchnik directly with his client and other
19        folks, to do a deep detailed analysis of the financial
20        condition of the defendant, to do an assessment of what they
21        actually could pay and what would be fair and reasonable to
22        the direct purchaser class.
23              In connection with that process, Judge, it is
24        important to know we met with their financial consultants.
25        We retained financial consultants.  We requested and
```

1     received financial information, and we ultimately came to an

2     assessment that albeit there was a real concern as to where

3     GEO was heading.

4          So one of the things that I think the direct

5     purchaser class is most pleased with or proud of in this

6     settlement, and I want to credit Mr. Mutchnik as well, is

7     that we were able to craft something that got appropriate

8     compensation to the direct purchaser victims, but allowed

9     GEO to continue, allowed GEO to fund this settlement and

10    allowed GEO to continue as a going concern.

11         One of the prime mechanisms that we came up with to

12    do that was it appeared to the direct purchaser team, myself

13    and Mr. Neuwirth, that at some point GEO was owned by -- the

14    primary equity participants are three funds, one of which is

15    named Solis.  One is BlackRock, who I am sure you are aware

16    of, and Deutch Bank.  They have a large equity stake in this

17    company.  We believe that at some point there would be the

18    possibility that they would want to exit that position

19    through a sale.

20         So the way we structured this deal is there is a

21    guaranteed cash component, which is about $10.6 million,

22    plus equity participation, and there is a sliding scale

23    about how the direct purchaser class participates, the

24    indirect purchaser class participates, depending upon the

25    value of that sale.

```
 1              What we also did, and we negotiated in a way that
 2     we felt that we were going to get the full value of what we
 3     negotiated for, which would be $13.8 million on the sale.
 4     So the total value to us, if there is a sale, will be 24.
 5     The guaranteed is the 10.6.
 6              What we also negotiated, Judge, was in the event
 7     that GEO did not settle, but that it turned its business
 8     around in a dramatic fashion and became a highly profitable
 9     entity, the direct purchaser class would participate through
10     a formula based on GEO's EBITDA, cash payments would be made
11     to us.  So that was sort of an insurance policy that we
12     negotiated in case they didn't sell, but they turned around,
13     they became profitable, and we didn't buy a pig in a poke,
14     so that process took a long time.
15              THE COURT:  So you will get a percentage of the
16     profits based on --
17              MR. CECCHI:  Correct.  If, if, if there is no sale.
18              THE COURT:  The "if" is if they become a profitable
19     concern going forward, and there's no sale.
20              MR. CECCHI:  Correct.  And that was really an
21     insurance policy, but we were confident that our financial
22     analysis confirmed what they told us, that, you know,
23     they --
24              THE COURT:  What is the status of this potential
25     sale now?
```

```
 1              MR. CECCHI:  Well, I am going to let Mr. Mutchnik
 2       address that, but I believe within the first and second
 3       quarter of the new year, there is going to be a process,
 4       but --
 5              THE COURT:  All right.  We will wait for Mr.
 6       Mutchnik's turn.
 7              MR. CECCHI:  So in terms of assessing the fairness,
 8       it's a creative settlement, but I think it is an outstanding
 9       settlement, because I think ultimately it is going to fully
10       compensate -- not fully compensate -- fairly and adequately
11       compensate our clients, but it also serves another purpose,
12       right?
13              It allows -- it allowed GEO to survive.
14              Could we have gone to trial?
15              Could we have got a judgment that would put them
16       out of business?
17              Probably, we could have done that.  But I don't
18       think that would have made much sense for them or for our
19       clients.
20              I want to point out another aspect of what we have
21       asked your -- what we requested in terms of the fee request.
22       The cash payments, the guaranteed cash payments are
23       structured in three tranches.  The largest will be within a
24       period of time, if your Honor grants final approval, that to
25       us is about $6 million, and then two payments on the yearly
```

1     anniversary of the final judgment.

2              What we have asked your Honor is today to grant our

3     fee request in total, but what we have said is we are only

4     going to take from that first tranche our expenses, and we

5     are going to distribute the balance to the class.  Direct

6     purchaser counsel will wait until next year and the year

7     after --

8              THE COURT:  So there is going to be six and then

9     two and two -- well, two plus and two plus, right?

10             MR. CECCHI:  I can give you the exact numbers,

11    Judge.  It's in the papers.

12             THE COURT:  Yes, I saw them.

13             Let me ask you this other question.

14             MR. CECCHI:  Yeah.

15             THE COURT:  Then the proposal is for the Court to

16    approve the entirety of the 33.3 percent or whatever?

17             MR. CECCHI:  Correct.

18             THE COURT:  Now, with the caveat that you would

19    only be, out of the six-million-dollar payment, the first

20    payment, you would only take your expenses --

21             MR. CECCHI:  Correct.

22             THE COURT:  -- and then the legal fees will come

23    out, I guess, one-half on the first anniversary and the

24    other half on the second anniversary?

25             MR. CECCHI:  Well, what we said in the papers was

```
 1          pro rata, so we will do some calculation.

 2                  The second payment is smaller than the third

 3          payment, so we will do a pro rata, and we will inform your

 4          Honor when we take those payments of what we are doing.

 5                  But your Honor is correct.  What we've asked is an

 6          order granting our fee request in total and granting the fee

 7          request in the event that the sale is effectuated, and we

 8          put in the analysis, and we have if the total settlement

 9          is -- comes in, the 24 million, I mean, I think our fee

10          request will be $10 million.  We have $17 million in

11          lodestar right now.  So in terms of doing an analysis, the

12          fee is clearly appropriate under the relevant factors in our

13          judgment.

14                  And what we think we should do because there are

15          other settlements that are lined up behind this one, we will

16          keep your Honor apprised through each application of where

17          we are in terms of what has come in, what the lodestar is,

18          so your Honor can be always fully informed about where we

19          are on that.

20                  I did want to briefly -- we briefed the issue.  I

21          know Mr. McShane's counsel is on the phone.  I wanted to

22          briefly address Mr. McShane.

23                  THE COURT:  Well, before we get to Mr. McShane,

24          opt-outs, what was the percentage of opt-outs?  I know it

25          was very small.
```

```
 1                    MR. CECCHI:  It is tiny.

 2                    I think we have ten, right, Jim, in addition to --

 3                    MR. MUTCHNIK:  Your Honor, I can address that.

 4                    THE COURT:  Okay.  Then I will wait for you.

 5                    MR. MUTCHNIK:  Well, I can answer it --

 6                    THE COURT:  Okay.  Go ahead.  What is it?

 7                    I know it was very small.  I remember reading in

 8       the papers.  Was it .5 percent or something?

 9                    MR. MUTCHNIK:  It is a small number over all of the

10       direct purchaser class.  The vast majority are separately

11       represented either by Mr. Fastow of Ballard Spahr or by

12       either the American Water Plant, which we settled with,

13       International Paper is another opt-out resolved, actually

14       leaving just four other entities that opted out, three of

15       which GEO had no sales to.  All they wanted was sales, which

16       was a very small amount of the total I think representing

17       less than a fraction of one percent of the total.

18                    THE COURT:  That is what I thought.

19                    MR. CECCHI:  Also in terms of the opt-outs, it is

20       important, as your Honor knows, the vast bulk of the

21       entities that we are calling opt-outs had filed direct

22       actions and participated in the settlement through the

23       opt-out process.  So only the new opt-outs really are the

24       ones that Jim identified, so --

25                    THE COURT:  Right.  Thank you.
```

```
1              Now, you wanted to address Mr. McShane?
2              MR. CECCHI:  Yes, your Honor.
3              THE COURT:  I understand he is a qui tam action.
4              MR. CECCHI:  Right.
5              So Mr. McShane seeks to intervene under Rule 24,
6    and what the rule talks about and what it tries to permit in
7    my reading of the case law is that somebody like Mr. McShane
8    can come and intervene when there is some -- something that
9    he needs to protect that is not being protected, that there
10   is an interest that is being impaired by virtue of his lack
11   of presence here.
12             I want to highlight two points.  The entities that
13   were harmed here, right, by virtue of the antitrust
14   conspiracy are the municipalities and other direct
15   purchasers of Liquid Alum.
16             In connection with the settlement, your Honor
17   directed direct notice to every single one of those
18   entities, the actual owners of the claim, the actual people
19   who were harmed by the antitrust conspiracy.  Not one of
20   those entities came forward and said to your Honor or to
21   counsel, "Oh, wait a minute, you know, Mr. McShane
22   represents us, or we think Mr. McShane should intervene and
23   represent us in that process."
24             They did something totally different.  They did not
25   opt out of the settlement.  They participated in the
```

```
1          settlement demonstrating their independent judgment as the
2          holders of the claim, the actual owners of the claim, that
3          this is a good settlement, and they want to participate.
4                  So the prong of Rule 24 that talks about is there
5          an interest being impaired here is clearly not satisfied,
6          because the people who have been harmed have spoken to your
7          Honor and have said, we are staying in this case.
8                  They could have opted out.  They could have done a
9          whole bunch of other things.  Indeed, Mr. Fastow will
10         address his clients.
11                 Some of the clients that McShane says he
12         represents, Mr. Fastow actually represents and entered into
13         settlements on behalf of them.  He will point out which
14         clients in Virginia and elsewhere he has direct
15         relationships with and entered into direct settlements with
16         the defendant.
17                 So perhaps the most important prong of the Rule 24
18         inquiry is not satisfied.
19                 So what does Mr. McShane say?
20                 He says:  Well, I have some interest that is being
21         impaired here.  I might not get paid in my qui tam cases.
22                 Well, unfortunately or fortunately, that is not an
23         interest under Rule 24 that permits intervention as of
24         right.  We have cited the case law in our brief which
25         supports that position.
```

```
 1              There are also two other fundamental problems here

 2      with Mr. McShane's application to intervene and his

 3      objection.  In every Federal Court case, as your Honor

 4      knows, you need standing to come to court and say "Do

 5      something for me."

 6              Mr. McShane is not member of this class.  He is not

 7      a member of any of the classes at issue here today.  He is

 8      not a direct purchaser.  He never purchased liquid alum, so

 9      he is not within the contours of the class definition.  So

10      under the case law, he can't come and object.  He has no

11      standing, and indeed, he has no standing as an indirect

12      purchaser, because he is not an indirect purchaser of liquid

13      alum, and it is important to know that we did ask his

14      counsel some questions when we received the objection, one

15      of which is:  Did you ever purchase liquid alum?

16              Are you a class member?

17              Well, we didn't get any information that he was.

18      So, indeed, he is not, so he has no standing.

19              And finally, the final impediment to intervention

20      and his objection, and I always hesitate to say this to an

21      Article III Federal Judge, the relief he is asking, he

22      really can't get here.  He is asking your Honor to rewrite

23      the settlement agreement, to rewrite the release, but the

24      settlement agreement and the release is a bargain we struck,

25      the direct purchaser class and the defendant.  It is the
```

```
 1         agreement we made.

 2              Now, your Honor can say:  Well, I don't like this

 3         settlement, and I am not going to approve it.

 4              But you can't do what McShane is asking, which is

 5         to rewrite the release in his favor when that is not the

 6         bargain we struck.

 7              So for all of those reasons, I don't think Mr.

 8         McShane should be permitted to intervene.  He doesn't have

 9         standing, and his objection is not well taken, and it is not

10         legally supported.

11              Judge, I can talk about the substantive settlement,

12         if you want, but as I noted, there are no real substantive

13         objections.  I think it is an excellent result given all of

14         the factors, and the direct purchaser class is pleased to

15         ask your Honor to approve it.

16              Thank you.

17              THE COURT:  Thank you.

18              Anybody else on the plaintiffs' side?

19              MR. MILLER:  Yes, your Honor.

20              Marvin Miller on behalf of the indirect purchasers.

21              I dare say the benefit of batting second is Jim has

22         adequately filled in, in our view, all of the pertinent

23         information that we would present.  There are some key

24         differences with our settlement.

25              First of all, we have structured ours similar to
```

```
 1          what the direct purchasers have with the exception of we
 2          receive our guaranteed cash payments in two installments
 3          with a contingency on the back end.  As Jim said, Mr.
 4          Mutchnik, I believe said or will say, those funds will
 5          become available shortly, if your Honor approves our
 6          settlement.
 7                  Second:  We also went through a detailed financial
 8          analysis of GEO's condition.  We believe that that is really
 9          the key to what drove our settlement given the fact that
10          there has been a guilty plea by GEO.
11                  One very important factor that we considered is the
12          cooperation that has to be given by GEO and Mr. Ghazey and
13          Mr. Steppig.
14                  With regard to fees, as your Honor may have noted,
15          we are not asking for fees at this time.  We are going to
16          take all of the funds that come in, hopefully we will have
17          resolution with the other defendants, and we will take our
18          pool and add it to that, and then we will ask for fees at
19          that time, if it is appropriate.
20                  THE COURT:  So there no request for fee approval on
21          your end at this point?
22                  MR. MILLER:  That's correct, not at this point.
23                  With regard to out-opts, we only received two
24          opt-outs in addition to what Mr. Fastow's clients have, so
25          we are not even sure if some of those have an interest in
```

```
 1          the case.  The language that we saw was to the extent that
 2          there were any purchasers, but we have not seen any
 3          information from the opt-outs.
 4                    THE COURT:  All right.  Thank you.
 5                    MR. MILLER:  Thank you.
 6                    THE COURT:  Anybody else on the plaintiffs' side?
 7                    MR. SHAPIRO:  Your Honor, I would just add one
 8          thing on the McShane objection with respect to the IPPs --
 9                    THE COURT:  Could you keep your voice up, please,
10          Counsel?
11                    MR. SHAPIRO:  I'm sorry?
12                    THE COURT:  Keep your voice up.
13                    MR. SHAPIRO:  I will, your Honor.
14                    THE COURT:  I want to make sure the court reporter
15          can hear you.
16                    MR. SHAPIRO:  Forgive me.
17                    This is Jay Shapiro on behalf of the indirect
18          purchaser class.
19                    As Mr. Cecchi just noted, we don't believe, like
20          Mr. Cecchi articulated, that McShane has derivative standing
21          on behalf of the municipalities to assert objections in this
22          case.
23                    But with respect to the IPPs, it is even more
24          attenuated, because the purported -- the municipalities,
25          which he purports to represent, he has not come forward with
```

```
 1          evidence that even those municipalities purchased indirectly
 2          and are part of the class, so he doesn't have standing on
 3          his own for the reasons that Mr. Cecchi articulated.  But he
 4          doesn't have -- even in the municipalities he purports to
 5          represent, they don't have standing because there is no
 6          evidence that they ever purchased indirectly, and we asked
 7          Mr. McShane's counsel for evidence, and this is all in the
 8          papers, we asked him for any evidence that there was ever an
 9          indirect purchase during the class period, and he came
10          forward with none.
11                   So for all of the reasons articulated by Mr.
12          Cecchi, plus that additional reason with respect to the
13          indirect purchaser class, he has got no standing to object
14          to our settlement.
15                   Thank you.
16                   THE COURT:  Very well.
17                   MR. FASTOW:  Thank you, your Honor.
18                   Jay Fastow for the Virginia direct action
19          plaintiffs we identified in our papers.
20                   I am just here to address the objector, just a few
21          points in addition to our brief.
22                   One is:  He can't object for us, for the Virginia
23          direct action plaintiffs, because we are opt-outs --
24                   THE COURT:  Because of what?
25                   MR. FASTOW:  -- because we are opt-outs.  There is
```

```
 1          no basis for opt-outs to object, simply to opt out.

 2                  If he purports to stand in our shoes, well, our

 3          shoes can't object because we already opted out of the

 4          proposed settlement class.

 5                  In his later -- latest -- what he says, he seems to

 6          want to object to our settlement, but he can't object to our

 7          settlement.  Our settlement is not a class settlement.  It

 8          is not before the Court.  There is no basis to object to

 9          that.

10                  He also seems to want to object saying -- he cites

11          a couple of the Virginia Fraud Against Taxpayer Act statutes

12          that refer to dismissal of those qui tam claims, and he

13          seems to raise that in his objection here.

14                  But just to be clear, no one here is asking this

15          Court to dismiss his Virginia State Court qui tam case.

16          That is in Virginia.  This Court is addressing the issues

17          before it, but that case is not before it, so there is no

18          request for a dismissal in this court of that case.

19                  We are actually asking for dismissal of the

20          Virginia qui tam case in Virginia.  That is where the issue

21          should be addressed.  This Court doesn't have that case to

22          address.

23                  THE COURT:  Well, I don't have that case, and I

24          don't have your settlement either.

25                  MR. FASTOW:  That's exactly the point, so he can't
```

```
 1          object to that.
 2                  And the last point is, as we explained in our
 3          papers, he doesn't represent us.  He purports to, but he
 4          doesn't represent us.
 5                  We have explained how he tries to take the
 6          definition of the term commonwealth under the Virginia
 7          fair -- Fraud Against Taxpayer Act Statute.  He likes it for
 8          purposes of trying to bring the case on behalf of our group,
 9          but then he says he doesn't like that same definition for
10          the next sub paragraph, it says he has to give us notice,
11          advanced notice and information and opportunity to take
12          action.
13                  That he doesn't want to do.  In his latest paper
14          what he says is:  Oh, no, the term commonwealth is
15          synonymous with the term attorney general, and there are a
16          lot of answers to that, but the easiest one is that is not
17          the approach of the Virginia legislature.
18                  In Section 8.01-216.2, that is the definitional
19          section of the statute, the Virginia Fraud Against Taxpayer,
20          there are definitions.  There is a definition of the term
21          "Commonwealth," and it's a very separate definition of the
22          term "Attorney General."  It defines Commonwealth to include
23          the Commonwealth of Virginia, any agency of State Government
24          in any political subdivision of the Commonwealth, and he
25          likes the part "political subdivision" to purport to bring
```

```
 1    suit for say the City of Richmond, but then he doesn't like
 2    that part when it says you have to give notice and an
 3    opportunity to act and information to the political
 4    subdivision.
 5            The statute separately defines "Attorney General."
 6    He's saying there's synonymous, but they are very different
 7    definitions.  "Attorney General" is defined to mean the
 8    Attorney General of Virginia, the Chief Deputy, other
 9    deputies, counsels or assistant attorneys general employed
10    by the Office of the Attorney General and designated by the
11    Attorney General to act pursuant to this article.
12            So when he looks at the statute, and he says under
13    Section 8.01-216.5A, he can bring a case he purports on
14    behalf of the Commonwealth, because it includes political
15    subdivision, well, in the very next subsection it says:  He
16    must give notice, information and an opportunity to act to
17    the Commonwealth.
18            He didn't do that.  He could have done that.  He
19    didn't do that, and now what he wants to do is say he
20    purports to represent us without having given us notice and
21    an opportunity to act.
22            THE COURT:  Thank you.
23            MR. FASTOW:  Thank you.
24            THE COURT:  Anyone else on the plaintiffs' side?
25            MR. MILLER:  No, your Honor.
```

```
1                    THE COURT:  Okay.

2                     MR. MUTCHNIK:    Good morning, your Honor.

3                 Jim Mutchnik.

4                 Mr. Cecchi is right.  The settlement represents an

5       alignment of interest that was a hard fought arrangement.

6       On the day we appeared when GEO appeared before you in June,

7       met with Mr. Cecchi in an attempt to settle this, that is

8       why I informed the Court on that day that GEO intended to

9       resolve these liabilities.

10                 It took a substantial period of time and a lot of

11      documents and information and a fair amount of swearing to

12      be frank in order to get to this arrangement that allows GEO

13      to receive what it needed, which is a future free of claims

14      on the basis of the releases, but also allowing its ability

15      to put the claims behind it, so it could refinance a

16      substantial debt load, which I am happy to report as of

17      yesterday, I believe the company will be able to receive

18      sufficient commitments to fund its operations, also to pay

19      off the liabilities associated with the settlements here

20      today.  In anticipation of the commitments being finalized,

21      we would expect that the funds being available to both the

22      classes and to any private direct action plaintiff in

23      December and January.

24                 It is also confirmed, once again, with its insurer

25      group to make sure that it is in a position to fund the
```

```
 1        settlement as well.

 2             The Board has begun to think about living up to the

 3   commitment with respect to a sale process, anticipates

 4   taking that step in the coming month, which would first be

 5   to identify for the class plaintiffs and others, a

 6   representative banker that would stand in front of the

 7   company to guide it through a process, have a Board meeting

 8   as well to announce internally and externally the beginning

 9   of the sale process.

10             So the goal is not just to have that to be a

11   potential contingency sometime in the future, but in order

12   to act quickly in the market and with this refinance ability

13   behind it to proceed through a process.

14             There is no commitment in the settlement papers

15   that that process be concluded with a sale, but the hope and

16   expectation is that a sale would occur sometime in 2019 to

17   bring the monetary value --

18             THE COURT:  There is no time limit in the

19   settlement as to when the sale must occur before this

20   contingency expires or --

21             MR. MUTCHNIK:  There is no timetable on the back

22   end.  There is a timetable that the marketing process begin

23   30 days after final, final judgment, and the company is

24   prepared to move forward on that timeline.

25             We also have begun the paperwork process again in
```

1     order to effect the sale in an orderly way, and hopefully we

2     can that moving in 2019.

3           As to Mr. McShane, we support all of the comments

4     of counsel here.  In addition to the issue of standing, I

5     only note that the way I read it, Mr. McShane is looking

6     for, in fact, an advisory opinion from the judge or a full

7     on red lining of our settlement agreement.

8           Mr. Cecchi has identified the reason why that would

9     be prohibited and not what we bargained for to have the

10    Court excise the words qui tam, but when I read his

11    objection and motion, I found language that struck me with

12    respect to the actual case or controversy as follows, which

13    is on Page 8, which says:  These releases and definitions of

14    releasing parties could be read, that in and of itself leads

15    me to say there is no case or controversy.

16          I can confirm for the record, that GEO has not

17    sought to dismiss any of Mr. McShane's actions on the basis

18    of the release language, whether we do that in the future,

19    that, as Mr. Fastow identified, will be something for

20    Virginia and Illinois and for the common courts, so today he

21    has no standing.  He has no issue.

22          Thank you, your Honor.

23          THE COURT:  Thank you.

24          MR. THEODOROU:  Your Honor, I have nothing to add

25    about the details of the settlement.  I think everything has

```
 1        been adequately laid out.

 2               But I will say one thing:  This resolution resolves

 3        a hotly litigated case, and I can say that with respect to

 4        my client in terms of, as you know, right from the beginning

 5        with the incipient motion to dismiss, thousands of pages

 6        being filed in terms of discovery.  I dealt with Mr. Miller

 7        and Mr. Shapiro I don't know how many times in terms of

 8        dealing with discovery issues in this case, motions to

 9        compel.  This is a good resolution in what has been a hotly

10        fought piece of litigation between the parties, and that I

11        can add.

12               I am not going to add anything more in terms of

13        what the details of the settlement are, but I think in terms

14        of the color of what we are dealing with here, this

15        litigation, this is revolving a hotly disputed set of legal

16        issues.

17               THE COURT:  All right.

18               And that leads us to Mr. Newell.  Are you still

19        there?

20               MR. NEWELL:  Yes.

21               Thank you, your Honor.

22               THE COURT:  All right.

23               Mr. Newell, I would like to start with the issue of

24        standing, because as I reviewed the paperwork that was

25        submitted, that was the one thing that jumped out.  Where is
```

1     your standing in this settlement?

2           I mean, your claims are not being extinguished

3     today.  There is not anyone here that is moving to dismiss

4     any of your qui tam actions at this point, so where are we

5     with regard to the standing issue?

6           MR. NEWELL:  Yeah.

7           Your Honor, thank you.

8           I think that the release provisions would be

9     tantamount to settling and dismissing the actions in our

10    claims, and the direct purchaser plaintiffs acknowledge in

11    their briefing that they are seeking a release of those

12    claims, and really what this fundamentally comes down to,

13    that there is not legal authority to release the claims in

14    the qui tam actions.

15          This Court does not have jurisdiction authority to

16    release those claims because the provisions in the Chicago,

17    Illinois and Virginia False Claims Act statutes provide that

18    only the Attorneys General and the Court have a role in

19    dismissing those claims, so that is really the fundamental

20    issue, that there just simply cannot be a release of those

21    claims beyond the issue of standing.

22          The issue of standing is that Mr. McShane obviously

23    is bringing these -- he's not representing the parties,

24    contrary to the claims, the Virginia direct action claims.

25    He has never purported to be anyone's attorney.  He is

1    representing and bringing the case on behalf of the entities
2    as provided for in the qui tam statutes.  You know, Supreme
3    Court opinions interpreting the Federal False Claims Act, as
4    we laid out in our papers, provide clearly that a relater
5    has Article III standing to bring claims on behalf of the
6    Government.
7            The qui tam statutes that Mr. McShane has brought
8    his claims under are patterned off of that Federal False
9    Claims Act and allow him to bring his claims on behalf of
10   those interests, and essentially these releases would be
11   extinguishing those claims, and that interest is not being
12   adequately protected because obviously the --
13           THE COURT:  The Virginia claims are not even before
14   this Court.  They are not class action claims, correct?
15           MR. NEWELL:  No.  They're class action claims, but
16   the main issue, that the release is purporting to settle and
17   dismiss those claims.  I mean, that is what a release is.
18   It's saying that the qui tams would not be able to go
19   forward as to the GEO settling parties, and I don't think
20   anyone is disputing that.  Whether or not someone has moved
21   to dismiss, they functionally are settling and dismissing
22   those claims, and there is no ability for these class
23   actions, for the direct or indirect purchaser claims, nor
24   for this Court to dismiss those claims.
25           And really what we are asking for is that, you

```
 1          know, this Court simply exclude the false claims actions

 2          from those releases because there is no authority to

 3          release.  The statutes clearly lay out that it has to be the

 4          Attorney General and the Court that can only settle or

 5          consent to dismissal of the case, so we're not --

 6                  THE COURT:  Counsel, Counsel, hold on.

 7                  Where is my authority to do that, because in

 8          essence you are asking me to get involved in the rewriting

 9          of their settlement, and I could certainly up end the entire

10          settlement.  That is part of the reason for the fairness

11          hearing, but where is my authority as I sit here to do that,

12          which you are asking me to do in terms of excise part of the

13          settlement?

14                  MR. NEWELL:  Well, I think the issue is there is no

15          authority to bless or release of those claims, so I think

16          something has to be done.  Either it is a written order that

17          excludes the release provisions or it takes this to the qui

18          tam court, because they are the ones presiding over these

19          actions, and the Attorneys General, they have to weigh in on

20          this, and they have not, you know, given their feedback,

21          because they are the only ones who can really do what these

22          releases are doing.

23                  And, you know, we kept the -- the Illinois Attorney

24          General has been kept in the loop, and I think that they

25          should, you know, on all of this briefing, and, you know, I
```

```
 1      would strongly suspect that they do not agree that there is

 2      any authority for the indirect and direct purchaser class to

 3      release the claim without the authority and without

 4      consultation and the consent of the Attorney General in

 5      Illinois, and, you know, there should be the guidance and

 6      the input of the Attorney General in Illinois.

 7              Just simply as a matter of law, the claims could

 8      not be released unless there is consent by the Attorney

 9      General and the qui tam courts, so we're asking for

10      something that would reflect, you know, to tee this issue up

11      for them, if your Honor does not feel comfortable excluding

12      the False Claims Act statutes from the release.

13              THE COURT:  Do you represent anyone that was or is

14      either a direct or an indirect purchaser or who is part of

15      this settlement class?

16              MR. NEWELL:  We don't directly represent, no, I'm

17      not the attorney for them.  We are bringing qui tam bases on

18      behalf of entities included in those classes.

19              THE COURT:  Say that again.

20              MR. NEWELL:  Under the False Claims Act statutes,

21      Mr. McShane is the relater, the whistleblower, who is able

22      under those statutes to bring claims on behalf of some

23      municipalities that would be encompassed in the direct

24      purchaser plaintiff class and likely in the indirect

25      purchaser plaintiff class.
```

```
1                THE COURT:  All right.

2                Anything else from you?

3                MR. NEWELL:  No, your Honor.

4                I just wanted to reiterate that I think there are

5      ways to work this out.  We are not looking to thwart the

6      settlement.  We think there's, you know, simply there isn't

7      legal authority to release our claims, and I think that it

8      can be worked by the proper parties, which are the qui tam

9      courts and the Attorneys General.

10               THE COURT:  I don't think anybody is taking quarrel

11     with that.

12               MR. NEWELL:  Well, I think the original order from

13     your Honor is something teeing up the issue, because

14     otherwise this will be deemed released, and you know, that

15     would be functionally dismissing and settling the cases

16     without, you know, properly having the Attorneys General and

17     qui tam courts weighing in, and I think it is within your

18     authority to say that there is an issue left to the qui tam

19     courts and should not be determined here today.

20                THE COURT:  All right.  Okay.  Thank you.

21               Hang in there, Mr. Newell.

22               Mr. Cecchi?

23               MR. NEWELL:  Thank you very much.

24               THE COURT:  Mr. Cecchi, isn't that not a reasonable

25     approach?
```

```
 1              MR. CECCHI:  That he bring his application to the

 2     qui tam courts?

 3              THE COURT:  Right, and that this Court's decision

 4     today does not affect how the qui tam actions will be

 5     decided one way or another.

 6              MR. CECCHI:  Yes.  I think that the jurisdiction of

 7     those qui tam courts is not impaired one way or another by

 8     what happens here today.

 9              THE COURT:  I guess his concern is that the way

10     that the settlement is written here, it would or could be

11     argued and interpreted by another Court to have been a de

12     facto of release of those claims that are not before this

13     Court today.  I think that is what he is saying.

14              Right, Mr. Newell?

15              MR. NEWELL:  Correct.

16              MR. CECCHI:  I think -- I think to the extent, and

17     I am thinking out loud here that -- I mean, it is not our

18     intention for your Honor's orders to in any way impede or

19     impair whatever those qui tam courts view their

20     jurisdiction --

21              THE COURT:  The Virginia actions I guess --

22              MR. CECCHI:  Yeah.

23              THE COURT:  -- that is where they are, right, Mr.

24     Newell?

25              MR. NEWELL:  Well, there's three actions, your
```

```
 1    Honor.  There's one -- there is two in Illinois State Courts
 2    under the Chicago False Claims Act and the Illinois False
 3    Claims Act, and there is a third in Virginia under
 4    Virginia's version of the False Claims Act.
 5            THE COURT:  Okay.  I think we need to hear from the
 6    defense side.  That is what he is worried about, not
 7    necessarily you.
 8            MR. CECCHI:  Correct.
 9            But I just do want to point out because he talked
10    about the Attorneys General.
11            Under CAFA, the Attorneys General, who he says make
12    this decision, got notice and made the decision, so they
13    were informed.
14            The municipalities, who he says he brings the
15    claims on behalf of, got notice and made a decision, so they
16    had this release, both of them.
17            THE COURT:  All right.
18            Let's hear from the defense.
19            MR. MUTCHNIK:  Sure.
20            THE COURT:  Now we got this teed up.  We know what
21    the concern is.
22            So what is your position?
23            MR. MUTCHNIK:   Just for the record, GEO sent out
24    the CAFA notices to be clear.
25            He is asking again, as I mentioned before, for some
```

1    opinion from you that he can take back to the cases that he
2    has filed elsewhere that he survives.  However, GEO today or
3    any other defendant has not sought to dismiss this case with
4    respect to these releases.  There is no guarantee that that
5    ever happens.
6          If and when some defendant says your claims have
7    been dismissed or released by fact of this judgment, that
8    will be an issue for those Courts to decide.  That happens
9    every day in jurisdiction across State Courts, other Federal
10   Courts --
11         THE COURT:  But would you agree that nothing I am
12   doing today should be served to indicate to another Court
13   how they should rule?
14         MR. MUTCHNIK:  Correct.
15         I believe your job is approval of this issue.  You
16   make a determination as the basis of this release, whether
17   that other Court decides that your ruling bars his claim is
18   for that Court alone, if it is even raised by any of the
19   defendants, and today that has not happened.
20         THE COURT:  Yes.  But it sounds to me like you are
21   trying to keep that door open, though, to be able to argue
22   to the Virginia court or the Chicago court or Illinois that
23   his claims were settled today by virtue of this judgment.
24         MR. MUTCHNIK:  Sure.  That is what we bargained
25   for.  I don't think this ruling, in effect, his view is his

```
 1        reading in asking you to decide today that his concerns that

 2        this release would bar his claims, that is his supposition

 3        and no more than that.

 4              THE COURT:  Well, why is that his supposition?  He

 5        is saying that that is what the release says.

 6              MR. MUTCHNIK:  That's -- people make claims all of

 7        the time.  That is something else in some other court might

 8        affect me, but you have to have the ability to make that

 9        argument.  It has to be a real case or controversy.  Just by

10        virtue of him saying, hey, it might happen --

11              THE COURT:  Well, I can tell you this.  I am not

12        taking a position, and this Court is not making a ruling

13        today that anything that I do with regard to this judgment

14        today releases or terminates the qui tam actions or affects

15        them in any way.  Then it is up to the other courts to

16        decide that issue.  Isn't that the way that this should be

17        handled?

18              MR. MUTCHNIK:   Yes.

19              THE COURT:  Because I can only decide what is in

20        front of me, and what is in front of me is the fairness of

21        this settlement and the appropriateness of this settlement.

22        Whether or not there is a decision by another court of what

23        the effect of this is, it is going to be up to them, except

24        that it's going to be clear from the record, as I am

25        speaking, that all I am doing is settling the claims that
```

```
 1        are before me --
 2                MR. MUTCHNIK:  Correct.
 3                THE COURT:  -- and this is not to indicate what, if
 4        anything, should be the decision on the qui tam actions at
 5        another state.
 6                MR. MUTCHNIK:  I agree.
 7                MR. CECCHI:  We are in agreement as well, your
 8        Honor.
 9                THE COURT:  All right, Mr. Newell?
10                MR. NEWELL:  Yeah.  I think that is fine, your
11        Honor.  I think, you know --
12                THE COURT:  You will have your transcript, and you
13        can quote it in your position brief when it happens.
14                I think that what I just said on the record,
15        because I have authority to say that, but beyond that I
16        think most of what you are trying to get me to do really was
17        (A) you were straining into areas where you had no standing
18        and asking me to get involved in claims that are not before
19        this Court.  But I think based on the statements I just made
20        on the record, I think that gives you at least the comfort
21        that you need with regard to the actions that are not
22        pending before this Court.
23                MR. NEWELL:  Yes, your Honor.
24                Thank you.
25                THE COURT:  All right.
```

```
1                  So here is what I have to say.  I have been living
2          with this case for a long time.  I have had many conferences
3          with the attorneys involved in this case.  I agree that this
4          was a hotly disputed litigation.  I have presided over the
5          criminal cases, so I know the nuances of the factual
6          background here and the conspiracy that was at issue that
7          propelled this litigation.
8                  So I am aware also of the concerns regarding GEO's
9          financial condition and the ability to be able to obtain a
10         judgment, if in fact this matter had gone to trial and a
11         verdict had been returned in favor of the plaintiff, and
12         whether or not at that point GEO would have been able to
13         continue as a business entity that was profitable and making
14         money.
15                 I think that this was a settlement that addressed
16         all of those issues, addressed what I believe was going to
17         be a clear liability of the defendant in light of the guilty
18         plea in the criminal action, but also took under
19         consideration the nuances of the financial condition of GEO
20         and the proposed restructuring and potential sale to the
21         benefit of the class.
22                 The plaintiffs' team has also handled this in a
23         reasonable way with regard to the issue of the attorneys'
24         fees, not wanting to glom up all of the money at the
25         beginning.  I think that that is commendable that the class
```

```
 1          came first and that the settlement the way that it was

 2          structured addresses that issue and leaves the door open for

 3          even more money for the class, if the company is sold or

 4          becomes a profitable concern going forward.

 5                  So under the totality of the circumstances, I think

 6          this is an appropriate and fair settlement, and I intend to

 7          sign the order approving it.

 8                  Thank you.

 9                  MR. CECCHI:  Thank you, Judge.

10                  In light of your Honor's ruling and explanation

11          regarding Mr. McShane, would Mr. Newell withdraw his

12          objection through a letter or otherwise or orally.  I mean,

13          I think that is just the best way to clean up his

14          objections.

15                  MR. NEWELL:  I am not willing to take a position at

16          this point.

17                  Will there be a transcript where I can review the

18          Court's ruling?

19                  Will we be able to obtain a transcript of today's

20          proceedings?

21                  THE COURT:  Yes.  You can order it from my court

22          reporter here.

23                  What did you just say?  You are willing to do that

24          letter or not?

25                  MR. NEWELL:  Not at this point.
```

```
 1                 I mean, if we are -- I want to consider things
 2        before committing to withdrawing our objection, and I think
 3        if we are withdrawing it, we will file something, but I am
 4        not going to withdraw it right now.
 5                 THE COURT:  That's fine.  I think that the Court
 6        will deal with it in our order.
 7                 MR. CECCHI:  Judge, we did file with our papers
 8        three orders, but I have additional copies.  Those orders
 9        are the final judgment, the order approving the planned
10        distribution and the attorneys' fees.
11                 I just brought extra copies, if I can bring them to
12        your deputy.
13                 THE COURT:  You can give them to my law clerk
14        there.
15                 MR. CECCHI:  And I am bringing the indirect as
16        well.
17                 THE COURT:  All right.
18                 Thank you.
19                 Mr. Newell, you are excused.
20                 MR. NEWELL:  Thank you, your Honor.
21                 THE COURT:  Thank you.
22                 (The matter concluded)
23
24
25
```